**E-FILED**
Tuesday, 18 January, 2005  03:38:31 PM
Clerk, U.S. District Court, ILCD

# JANICE SHONKWILER

**1**

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MELISSA ROBINSON,
(p/k/a MELISSA SCHROEDER),

    Plaintiff,

vs.              Case No. 99-2266

JUDGE WARREN A. SAPPINGTON,
SIXTH JUDICIAL CIRCUIT,
(IN OFFICIAL CAPACITY AND
INDIVIDUALLY), and MACON
COUNTY,

    Defendants.



THE DEPOSITION of JANICE SHONKWILER, a witness,
called by the Plaintiff for examination pursuant to
notice and pursuant to the Federal Rules of Civil
Procedure pertaining to the taking of depositions, taken
before Rose M. LaBerdia, CSR, RDR, CRR, License No.
084-001506, a Notary Public in and for the County of
Peoria and State of Illinois, at 105 N. Center Street, in
the City of Bloomington, County of McLean, and State of
Illinois, on the 19th day of July, A.D. 2000, commencing
at 9:10 a.m.

---

**2**

APPEARANCES:

    MELISSA M. McGRATH, ESQ.
    THOMSON & WEINTRAUB
    105 N. Center Street
    Bloomington, Illinois  61701
       On Behalf of the Plaintiff.

    KAREN McNAUGHT, ESQ.
    Assistant Attorney General
    500 South Second Street
    Springfield, Illinois  62706
       On Behalf of the Defendant Sappington.

    RICHARD CHAPIN, ESQ.
    HINSHAW & CULBERTSON
    1802 Fox Drive
    Champaign, Illinois  61820
       On Behalf of the Defendant Macon County.

*I N D E X*

WITNESS:                       Page

JANICE SHONKWILER

    Examination by Ms. McGrath . . . 3
    Examination by Ms. Chapin . . . 115
    Examination by Mr. McNaught . . . 138
    Further Examination by Ms. McGrath . 141

EXHIBITS:               Page Marked

Exhibit No. 1 . . . . . 15
    Supreme Court Policy

Exhibit No. 2 . . . . . 23
    Drawing/Diagram

Exhibit No. 3 . . . . . 27
    Redacted Notes

---

**3**

 1           JANICE SHONKWILER,
 2  called as a witness, after being first duly sworn, was
 3  examined and testified upon her oath as follows:
 4            EXAMINATION
 5  BY MS. McGRATH:
 6    Q.  Would you spell your name for the court
 7  reporter?
 8    A.  Janice, J-A-N-I-C-E, Shonkwiler,
 9  S-H-O-N-K-W-I-L-E-R.
10    Q.  Thank you.  Do you mind if I call you Janice
11  while we're --
12    A.  That's fine.
13    Q.  -- talking?  Have you had your deposition taken
14  before, Janice?
15    A.  No.
16    Q.  Okay.  Let me just tell you -- give you a little
17  bit of ground rules.  I'm going to be asking you
18  questions.  I'm going to admit right up front that
19  sometimes I get wordy with my questions.  If you don't
20  understand something I say, feel free to say, "You've
21  confused me" or --
22    A.  Okay.
23    Q.  -- or, "Please reword the question."  If you're
24  going to answer yes or no, we need for you to not just

---

**4**

 1  nod your head but to speak your answer --
 2    A.  Right.
 3    Q.  -- so that the Court reporter can get down what
 4  you're saying.  Also, try to wait.  Sometimes I'm going
 5  to ask you a question, and you're going to know what I'm
 6  asking you before I even finish the question.
 7    A.  Okay.
 8    Q.  Try to wait until I've asked you the whole
 9  question so that the court reporter can get both of us
10  down in the record.
11    A.  Okay.
12    Q.  Okay.  I don't expect to go a very long time
13  today, but if at any time you need to take a break, just
14  let me know.  If you decide you'd like some coffee or
15  water, just let me know.
16    A.  Okay.
17    Q.  Okay?  Just for the record, are you represented
18  today by counsel?
19    A.  No.
20    Q.  Okay.  What is your present address?
21    A.  My home address?
22    Q.  Yes, your home address.
23    A.  2765 Cherokee Drive.
24    Q.  Could you spell Cherokee?

5

1    A. C-H-E-R-O-K-E-E. And that's at Decatur, 62521.
2    Q. Did you see the notice of deposition scheduling
3  the deposition today?
4    A. Yes. I have that with me.
5    Q. Okay. The notice of deposition asked you to
6  bring with you "any and all notes, memoranda or material
7  in any written form or verbal form which in any way
8  relate to Plaintiff's claim of sexual harassment." Did
9  you bring anything with you today?
10    A. I brought a calendar with me. It doesn't really
11  relate to her claim of sexual harassment, but I had
12  written some notes on it just of events that had occurred
13  at work.
14    Q. Does this calendar relate back to the time when
15  Melissa Schroeder worked at the same place of employment?
16    A. Yes.
17    Q. Okay. And do those notes of events – do those
18  events relate to Missy Schroeder in any way?
19    A. Yes.
20    Q. Okay. Can I see what you've brought with you?
21    A. Sure. And what I – I might explain that this
22  is just a calendar. It's kind of like my personal diary
23  of things that have taken place. I did make copies of
24  the pages where I had made any reference to Missy, and I

6

1  blacked out all the rest. So if you want to look at
2  that. And the calendar.
3    Q. Okay. So you have handed me a photocopy of the
4  original of what you've brought with you, which is a
5  spiral, kind of like a stenographer's notebook. Am I
6  understanding you correctly that you've copied all the
7  pages, blacked everything out with the exception of any
8  reference to Missy Schroeder?
9    A. That's correct.
10    Q. Okay.
11    A. And there's not much there.
12    Q. Okay. Well, I tell you what. I'll – during a
13  break, I'll take a look at those materials, and we can
14  talk about those then.
15    A. Okay.
16      MR. CHAPIN: May I go ahead and take a look at
17  them?
18    Q. Anything else you brought with you?
19    A. I just have a few notes of some dates that I
20  thought you might ask me about. I looked a few things
21  up, because I didn't remember when Missy started work, or
22  her termination date for sure.
23    Q. Okay. And is that the –
24    A. It's a piece of paper.

7

1    Q. That you have in front of you –
2    A. Yes.
3    Q. – right now? We'll see if that doesn't help
4  you out as I'm asking you questions. Okay?
5    A. Okay.
6    Q. Who is your present employer?
7    A. My present employer is Macon County.
8    Q. I'm sorry. Go ahead.
9    A. I work under Judge Greanias.
10    Q. What is your job title?
11    A. I'm the court administrative assistant.
12    Q. When did you – how long have you held that
13  position?
14    A. I started doing that in December of '95, so five
15  years, four and a half.
16    Q. Since you, for your convenience have noted when
17  the plaintiff – you know the plaintiff by Missy
18  Schroeder?
19    A. Yes.
20    Q. Since you have noted when Missy Schroeder began
21  working at the same place as you, can you indicate that
22  on the record?
23    A. Missy started on March 28th, 1994.
24    Q. And are you also aware of her termination date?

8

1    A. I'm not sure of the exact date. I think it was
2  December the 13th. Her actual termination date, as far
3  as papers, was January 10, 1997. And that was because
4  she had accrued vacation and personal days that she
5  hadn't used, so it actually went on past her last day of
6  work.
7    Q. December 13th would have been of '96?
8    A. Right. And that would have been, I think, about
9  her last day of work.
10    Q. Were you employed with Macon County before you
11  became the court administrative assistant in December
12  '95?
13    A. Yes.
14    Q. What was your position prior to that position?
15    A. I was Judge Greanias' secretary.
16    Q. When did you begin in that role?
17    A. March 12, 1987.
18    Q. Have your responsibilities as the court
19  administrative assistant remained the same throughout
20  your tenure in that position?
21    A. Yes.
22    Q. Okay. Can you tell me what your
23  responsibilities are?
24    A. I'm responsible for payroll. I do the personnel

**9**

1  matters. I have possession of all the personnel files.
2  I make sure there's staffing in all the courtrooms. Just
3  recently, we've hired another person, and she kind of
4  does that on a share basis with me, but we coordinate the
5  staff in the courtrooms. I do all the jobs around the
6  courthouse nobody else wants to do. Clear the paper jams
7  and things like that.
8      Q. What job titles -- well, strike that.
9      Do you have supervisory roles in that job?
10     A. We don't have any supervisors.
11     Q. So is there any other employee who you are
12  responsible for supervising?
13     A. Actually, I'm over all of the court staff. So
14  there are bailiffs that I'm over. We have a couple of
15  county paid court reporters, and I am over them. That's
16  it. And the judicial clerks.
17     Q. What do you mean by judicial clerks?
18     A. Each judge has a court reporter and a judicial
19  clerk. And in the past, the judicial clerks were
20  actually the judges' secretaries. At one point in time,
21  the secretaries were all renamed judicial clerks, because
22  they started going in the courtroom with the judge when
23  he's in court sessions. And when they are not in court,
24  she's at her desk performing secretarial duties.

**10**

1      Q. Do you know when that change in title came
2  about?
3      A. I think it was about the same time that I became
4  the administrative assistant. Probably, I would say,
5  probably December of '95.
6      Q. Am I correct that there's only one court
7  administrative assistant?
8      A. Right.
9      Q. And was throughout your tenure?
10     A. Right.
11     Q. And by tenure, I mean since December of '95?
12     A. Yes.
13     Q. Would there then be an administrator over and
14  above you?
15     A. No. Judge Greanias is the only one above me.
16  He's the presiding judge for the county.
17     Q. Has he been the presiding judge since December
18  '95?
19     A. Yes.
20     Q. Do you know when he became the presiding judge?
21     A. I'm not sure. Judge Scott -- it was when Judge
22  Scott retired. That may have been October, but I'm not
23  positive of the date. It was when Judge Scott retired.
24     Q. Okay. But when you say October, are you

**11**

1  referring to October of '95?
2      A. Yes.
3      Q. Okay. As far as your responsibilities for
4  payroll, what job titles -- I mean, whose payroll are you
5  responsible for?
6      A. I prepare the payroll sheets for the judicial
7  clerks, the two county paid reporters, the bailiffs. We
8  also have jury commissioners that get paid just
9  quarterly. I prepare payroll sheets for them. We have a
10  law librarian, a court technology person. I think that's
11  it.
12     Q. Do you hire the judicial clerks?
13     A. Yes.
14     Q. You interview the clerks?
15     A. Yes.
16     Q. And, again, these job duties would have been the
17  same from December '95 --
18     A. Correct.
19     Q. -- forward? Okay. Are you the sole decision-
20  maker as far as --
21     A. No.
22     Q. -- who gets hired?
23     A. No. Usually, I interview the persons.
24  Sometimes Judge Greanias sits in on the interviews,

**12**

1  sometimes he doesn't. Depends on his schedule. But I
2  always confer with him before making a final decision.
3      Q. If a particular judge -- judge's judicial clerk
4  leaves, do they have -- does that judge have any input
5  into the hiring of -- who is hired as a judicial clerk?
6      A. Occasionally. Sometimes they have somebody in
7  mind that they would like to have interviewed or hired.
8  Sometimes they just say find me someone. So it depends
9  if they have someone in mind for that job.
10     Q. Okay. Tell me more about what you meant when
11  you said one of your responsibilities was to coordinate
12  the staff in the courtrooms?
13     A. I just have to make sure there's a judge -- I
14  mean not a judge, a court reporter and a clerk in the
15  courtroom at all times with the judge. We have nine
16  judges, so we have nine court reporters and clerks, and
17  there's always somebody who's sick, their kids are sick,
18  or they are on vacation. So I just make sure that each
19  courtroom is fully staffed for the day, and that they
20  don't need for me to find help from somewhere else.
21     Q. And as far as your responsibility for personnel
22  matters, I bet that's probably a whole gamut of issues
23  that might come up?
24     A. Right.

13

1  Q. Okay. As a Macon County employee, is there a
2  sexual harassment policy in place presently that you're
3  aware of?
4      A. It's just the Supreme Court policy. We have a
5  copy of that that we give to everyone.
6      Q. Was there a sexual harassment policy in place in
7  July of 1996 through -- I'm sorry, through January of
8  1997?
9      A. We had copies in the office. I don't think they
10 were ever personally distributed to each person, but we
11 did have copies available in the office.
12     Q. When a judicial clerk was hired during that time
13 period, were there certain policies that were provided to
14 the clerks?
15     A. We didn't have any written policies. We haven't
16 had a written handbook for years and years. It's just
17 word of mouth, I think. We do have one sheet that we
18 would give to the new hire that would tell how many
19 vacation days, personal days, and sick days they were
20 allowed per year, but there was no handbook.
21     Q. Was there any kind of orientation that someone
22 went through when they began working for Macon County?
23     A. As a new hire? Do you mean as training or --
24     Q. Let's just talk about judicial clerks. Once a

14

1  decision was made to hire a judicial clerk, was there any
2  kind of process that they went through at the onset of
3  their employment? And if it would be training, then I'd
4  like to hear about the training.
5      A. There wasn't any orientation, that I know of.
6  The administrative assistant, I guess, would do all the
7  paperwork to get them actually settled in, get them
8  signed up for payroll. The actual training part, as far
9  as their job, was conducted by the secretary leaving, or
10 possibly the court reporter and judge from that staff who
11 would train the person as to what her job duties were.
12     Q. Now, the sexual harassment policy that you
13 mentioned, you referred to it as the Supreme Court
14 policy?
15     A. Yes.
16     Q. Did I hear you right? Okay. If I showed you a
17 copy of that policy, is that something you could
18 identify?
19     A. Yes.
20     Q. Okay. Is there -- if you recall, is there any
21 introductory sheet or cover sheet to this policy, or do
22 you recall it?
23     A. No.
24     Q. Just beginning out as a policy?

15

1      A. It just began as a policy.
2      (Whereupon the court reporter marked Exhibit No.
3  1 for identification.)
4      Q. I'm going to ask you to take a look at what I've
5  marked as Exhibit 1, Janice. And take your time. I'd
6  like to know if that is the sexual harassment policy that
7  you have referred to?
8      A. Yes, this looks like the copies that we hand
9  out.
10     Q. Am I correct that this policy wasn't posted
11 anywhere within the courthouse?
12     A. I don't believe it was posted, but like I said,
13 we did have copies. I know we had copies somewhere
14 around the office. We had moved from the courthouse over
15 to temporary facilities while the courthouse was being
16 remodeled, and I know we had copies around somewhere.
17 I'm not sure if they were posted on boards or not.
18     Q. What time period were you in temporary
19 facilities or the temporary facility, as best you recall?
20     A. I can't remember for sure.
21     Q. Were you in --
22     A. I think maybe it was like November of '95 to
23 January of '97. I'm not positive. But it was like a
24 two-year period that we were over there.

16

1      Q. So you were in the temporary facility when you
2  began as the administrative assistant?
3      A. Yes.
4      Q. Okay. Now, you mentioned one of your
5  responsibilities being for personnel matters. Would
6  those personnel matters include if some employee reported
7  a concern about sexual harassment?
8      A. Yes.
9      Q. Who else, if anyone, would have had
10 responsibilities for addressing a concern that was raised
11 about sexual harassment?
12     A. Judge Greanias.
13     Q. Have you been given -- since you began as the
14 administrative assistant in December '95, have you been
15 provided any particular training on sexual harassment and
16 how to address a complaint?
17     A. I don't recall any training in the past years.
18 I did have the manual to read through or the policy. I
19 have just had training recently.
20     Q. By the policy, you're referring to what we
21 marked as Exhibit 1?
22     A. Right.
23     Q. Okay. How recently did you have training?
24     A. First of June, I went to a sexual harassment

**Page 17**

1 training seminar.
2     Q.  That was of this year?
3     A.  Yes.
4     Q.  Now, how was it that you were provided the
5 policy to read? And by the policy, I'm referring to
6 Exhibit 1.
7     A.  It's just whenever we received it from the --
8 actually, I believe this copy of the Supreme Court Policy
9 may have come from the Chief Judge, Judge Shonkwiler in
10 Monticello. I think he furnished it to all the circuits,
11 and because I was in charge of personnel problems, I was
12 given a copy.
13     Q.  Do you recall when you were given the copy of
14 Exhibit 1?
15     A.  No, I don't.
16     Q.  Was it sometime after you became the court
17 administrative assistant?
18     A.  Yes.
19     Q.  Can you give me any estimate as to how long
20 after you became the assistant? Whether it would be six
21 months or definitely within the first year?
22     A.  I really don't recall.
23     Q.  Okay. Are you related to Judge Shonkwiler?
24     A.  Very distant and only through marriage.

**Page 18**

1     Q.  Okay.
2     A.  He doesn't claim me, I don't think. It would be
3 through my husband, and it's cousins down the line
4 somewhere.
5     Q.  How far down the line?
6     A.  Judge Shonkwiler's father was a cousin to my
7 father-in-law. I don't know how close. We've never had
8 any personal family contacts.
9     Q.  Okay. That's what I was going to ask you. Are
10 there family affairs --
11     A.  No.
12     Q.  -- that you attend --
13     A.  No.
14     Q.  -- that he attends? These are the kinds of
15 questions where you can tell what I'm going to ask, and
16 while I'm asking, you're answering. And it's tempting to
17 do that, but -- and I also need to try to make sure I'm
18 not talking when you're giving your response, because it
19 makes it really challenging for the court reporter.
20     A.  Okay.
21     Q.  But you probably have that -- some of that
22 experience from court reporters?
23     A.  Yes.
24     Q.  So we'll try to work with you. Were you

**Page 19**

1 involved in hiring Missy Schroeder?
2     A.  No.
3     Q.  Do you have any -- do you know who was involved
4 in that process?
5     A.  Margie Treacy. I don't know who actually hired
6 her, but Margie Treacy would have been the administrative
7 assistant at the time Missy hired in. She worked for
8 Judge Scott, and when he retired, Margie retired.
9     Q.  Okay.
10     MR. CHAPIN:  She was your predecessor in your
11 office?
12     THE WITNESS:  Yes, yes.
13     Q.  When you became the administrative assistant,
14 you had the same responsibilities then over Missy
15 Schroeder as you've already outlined for me?
16     A.  Yes.
17     Q.  Okay. Did you see any problems with Missy
18 Schroeder's work performance as her supervisor?
19     A.  In the beginning, she was a very hard worker.
20 Towards the end, she spent more time away from her desk.
21     Q.  Now, where was your work site in relation to
22 Missy Schroeder's?
23     A.  We were right in the same area.
24     Q.  In the same room?

**Page 20**

1     A.  We had an open work space in our temporary
2 facilities. My desk was probably as close as I am to you
3 to Missy's, because there was like four of us in a very
4 small area, open area.
5     Q.  Okay. And so, for the record, your desk, I'm
6 going to estimate -- and somebody can correct me if they
7 disagree, I don't know -- what is this? Four feet away
8 from each other?
9     MR. CHAPIN:  Cross wise?
10     MS. McGRATH:  Yeah.
11     MR. CHAPIN:  Three feet.
12     Q.  Three feet, maybe, from Missy Schroeder's desk?
13     A.  Well, it was kind of a wide area, so four or
14 five feet, but we were like across from each other.
15     Q.  Now, Missy Schroeder was a judicial clerk for --
16     A.  Judge Sappington.
17     Q.  -- Judge Sappington? Where was -- did Judge
18 Sappington have an office separate from this open area
19 that you're referring to?
20     A.  Yes.
21     Q.  Where was his office in relation to your desk
22 and Missy's desk?
23     A.  The office space that we occupied was in a U-
24 shape. I would draw you a picture but --

21

1    Q.  If that would help in describing the office
2  area --
3    A.  Okay.
4    Q.  -- I would appreciate it.
5    A.  Okay.  Here's sort of a picture.  Missy's desk
6  was here.  Mine was across from her.  Judge Sappington
7  was actually -- this is like a hallway.  There were just
8  windows along here.  Judge Sappington's office was around
9  on the other side of the U-shape.
10    Q.  Okay.  And you also have labelled here "Ruth."
11  That a desk where Ruth --
12    A.  Yes.
13    Q.  -- where a Ruth would sit?
14    A.  Yes.
15    Q.  What is Ruth's last name?
16    A.  Ruth Young.
17    Q.  Okay.  And beyond your desk you have a desk
18  marked "Leona."  What is Leona's last name?
19    A.  Miller.  She was Judge Sappington's court
20  reporter.
21    Q.  And what role did Ruth Young serve?
22    A.  Ruth was Judge Greanias' clerk.
23    Q.  Is Ruth Young still employed with Macon County?
24    A.  No.

22

1    Q.  Do you know when she left?
2    A.  I should.
3    Q.  If you don't, if I ask you anything and you
4  don't know, I mean I appreciate you taking the time to
5  try to think it through and answer it, and if you can't,
6  you can't.
7    A.  I think it was December of '97.  I'm not
8  positive.
9    Q.  Okay.  And is Leona still employed with the
10  county?
11    A.  Yes.
12    Q.  Okay.  Do you know, did Ruth Young leave
13  voluntarily?
14    A.  No.
15    Q.  Were you involved in the decision then to
16  terminate her employment?
17    A.  No.  Judge Greanias made that decision.
18    Q.  As far as your supervisory authority, do you
19  have authority to fire?
20    A.  To terminate someone?
21    Q.  Yes.
22    A.  I never have.  I don't know if I have that
23  authority.  I wouldn't want the responsibility.
24    Q.  Okay.  Is there a written job description for

23

1  your position as administrative assistant that you've
2  seen?
3    A.  We have worked on one, but I don't believe
4  there's a description set in concrete as far as what my
5  duties are.
6    Q.  Okay.  So you don't know of a written job
7  description for your position?
8    A.  No.
9    Q.  Do you have authority for reprimanding
10  individuals?
11    A.  I talk to them if there's problems.  I'll put it
12  like that.
13    Q.  Okay.  It sounds like a yes to me, though.  Am
14  I stretching your testimony?
15    A.  I don't know that I've ever made reprimands, but
16  if we have problems, I talk to the people, see if we
17  can't work out a solution.
18    Q.  Okay.  I'm going to mark this as Exhibit 2, and
19  by this it's what you've diagrammed for us as far as the
20  locations of offices.
21        (Whereupon the court reporter marked Exhibit No.
22  2 identification.)
23        (There was discussion off the record.)
24    A.  I believe you indicated -- we were talking about

24

1  Missy Schroeder's work performance.  And you indicated
2  that at some point she was not at her desk as regularly
3  as she had been earlier.
4    A.  Right.
5    Q.  Did you see that as some type of a work
6  performance problem?  I'm wondering why you brought that
7  up.
8    A.  You asked about her work performance.  When we
9  were over at the other building, she was very good about
10  volunteering to help people if she didn't have any work
11  at the moment and somebody else needed some help.  When
12  we moved over to the temporary facilities, she still did
13  that, to a certain extent, but after the Judge Sappington
14  incident came along, she seemed to spend more time away
15  from her desk.  And, yes, I thought that was a problem,
16  but I didn't know if that was something that I should
17  talk to her about.
18    Q.  Did you talk to her about that?
19    A.  About being away from her desk?
20    Q.  Yes.
21    A.  Not really, because when she was away from her
22  desk, she was usually in her judge's office, and I don't
23  have authority over the other judges.
24    Q.  So you don't know -- strike that.

**25**

1    Do you know whether Missy's decreasing abilities
2 or her not volunteering as often, do you know whether
3 that was a decision she made or perhaps a directive that
4 she was given by Judge Sappington?
5    A. I don't know.
6    Q. Okay. Between July '96 and January '97, were
7 you -- or, I'm sorry -- were employees who were hired,
8 were they told upon their hiring date about the existence
9 of a sexual harassment policy? And I guess I'm asking,
10 did you tell employees when they would be hired about a
11 sexual harassment policy in existence?
12    A. I'm trying to think. I don't recall if we even
13 hired anybody during that particular period. I don't
14 recall any new hires when we moved to temporary
15 facilities.
16    Q. Okay. Well, let's start with December '95 when
17 you became the administrative assistant. Was it your
18 practice, as the administrative assistant, to inform
19 employees that there was this sexual harassment policy?
20    A. I don't believe so.
21    Q. Did there come a time when that became a
22 practice of yours?
23    A. Like I said, we had copies of the policy
24 available if anybody wanted to look at them. It wasn't

**26**

1 until after this incident that we handed out copies to
2 every employee, along with a letter having them sign off
3 that they had received a copy. And it's common practice
4 now to give new hires a copy, have them sign a letter
5 saying they've received a copy. We probably didn't start
6 that until after Missy left.
7    Q. Okay. So am I correct that while Missy was
8 employed there, if someone had -- the way that someone
9 would find out about the sexual harassment policy would
10 have been for them to raise a problem or ask if there was
11 a policy?
12    A. We never had the problem. It never came up
13 before.
14    Q. Okay. All right. Now, you referred to the
15 Judge Sappington incident. You are aware, as you sit
16 there today, that Missy Schroeder, who is now Missy
17 Robinson, but Missy Schroeder has raised claims of sexual
18 harassment --
19    A. Yes.
20    Q. -- concerning Judge Sappington. When did you
21 first learn about Missy's claim of sexual harassment?
22    A. Could I look at my notes, please?
23    Q. You surely can. By "notes," this is the
24 handwritten journal that you're referring to?

**27**

1    A. If you let me look at the copy, I have just
2 anything that had to do with Missy written down, that
3 then I won't have to read the whole calendar. I mainly
4 made notes saying they went to lunch together. There is
5 a particular day where she sat down and told me what was
6 going on. I think I have in there that she said she
7 decided to quit.
8    Q. Okay. Why don't we go off the record for a
9 minute. I'm going to make copies of these so that
10 counsel can have copies, too.
11        (A recess was taken.)
12        (Whereupon the court reporter marked Exhibit No.
13 3 for identification.)
14    Q. Joyce, I'm going to hand you Exhibit 3, which is
15 your redacted -- a copy of your redacted notes that we've
16 referred to earlier. And I had asked you when you first
17 learned that Missy Schroeder was raising claims of sexual
18 harassment against Judge Sappington, and you had asked to
19 review those.
20    A. Maybe I misunderstood. You just now said when
21 did she raise claims of sexual harassment?
22    Q. Yes. When did you know that Missy Schroeder was
23 raising claims of sexual harassment against the judge?
24 Was complaining, not filing a lawsuit, but was

**28**

1 complaining of the judge's behavior?
2    A. She never complained of sexual harassment until
3 after she left the job.
4    Q. Did Missy Schroeder raise any complaints to you
5 about Judge Sappington's behaviors?
6    A. Yes.
7    Q. What were those complaints, and when did she
8 raise them?
9    A. Looking at my notes, I have on October the 16th
10 that Missy told me the story about she and Judge
11 Sappington.
12    Q. Tell me what you mean by that note.
13    A. She told me about several events that had
14 occurred. She said that they were just very, very good
15 friends, but she thought it had gone too far, and maybe
16 he had misinterpreted her feelings. She told me about
17 specific incidents that had happened.
18    Q. And is this on October 16th that she's telling
19 you this?
20    A. Yes, October 16th of '96.
21    Q. Tell me about the specific incidents that Missy
22 related to you.
23    A. She told me that she had talked to Judge
24 Sappington about her divorce. She told me that she

29

1 thought Judge Sappington was spying on her. She named a
2 specific incident where they had both taken the afternoon
3 off. She was at her parents' house, I believe, and an
4 airplane flew over, and she thought it was Judge
5 Sappington checking up on her. She told me that Judge
6 Sappington was kind of counseling -- I don't know if
7 that's the correct word -- but counseling her because of
8 her marriage break-up.
9      Q. Was there anything else she told you about her
10 concern or her belief that Judge Sappington was spying on
11 her?
12      A. Seems to me like there was an incident where she
13 said that she had left her vehicle parked outside the
14 office building late in the evening, and Judge Sappington
15 had driven by and seen it and wanted to know what she was
16 doing there.
17      Q. Any other -- anything else you can recall about
18 her belief or thoughts that Judge Sappington was spying
19 on her?
20      A. I can't think of anything else about spying on
21 her.
22      Q. Okay. What about anything else concerning Missy
23 indicating to you that they, apparently she and Judge
24 Sappington, had talked about her divorce?

30

1      A. She told me that he thought she had two very
2 lovely daughters, and if he ever found out that she was
3 shacking up with someone, he would kill her.
4      Q. Anything else that she told you about that
5 particular topic? And by topic, what you have referred
6 to as them talking about her divorce.
7      A. I can't recall. He told her that he would buy
8 her a sexual device if she needed one.
9      Q. Now were these -- was this information shared by
10 Missy to you in one setting? In one conversation on
11 October 16th of '96?
12      A. Yes.
13      Q. Okay. How did this conversation come about?
14      A. She had been very upset at work, and she felt
15 like she needed to tell somebody what was going on.
16      Q. In the course of this conversation, did you
17 sense that Missy Schroeder was upset by these things that
18 she was sharing with you?
19      A. Yes.
20      Q. Okay. What else did she tell you, if anything,
21 that you remember, about Judge Sappington counseling her
22 because of her marriage break-up?
23      A. I don't recall that she told me anything else.
24 I didn't know the specifics of the break-up or anything,

31

1 and I didn't ask.
2      Q. Was that something that she, Missy, was telling
3 you as another example of behaviors by Judge Sappington
4 that were troubling her?
5      A. No. As far as her marriage break-up, everybody
6 knew that she was getting divorced, but she was having
7 problems, so I mean it was common knowledge.
8      Q. I guess what I'm somewhat unclear about is why
9 she was telling you, as one of the three topics that she
10 brought up to you, why she raised that, that he was
11 counseling her because of her marriage break-up? And you
12 may not be able -- maybe I'm thinking out loud. You may
13 not be able to answer that.
14      Let me see if I can reword the question.
15      She tells you she believed Judge Sappington was
16 spying on her. She tells you that he said he'd kill her
17 if she shacked up with anyone. She tells you about the
18 sexual device remark.
19      Now, am I correct that all of those things, you
20 believed those things caused Missy concern, and that's
21 why she was raising them to you?
22      A. She and Judge Sappington had been on very
23 friendly terms prior to this, and none of the court staff
24 really knew what was going on. We would see them go to

32

1 lunch together. I didn't actually know what was going on
2 until she sat down and told me. But the part about Judge
3 Sappington counseling her was one of the things that had
4 drawn them close together in the beginning. It wasn't
5 one of the problems; it was something that had drawn them
6 together in the beginning, one of the reasons why she
7 spent time over in his office.
8      Q. Is that something that she told you? By that I
9 mean, you just said that was one of the reasons she spent
10 time in his office. How do you know that?
11      A. Well, she told me that he was counseling her and
12 giving her advice about her divorce. She spent a lot of
13 time in his office.
14      Q. Do you know from something Missy told you that
15 she was spending time in his office by her own choice as
16 opposed to Judge Sappington requiring that she spend time
17 in his office?
18      A. I don't know that he required her to spend time
19 in there. I know that she, most every morning, brought
20 some type of food in. She would bring in her newspaper.
21 She would usually go to his office first thing in the
22 morning, have a cup of coffee, read the paper, eat
23 whatever it was brought, and I don't know what else
24 went on. Sometimes, he helped her with homework. She

**33**

1  was attending college at the time. This happened
2  different times throughout the day. I'm not necessarily
3  saying it was just in the morning.
4      Q.  What I'm asking is, do you know whether Judge
5  Sappington required that she spend more time in his
6  office or whether that was Missy's own choice?
7      A.  I don't know.
8      Q.  Okay. Now from what we've marked as Exhibit 2,
9  which was your diagram that you made for our convenience
10  as far as the locations of offices, from where you sat in
11  the open area that you described, could you see Judge
12  Sappington's office?
13      A.  No.
14      Q.  Okay. You have to walk around that hallway to
15  get to Judge Sappington's office?
16      A.  Correct.
17      Q.  So when Missy was not at her desk, did you know
18  from that or conclude from that that she was in Judge
19  Sappington's office?
20      A.  I didn't know for sure, but if they weren't in
21  court, usually she was in his office. There were rest
22  rooms along this hallway, so you had to go around -- the
23  rest rooms were right outside Judge Sappington's office.
24  There was also a doorway that went to the stairs. So if

**34**

1  you just wanted to go down a flight of stairs, you had to
2  go past Judge Sappington's office. So, in other words,
3  we went around this direction a lot even though I
4  couldn't see in his office from my desk.
5      Q.  Okay. Sure. And I'm just trying to understand
6  how it would be that you would -- how you would know
7  whether Missy was in his office when she wasn't at her
8  desk?
9      A.  Okay. Another thing that -- another duty of
10  mine as administrative assistant, I have court setting
11  sheets, one for each judge, which tells the times that
12  they are in court. So I knew when her judge was supposed
13  to be in court.
14      Q.  And so if Judge Sappington was in court, Missy
15  Schroeder would have been in court with him?
16      A.  Correct.
17      Q.  Correct?
18      A.  Correct.
19      Q.  If Judge Sappington were not in court, did
20  Missy's role require that she -- I mean is there anywhere
21  else she could have been performing her work duties,
22  other than either at her desk or working with Judge
23  Sappington in his office?
24      A.  Not really. I mean she may have been running

**35**

1  errands, delivering something to another office, or been
2  away from her desk temporarily to go to the rest room, or
3  take a form down to another floor. But it would have
4  been for a short period of time.
5      Q.  When did this change happen that you referred to
6  where Missy was no longer at her desk as often as she had
7  been, if you can tell me? And perhaps reviewing --
8      A.  I can't give you definite dates, but it seemed
9  like maybe from August of '96 through November.
10      Q.  This was the time when she was no longer at her
11  desk as often?
12      A.  Right.
13      Q.  Okay.
14      A.  She was away from her desk more.
15      Q.  Okay.
16      MS. McNAUGHT:  Could we have the witness mark
17  where the bathrooms were and where the stairs were.
18      MS. McGRATH:  That would be a good idea. That's
19  on Exhibit 2.
20      MS. McNAUGHT:  Right. And then the witness also
21  said we did a lot of traveling this way. Maybe if she
22  could draw an arrow by what she meant, the direction
23  which led to the stairs that I believe she talked about.
24  Right. Thank you.

**36**

1      THE WITNESS:  I'm not a very good artist.
2      Q.  Is there anything else you recall Missy
3  indicating to you on October 16 of '96 after having
4  reviewed your note on that date?
5      A.  I can't tell of anything specific. If you have
6  questions, I will answer them, but I can't think of
7  anything offhand.
8      Q.  Okay. That's fine. What did you say to Missy
9  in the course of this conversation on October 16th?
10      A.  I think I advised her to talk to Judge Greanias.
11      Q.  Your note doesn't indicate that, does it?
12      A.  No.
13      Q.  Do you specifically recall telling her to talk
14  with Judge Greanias on October 16th of '96?
15      A.  I remember telling her to talk to Judge
16  Greanias. I don't recall if it was that specific date.
17  I believe he was on vacation that week.
18      Q.  So may it have been in the course of an entirely
19  different conversation with Missy that you told her to
20  talk with Judge Greanias?
21      A.  It could have been.
22      Q.  You didn't see this -- the information that
23  Missy was disclosing to you on October 16th, you didn't
24  see that as a report or that she was raising any concerns

**37**

1  about sexual harassment?
2      A.  No.  She didn't mention sexual harassment.  She
3  just was upset at what was occurring between her and
4  Judge Sappington.
5      Q.  Now, I think that you -- I believe you indicated
6  that recently you went to sexual harassment training.
7      A.  Yes.
8      Q.  Is that correct?  In June of 2000?
9      A.  Yes.
10      Q.  After having gone to that training, if someone
11  came to you as the administrative assistant today and
12  reported the same things that Missy reported to you on
13  October 16th of '96, would you view that report as a
14  report of sexual harassment?
15      MS. McNAUGHT:  To the extent that asks for a
16  legal conclusion, I'll object.  But go ahead and answer.
17      MS. McGRATH:  Well, I'm sorry.  I wasn't aware
18  that you are representing her in the deposition.
19      MS. McNAUGHT:  I'm not, but I'm representing two
20  other individuals, and I have an objection to that to the
21  extent that it asks for a legal conclusion.  And I don't
22  think that one must represent the witness in order to
23  make an objection.
24      MS. McGRATH:  No, I agree.  You don't have to

**38**

1  represent the witness to make an objection, but then when
2  you further said "go ahead and answer," I kind of saw
3  that as advice.  I just wanted to clarify that you're
4  still not representing her.
5      MS. McNAUGHT:  It's not advice.  It's merely
6  meant since an objection was raised, and we don't have a
7  judge here, that she should go ahead and answer the
8  question.
9      MS. McGRATH:  Okay.
10      MS. McNAUGHT:  Or she shouldn't not answer the
11  question on my objection -- on account of my objection.
12      Q.  I bet you might have forgotten the question by
13  now?
14      A.  Go for it.  Give me the question again.
15      Q.  After having -- since you've now gone through
16  the sexual harassment training in June of 2000, if
17  someone came to you now as the administrative assistant
18  and said the same types of things as Missy Schroeder said
19  to you on October 16 of '96, would you view that as a
20  possible claim of sexual harassment?
21      A.  I would view it as something that needed to be
22  investigated.
23      Q.  Now, you mentioned earlier that before October
24  16, Missy and Judge Sappington were on friendly terms and

**39**

1  no one knew what was going on.  Tell me what you meant by
2  that.
3      A.  They went to lunch together quite often, and
4  that's usually a practice that's avoided.  The judges
5  don't take their secretaries to lunch unless it's
6  Secretary's Day or Christmas or some special occasion.
7  There were -- it was such a common event that even
8  attorneys and secretaries from other offices would see
9  them together over the lunch hour, and they were saying,
10  "What's going on with Missy and Judge Sappington?"
11      Q.  These were people making the remark to you, I
12  take it?
13      A.  Yes.
14      Q.  Who do you recall asking what's going on with
15  Missy and Judge Sappington?
16      A.  I don't know that I can give specific names.  I
17  know there were just different attorneys in the building.
18  And like I said, some of the secretaries from downtown
19  offices that would see them walk up the street together
20  to some restaurant or cafe.
21      Q.  Can you name any of the attorneys in the
22  building who remarked about what they had seen or noted?
23      A.  No, not specifically.
24      Q.  Or any of the secretaries from downtown offices?

**40**

1      A.  I know one specific secretary from downtown.
2  Her name is Beverly Brown.
3      Q.  And she would raise this?
4      A.  She asked me just because she had seen them
5  together more than -- on more than one occasion.  "What's
6  going on with Missy and Judge Sappington?"
7      Q.  What did you say to Beverly Brown about that?
8      A.  At that point I told her I didn't know.  They
9  just went to lunch together a lot.
10      Q.  Did you observe them going to lunch together?
11      A.  Yes.
12      Q.  Did anyone else -- did you observe anyone else
13  going to lunch with them?
14      A.  Yes.  Ruth Young went on several occasions.
15      Q.  Well, how many times -- what time period are we
16  talking about here, again, where you would see them going
17  to lunch?  And if I can refer --
18      A.  August.
19      Q.  Let me finish the question.  If I can refer you
20  to your notes, Exhibit 3, which we've given you to help
21  you recall more specifically, if those notes help you --
22      A.  Okay.
23      Q.  -- please use them.
24      A.  August of '96, are you wanting specific dates?

**Page 41**

1   Q. No, just months for now.

2   A. Okay.

3   Q. August '96?

4   A. August.

5   Q. Through what month did you see this happen?

6   A. I would say through November of '96.

7   Q. Now, was Ruth Young with them when you would see

8   them more often than not?

9   A. Yes.

10   Q. Were people -- did people still question this

11   lunch practice even though Ruth Young was -- Ruth Young,

12   Missy Schroeder, and Judge Sappington were going to

13   lunch?

14   A. Yes. Ruth didn't go with them all the time.

15   Most of the time, but not all of the time.

16   Q. Did you question what was going on while you

17   would observe Missy and Judge Sappington and Ruth Young

18   going to lunch together?

19   A. I wondered what was going on, but I didn't ask.

20   Q. Okay. Did you ever have conversation -- a

21   conversation with Missy Schroeder about what she felt or

22   her view about these lunch dates?

23   A. No.

24   Q. After your conversation on October 16th, '96,

**Page 42**

1   with Missy, did you have other conversations with her

2   about Judge Sappington's behaviors?

3   A. Yes, I believe I did.

4   Q. And does that conversation -- is that reflected

5   in your notes in Exhibit 3 anywhere?

6   A. Would you repeat the question?

7   Q. I asked you if you had another -- any other

8   conversations with Missy Schroeder about Judge

9   Sappington's behaviors. I believe you indicated you did.

10   And I then asked you if the additional conversations are

11   noted on these calendars anywhere.

12   A. I don't have specific notes about conversations,

13   just things that occurred.

14   Q. Okay. Tell me then about the next conversation

15   you had with Missy concerning Judge Sappington's

16   behaviors. What you recall about that conversation.

17   A. I don't recall the next conversation I had, I

18   mean as specific conversations. I don't recall.

19   Q. I'm sorry, maybe I misunderstood. Other

20   than the October 16, 1996, discussion you had with Missy

21   concerning Judge Sappington, were there other occasions

22   where you spoke with Missy about Judge Sappington?

23   A. Yes.

24   Q. And I'm asking you to tell me what you recall

**Page 43**

1   about those discussions.

2   A. Okay. I don't recall what dates those

3   discussions were, but I did tell her to talk to Judge

4   Greanias. I don't -- at one point in time we talked

5   about Judge Shonkwiler. I said maybe she should say

6   something to him, and she said there was no point in

7   talking to Judge Shonkwiler because he and Judge

8   Sappington were good friends.

9   Q. Do you agree that Judge Sappington and

10   Shonkwiler were good friends?

11   A. Yes.

12   Q. Is there anything else you remember about your

13   discussion with Missy where you would have told her to

14   talk with Judge Greanias? What prompted you to tell her

15   that?

16   A. Well, I just thought that he is my superior, I

17   guess, and I thought she should explain to him what was

18   going on, or her problems and concerns, with Judge

19   Sappington.

20   Q. Do you remember anything that Missy was telling

21   you or may have been telling you that prompted you to

22   tell her to talk with Judge Greanias?

23   A. Just the incidents that I've already related.

24   Q. Okay. What did Missy say when you told her to

**Page 44**

1   talk to Judge Greanias?

2   A. I know that she did call him at home. Like I

3   said, I'm not positive, but I believe he was on vacation

4   this week of October the 16th. I know she did call him

5   at home and talk to him.

6   Q. Okay. How do you know that?

7   A. Because she told me she called him.

8   Q. What else do you know about her phone call to

9   Judge Greanias?

10   A. I just know that she called him.

11   Q. Did she tell you anything about what she said to

12   Judge Greanias?

13   A. I don't recall that.

14   Q. And did she tell you anything about what Judge

15   Greanias said to her when she called him?

16   A. I don't remember.

17   Q. What is your purpose or was your purpose back in

18   '96 for making these notes that you made on your

19   calendars or on your calendar? And I'm referring to the

20   notes in Exhibit 3 that we've talked briefly about. Why

21   did you make those notes?

22   A. As I said earlier, I just use this calendar kind

23   of as a daily diary. Sometimes I write down things from

24   work just -- I don't know, special thoughts, I guess,

**109**

1  I ever heard was what Missy relayed to me.

2      Q.  Did you know Missy to be someone who did not

3  tell the truth?

4      A.  There was times when I didn't think she told the

5  truth.

6      Q.  Tell me about those times.

7      A.  I can't think of anything specific, but I know

8  there was just times when she would tell me things that I

9  didn't think that they were probably truthful.  I don't

10  have any specific recollections.

11      Q.  Were these things other than what she told you

12  about Judge Sappington?

13      A.  Yes.

14      Q.  What -- what were the things related to?  What

15  types of topics?

16      A.  Just anything in general.  She let on like they

17  had a lot of money.  I really don't -- I don't know their

18  financial circumstances.  I don't think they had that

19  much money, but I know that her parents had money.  She

20  was a very generous person.  She was always buying big

21  gifts for people.  Just general things.

22      Q.  Well, I'm sorry.  Her buying big gifts for

23  people, does that have to do with her -- with your view

24  that you didn't believe she was always truthful?

**110**

1      A.  No.  But I mean the fact that -- I don't know

2  how to put it.

3      Q.  Take your time.

4      A.  There was just general things where she would

5  say something, and I didn't necessarily believe her.

6      Q.  But did you ever learn of anything that she said

7  to you?  Did you ever learn that that, in fact, was not

8  truthful?

9      A.  I can't tell of specifics.

10      Q.  What I'm asking is, did Missy Schroeder ever

11  tell you something that you didn't believe or you weren't

12  sure it was truthful, and then you later learned that it

13  wasn't truthful?

14      A.  I can't think of any specific incidents, but I

15  was just -- my impression was that she just wasn't always

16  truthful.

17      Q.  And I guess what I'm trying to find out is what

18  led you to believe that?  You've indicated she let on

19  like they had a lot of money was one thing you said.  Do

20  you know that she doesn't have a lot of money?

21      A.  No, I don't know that.

22      Q.  Okay.  That she bought big gifts didn't have to

23  do with her truthfulness.  Correct?

24      A.  No.

**111**

1      Q.  Okay.  And you can't tell me anything -- any

2  specific incident where you learned that, in fact, Missy

3  had not been truthful?

4      A.  I can't think of anything right now.

5      Q.  Did you have some particular reason to believe

6  that Judge Sappington was or was not truthful?

7      A.  No.

8      Q.  What was it that caused you and Ruth Young to

9  not -- I believe you indicated you didn't get along very

10  well?  What were the problems there?

11      A.  Does this have to do with Missy?

12      Q.  Yeah, it does.  I can ask you the questions I

13  think are relevant.  I haven't even heard an objection to

14  it.

15      A.  She started work as Judge Greanias' judicial

16  clerk, which basically was his secretary, which is the

17  job that I had previously performed.  Ruth Young is a

18  person who believes in working her way up the ladder by

19  brown-nosing.

20      Q.  And did that somehow cause some problem between

21  you and she in the workplace?

22      A.  Yes, because she was hired in as a judicial

23  clerk, which is like at the bottom of the ladder, but

24  she, because she was working for Judge Greanias, she

**112**

1  thought she should be somebody higher than a judicial

2  clerk, should have more responsibilities.

3      Q.  And did she tell you this?

4      A.  No.  She and I didn't talk much.

5      Q.  How do you know that's what she thought?

6      A.  Well, I don't know what she thought.  That was

7  the way she came across.

8      Q.  So it was the way she came across that caused

9  the friction?

10      A.  The way she was perceived.

11      Q.  Between the two of you?

12      A.  Yes.

13      Q.  Who else perceived her in that way?

14      A.  I think most of the clerks realized that she was

15  that type of person.

16      Q.  Who would that have included?

17      A.  The other eight clerks.  There are eight

18  judicial clerks, or seven.  The one was actually over in

19  the other building.  She didn't have a lot of contact

20  with her.

21      Q.  Now, out of the seven, Missy Schroeder was one.

22  Right?

23      A.  Right.

24      Q.  And who were the others, as best you recall?  I

**113**

1  know one you at least can't identify.
2      A.  Christina.  Her last name is Boarman now.  It
3  was Lees at the time.  Do you want me to name all the
4  clerks?
5      Q.  Yeah, if you would.
6      A.  Jeannine Sheets.
7      Q.  Okay.
8      A.  Angie Webner, W-E-B-N-E-R; Shelly Creek; Dory,
9  D-O-R-Y, Pasquale, P-A-S-Q-U-A-L-E.  How many clerks have
10  I given you so far?
11      Q.  Six.
12      A.  And is that counting Missy?
13      Q.  That counts Missy.
14      A.  And Ruth.
15      Q.  Oh, and Ruth.  That's seven.
16      A.  Seven.  Then there would have been one more.
17  Sue Hale.
18      Q.  Sue Hale?
19      A.  H-A-L-E.
20      Q.  And out of those clerks, which ones do you
21  believe thought the same way about Ruth Young as you did?
22      A.  I think most of them came to know her for what
23  she was.
24      Q.  Well, we don't know what she was.  Right?  What

**114**

1  she was was what you think she was.
2      A.  What I perceived her to be.
3          MR. CHAPIN:  Since this is a federal deposition,
4  I guess I'm going to object.  This has gone on for some
5  extended time now, and I don't see what relevance it has,
6  unless you can tie it into the case which involves a
7  different person, and it's hearsay.  You're asking her to
8  speculate as to what other people think.  Then you take
9  issue with her when she tells you what she thinks other
10  people think when she obviously doesn't know what other
11  people think.  So I just don't see the relevance of this
12  line of inquiry.  But that's for the judge to decide
13  later.
14          MS. McGRATH:  Speaking objections are also
15  generally not used in federal proceedings, but I just
16  have a few more questions on it.
17      A.  Okay.
18      Q.  On that topic, because I'm trying to understand
19  your answer.  You've indicated that you thought most of
20  those clerks would view Ruth Young in that -- in the same
21  fashion.  Am I correct?
22      A.  Yes.
23      Q.  Out of the seven who you've named, are there any
24  that you would identify as perhaps not holding that view?

**115**

1          MR. CHAPIN:  Objection.  Relevance.  Objection.
2  Requires her to speculate as to a state of mind of
3  another.
4      Q.  But you can go ahead and answer.
5      A.  I would say possibly Dory Pasquale.  I don't
6  think she worked very closely with her.  Possibly Angie
7  Webner, because like said, I believe she was over in the
8  other building, I think.  Maybe Sue Hale, because I know
9  that she did have lunch with her on occasion.
10      Q.  Is that it?
11      A.  That's it.
12          MS. McGRATH:  Okay.  I don't have anything
13  further.  Thank you.
14              **EXAMINATION**
15          **BY MR. CHAPIN:**
16      Q.  Janice, I note in your diaries there's a record
17  that Lois Durbin was hired to fill this position that
18  Missy had; is that right?
19      A.  Yes.
20      Q.  And who made that decision to hire Lois Durbin?
21      A.  Actually, I guess I was the one who hired her,
22  but Judge Greanias also had input on that.
23      Q.  When you realized there was going to be an
24  opening, did you have to post to receive applications?

**116**

1      A.  I don't recall if she -- if she submitted a
2  resume or not.  She had been working in the circuit
3  clerk's office, and was looking for a different job.  So
4  I don't recall if somebody gave her name to me, or if she
5  submitted a letter and a resume.  I don't recall how that
6  came about but --
7      Q.  Was there any posting or advertising of the
8  position being open?
9      A.  I don't recall if there was.
10      Q.  Did the county board in any way consider Lois
11  Durbin's request to be considered for this position?
12      A.  No.
13      Q.  Did the county board have any input in the
14  hiring decision?
15      A.  No.
16      Q.  The diary that you've brought with you today --
17  and we've had some excerpts there, I think they are
18  Deposition Exhibit No. 3 -- is that basically your
19  personal diary?
20      A.  Yes.
21      Q.  It's not something you're required to keep as a
22  part of your job?
23      A.  No.
24      Q.  Do you make those entries at home or at the

117

1  office?
2      A.  At home.
3      Q.  And you don't leave a copy at the office or make
4  a copy as a part of your job?
5      A.  No.
6      Q.  The things you have blacked out, I looked very
7  briefly at a couple of entries.  It looks like they're
8  largely personal and family in nature; is that right?
9      A.  Yes.
10     Q.  These things that you noted regarding the job
11  were just sort of things that were of interest, sort of
12  out-of-the-ordinary type of things.  Correct?
13     A.  Right.  They are just sentences that I happened
14  to mention Missy.
15     Q.  Things going on in your life --
16     A.  Right.
17     Q.  -- of interest.  Okay.  The option to transfer
18  Missy to Judge Francis, that was an option presented to
19  her by Judge Greanias; is that right?
20     A.  Yes.
21     Q.  Do you know who Judge Greanias spoke with before
22  he developed that as a possible option here for Missy?
23     A.  No, I don't.
24     Q.  Do you know if he ever discussed it with the

118

1  county board?
2      A.  I don't know that he did.  I don't know why he
3  would have.
4      Q.  Okay.  To your understanding of how things
5  worked, he would have had the authority to make a
6  decision as to whether or not to transfer her; is that
7  correct --
8      A.  Yes.
9      Q.  -- without the county board input?
10     A.  Right.
11     Q.  Do you know if he contacted any other
12  representative of Macon County relative to offering a
13  transfer?
14     A.  I don't know if he did or not.
15     Q.  There's been produced under a cover of a
16  certificate of service from Karen McNaught a copy of the
17  personnel file of Melissa Schroeder.  Now, did you
18  provide a copy of that to Karen McNaught?
19     A.  Yes.
20     Q.  And that was a request she made to you?
21     A.  Yes.
22     Q.  Okay.  And you went to a file someplace and made
23  a copy of the materials contained in that file; is that
24  right?

119

1      A.  Correct.
2      Q.  Where did you go to get the personnel file of
3  Melissa Schroeder?
4      A.  I have that in my office.
5      Q.  Okay.  And your office -- who else would you
6  have personnel files for in your office?
7      A.  I have personnel files for all of the judicial
8  clerks, for the two -- well, actually for all of the
9  court reporters, both county and state.  I have personnel
10  files for the bailiffs, the court technologists, the law
11  librarian; I believe that's it.
12     Q.  Are these all courthouse personnel, I mean?
13     A.  They are court -- considered court staff.
14     Q.  Considered court staff?
15     A.  Yes.
16     Q.  Okay.  You don't have all the personnel files of
17  all county employees in your office, do you?
18     A.  No.
19     Q.  Is there a separate place where the county keeps
20  personnel files for its employees?
21         MS. McGRATH:  Objection as to this witness'
22  knowledge.
23     Q.  Do you have any knowledge as to whether or not
24  there is a place where the county maintains the records

120

1  of its employees?
2      A.  I believe it's up to each office to keep their
3  own files.  I'm not aware of any place where all files
4  are kept.
5      Q.  Okay.  Now, you wrote a letter to Melissa
6  McGrath where you enclosed a copy of Melissa Schroeder's
7  personnel file that was in response to a request you
8  received from Miss McGrath; is that right?
9      A.  Yes.
10     Q.  That was on stationery titled -- looks like it
11  is Judge Greanias' stationery?
12     A.  Yes.
13     Q.  Do you have separate stationery that bears a
14  Macon County logo or heading?
15     A.  No.
16     Q.  Your stationery is all under Judge Greanias?
17     A.  Yes.
18     Q.  When you first received a request for the
19  personnel file of Melissa Schroeder it was regarding her
20  employment as a -- well, you wrote a letter on April 4,
21  '97, to Ms. McGrath in response to a request of the
22  personnel file of Melissa Schroeder, and you said that
23  Miss Schroeder was employed by the court and not by the
24  circuit clerk; is that right?

121

1    A.   Yes, I believe she had indicated that she
2  thought she was a circuit clerk employee.
3    Q.   The letter she wrote said -- quotes -- and it's
4  dated March 24, 1997, and it was directed to the Macon
5  County Circuit Clerk's Office, "To whom it may concern:
6  I write on behalf of Melissa Schroeder who was employed
7  by Macon County from March 1994 to January 1997," and
8  then makes the request.  Signed Melissa McGrath.
9         And you wrote back and said she was employed by
10  the court, not by the circuit clerk.  Right?
11    A.   Right.  I believe the circuit clerk's office
12  forwarded that letter to me.
13    Q.   And Judge Greanias, in a letter dated December
14  3, 1996, wrote a letter to Melissa Schroeder and signed
15  that letter regarding her resignation and her unused
16  vacation pay and being part of her final compensation; is
17  that right?
18    A.   That's correct.
19    Q.   And that was under his stationery as presiding
20  judge.  Right?
21    A.   Yes.
22       MS. McNAUGHT:  Do you want to look at that
23  before you answer the question?
24       MS. McGRATH:  I'd like to see the other one,

122

1  too, you asked her about.
2    A.   I saw it.
3    Q.   It was your impression, certainly, that Judge
4  Greanias had the authority to deal with Melissa Schroeder
5  regarding the termination of her employment.  Right?
6    A.   Yes.
7    Q.   And it wasn't necessary for the county board or
8  a representative of the county to get involved in that
9  decision.  Correct?
10    A.   No.
11    Q.   Would the county have a separate personnel file
12  or anything in addition to what you have in the personnel
13  file that you maintain as court administrator for Melissa
14  Schroeder, to your knowledge?
15    A.   There shouldn't be any separate files, except
16  there would be payroll records in the auditor's office.
17    Q.   Okay.  Now, payroll, that's something that the
18  county does handle for the court staff, right, courthouse
19  staff?
20    A.   Right.
21    Q.   They issue the check.  Correct?
22    A.   That's correct.
23    Q.   You provide them with the information regarding
24  hours and everything like that; the county cuts the

123

1  check?
2    A.   Correct.
3    Q.   Okay.  Now, do you know if the county gets
4  reimbursed for any of -- by any other state or county
5  agency or anything?
6    A.   I don't know how that works.
7    Q.   Who sets salaries for courthouse staff?
8    A.   Judge Greanias.
9    Q.   Who sets the hours of employment?
10    A.   Judge Greanias.
11    Q.   Judge Greanias makes the assignment of who works
12  in what -- for what judge.  Correct?
13    A.   Some of the court reporters and clerks actually
14  came into the building with the particular judge they are
15  with, and they've served with that judge from the time
16  they came until the present time.
17    Q.   Okay.
18    A.   We have made some changes, but it's because
19  people have left or people have requested changes, or for
20  various reasons that some people did actually come in
21  with the judges they started with, and they are still
22  there.
23    Q.   Okay.  With regard to Missy Schroeder going to
24  lunch with Judge Sappington, you made notes in your diary

124

1  a couple of times about Missy and Ruth and the Judge
2  going together, and also apparently there were times when
3  just Missy and the Judge went together; is that right?
4    A.   Yes.
5    Q.   Did you ever hear Missy complain about, "Oh,
6  I've got to go to lunch with the judge again," or "the
7  judge asked me to go to lunch, I guess I better go with
8  him," anything like that?
9    A.   No.
10    Q.   Did you ever hear Missy asking the judge, you
11  know, "Do you want to go to lunch today," or anything
12  like that?
13    A.   No.
14    Q.   Okay.  Did you ever hear Missy asking Ruth,
15  "Hey, will you go with us?  I've got to go to lunch with
16  the judge.  Will you go along," or anything like that?
17    A.   No.
18    Q.   Did you ever hear Missy complain about going to
19  lunch with the judge in any way?
20    A.   No.
21    Q.   When she first spoke to you about complaints she
22  had about Judge Sappington's behavior toward her, did you
23  ever tell her she needed to go talk to a representative
24  of the county board?

**125**

1   A. No.
2   Q. Or of any county official?
3   A. No.
4   Q. Do you know Larry Fichter?
5   A. Yes.
6   Q. And who is Larry?
7   A. He's the state's attorney.
8   Q. Do you know what his position involves?
9   A. Handling criminal cases.
10  Q. Okay. Is that the extent of your understanding
11 of his position?
12  A. Pretty much.
13  Q. Okay. Did you ever suggest she go talk to Larry
14 Fichter about what was going on?
15  A. No.
16  Q. You referred her only to Judge Greanias; is that
17 right?
18  A. Judge Greanias or Judge Shonkwiler.
19  Q. Now, of the times that Missy went to lunch with
20 the judge, either just with the judge or with her -- or
21 with the judge and Ruth -- strike that question.
22      Considering the number of times that Missy went
23 to lunch with the judge, and also those times she went
24 with Ruth and the judge, can you tell me what percent of

**126**

1   the time it was just her and the judge that went, and
2   what percent of the times it was the three of them?
3   A. I can't give you a percentage, but more times
4   than not, it was the three of them rather than just the
5   two of them.
6   Q. Okay. Predominantly, was it closer to 50/50 or
7   was it overwhelming 90/10, something like that, if you
8   can give an estimate?
9   A. Overwhelmingly the three of them went.
10  Q. Okay. Was that something that was maybe once a
11 week? Three or four times a week? Did it vary?
12  A. It varied.
13  Q. What would be the most frequently in a week that
14 you can recall that they went to lunch?
15  A. I don't know, maybe twice a week.
16  Q. Okay. Now, the disclosure that Missy made to
17 you was in October. But in August you were making some
18 notes about -- you made a note about Ruth and Missy and
19 the judge going to lunch. So I mean at least on that
20 occasion it stuck in your mind enough to record in your
21 calendar. And you've talked about, as I understood your
22 testimony, that Missy would on occasion -- strike that.
23      Did I understand your testimony that Missy would
24 go into the judge's office in the morning and have her

**127**

1   cup of coffee?
2   A. Yes.
3   Q. Okay. Was that a daily sort of thing?
4   A. Pretty much.
5   Q. And, you know, what time does the day start,
6   workday start?
7   A. Court starts or the court day starts at 8:30.
8   Q. Okay. Is that what time she was supposed to be
9   to work?
10  A. Yes.
11  Q. Okay. And then when she came into work at 8:30,
12 would she routinely get a cup of coffee and go into the
13 judge's office?
14  A. Yes.
15  Q. Would that be two, three, four, five times a
16 week? How many?
17  A. Four times, maybe. I mean it happened quite
18 often.
19  Q. Would she close the door when she went in or
20 leave the door open?
21  A. I think the door was usually left open.
22  Q. And the judge would be in his chambers --
23  A. Yes.
24  Q. -- when she went in there to have coffee?

**128**

1   A. Yes.
2   Q. You said she'd take her newspaper in and go in
3   and read the newspaper?
4   A. Yes.
5   Q. Is that what you could see through the door?
6   A. Like I said, I distributed papers to all of the
7   judges. I would have occasion just to walk around there
8   and see her in his office.
9   Q. Okay. You said she'd bring food to eat. Was
10 that something for the common breakroom, or was that more
11 for Judge Sappington, or for her and Judge Sappington?
12  A. She would put it in Judge Sappington's office,
13 but she would tell other people that she brought food in,
14 and if anybody wanted to stop in and have something, they
15 could.
16  Q. But it would be in his chambers, not in the
17 breakroom?
18  A. We didn't have a breakroom.
19  Q. Okay. All right. Did you feel that by doing
20 this sort of daily thing and having this sort of contact
21 with the judge that Missy was trying to curry her favor,
22 or that she was getting preferential treatment, or not
23 having to work as hard because of her personal
24 relationship with the judge?

129

1       MS. McGRATH:  Objection as to witness'
2  qualifications.
3       A.  I don't think she was getting preferential
4  treatment.  I think she just felt comfortable around him.
5       Q.  Okay.  During the time that all this took place,
6  and I guess focusing on the October -- what was that
7  date -- October 16 when she first spoke to you about it,
8  about her concerns about Judge Sappington's behavior,
9  until the time that she terminated and left her
10  employment with the circuit court, do you recall any
11  county representative being involved for any reason?
12      A.  No.
13      Q.  Or being consulted?
14      A.  I didn't consult anyone.  I don't know if Judge
15  Greanias would have.  I'm not aware of that.
16      Q.  Do you draft or type memos that Judge Greanias
17  would do?
18      A.  Yes.
19      Q.  You don't recall doing any letters or memos to
20  the county board or a county official regarding Judge
21  Sappington and Melissa Schroeder?
22      A.  No.
23      Q.  You said that after this series of events with
24  Missy Schroeder and Judge Sappington that the sexual

130

1  harassment policy was passed out, and there was a
2  requirement that all the employees acknowledge receipt of
3  it.  Correct?
4       A.  Yes.
5       Q.  Now, who required this or directed this be done?
6       A.  Judge Greanias.
7       Q.  And who had to receive a copy of the sexual
8  harassment policy under that directive?
9       A.  I gave it to all of our court staff, which would
10  have included the clerks, the reporters, the bailiffs,
11  court technologist.
12      Q.  Okay.  You didn't go to the county clerk's
13  office and pass it out?
14      A.  No.
15      Q.  You didn't go to the county recorder of deeds
16  office?
17      A.  No, just court staff.
18      Q.  Did you report to the county board then that had
19  been done?
20      A.  No.
21      Q.  Did you think that that was something you were
22  supposed to do?
23      A.  Report to the county board?
24      Q.  Right.

131

1       A.  No.
2       Q.  Just report back to Judge Greanias?
3       A.  Right.
4       Q.  Now, how long -- you testified at the start of
5  your deposition that you're an employee of the county?
6       A.  Correct.
7       Q.  When did you first become hired by the county?
8       A.  March 12th, 1987.
9       Q.  And what was your first job with the county?
10      A.  I was Judge Greanias' secretary.
11      Q.  Okay.  Now, who did you interview with or who --
12  yeah, did you have to go to an interview?
13      A.  No.
14      Q.  Did you have to submit an application?
15      A.  No.
16      Q.  How did you come about becoming employed by the
17  county?
18      A.  I worked for Judge Greanias in private practice.
19  He was appointed to fill the judgeship, and he asked if I
20  would go to the courthouse and be his secretary.
21      Q.  Okay.  So you had a personal in with Judge
22  Greanias because of your prior experiences --
23      A.  Right.
24      Q.  -- as his secretary?  So Judge Greanias hired

132

1  you?
2       A.  Yes.
3       Q.  Did you ever meet with anyone from Macon County
4  with regard to your initial hiring?
5       A.  No.
6       Q.  Never even submitted an application to Macon
7  County?
8       A.  No.
9       Q.  And your terms of employment were set for you by
10  Judge Greanias; is that right?
11      A.  What do you mean by terms of employment?
12      Q.  How much you're going to be paid.  Did he tell
13  you how much you'd be paid?
14      A.  He told me how much I would be paid, but that
15  was already decided.  I mean there's like a pay scale,
16  and that would have been a pay scale that the previous --
17  well, Judge Scott and his administrative assistant would
18  have had possession of that.  They would have told Judge
19  Greanias how much money he could offer me to come in as
20  his secretary.
21      Q.  Okay.  All the time you've been employed then,
22  you have been with the circuit court staff, is that
23  right, a part of the circuit court staff?
24      A.  No.

133

1    Q.  Okay.  What other jobs have you held that
2  weren't circuit court related?
3    A.  It's just court related, not --
4    Q.  Okay.
5    A.  Okay.  Maybe I misunderstood.  I was thinking
6  about the circuit clerk's office.
7    Q.  You have the circuit clerk's office, but the
8  court is generally the circuit court, but if I dropped
9  that, all your employment has been with the court?
10    A.  Yes.
11    Q.  And the court staff?
12    A.  Yes.
13    Q.  Okay.  And do you know who does your -- I mean
14  do you get a salary review periodically?
15    A.  No.
16    Q.  Do you get a raise every so often?
17    A.  Yes.
18    Q.  Who tells you about that?
19    A.  Judge Greanias has a recommended pay scale from
20  the state, I believe it is, and he revises it every year
21  according to how much money we have in the budget.  And
22  then he is the one who makes up the pay scale and I
23  just --
24    Q.  Get whatever?

134

1    A.  I get whatever there is; whatever he allows me
2  to have.
3    Q.  Now, is Kathy Hott still the circuit clerk;
4  isn't she?
5    A.  Yes.
6    Q.  She has been, what, now eight years?
7    A.  That's probably right.  She's up for election
8  this year.
9    Q.  I think she won the first time Clinton was
10  elected; isn't that right?
11    A.  I think so.
12    Q.  Then she got re-elected.  Now, the judicial
13  clerks are not a part of her office; is that true?
14    A.  No, they are not.
15    Q.  Okay.  So she doesn't control any of -- make
16  assignments to them or anything like that?
17    A.  No.
18    Q.  Shelly Creek used to be with Kathy Hott's
19  office; isn't that true?
20    A.  No.
21    Q.  Do you know?  She didn't?
22    A.  No.
23    Q.  Okay.
24    A.  Jeannine Sheets used to be with the circuit

135

1  clerk's office.
2    Q.  Now, you do payroll sheets for the court staff.
3  Right?
4    A.  Yes.
5    Q.  And you send those over to the county?
6    A.  Yes.
7    Q.  County auditor?
8    A.  Yes.
9    Q.  Okay.  Is that the only communication you have
10  with the county or the county office regarding the court
11  staff?  Is everything else up to Judge Greanias?  Do you
12  understand what I mean?
13    A.  No.
14    Q.  I mean, is payroll the only thing that goes to
15  the county regarding the employment of the court staff?
16  For instance, hiring you said is done by Judge Greanias?
17    A.  Yes.
18    Q.  Judge Greanias controls assignments?
19    A.  Yes.
20    Q.  He can fire and hire people?
21    A.  Yes.
22    Q.  Can you think of anything, other than payroll,
23  where the county gets consulted?
24    A.  The insurance.

136

1    Q.  Okay.
2    A.  Or worker's comp claims.
3    Q.  Okay.  And then I imagine equipment and office
4  space, is that --
5    A.  There's like a purchasing department that we
6  order supplies through.  There's like IMRF retirement.
7  That's also through the auditors's office.
8    Q.  Okay.  So --
9    A.  I think that's it.
10    Q.  So who hires the court reporters?  You talk
11  about -- you said there's some county court reporters.
12  Who hires those?
13    A.  Actually, I've never hired a court reporter.
14  We've always had county reporters in place, and what
15  happens is as a state reporter retires or leaves, we move
16  a county reporter into their spot.  And there's usually
17  somebody there, already there, that we can move into the
18  county reporter's spot.  For instance, Shelly Creek,
19  although she is a reporter, she started out as a judicial
20  clerk because there was an opening there.  And as soon as
21  there was an opening for a reporter, she moved from a
22  judicial clerk position to a county paid reporter.
23    Q.  Who hires bailiffs?
24    A.  Our bailiffs have been around for years and

137

1 years, and they are not being replaced. I don't know who
2 hired them to start with.
3   Q. What about your courthouse -- what do you call
4 them, technologist?
5   A. Court technologist.
6   Q. Who hired him?
7   A. Judge Greanias hired her.
8   Q. What are the other -- court librarian, who
9 hires?
10   A. Actually I interviewed her. Judge Greanias and
11 I hired her together.
12   Q. Okay. Can you think of anyone in the courthouse
13 staff, the court staff, that is hired by the county as
14 opposed to going through you or Judge Greanias or a
15 combination?
16   A. No.
17   Q. Everyone is through you and Judge Greanias?
18   A. Right.
19   Q. Okay.
20   A. Or like I said, those who have come in with the
21 judge coming directly from the outside.
22   Q. The training that you recently received in
23 sexual harassment --
24   A. Yes.

138

1   Q. -- who sponsored or put that on?
2   A. The training was held over at Monticello. It
3 was for all of the circuit judges, and they took
4 supervisors and administrative assistants. It was put on
5 by some gal out of Chicago. I think maybe she had
6 something to do with the Supreme Court.
7   Q. Okay. Office of the -- Administrative Office of
8 the Illinois Courts or something like that?
9   A. Maybe. I'm not positive.
10   Q. On an annual basis, as court administrative
11 assistant, do you have to file a report with the county
12 board on anything other than payroll type information?
13   A. No.
14   MR. CHAPIN: That's all I've got. Thank you.
15   MS. McGRATH: Can we take a break before you
16 start in?
17   MS. McNAUGHT: Sure.
18     (A recess was taken.)
19   EXAMINATION
20   BY MS. McNAUGHT:
21   Q. Miss Shonkwiler, do you know where Exhibit No. 1
22 came from?
23   A. No, not for sure. I think it was sent from
24 Judge Shonkwiler to Judge Greanias, but I'm not positive.

139

1   Q. You don't know from where Judge Shonkwiler got
2 it?
3   A. No.
4   Q. Do you know if there's anything more in a policy
5 manual, or do you know if this is part of a policy manual
6 that this might be contained in, Exhibit No. 1, might be
7 contained in?
8   A. That's the only thing that Macon County or that
9 court system has.
10   Q. Now, judges usually like to be able to control
11 what goes in and out of their courtroom and what's in
12 their courtroom; isn't that right?
13   MS. McGRATH: Objection as to the witness'
14 qualifications.
15   Q. Well, I can go back and rephrase. Have you ever
16 sat in a judge's courtroom as his court staff?
17   A. Yes.
18   Q. And while you've been a member of that court
19 staff, have you observed judges who like to be able to
20 control their courtrooms?
21   A. Yes.
22   Q. Do you know if when Frank Byers -- do you know
23 how often Frank Byers came into Judge Sappington's
24 courtroom?

140

1   A. No, I don't.
2   Q. Do you know whether he interrupted Judge
3 Sappington's courtroom?
4   A. No, I don't.
5   Q. Do you know if that was the basis for Judge
6 Sappington not being very happy with his appearance in
7 his courtroom?
8   A. I don't really know what caused that conflict.
9   Q. So then you don't really know whether Judge
10 Sappington was jealous of Frank Byers, do you?
11   MS. McGRATH: Objection. Asked and answered.
12   A. No.
13   Q. These judicial clerks, can they swear witnesses
14 in a courtroom?
15   A. Yes.
16   Q. And who deputizes them in order to swear
17 witnesses?
18   A. They are actually deputized by Kathy Hott, the
19 circuit clerk.
20   Q. Do you have any interaction with probation
21 officers?
22   A. Some.
23   Q. Do you know how they are hired?
24   A. The probation officers?

Deposition of Janice Shonkwiler

141

1    Q. Right.

2    A. No, I don't.

3    Q. Do you know whether they are county or state

4  employees?

5    A. I don't know that either.

6    Q. And do you know of any personnel manual or

7  policies that they are required to follow?

8    A. No.

9      MS. McNAUGHT: I have nothing further.

10     MS. McGRATH: I have a few follow-up questions.

11        FURTHER EXAMINATION

12        BY MS. McGRATH:

13    Q. Did you hear -- you were asked whether you ever

14  heard Missy Schroeder complain about going to lunch with

15  Judge Sappington. Did you ever hear any conversations

16  leading to their lunch dates?

17    A. No.

18    Q. Okay. So you would just observe them leaving

19  for lunch --

20    A. Right.

21    Q. -- or coming back from lunch? You also

22  indicated that at least at some point you -- it was your

23  view that Missy Schroeder felt comfortable around Judge

24  Sappington. Do you remember indicating that?

142

1    A. Yes.

2    Q. Now, wouldn't you agree that Missy Schroeder at

3  some point no longer felt comfortable around Judge

4  Sappington?

5    A. Yes.

6    Q. Based on what she had indicated to you?

7    A. Yes.

8      MS. McGRATH: I have nothing further.

9      MR. CHAPIN: Nothing.

10     MS. McNAUGHT: You have to tell the court

11  reporter whether you want to read the deposition for any

12  mistake the court reporter may have made, or if you would

13  like to waive your signature.

14      THE WITNESS: I'll waive.

15      (The deposition concluded at 2:48 p.m.)

16

17

18

19

20

21

22

23

24

143

STATE OF ILLINOIS )
          ) SS
COUNTY OF PEORIA )

<u>CERTIFICATE</u>

I, Rose M. LaBerdia, CSR, RDR-CRR, a Notary Public duly commissioned and qualified in and for the State of Illinois, DO HEREBY CERTIFY that, pursuant to notice, there came before me on the 19th day of July, A.D. 2000, at 105 N. Center Street, Bloomington, Illinois, the following named person, to wit:

JANICE SHONKWILER, a witness, called by the plaintiff, who was by me first duly sworn to testify to the truth and nothing but the truth of her knowledge touching and concerning the matters in controversy in this case, and that she was thereupon carefully examined upon her oath and her examination immediately reduced to shorthand by means of stenotype and thereafter converted to typewriting using computer-aided translation by me.

I ALSO CERTIFY that the deposition is a true record of the testimony given by the witness.

I FURTHER CERTIFY that I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which this deposition is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal at Edwards, Illinois, this 30 day of July, A.D. 2000.

Rose M. LaBerdia, CSR, RDR-CRR
Illinois License No. 084-001506

OFFICIAL SEAL
ROSE M LABERDIA
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES:05/18/03