E-FILED
Tuesday, 18 January, 2005  03:39:07 PM
Clerk, U.S. District Court, ILCD

# JUDGE JERRY PATTON

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MELISSA ROBINSON, (f/k/a )
MELISSA SCHROEDER),       )
                          )
    Plaintiff,             )
                          )
    -vs-                   )   No. 99-2097
                          )
JUDGE WARREN A. SAPPINGTON, )
SIXTH JUDICIAL CIRCUIT, (IN )
OFFICIAL CAPACITY AND      )
INDIVIDUALLY)              )
    Defendant,             )
                          )
MACON COUNTY,              )
JOHN P. SHONKWILER, CHIEF  )
JUDGE, SIXTH JUDICIAL      )
CIRCUIT, MACON COUNTY CIRCUIT)
COURT, MACON COUNTY (IN    )
OFFICIAL CAPACITY AND NOT  )
INDIVIDUALLY)              )
                          )
    Defendant.             )

Deposition taken of JERRY PATTON, on the 25nd day of October, A.D., 2001, at Macon County Courthouse, 253 E. Wood Street, Fifth Floor, Decatur, Illinois, commencing at 10:05 a.m., before Kitty L. Malcom, a Certified Shorthand Reporter, License No. 084-002106, pursuant to Notice.

APPEARANCES:
      Ms. Melissa M. McGrath, Esq.
      THOMSON & WEINTRAUB
      105 North Center St., P.O. Box 3577
      Bloomington, IL 61702-3577
      309/829-7069
          On behalf of Plaintiff

Page 2

      Ms. Karen McNaught
      Assistant Attorney General
      OFFICE OF THE ATTORNEY GENERAL
      500 So. Second Street
      Springfield, IL 62706
      217/782-5819
          On behalf of Warren Sappington

      Ms. Diane Baron, Esq.
      CLAUSEN MILLER, P.C.
      10 So. LaSalle Street
      Chicago, IL 60603-1098
      312/855-1010
          On behalf of Warren Sappington

      Mr. Robert Gillespie, Esq.
      HINSHAW & CULBERTSON
      400 So. Ninth Street, Suite 200
      Springfield, IL 62701
      217/528-7375
          On behalf of Judge Shonkwiler

      Mr. John E. Cassidy, Esq.
      CASSIDY & MUELLER
      323 Commerce Bank Bldg.
      416 Main Street
      Peoria, IL 61602
      309/676-0591
          On behalf of Macon County

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

            I N D E X
WITNESS:
JERRY PATTON
    Examination by Ms. McGrath........... 3
    Examination by Mr. Cassidy........... 15
    Examination by Ms. McNaught.......... 22
    Examination by Ms. McGrath........... 24
    Examination by Mr. Cassidy........... 26

EXHIBITS:
    None marked

MALCOM REPORTING SERVICE
1310 Ironwood CC Drive
Normal, IL 61761
(309) 454-3378

Page 3

CASSIDY & MUELLER
JERRY PATTON

1  called as a witness, after being first duly sworn,
2  was examined and testified upon his oath as follows:
3
4
5      EXAMINATION
6  BY MS. McGRATH:
7      Q. Judge, would you spell your name for the
8  court reporter?
9      A. Jerry Patton. P as in Paul, A-T-T-O-N.
10     Q. And how long have you been a judge here in
11 Macon County?
12     A. Approximately 26 and a half years.
13     Q. Did you recently retire?
14     A. I retired approximately a year and two or
15 three months ago.
16     Q. Are you represented by Ms. NcNaught in this
17 deposition today?
18     A. Yes.
19     Q. I'm going to be asking you some questions.
20 There are times when I get wordy. If you don't
21 understand something, please ask me to reword it.
22 Okay?
23     A. That's fine.
24     Q. During the period 1996 was your office

Page 4

1  located in the Ambassador building?
2      A. I think we moved over in early 1996.
3      Q. And during the time you were located in the
4  Ambassador building can you tell me on what floor
5  your chambers were?
6      A. I think the sixth. I don't remember the
7  floor.
8      Q. That's fine. Were there other judges'
9  chambers on the same floor?
10     A. Yes. Judge Sappington's office was west of
11 me and Judge Greanias's office was south of me.
12     Q. Did you have a court reporter who worked
13 with you at that time?
14     A. That's correct.
15     Q. What was your court reporter's name?
16     A. Gina Jones.
17     Q. And did you have a judicial clerk who worked
18 with you at that time?
19     A. Actually then we called them secretaries.
20     Q. Okay. Can you tell me your secretary's name
21 at that time?
22     A. I had two. I had Jamie Mesnard, and Jamie
23 retired or quit about the middle of the year. And
24 then I hired Christina Lees, who later became -- she

Page 5

1 was married and later became Boarman, B-O-A-R-M-A-N.
2    Q. During that same time period was Missy
3 Schroeder Judge Sappington's secretary?
4    A. That's correct.
5    Q. Judge, did you at any time hear Judge
6 Sappington make comments about Missy Schroeder's
7 physical appearance?
8    A. No, I did not.
9    Q. Did you at any time discuss with Judge
10 Sappington the amount of time that Missy was spending
11 in his chambers?
12    A. I don't think I ever had a discussion with
13 him about that. I saw her going into his office
14 quite often, but I just assumed they were working.
15    Q. So seeing her go into his office quite often
16 didn't raise any concerns for you?
17    A. No.
18    Q. Before your retirement and while you were a
19 judge here in Macon County, was there ever a sexual
20 harassment policy distributed to staff?
21    A. There was. And I think it came from the
22 court administrator's office. I believe it was
23 probably about a year before I retired.
24    Q. What year would that place it in, sir?

Page 6

1    A. 1999 I think.
2    Q. Would you have contact with Missy Schroeder
3 on a daily basis?
4    A. I am certain I would see her on a daily
5 basis. Any contact might be, "Good morning, how are
6 you." That's about it.
7    Q. Did you ever see her act in an
8 unprofessional manner in the workplace?
9    A. No.
10    Q. Did you ever see her -- during the time you
11 were located over at the Ambassador building did you
12 ever see her seem emotionally upset at work?
13    A. Maybe at one point. I think her parents
14 were having marital problems.
15    Q. What causes you to think that, Judge?
16    A. I think Judge Sappington told me later that
17 she had discussed with him that her parents were
18 having marital problems.
19    Q. Missy Schroeder left her job at the
20 courthouse sometime before you retired, correct?
21    A. Correct.
22    Q. When Missy left her job were you given any
23 explanation for her departure from Judge Greanias?
24    A. I don't think I was.

Page 7

1    Q. Were you given any explanation for her
2 departure from any judge?
3    A. No. Judge Greanias gave me an explanation
4 at one point that a problem had arisen and he was
5 thinking about transferring Missy from the Ambassador
6 back to the arraignment courtroom in the old
7 courthouse. And he told me that later Missy and Art
8 came in and said that they didn't want her
9 transferred over there, so he didn't make the
10 transfer.
11    Q. If the transfer had taken place, would that
12 have been assigning Missy to work for Judge Francis
13 then?
14    A. Correct.
15    Q. What else, if anything, did Judge Greanias
16 tell you with regard to the reasoning for considering
17 that transfer?
18    A. I think he said that there was something
19 about a statement made by Judge Davis that had caused
20 some embarrassment and in order to prevent that in
21 the future he was going to offer her the opportunity
22 or did offer her the opportunity to go to another
23 courtroom.
24    Q. What was the statement that was made by

Page 8

1 Judge Davis that Judge Greanias indicated to you had
2 caused some embarrassment?
3    A. I don't really remember.
4    Q. Do you have any recollection of what the
5 statement was?
6    A. Something about her sitting on Arthur's face
7 or words to that effect.
8    Q. Okay. And is it your recollection that
9 Judge Greanias indicated he had offered that transfer
10 to Missy?
11    A. That's correct.
12    Q. Then I believe you indicated that Judge
13 Greanias spoke with you again at some point
14 indicating that Missy and Judge Sappington had come
15 in and spoke with him about the transfer?
16    A. That's correct.
17    Q. Tell me as best you recall what Judge
18 Greanias indicated happened when Missy and Judge
19 Sappington came in to speak with him?
20    A. He said that he had I think set up the
21 transfer and told the people that they were going to
22 make the transfer. And then later I got the
23 impression at the same time Arthur and Missy came
24 into his office and both of them indicated to him

**Page 9**

that they did not want the transfer, so he didn't go ahead and make the transfer.

Q. How long after the first conversation with Judge Greanias did you hear from him again that the transfer was not going to take place?

A. You are asking me to guess. Probably two and a half weeks.

Q. During those two and a half weeks or whatever time span it was between the first indication you had that the transfer was going to take place and when you learned it wasn't going to take place, did you notice any of the support staff treating Missy differently?

A. I did not.

Q. The transfer was not going to involve any of your support staff?

A. No.

Q. Were you ever in a meeting with Judge Greanias other than the one we've just talked about where the "sit on your face" comment came up?

A. Not to my knowledge.

Q. When you had this conversation with Judge Greanias where he first indicated to you that the transfer was going to take place, who else if anyone

**Page 10**

was present at that meeting?

A. Just he and I. Basically I was Judge Greanias's right-hand man, and any time he needed to talk to somebody or needed to talk about administration -- I assisted in administration -- then I would talk with him.

Q. Did you ever have any other discussions with Judge Greanias where he shared with you concerns that Missy told him about with regard to Judge Sappington's behaviors?

A. Not to my knowledge.

Q. Judge, while your chambers were located over at the Ambassador, did you ever observe any improper behaviors between Judge Sappington and Missy Schroeder?

A. No. To the contrary. Missy would bring in donuts, cookies and cake to Arthur's office probably once a week.

Q. During what time period did you observe Missy bringing these items into Judge Sappington's office?

A. It seems like to me it would have been almost the entire time we were there.

Q. Was there any time in 1996 that you saw that

**Page 11**

pattern change?

A. No.

Q. Are you certain that in October of 1996 you would have still continued to observe Missy bring items such as donuts, cookies and cake into Judge Sappington's chambers?

A. To the best of my knowledge, yes.

Q. And that she continued to do that in November and December of 1996?

A. If she was working there, I think so.

Q. Did Judge Sappington have discussions with you concerning Missy Schroeder?

A. No. I think he mentioned about the fact that her parents at one point were having some marital problems, and I think he might have mentioned at one point Missy was concerned about her husband because he was going back to work real late at night, but I think her husband worked for her father at the body shop.

Q. Did Judge Sappington mention anything else to you concerning Missy Schroeder?

A. Not that I can recall. One day I went in to Art's office and Missy was in there talking to him, I think they were both seated, and she had said

**Page 12**

something about schooling or wanting to go to school at RCC, and I think that the schooling would have been in the late afternoon. And I told Art and her that what they might do is go see Judge Greanias and see if they could arrange it for her to work over her noon hour so she could leave early in the evening and take that class.

Q. Okay. Did this discussion take place while you were over in the Ambassador?

A. Yes.

Q. Can you tell me what month that discussion may have taken place?

A. I really can't.

Q. Okay.

A. Because I think Missy was wanting to take some classes at RCC.

Q. Being in the same vicinity as Judge Sappington's chambers, were you aware that the judge and Missy were going to lunch together?

A. I was not unless from time to time the judges would take the secretaries, their staff to lunch. My staff, if somebody had a birthday, it would not be uncommon for us to go out and have lunch; my bailiff, my secretary, my court reporter

Page 13

1 and myself.
2    Q. Okay. But other than on an occasion like
3 that, you hadn't observed the judge and Missy going
4 to lunch?
5    A. No, I had not.
6    Q. Did Judge Greanias ever discuss with you the
7 reason that Missy Schroeder left her job?
8    A. He probably did, but I can't remember
9 exactly what the discussion was. I thought -- I
10 thought he told me that he assured her if she wanted
11 to continue to work that he would have a job for her.
12 And I don't know exactly what reason she gave him for
13 leaving. I don't know.
14    Q. Okay. But Judge Greanias told you that he
15 had told Missy that if she wanted to continue to
16 work, he would have a job for her?
17    A. That is my understanding, yes.
18    Q. Were there occasions that Missy was in Judge
19 Sappington's chambers that you would note that the
20 door was closed?
21    A. I don't know. It's possible, but I honestly
22 can't say.
23    Q. Did you ever have any discussions with Judge
24 Sappington concerning an attorney whose name was

Page 14

1 Frank Byers?
2    A. I think at some point I did, yes.
3    Q. Your discussion with Judge Sappington
4 concerning Frank Byers, did that relate to an
5 incident that took place in Judge Sappington's
6 courtroom?
7    A. I don't believe so.
8    Q. Tell me about the conversation you had
9 concerning Frank Byers?
10    A. I think that Art said something about he had
11 heard that Missy had met Frank Byers out of town, in
12 another town.
13    Q. What else did the judge tell you about that?
14    A. I think he said he was going to call her in
15 and talk to her and tell her that that was
16 inappropriate because she was married and Frank Byers
17 was married.
18    Q. Did you have any other discussions with
19 Judge Sappington where Missy Schroeder was mentioned?
20    A. I don't remember.
21      MS. McGRATH: I don't have anything further
22 for you, Judge. Thank you.
23      EXAMINATION
24 BY MR. CASSIDY:

Page 15

1    Q. My name is John Cassidy and I represent
2 Macon County. You were a circuit judge; is that
3 correct?
4    A. Correct.
5    Q. You indicated that you were Judge Greanias's
6 I think you used the word right-hand man to the
7 effect that you helped him and assisted in
8 administrative matters; is that correct?
9    A. Correct.
10    Q. Each year Judge Greanias submits a budget to
11 the Macon County Board; is that correct?
12    A. Correct.
13    Q. Are you familiar with that process?
14    A. Sure. The last few years that Judge Scott
15 was the chief judge here, he didn't particularly like
16 to do that, so I did it.
17    Q. Obviously there's a lot of things that go
18 into the judicial budget; the library, the equipment,
19 staff and so forth. When you submitted a budget to
20 the Macon County Board, would you just submit a
21 single bottom line figure?
22    A. No. You normally break it down. At least I
23 did. You would have your different categories, your
24 jury expenses for the juries each month, your

Page 16

1 expenses for the bailiffs, your expenses for the
2 secretaries, your expenses for the county court
3 reporters and you would use -- I would normally show
4 last year's budget and the proposed increase for the
5 next year.
6    Q. And those would just be general. Would the
7 board get involved in the decision making as to how
8 much each bailiff made?
9    A. Absolutely not.
10    Q. Or secretary?
11    A. No. That was within our discretion when he
12 proposed the budget.
13    Q. So basically there would be a total for
14 bailiffs, or a total for judicial clerks, or
15 secretaries, but as far as who and how much each one
16 got would be a decision that was made within the
17 judiciary?
18    A. Correct.
19    Q. Did the board ever deny a budget request
20 that you're aware of?
21    A. In the years past when money was tight, yes.
22 There was a year or two that the staff didn't get any
23 raises I don't think at all or maybe one percent.
24    Q. Under those circumstances or one percent --

Page 17

1 under those circumstances, though, if basically the
2 board said that we just don't have the money for the
3 judicial branch, but it would be the judiciary, Judge
4 Greanias and yourself, if you helped, or Judge Scott
5 who would decide how that lower amount of budget
6 would be divied up. Is that correct?
7    A. Yes and no. They basically said no raises,
8 nobody was getting raises, then we couldn't give our
9 staff raises.
10    Q. Okay. In other words, if the people on the
11 county side weren't getting raises, they would point
12 that out?
13    A. Yes.
14    Q. But if you in fact wanted to give your
15 people raises, again, that would be your decision?
16    A. I don't see how. If the money wasn't there,
17 I don't see how you can give the raises.
18    Q. But as far as the money that was given to
19 you, you determined, as I pointed out, what money
20 went to which judicial clerks and so forth?
21    A. Certainly.
22    Q. Can you tell me the process that you went
23 through when you hired Christina Lees, Christina
24 Boarman now I guess?

Page 18

1    A. Well, I just basically let the word be out
2 among all the county employees and people that I
3 knew, the attorneys, that I was looking for a
4 secretary, and if they knew anyone who was
5 interested, to submit an application with me.
6    Q. Okay. And you did the interviewing,
7 received the application, made the decision on who
8 you would hire; is that correct?
9    A. Yes. But I also called in my court reporter
10 to assist with the interviewing because she was going
11 to have to work closely with that person and I wanted
12 the court reporter to feel that I was selecting a
13 person that she could be comfortable with.
14    Q. Now, the county board side did not get
15 involved in any way with the hiring process?
16    A. They did not.
17    Q. And would you agree as far as control over
18 your staff -- the bailiffs, the secretaries, slash,
19 judicial clerks, I know the titled changed later --
20 the county board had no control over that either on
21 the day-to-day scheduling, operation and so forth; is
22 that correct?
23    A. That's correct.
24    Q. And would you agree there is an important

Page 19

1 reason for that, that the judicial branch has to stay
2 separated from the executive bounds of the county?
3      MS. McNAUGHT: Objection that it asks for any
4 kind of opinion.
5      THE WITNESS: My answer would be yes.
6 BY MR. CASSIDY:
7    Q. That is a separation of power question?
8      MS. McNAUGHT: Objection. That calls for a
9 legal conclusion.
10      MR. CASSIDY: Go ahead and answer.
11      THE WITNESS: My answer would be yes.
12 BY MR. CASSIDY:
13    Q. In fact there are often times that in fact
14 the law requires that if a lawsuit is brought against
15 the county it has to be brought within -- the proper
16 jurisdiction is in those county courts; is that
17 correct?
18      MS. McNAUGHT: Objection. That calls for a
19 legal conclusion.
20      THE WITNESS: I think that's right.
21 BY MR. CASSIDY:
22    Q. So there must be a separation between the
23 county itself and the judiciary because there
24 certainly could be conflict involved. Would you

Page 20

1 agree with that?
2      MS. McNAUGHT: Objection. That calls for a
3 legal conclusion.
4      THE WITNESS: Correct.
5 BY MR. CASSIDY:
6    Q. I take it then if the county board were to
7 come to you and say I want your judicial clerk to do
8 such and such on such and such a day, you would
9 ignore that or -- I'm not sure. You may try to
10 handle it diplomatically, but make sure they did not
11 exercise any such control over your clerks. Would
12 you agree with that?
13    A. Correct.
14    Q. Okay. So the bottom line is the county
15 outside the judicial branch had absolutely no control
16 over the judicial clerks in the performance of their
17 jobs?
18    A. Correct.
19    Q. Now, you indicated also that it appeared
20 that the relationship between Missy, the plaintiff,
21 and Judge Sappington was a good one and that she
22 brought in baked goods or things of that nature up to
23 the date that you recall her leaving; is that
24 correct?

**Page 21**

1   A. Yes.
2   Q. Would you agree based upon your observation
3 that it did not appear that Missy Schroeder was
4 suffering from a hostile work environment while she
5 was here?
6   A. That's correct.
7   Q. You never observed anything that would
8 indicate a hostile work environment to you the entire
9 time that she was here; would you agree with that?
10   A. Not to me.
11   Q. Do you know why Ruth Young was let go?
12   A. Do you want to know the truth?
13   Q. Yes.
14   A. I don't think she was doing a very competent
15 job.
16   Q. How about her relationship with other people
17 and so forth?
18   A. She was very friendly with everyone,
19 everyone got along with Ruth, but it was my
20 understanding that she was getting motion settings
21 improperly on the book and you can't have that. You
22 only have so much time and your time is valuable.
23   Q. There was some difficulty in her job
24 performance?

**Page 22**

1   A. That was my understanding.
2     MR. CASSIDY: I don't have anything else.
3     MS. BARON: No questions.
4     MR. GILLESPIE: No questions.
5     MS. McGRATH: I have a few.
6     MS. McNAUGHT: I need to ask some.
7     EXAMINATION
8 BY MS. McNAUGHT:
9   Q. Just to clarify, The Administrative Office
10 of the Illinois Courts sets policy for judges and
11 their staff; is that correct?
12   A. To my knowledge there was really no policy
13 out until about I am thinking about 1999.
14   Q. I want to talk about in a broad sense, the
15 Administrative Office of the Illinois Courts sets
16 certain policies for judges and other state
17 employees; is that correct?
18   A. I didn't know that they had any set policies
19 until that came out.
20   Q. Probation officers, for example, are state
21 employees; is that correct?
22   A. Correct.
23   Q. And there are certain provisions that
24 probation officers have to comply with under the

**Page 23**

1 rules of The Administrative Office of the Illinois
2 Courts, isn't that correct?
3   A. Yes.
4   Q. That would also be true with court
5 reporters?
6   A. Yes.
7   Q. And that would also be true with judges?
8   A. Yes.
9   Q. Okay. So there are some policies that The
10 Administrative Office of the Illinois Courts proffers
11 that judges and their staff are required to comply
12 with?
13   A. Sure.
14   Q. Okay. Did you know Judge Sappington before
15 he was on the bench?
16   A. Not really.
17   Q. You knew him while he was on the bench?
18   A. Certainly.
19   Q. Did he seem to be interested in people who
20 further their education?
21   A. Sure.
22     MS. McNAUGHT: I have nothing further.
23
24

**Page 24**

1     EXAMINATION
2 BY MS. McGRATH:
3   Q. Judge, am I correct that you were not aware
4 of any sexual harassment policy until 1999?
5   A. If you are going to use the term policy,
6 yes, that's correct. I think everybody expected
7 judges to have good common sense and how to act and
8 how not to act.
9   Q. You mentioned your understanding that Ms.
10 Young was let go because she wasn't performing
11 competently. Where did you get that understanding
12 from?
13   A. Judge Greanias.
14   Q. And Ruth Young had worked for Judge
15 Greanias?
16   A. Yes.
17   Q. And in what capacity?
18   A. I guess you would call it secretary.
19   Q. Okay. If your secretary were making errors,
20 for example, docket entries as you mentioned that
21 Ms. Young was, would you discuss those concerns with
22 her before terminating that person?
23   A. I certainly would.
24   Q. And did Judge Greanias -- well, strike that.

Page 25

1 Tell me as best you recall what Judge Greanias told
2 you about the reason Miss Young was let go?
3   A. Well, you might say there are conflicting
4 statements. One reason was given to her I think not
5 to hurt her feelings, that they just didn't have
6 enough work for her. But he indicated to me that she
7 was not doing a competent job. And I think at that
8 time he was hearing a lot of civil cases, major civil
9 cases, and you have a lot of motions and setting of
10 motions. Some of those were getting jumbled up and
11 he was very disappointed with her performance.
12   Q. Did Judge Greanias tell you one way or the
13 other whether he had discussed his concerns with Ruth
14 Young?
15   A. He did not, but probably -- he is probably a
16 nicer guy than I am. I would have called her in and
17 said that we've got a problem that has to be
18 corrected or I'm going to have to let you go. I
19 don't think his personality is the same as mine.
20   Q. What do you mean by he may be a nicer guy?
21   A. Well, I think when he decided that he was
22 going to let her go, I think he called her in and
23 told her that he just really didn't have enough work
24 for her and therefore he was going to terminate her

Page 26

1 services, so she wouldn't be upset and wouldn't feel
2 bad.
3   Q. And that in your view is being nicer than
4 talking to the employee and trying to work with them
5 to remedy their problems?
6   A. I think that is just John's personality.
7   Q. During the entire time you served as a judge
8 here, are you aware of any other secretary being
9 terminated?
10   A. I can't think of anybody right now.
11   Q. So Ruth Young is the only secretary you're
12 aware of who was terminated for performance problems?
13   A. Correct.
14     MS. McGRATH: I have nothing further, Judge.
15     EXAMINATION
16 BY MR. CASSIDY:
17   Q. I have a follow-up. I should have asked
18 this before. You know Janice Shonkwiler?
19   A. Certainly.
20   Q. What is her position?
21   A. I don't know what her title is.
22 Administrative assistant to the presiding judge
23 probably.
24   Q. Would you agree that Janice Shonkwiler is an

Page 27

1 employee within the judicial branch?
2   A. Yes.
3   Q. In other words, all the questions I asked
4 you previously about the ability of the county board
5 to control the actions of the staff, you would agree
6 that Janice Shonkwiler also would fall outside of
7 their ability to control that?
8   A. Correct.
9   Q. She would be solely controlled by the
10 judiciary?
11   A. Correct.
12     MR. CASSIDY: I have nothing further.
13     MS. McNAUGHT: Signature? Do you want to
14 read or waive?
15     THE WITNESS: I will waive it.

Page 28

1 STATE OF ILLINOIS     )
2 COUNTY OF McLEAN      )
     FEDERAL RULE OF CIVIL PROCEDURE RULE
3         30(f)(1) CERTIFICATE
4     I, KITTY L. MALCOM, C.S.R., a notary public
5 in and for the County of McLean and State of
6 Illinois, do hereby certify that on the 25th day of
7 October, 2001, personally appeared before me at 253
8 East Wood Street, Decatur, Illinois, JERRY PATTON,
9 produced as a witness in said cause.
10     I further certify that said witness was by
11 me first duly sworn to testify the whole truth in the
12 cause aforesaid before the taking of the deposition;
13 that the testimony was reduced to writing in the
14 presence of said witness by means of machine
15 shorthand and afterwards transcribed into
16 typewriting; and that the foregoing is a true and
17 correct record of the testimony given by said
18 witness.
19     I further certify that I am neither counsel
20 for nor related to counsel for any of the parties to
21 this suit, nor am I in any way related to any of the
22 parties to this suit, nor am I in any way interested
23 in the outcome thereof.
24     I further certify that my certificate

SCHROEDER v.SAPPINGTON, et al     CondenseIt!™     JERRY PATTON

Page 29

1  annexed hereto applies to the original transcript and
2  copies thereof, signed and certified by me only. I
3  assume no responsibility for the accuracy of any
4  reproduced copies not made under my control or
5  direction.
6
7      IN WITNESS WHEREOF, I have hereunto set my
8  hand and affixed my notarial seal this 15th day of
9  November, 2001.
10
11  *[signature: Kitty L. Malcom]*
12  Kitty L. Malcom, CSR-RPR
13  1310 E. Ironwood CC Dr.
    Normal, IL 61761
14  (309)454-3378

OFFICIAL SEAL
KITTY L. MALCOM
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7-20-2005