**E-FILED**
Tuesday, 18 January, 2005 03:39:50 PM
Clerk, U.S. District Court, ILCD

# JUDGE JOHN DAVIS

CondenseIt!™                                                                                          JOHN DAVIS

```
                                                    Page 1
IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
        URBANA DIVISION

MELISSA ROBINSON, (f/k/a )
MELISSA SCHROEDER),      )
         Plaintiff,      )
   -vs-                  )  No. 99-2097
JUDGE WARREN A. SAPPINGTON, )
SIXTH JUDICIAL CIRCUIT, (IN )
OFFICIAL CAPACITY AND    )
INDIVIDUALLY)            )
         Defendant,      )
MACON COUNTY,            )
JOHN P. SHONKWILER, CHIEF )
JUDGE, SIXTH JUDICIAL    )
CIRCUIT, MACON COUNTY CIRCUIT )
COURT, MACON COUNTY (IN  )
OFFICIAL CAPACITY AND NOT )
INDIVIDUALLY)            )
         Defendant.      )

     Deposition taken of JOHN DAVIS, on the 13th
day of February, A.D., 2001, at 105 North Center
Street, Bloomington, Illinois, commencing at
approximately 9:00 a.m., before Kitty L. Malcom, a
Notary Public and Certified Shorthand Reporter,
License No. 084-002106, pursuant to Notice.
```

COPY

Page 3

**RECEIVED**
**MAR - 7 2001**
**CASSIDY & MUELLER**

INDEX

WITNESS:

JOHN GREANIAS

Examination by Ms. McGrath............ 4
Examination by Mr. Cassidy............ 47
Examination by Ms. McGrath............ 64
Examination by Ms. McNaught........... 69
Examination by Mr. Cassidy............ 70
Examination by Ms. McGrath............ 75

EXHIBITS:

Exibit Number 1..................... Attached

---

Page 2

```
APPEARANCES:
   Ms. Melissa M. McGrath, Esq.
   THOMSON & WEINTRAUB
   105 North Center St., P.O. Box 3577
   Bloomington, IL 61702-3577
   309/829-7069
       On behalf of Plaintiff

   Ms. Karen McNaught
   Assistant Attorney General
   OFFICE OF THE ATTORNEY GENERAL
   500 So. Second Street
   Springfield, IL 62706
   217/782-5819
       On behalf of Deponent Greanias

   Ms. Diane Baron, Esq.
   CLAUSEN MILLER, P.C.
   10 So. LaSalle Street
   Chicago, IL 60603-1098
   312/855-1010
       On behalf of Judge Shonkwiler

   Mr. Robert Gillespie, Esq.
   HINSHAW & CULBERTSON
   400 So. Ninth Street, Suite 200
   Springfield, IL 62701
   217/528-7375
       On behalf of Judge Shonkwiler

   Mr. John E. Cassidy, Esq.
   CASSIDY & MUELLER
   323 Commerce Bank Bldg.
   416 Main Street
   Peoria, IL 61602
   309/676-0591
       On behalf of Macon County
```

MALCOM REPORTING SERVICE
1310 Ironwood CC Drive
Normal, IL 61761
(309) 454-3378
Fax (309) 454-8286

Page 4

1          JOHN DAVIS
2 called as a witness, after being first duly sworn,
3 was examined and testified upon his oath as follows:
4
5          EXAMINATION
6 BY MS. McGRATH:
7     Q. Sir, could you state your name for the court
8 reporter?
9     A. John Davis.
10    Q. And you are here today, are you not, under
11 subpoena which was served upon you as Judge John
12 Davis?
13    A. It's addressed to The Honorable Judge John
14 L. Davis and it was not served upon me personally.
15    Q. Okay.
16    A. I did not receipt for it.
17    Q. I'm sorry?
18    A. I did not receipt for it.
19    Q. Let me indicate for the record I'm going to
20 be asking you a series of questions. If I ask you
21 something that you don't understand, please ask me to
22 reword it. Okay?
23    A. Yes.
24    Q. If you want to take a break at any time,

Page 5

1 certainly let me know and we can do that. Okay?
2  A. Fine.
3  Q. Finally, if you can try to wait until I've
4 asked the full question, there are going to be times
5 when I ask you something and you are going to know
6 what your response is before I get the question out.
7 If you can wait so that the court reporter records
8 what I have asked as well as what you've responded.
9 Okay?
10  A. Yes.
11  Q. There's another finally, though. Do try to
12 answer verbally as opposed to any nod of the head so
13 the court reporter properly records your responses.
14 Okay?
15  A. Yes.
16  Q. You were asked, were you not, to bring with
17 you this morning any and all notes, memorandum or
18 material in any written form or verbal form which in
19 any way related to plaintiff's claim of sexual
20 harassment.
21  A. I was.
22  Q. Have you brought any documents responsive to
23 that?
24  A. I brought with me some documents that were

Page 6

1 furnished to me by Karen McNaught.
2  Q. Can I see those documents? The documents
3 you have brought with you this morning include a
4 document entitled Inter-office memorandum to Judge
5 Greanias from you dated November 15, 1996, and there
6 was apparently a transcript attached to it. Is that
7 accurate, sir?
8  A. That's correct.
9  Q. Other than that document, do you have in
10 your possession any other documents responsive to the
11 subpoena?
12  A. I have none that I'm aware of.
13  Q. We will at a break copy that and mark it as
14 an exhibit and then we can talk about that.
15    MS. McNAUGHT: Just for the record, they are
16 documents that have already been introduced into
17 previous depositions and also been produced on
18 previous occasions without of course the fax
19 information on top.
20    THE WITNESS: I detached the letter that you
21 sent to me. I thought that was between you and me.
22 BY MS. McGRATH:
23  Q. That's fine. By you and me you are
24 referring to Ms. McNaught, your attorney here?

Page 7

1  A. Yes.
2  Q. Sir, are you currently a circuit court
3 judge?
4  A. I am not.
5  Q. And perhaps I should have started out with
6 were you a circuit court judge?
7  A. I was.
8  Q. In what county?
9  A. I was in the Sixth Circuit, a full circuit
10 judge.
11  Q. Did you sit in a particular county?
12  A. I was primarily assigned to Macon County.
13  Q. How long were you a Sixth Circuit judge?
14  A. I was elected to the circuit court in 1982 I
15 believe.
16  Q. How long did you sit as a Sixth Circuit
17 judge?
18  A. From that date until I retired.
19  Q. Can you tell me when you retired?
20  A. I believe it was January 1999, but I'm not
21 exactly certain of the date.
22  Q. Okay. And how are you currently employed?
23  A. Self-employed.
24  Q. In what capacity?

Page 8

1  A. Practicing attorney.
2  Q. While you were a circuit judge, sir, did you
3 become aware of a judicial clerk by the name of
4 Melissa Schroeder?
5  A. Would you explain what you mean by become
6 aware of?
7  Q. Well, let me try to reword the question. Do
8 you know of a person by the name of Melissa
9 Schroeder?
10  A. Yes.
11  Q. And how do you know a person by the name of
12 Melissa Schroeder?
13  A. She was employed by the Circuit Court of
14 Macon County, I believe.
15  Q. Do you know in what capacity?
16  A. I believe she was a clerk, but I did not
17 hire her.
18  Q. Do you know if she worked with anyone in
19 particular within the Macon County Circuit Court?
20  A. I'm sorry, what do you mean by anyone in
21 particular.
22  Q. Let me reword the question. Do you have any
23 understanding of what Melissa Schroeder's job duties
24 were while she was employed within the Circuit Court

Page 49

1  A. I think Judge Gulley had retired at that
2  time and I think it was -- I don't know if it was Bob
3  Davison or his successor. I would have to try to go
4  back and piece it together. It was Judge Gulley,
5  then it was Bob Davison, then it was the current.
6     MS. McNAUGHT: No.
7     THE WITNESS: It wasn't?
8     MS. McNAUGHT: It was Judge Holdridge for a
9  time.
10    THE WITNESS: Oh, was it? Okay. Who is it
11 now?
12    MS. McNAUGHT: I'll think of it.
13    THE WITNESS: But I'm trying to think of when
14 it was Roy retired. Holdridge or Davison I think.
15 But it might have been -- I can't think of his name,
16 the man who has it presently. I do know that he came
17 in under Chief Justice Bolandic. So whenever Judge
18 Bolandic came in.
19 BY MR. CASSIDY:
20    Q. What are the functions of the administrative
21 officer in the administrative office?
22    A. To carry out the rules of the Supreme Court
23 with respect to the administration of the courts
24 throughout the state.

Page 50

1  Q. And then how about below that level?
2  A. Below that you have the appellate courts and
3  each court has a presiding justice. Actually
4  justices is a misnomer because the only justice
5  provided is the chief justice of the Supreme Court.
6  All the rest are judges. So you have judges of the
7  appellate court, there's a presiding judge. Again,
8  each district I think has its own rules with respect
9  to how they are selected. The appellate courts have
10 no direct administrative responsibilities over any
11 court except themselves.
12    Then it goes down to the circuit courts.
13 Each circuit has a chief judge. Each circuit has
14 their own methods and rules for how long a chief
15 judge can serve. In our circuit, I think in the
16 history of the Sixth Circuit there has only been four
17 chief judges. Most of the circuits rotate between
18 the circuit judges serving for one or two years, but
19 the Sixth has never done that. Traditionally it's
20 always been the oldest circuit judge, and by that I
21 mean seniority.
22    Q. Is that Judge Shonkwiler?
23    A. It is now Judge Shonkwiler.
24    Q. At the time it was?

Page 51

1  A. Rodney Scott.
2  Q. It would have been in '96?
3  A. It was Shonkwiler.
4  Q. Was he elected to that position in some
5  manner?
6  A. By the circuit judges, by a majority of the
7  circuit judges.
8  Q. Then what are his administrative functions
9  as you understand them?
10 A. Well, I suppose technically the chief judge
11 has total administrative power, but in our circuit
12 traditionally each county has been left to handle its
13 own internal administration. That goes with respect
14 to personnel, assignment of personnel, compensation
15 of county employees who work for the courts.
16 Q. Well, I'm going to get to county employees
17 that work for the courts, but keep going down. The
18 chief judge. Then would the next level be the
19 presiding judge of each county?
20 A. Yes.
21 Q. How is the presiding judge elected or
22 appointed?
23 A. By the chief judge. In four of the six
24 counties there's no choice because there's only one.

Page 52

1  Champaign and Macon have more, so the chief judge
2  appoints a presiding judge.
3     Q. Now, the presiding judge according to at
4  least Judge Greanias when we took his deposition said
5  that he has no really control over the other circuit
6  judges. He may suggest something but there is
7  nothing he can do. Is that your understanding that
8  there is no disciplinary power or directive from the
9  presiding judge to the chief judges?
10    A. Are you talking administratively or
11 judicially?
12    Q. Well --
13    A. There is a big difference in my opinion.
14    Q. You might be right. How about
15 administratively, what power?
16    A. Administratively I think he had the power to
17 assign personnel. There's a lot of things that --
18 it's a difficult question to answer because, again, a
19 lot of what we did in Macon County was traditionally
20 done under Judge Rodney Scott who happened to be the
21 chief and presiding judge for many, many, many years
22 when I started. And Judge Scott had a different way
23 of doing things than Greanias. Judge Scott pretty
24 well let us -- that's when we hired and fired our own

Page 53
1 people. Judge Greanias came along and changed that.
2  Q. How did he change it?
3  A. He wanted it done through his office.
4  Q. So his office, the presiding judge would
5 hire and fire?
6  A. Yeah. But that is not complete. I mean, he
7 didn't come in and make a blank change, let me put it
8 that way. It was kind of an attrition kind of thing.
9 He pretty well let the circuit judges particularly
10 hire their own people.
11  Q. Would that include judicial clerks?
12  A. Yes, when they were working for us.
13  Q. Right. But once they were hired as judicial
14 clerks he would have the right to reassign them
15 between judges?
16  A. The presiding judge always had that power.
17 Whether he exercised it was within his individual
18 discretion. And Judge Greanias never tried to tell
19 me who I could hire or fire. I don't think he did
20 with respect to any of the other people, including
21 associate judges, who had long-standing offices in
22 personnel. Now, how Ms. Schroeder came on board I
23 don't know. I don't know whether Greanias hired her
24 or whether Sappington hired her. I don't know. She

Page 54
1 could have been hired by the circuit clerk herself.
2  Q. You don't know?
3  A. I have no idea.
4  Q. Because you indicated at some time in the
5 distant past the circuit clerk would hire these
6 people, but --
7  A. After Judge Greanias I think came in, I
8 think the clerks themselves actually became employed
9 through the clerk's office. I'm guessing now. But I
10 think that's what happened.
11  Q. I understand it's a guess. Who, though, who
12 makes the final decision of hiring and firing within
13 the judicial branch of Macon County?
14  A. Judge Greanias kind of kept to himself. I
15 don't know if it was a joint decision of him and Ms.
16 Hott, who was the circuit clerk, or if it was Judge
17 Greanias himself who made the decision on new
18 personnel. I don't know the answer to that question.
19  Q. So you don't know?
20  A. I don't know.
21  Q. And we would have to ask Judge Greanias?
22  A. I do know that Judge Greanias in terms of
23 talking about when pay raises were coming up, that he
24 worked with Ms. Hott in obtaining salary increases

Page 55
1 for her personnel. But at that time we had -- see,
2 that's when we had secretaries who became clerks.
3 Secretaries had been hired by the courts and then
4 they were transferred into the Circuit Clerk's
5 Office.
6  Q. Would the county board in any way get
7 involved in the hiring and firing of judicial
8 personnel?
9  A. No.
10  Q. So the only possible non-judicial branch
11 personnel that would get involved, and again you
12 don't know who, it might have been the circuit clerk?
13  A. Correct.
14  Q. But as far as the county itself --
15  A. The county had no control over who we hired
16 or fired. The county board only set budgets.
17  Q. Right. Is this your understanding -- if you
18 don't know, let me know -- what Judge Greanias said
19 was every year he would submit a total budget for the
20 county board to approve payment of salaries and
21 expenses and so forth for these personnel, and
22 running the court, but the actual decision of what
23 amount from that total budget was to be paid to each
24 individual or each function was made within the

Page 56
1 judicial branch. Is that your understanding?
2  A. Again, Judge Greanias wasn't very open on
3 telling us how he did that. If he said that, then I
4 assume that's the case. Now, under Judge Scott, he
5 gave portions of the budget to each of us to come up
6 depending upon what our assignment was. For example,
7 I was assigned in the juvenile division for quite
8 some time. Under the juvenile division we had
9 probation officers, and I was required by Judge Scott
10 to submit a budget for the juvenile court every year
11 to the county board.
12  Q. Would that be a total number that then you
13 would divide up?
14  A. No. We fixed our salaries within that
15 budget.
16  Q. Would it be fair to say that the only thing
17 you submitted to the county board then would be
18 payment numbers and maybe benefits such as insurance
19 and comp?
20  A. Benefits we had nothing to do with.
21  Q. Right.
22  A. The only thing we did was raises.
23  Q. Other than the payment of pay and benefits,
24 are you aware of any other area that the county board

Page 57

1  would get involved in in regards to running the
2  judicial portion?
3    A. The county board never attempted to
4  intervene in how the courts were run.
5    Q. Would it be fair to say that -- well, this
6  is a basic question, but would you agree obviously
7  the judicial branch is a separate branch of
8  government, one of three branches under Illinois law?
9    A. I would agree with that.
10   Q. Pretty basic. And you would agree then that
11 there might be separation of power problems if the
12 county board started directing judges on what they
13 could and couldn't do and things of that nature as
14 far as running their staff and their courtrooms?
15   A. Most definitely.
16       MS. McNAUGHT: Objection to the extent that
17 it asks for a legal conclusion.
18 BY MR. CASSIDY:
19   Q. I believe -- objection noted. And there's a
20 legitimate separation of powers issue involved why
21 that must be so. Would you agree with that?
22       MS. McNAUGHT: Same objection.
23       MR. CASSIDY: You can answer.
24       THE WITNESS: Yes.

Page 58

1  BY MR. CASSIDY:
2    Q. And in regards to policies such as sexual
3  harassment, would you agree that the county board
4  didn't get involved in that also?
5        MS. McNAUGHT: Same objection.
6        THE WITNESS: I don't believe -- I don't
7  believe the county board did. I don't believe they
8  did. With respect to other county offices, I don't
9  know. With the judicial area, no.
10 BY MR. CASSIDY:
11   Q. I'm only speaking of the judicial branch and
12 non-judicial members such as staff and clerks.
13   A. I don't recall anything coming from the
14 county board with respect to sexual harassment.
15   Q. But you do recall The Administrative Office
16 issuing its sexual harassment policy?
17   A. I think that's where it came from. I'm not
18 sure.
19   Q. I am going to show you what has been
20 previously marked Exhibit Number 1 in Janice
21 Shonkwiler's deposition and ask you if this is the
22 policy you referred to earlier in your deposition?
23   A. Yes, I believe it is.
24   Q. Now, that particular policy as you note is

Page 59

1  dated May of '93; is that correct?
2    A. Down here at the bottom of Page 1, yes.
3    Q. In fact every page has that date on it.
4    A. Okay.
5    Q. Does that in any way help you recall when
6  that might have been passed out?
7    A. I'm sure it would have been at the time that
8  we received it, which would have been about that
9  date.
10   Q. Then when you received it, you indicated
11 that the clerk and the non-judicial members of your
12 branch, the bailiffs and staff and so forth, would
13 have become aware of it either through posting or
14 directly having them handed it?
15   A. Yes.
16   Q. It's your recollection that it would have
17 been in 1993 or sometime in that area?
18   A. Again, if that is what the date bears, so
19 I'm assuming that's when it was distributed.
20   Q. You're sure that members of the staff such
21 as judicial clerks and so forth received it because
22 you remember them joking about some of the provisions
23 in there and so forth?
24   A. That is my recollection.

Page 60

1    Q. Now, concerning disciplining judges, in this
2  case as you know Judge Sappington is being accused of
3  sexual harassment.
4    A. Yes.
5    Q. Concerning disciplining a judge in regards
6  to his conduct towards one of his staff members, in
7  this case I believe you testified that Mrs. Schroeder
8  was assigned to act as judicial clerk. Would you
9  agree that that disciplinary action would go through
10 the presiding judge and would not involve the county
11 board?
12   A. I would agree that it would not involve the
13 county board.
14   Q. I believe the way you indicated or at least
15 on that memo, there was a pecking order that you
16 thought when a judge needed to be corrected or
17 disciplined, that you would take it up the line. In
18 this case the memo was written to Judge Greanias as
19 presiding judge.
20   A. I hope I did not give the impression by this
21 memo that I intended for Judge Greanias or would
22 suggest that Judge Greanias had any disciplinary
23 authority. If I inferred that, that was not my
24 intent. I don't believe that Judge Greanias had

**Page 61**

1 disciplinary authority over any judge, whether it
2 would be a circuit judge, or associate judge, or
3 appellate judge, or a supreme court judge. I do
4 believe, however, that he had administrative
5 authority that would have permitted him to discuss
6 this situation. I don't know whether -- the point
7 about this memo is I don't know. It could very well
8 have been that Missy Schroeder was acting completely
9 on her own.
10   Q. Right.
11   A. I don't mean to infer that Judge Sappington
12 authorized her to do this in any way.
13   Q. I didn't mean to suggest that.
14   A. But I do think it called for an
15 administrative function and that was the presiding
16 judge's responsibility. That is why I sent the memo.
17   Q. I'm going to the procedure for reporting a
18 problem of sexual harassment that was passed out from
19 the Supreme Court of Illinois that says an employee's
20 complaint of sexual harassment may be reported to his
21 or her immediate supervisor, a higher supervisory
22 authority, or the EEO officer of The Administrative
23 Office.
24   A. Okay.

**Page 62**

1   Q. First of all, who in your opinion would have
2 been Melissa Schroeder's immediate supervisor?
3   A. I don't know.
4   Q. Would you agree it would be no one at the
5 county level outside of the judicial branch?
6     MS. McNAUGHT: Objection to the extent that
7 it calls for a legal conclusion.
8     THE WITNESS: My understanding is it would
9 have been within the judiciary or the Circuit Clerk's
10 Office.
11 BY MR. CASSIDY:
12   Q. Okay. Why do you include the clerk's --
13   A. Because I'm not sure who she works for. I'm
14 not sure if she was employed by the circuit court
15 office or under the circuit court's budget. I just
16 don't know.
17   Q. Let me ask you this. Who would know?
18   A. Judge Greanias.
19   Q. Anybody else in the Circuit Clerk's Office?
20   A. Kathy Hott.
21   Q. Who is the circuit clerk?
22   A. The county board would know. I would think
23 the chief judge. I don't know.
24   Q. Then it says a higher supervisory authority.

**Page 63**

1 Do you know who that would include?
2   A. No.
3   Q. And of course we already talked about the
4 administrative office.
5   A. Uh-huh.
6   Q. Okay. But you would agree this appears to
7 be the hierarchy that is within the judicial branch
8 as you describe it; is that correct?
9   A. That's correct. But again referring to my
10 memo, my memo has nothing to do with sexual
11 harassment.
12   Q. I understand. My question was directed
13 strictly to sexual harassment. Okay. Let's assume
14 that someone has a complaint concerning your conduct
15 in regards to your judicial clerk in your situation.
16 If a county board member or the county initiated some
17 directive instructing you to cease and desist or so
18 forth, would you feel that you would have to follow
19 that directive in any manner or would you feel that
20 that would have to be coming from within the judicial
21 branch because it's a separation of power question?
22     MS. McNAUGHT: Objection to the extent that
23 it calls for a legal conclusion.
24     THE WITNESS: Would I feel the county --

**Page 64**

1 would I feel subject to their authority?
2 BY MR. CASSIDY:
3   Q. Yes.
4   A. No.
5   Q. Okay. And can you explain why not?
6   A. Because, as you say, to the separation. The
7 county board has authority only to set -- to deal
8 with dollars.
9   Q. And do you recognize that there would be
10 problems if they had more authority than dealing with
11 dollars in regards to the way judges acted in their
12 capacity as judges --
13     MS. McNAUGHT: Objection to the extent --
14     MR. CASSIDY: -- and the treatment of their
15 judicial staff? Now.
16     MS. McNAUGHT: Object to the extent that it
17 calls for a legal conclusion.
18     THE WITNESS: That situation would probably
19 find itself on the doorstep of the United States
20 Supreme Court very quickly.
21 BY MR. CASSIDY:
22   Q. Because of the separation of power question?
23     MS. McNAUGHT: Same objection.
24     MS. CASSIDY: Okay. Thank you.

**Page 65**

1  MS. BARON: No questions.
2  MS. McNAUGHT: No questions.
3  MS. McGRATH: I have a few follow-up
4  questions.
5  EXAMINATION
6  BY MS. McGRATH:
7  Q. Mr. Davis, you were asked about the sexual
8  harassment policy which was part of -- which is
9  Exhibit 1 of the deposition of Janice Shonkwiler.
10 The policy is dated May 1993. I believe we already
11 established that. Can you tell me if you know where
12 that policy was posted?
13  A. I need to ask a question. Does the policy
14 require a posting? I don't know. It's been -- if it
15 requires a posting, it was posted. If it doesn't
16 requiring a posting, it was probably just circulated.
17 I don't have a recollection.
18  Q. Okay. Am I correct then that you have no
19 recollection that that policy was posted?
20  A. I do know that it was made known to all
21 staff. How it was made known, I don't know.
22  Q. How do you know it was made known to all
23 staff?
24  A. Because I remember the staff talking about

**Page 66**

1 it.
2  Q. Do you specifically recall that the staff
3 talked about the sexual harassment policy in May of
4 1998 -- I'm sorry, May of 1993 as opposed to May of
5 1997?
6  A. No. I don't remember when they talked about
7 it, but I do remember they talked about it. I do
8 remember it came up from time to time.
9  Q. What do you mean it came up from time to
10 time?
11  A. Jokes from as many female staff as male
12 staff. They joked about it.
13  Q. Am I correct that the policy may not have
14 been distributed to staff before May of 1997?
15  A. No, I don't think you are. I think that we
16 would have distributed this as soon as we received
17 it. When something came from the Supreme Court, it
18 got passed around.
19  Q. And do you know specifically that it was
20 passed around to staff of the judges?
21  A. I know that my staff was aware of it. How
22 it was distributed -- again, if it came down as an
23 administrative directive that it was to be posted
24 publicly, then that directive would have been

**Page 67**

1 followed. On the other hand, if it was just to be
2 circulated, then it was circulated. Whatever the
3 court said or The Administrative Office said as to
4 how it would be distributed, that's what was done.
5  Q. Sir, you do not know, do you, that each
6 judicial clerk received the sexual harassment policy
7 as of May of 1993?
8  A. All I can speak to is my staff.
9  Q. Is it your testimony that you know that your
10 staff received a copy of the sexual harassment policy
11 in May of 1993?
12  A. Do I know for a fact that they did?
13  Q. Yes.
14  A. I have no recollection that they did, but I
15 feel confident that if I was directed to give it to
16 them, that I did it. I did what the Supreme Court
17 and Administrative Office told me to do. If they
18 told me to distribute it, I did it. If it came from
19 the chief judge's office, then it came from the chief
20 judge's office. But I do know that my staff was
21 aware of it.
22  Q. Are you familiar with a Janice Shonkwiler?
23 Have you ever heard of that person before?
24  A. Sure, yes.

**Page 68**

1  Q. Do you know what, if any, role Mrs.
2 Shonkwiler played in investigating reports of sexual
3 harassment?
4  A. I have no idea. She is an administrative
5 assistant to the chief judge. I don't know what
6 responsibilities she was given by the chief judge.
7 You are talking about Janice Shonkwiler?
8  Q. Yes.
9  A. Now, wait a minute. No, I'm thinking it was
10 somebody else.
11  Q. Is --
12  A. Janice Shonkwiler was a clerk, right? She
13 worked for Judge Greanias.
14  Q. Do you recall her working for Judge
15 Greanias?
16  A. I had her confused with Judge Shonkwiler's
17 administrative assistant. Sorry.
18  Q. Janice Shonkwiler, would you have any idea
19 -- would you know what her responsibilities were with
20 regard to investigating reports of sexual harassment?
21  A. No. By the way, the third party that I
22 referred to earlier this morning that went to lunch
23 with Missy, I couldn't recall her name at the time.
24  Q. Janice Shonkwiler?

Page 69

1  A. Uh-huh. I believe we're talking about the
2  same person.
3  Q. As opposed to a Ruth Young?
4  A. You're right. I'm sorry. Ruth Young.
5  Q. It would have been Ruth Young who went to
6  lunch with Judge Sappington?
7  A. Now I've got them straight. It was Ruth
8  Young who went to lunch. She was I think Judge
9  Greanias' clerk. Janice Shonkwiler is Judge
10 Greanias' administrative assistant. Right? Now I've
11 got them straight.
12 Q. Having gotten them straight, can you
13 indicate any further as far as any knowledge that you
14 would have with regard to Janice Shonkwiler's
15 responsibilities in investigating claims of sexual
16 harassment?
17 A. No.
18   MS. McGRATH: I have nothing further.
19       EXAMINATION
20 BY MS. McNAUGHT:
21 Q. I want to clear up a couple of things.
22 Kathy Hott is the -- or was the circuit clerk of
23 Macon County in or about the 1996 time frame?
24 A. I am pretty sure he was.

Page 70

1  Q. Joe Shelasy was the name of the director of
2  the Administrative Office of the Illinois Courts?
3  A. Right.
4  Q. When you were being asked questions by
5  Mr. Cassidy about whether judicial clerks were county
6  employees or state employees, you weren't trying to
7  give any kind of a legal opinion, were you?
8  A. No. They were never state employees. The
9  only state employees were court reporters, and not
10 all of them were.
11 Q. If you had seen any kind of inappropriate
12 behavior by Judge Sappington towards any female,
13 would you have talked to Judge Sappington about it?
14 A. I think that I would. I felt that I -- I
15 think I knew him well enough personally that I would
16 have done that, yes.
17   MS. McNAUGHT: Nothing further.
18       EXAMINATION
19 BY MR. CASSIDY:
20 Q. A few follow-up questions. Concerning
21 judicial clerks, then you indicated they weren't state
22 employees, they were county employees, or you said
23 you are not sure. What are you basing that on; just
24 who they receive their paychecks from?

Page 71

1  A. Yes.
2  Q. Is there anything else that you are basing
3  that upon beyond who they receive their paycheck
4  from?
5  A. So far as whether they were state or county
6  employees?
7  Q. Yes.
8  A. The only state employees in the judiciary at
9  the circuit court level are judges and court
10 reporters.
11 Q. Okay. And is that based upon where -- when
12 you use the word state employees, are you just basing
13 that upon who provides their paycheck?
14 A. No. I am basing it on the fact of who their
15 employers are.
16 Q. Then what do you mean by who their employers
17 are? I know it's a very -- this is a complicated
18 area and I understand that.
19 A. With respect to judges it's kind of easy
20 because we are constitutionally elected or appointed
21 officers, so our employer is the state of Illinois.
22 Court reporters is a position created by an
23 administrative rule of the Supreme Court and they are
24 or most of them were state employees.

Page 72

1  Q. By that you mean the state paid them?
2  A. They paid them. They also were subject to
3  The Administrative Office and their rules of conduct,
4  their professionalism. They were required to attend
5  an annual seminar just like we were. It was all
6  through The Administrative Office.
7  Q. Let's go to judicial clerks. Let's not go
8  to the issue of pay, who paid them because I think we
9  understand where that comes from. Let's go to the
10 question of control. Would you agree that the person
11 who gave the day-to-day directives to the judicial
12 clerk would be the judge who they were assigned to?
13 A. Again, that became a gray area after Judge
14 Scott retired. When Judge Scott was the chief judge,
15 the answer to your question would have been easy. It
16 would have been an absolute yes. We had control over
17 them.
18 Q. Each circuit judge?
19 A. Each circuit judge. But at that time they
20 also weren't employed through the Circuit Clerk's
21 Office I don't believe. We had the power to hire our
22 own secretary, we had the power to fire our own
23 secretary.
24 Q. And --

Page 73

1  A. And then when Judge Greanias became chief
2 judge he gradually started implementing a policy
3 where he took over control of who was hired and
4 fired.
5  Q. Which would still be --
6  A. But I think he did that in conjunction with
7 the Circuit Clerk's Office.
8  Q. Why do you think that?
9  A. Only because of his comments about working
10 with Ms. Hott during the budget in order to set
11 salaries.
12  Q. That goes to salaries. I'm talking the
13 hiring and firing.
14  A. I assume that. Just a conclusion on my
15 part.
16  Q. And I guess we've got to be careful about
17 just assumptions here. Would you agree, though, that
18 under Judge Scott each circuit judge had the decision
19 to hire and fire and the day-to-day control over
20 their actions? Would you --
21  A. Yes.
22  Q. As far as you know after Judge Greanias that
23 Judge Greanias would get involved on the hiring and
24 firing, you do know that?

Page 74

1  A. Uh-huh.
2  Q. But as far as the day-to-day operations of
3 what a judicial clerk would do, that would still be
4 within each judge's --
5  A. Again there was a transitory period. For
6 example, it's not today like it was when I was there
7 just two years ago. As I understand now, for
8 example, in court all the clerks take what I always
9 called docket entries, now called minute entries. My
10 clerk never did that before. My court reporter did
11 it because that is the way that I preferred that it
12 would get done because it was quicker. Now, as I
13 understand it, there is a rule that all the clerks
14 are required to do minute entries.
15  Q. Did that come from?
16  A. Came from Judge Greanias.
17  Q. Again, the judicial branch?
18  A. Yes.
19  Q. In regard to the day-to-day control or the
20 decisions to hire and fire, not payment, would you
21 agree that the county board would not get involved in
22 those decisions?
23  A. You want to object?
24  MS. McNAUGHT: No.

Page 75

1  THE WITNESS: I would agree with that.
2  EXAMINATION
3 BY MS. McGRATH:
4  Q. I have one or two questions. Do you know
5 whether Janice Shonkwiler was involved in the
6 day-to-day control of what judicial clerks did?
7  A. Do I know or you want to know what I
8 believe?
9  Q. I want to know what you know.
10  A. What I know, I don't know.
11  MS. McGRATH: That's the only questions I
12 have.
13  REPORTER: Signature?
14  (Whereupon discussion was held off the
15 record.)
16  MS. McNAUGHT: Reserve.

Page 76

1 RE: MELISSA ROBINSON v. JUDGE WARREN SAPPINGTON,
    et al
2   USDC (Urbana) # 99-2266
    Attys. Baron, Cassidy, Gilespie, McGrath,
3   McNaught

4       SIGNATURE SHEET

5 STATE OF ILLINOIS )
                    )
6 COUNTY OF McLEAN  )

7
     I, JOHN DAVIS, do hereby certify, having
8 read the foregoing deposition, that said transcript
  is a true and accurate recording of the proceedings
9 had on the 13th day of February, 2001, including
  corrections and/or amendments noted on the Errata
10 Sheet attached, if any.

11

12    JOHN DAVIS

13    DATE:

14

15

16
  SUBSCRIBED and SWORN to
17 before me this ____ day
   of _____
18 A.D., 2001.

19 _____
   Notary Public
20

21

22

23

24