E-FILED
Tuesday, 18 January, 2005  03:40:40 PM
Clerk, U.S. District Court, ILCD

# JUDGE JOHN GREANIAS

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MELISSA ROBINSON, (f/k/a
MELISSA SCHROEDER),
    Plaintiff,
    -vs-          No. 99-2097
JUDGE WARREN A. SAPPINGTON,
SIXTH JUDICIAL CIRCUIT, (IN
OFFICIAL CAPACITY AND
INDIVIDUALLY)
    Defendant
MACON COUNTY,
JOHN P. SHONKWILER, CHIEF
JUDGE, SIXTH JUDICIAL
CIRCUIT, MACON COUNTY CIRCUIT
COURT, MACON COUNTY (IN
OFFICIAL CAPACITY AND NOT
INDIVIDUALLY)
    Defendant.

COPY

Deposition taken of JUDGE JOHN K. GREANIAS, on the 27th day of January, A.D., 2001, at Baymont Inns, 5100 Hickory Point Frontage Road, Decatur, Illinois, commencing at approximately 9:30 a.m., before Kitty L. Malcom, a Notary Public and Certified Shorthand Reporter, License No. 084-002106, pursuant to Notice.

MALCOM REPORTING SERVICE
Kitty L. Malcom, CSR, RPR
1625 Gregory
Normal, IL 61761-2325
(309) 454-3378

**Page 2**

APPEARANCES:
  Ms. Melissa M. McGrath, Esq.
  THOMSON & WEINTRAUB
  105 North Center St., P.O. Box 3577
  Bloomington, IL 61702-3577
    On behalf of Plaintiff

  Ms. Karen McNaught
  Assistant Attorney General
  OFFICE OF THE ATTORNEY GENERAL
  500 So. Second Street
  Springfield, IL 62706
    On behalf of Deponent Greanias

  Ms. Diane Baron, Esq.
  CLAUSEN MILLER, P.C.
  10 So. LaSalle Street
  Chicago, IL 60603-1098
  312/855-1010
    On behalf of Judge Shonkwiler

  Mr. Bradley Blodgett, Esq.
  HINSHAW & CULBERTSON
  400 So. Ninth Street, Suite 200
  Springfield, IL 62701
    On behalf of Judge Shonkwiler

  Mr. John E. Cassidy, Esq.
  CASSIDY & MUELLER
  323 Commerce Bank Bldg.
  416 Main Street
  Peoria, IL 61602
    On behalf of Macon County

*****************************************

INDEX

WITNESS:
  JOHN GREANIAS
    Examination by Ms. McGrath ........... 3
    Examination by Mr. Cassidy ........... 104
    Examination by Ms. McNaught ......... 115
    Examination by Mr. Cassidy ........... 126

EXHIBITS:
  Exhibit Number 1 .................... Attached
  Exhibit Number 2 .................... Attached

**Page 3**

1              JOHN GREANIAS
2 called as a witness, after being first duly sworn,
3 was examined and testified upon his oath as follows:
4
5              EXAMINATION
6 BY MS. McGRATH:
7   Q. Judge Greanias, could you spell your name
8 for the court reporter, please?
9   A. G-R-E-A-N-I-A-S.
10   Q. And you are represented by counsel here
11 today?
12   A. I believe so, yes. Karen McNaught.
13   Q. Thank you. Judge, I'm sure you're probably
14 familiar with these directions, so I will be brief.
15 I am going to be asking you some questions today. If
16 I ask you something that you don't understand, please
17 ask me to reword it. Okay?
18   A. Certainly.
19   Q. Do answer the questions verbally as opposed
20 to a nod of the head so that the court reporter gets
21 your responses down.
22   A. Yes.
23   Q. If you want to take a break at any time,
24 please let me know.

**Page 4**

1   A. Thank you.
2   Q. There's also going to be times when I'm
3 asking you a question and you know the answer before
4 I have even finished talking. Please let me finish
5 the question before you start talking for the court
6 reporter to get us both down. Okay?
7   A. I will do my best.
8   Q. Thank you. Your current position within the
9 Macon County Circuit Court is what?
10   A. Presiding judge.
11   Q. How long have you been the presiding judge
12 there?
13   A. Approximately six years.
14   Q. That would take us back to 1995?
15   A. I believe it started in December of '94.
16   Q. As the presiding judge, are your duties
17 distinct from the other judges within the county?
18   A. I have a full court calendar just like every
19 judge, and in addition I am responsible for the
20 administrative decisions of the court in Macon
21 County.
22   Q. As the presiding judge, do you have
23 responsibilities with regard to supervision of the
24 other judges within Macon County?

Page 5

1  A. I assign them work. I assign them work
2  spaces.
3  Q. Any other duties with regard to --
4  A. To the judges?
5  Q. -- the other judges, yes.
6  A. Not really.
7  Q. If an employee of the Macon County Circuit
8  Court reported concerns about another judge, do you
9  have any role in addressing those concerns?
10  A. Yes.
11  Q. What would that role be?
12  A. I would talk to the employee and I would
13  resolve the problem if I could.
14  Q. In 1996, as the presiding judge, what if any
15  responsibilities did you have over judicial clerks?
16  A. Well, not much. At that time each judge
17  hired his own clerk. If a judge was without a clerk,
18  then either I or my administrative assistant would
19  make sure that the judge had another clerk from
20  somewhere else. We would replace a clerk that was
21  unavailable.
22  Q. Okay.
23  A. I did set work hours for clerks. I
24  initiated time sheets for clerks so that there would

Page 6

1  be an accurate reporting of when they were there. I
2  set up a system for recording absences and some
3  policies on requesting absences. We didn't have any
4  formal structure before I became presiding judge.
5  Q. Anything else?
6  A. Right now I can't think of anything else.
7  Q. If you think of anything else during the
8  course of the deposition, please let me know.
9  A. I will.
10  Q. The policies that you initiated, were those
11  in writing?
12  A. There was an instruction sheet for the time
13  sheets, how to fill them out. I assume that from
14  time to time we had a memorandum to address a
15  particular issue that came up, but I can't recall any
16  of those right now.
17  Q. Was there a written policy in 1996 for
18  leaves of absence?
19  A. I don't recall.
20  Q. Is there a written policy currently for
21  leaves of absence?
22  A. We don't have a personnel handbook. And I
23  can't recall whether or not they had put out some
24  memorandum as to how it's to be done.

Page 7

1  Q. In 1996, under the policy that you
2  established, were you directly involved in deciding
3  whether or not someone took a leave of absence or
4  not?
5  A. What do you mean by a leave of absence? I
6  don't think we had ever had anyone take a leave of
7  absence. You mean something other than vacation or
8  sick time?
9  Q. Yes.
10  A. I don't think the issue had ever come up.
11  Q. Okay. Now, you brought with you a file this
12  morning. Can you tell me what is contained within
13  the file?
14  A. Your subpoena or notice asked that I bring
15  with me any documents that related to Mrs. Robinson's
16  claim. I have what I had in my files that I think
17  are responsive to that.
18  Q. Okay. May they be of assistance to you
19  today in the deposition?
20  A. I don't know.
21  Q. Can I take a look at what you brought?
22  A. Except for one document, it's a transcript
23  of a juvenile court proceeding, I provided this to
24  Mrs. McNaught. She may have given it to you, but

Page 8

1  because of confidentiality rules I think it should
2  only be disclosed through some kind of court process
3  here. But I have it here. Did you want to see the
4  other documents?
5    MS. McGRATH: Ms. McNaught, maybe we can
6  address that on the record. Is that something that
7  has been disclosed in the course of discovery, the
8  court transcript, if you know?
9    MS. McNAUGHT: I believe it has.
10    THE WITNESS: I brought one other document.
11  I don't know if it has been disclosed or not.
12    MS. McNAUGHT: I don't believe so.
13    THE WITNESS: I found it in the file
14  yesterday.
15    MS. McNAUGHT: I don't believe that it has
16  been disclosed because I haven't seen it before. I
17  also don't think that it's responsive to the notice
18  request. But I don't have a problem if you show it
19  to those who would like to see it.
20    MS. McGRATH: Ms. McNaught, do you have a
21  problem introducing this onto the record for any
22  particular reason?
23    MS. McNAUGHT: None whatsoever.
24  BY MS. McGRATH:

**ROBINSON v. SAPPINGTON, et al**  CondenseIt!™  **JOHN GREANIAS**

Page 9

1  Q. Judge Greanias, am I correct that one of the
2  documents you brought with you today is a memorandum
3  dated September 17th, 1996, to Judge Sappington from
4  Judge Davis, and it concerns an issue revolving
5  around the Adoption Act?
6  A. Correct.
7     MS. McGRATH: I don't believe it's necessary
8  to mark it as an exhibit; however, Ms. McNaught, can
9  I ask that you just provide to me a copy of it in the
10 course of discovery.
11    MS. McNAUGHT: Not only that, I will provide
12 everyone else with one.
13 BY MS. McGRATH:
14 Q. Were there other documents other than the
15 transcript, Judge, that you brought with you today?
16 A. I will show you the file I brought except
17 for the transcript.
18 Q. Within the file, Judge, is a letter dated
19 January 14th, 1996, from -- I'm sorry, from you to a
20 Robert Kirchner, is that correct?
21 A. May I see it?
22 Q. Sure.
23 A. Yes.
24 Q. And within that correspondence you were

Page 10

1  suggesting a meeting between yourself, Mr. Kirchner,
2  and the State's Attorney, Lawrence Fichter,
3  concerning a claim raised by Mrs. Schroeder?
4  A. I think Mr. Kirchner had asked for the
5  meeting and I was giving him some times. May I see
6  the other letter?
7  Q. By the other letter, are you referring to a
8  January 9th, 19 -- does that indicate 1997?
9  A. Yes.
10 Q. Although it was likely 1997 --
11 A. My date would have been in error. One of
12 those January things when you get the wrong year.
13 Q. So that your January 14th letter, although
14 it's dated 1996, would have been sent in 1997?
15 A. Yes. He asked for a meeting and I agreed to
16 it.
17 Q. Did a meeting ever take place?
18 A. Yes.
19 Q. Was my client present at that meeting?
20 A. I don't think so, but I really don't recall.
21 Q. Do you recall any of the individuals who
22 were present?
23 A. Yes, Mr. Kirschner was there and the state's
24 attorney was there. I don't know if Mrs. Robinson --

Page 11

1  I don't remember her being in the room. I don't know
2  if she was there or outside the room. I just don't
3  recall.
4  Q. The final document that you've brought with
5  you this morning is titled Interoffice Memorandum,
6  and it is to you from Judge Davis dated November
7  15th, 1996?
8  A. Correct.
9     MS. McGRATH: Unless anyone else would like
10 these marked as exhibits, I don't see a reason to
11 have them as exhibits to the deposition, but I would
12 again ask Ms. McNaught, I think one of them may have
13 been provided in discovery but I would ask if you
14 would agree to provide them to me in response to our
15 discovery?
16    MS. McNAUGHT: I believe that all of them
17 have been provided previously, but I will be more
18 than happy to do again.
19    MS. McGRATH: Thank you.
20    MR. CASSIDY: Can I look at those real quick?
21    MS. McNAUGHT: Sorry.
22 BY MS. McGRATH:
23 Q. In 1996, 1997, did you have an assistant who
24 worked with you?

Page 12

1  A. Yes.
2  Q. What was that person's name?
3  A. Janice Shonkwiler. Excuse me, what were the
4  years you gave me?
5  Q. 1996 in 1997.
6  A. Yes.
7  Q. And what was Mrs. Shonkwiler's title at that
8  time?
9  A. Administrative assistant.
10 Q. Is she currently, Ms. Shonkwiler currently
11 your administrative assistant?
12 A. Yes, although I think it's more proper to
13 refer to her now as court administrative assistant.
14 She assists everyone with administrative matters.
15 Q. Were her duties distinct in 1996 and 1997
16 from those which she has now?
17 A. They have been expanded since then.
18 Q. What were her duties in the time period I'm
19 asking you about, '96-'97?
20 A. If anyone wanted to get a hold of the
21 presiding judge or any other judges, and they were
22 unavailable, the calls went to Mrs. Shonkwiler. She
23 took care of any problems that came up involving the
24 court when the judges were unavailable because they

Page 13

1 were in court much of the day, so she was the contact
2 point for people that couldn't get ahold of judges or
3 clerks. She kept track of the time sheets. She was
4 the contact person if a judge needed assistance
5 because staff was absent and she had to make
6 arrangements. I'm sure anything administrative that
7 had to be done and I didn't take care of myself she
8 assisted me with.
9   Q. Did she then have supervisory duties over
10 the judicial clerks during that time period?
11   A. She had my delegated authority to reassign
12 them. I don't recall whether or not she was doing
13 any training of them or not. I assume not. We were
14 just going to automation and the training would have
15 been done by our court technology administrator.
16   Q. If a judicial clerk expressed a concern
17 about the way he or she were being treated, would
18 that be an issue that Ms. Shonkwiler would address
19 with them?
20   A. She could.
21   Q. She had the authority to do that?
22   A. I don't know that she and I had ever talked
23 about that. I didn't have a job description for her.
24 I'm sure if someone came to her she would discuss it

Page 14

1 with them. If they wanted to present it to her and
2 if she couldn't resolve it, she would come and see
3 me.
4   Q. Judge, you've worked for a number of years,
5 have you not, with a Judge Warren Sappington?
6   A. Yes.
7   Q. Do you consider Judge Sappington a friend?
8   A. Could I ask what you mean or give me a
9 definition for friend?
10   Q. How would you describe your relationship
11 with Judge Sappington?
12   A. A business colleague. You say a friend. To
13 me a friend is someone you are with socially,
14 occasionally, and might discuss family and friends.
15 I never had any social contact with Judge Sappington
16 and I don't recall that we ever had a personal
17 discussion about kids or wives, but we were certainly
18 business colleagues and saw each other regularly.
19   Q. In 1996 -- well, strike that. Since you've
20 became the presiding judge in approximately December
21 1994, has there ever been a personnel policy
22 distributed to judicial clerks, written personnel
23 policy?
24   A. Probably on an issue by issue basis, but we

Page 15

1 do not have a personnel manual.
2   Q. In 1996, were judicial clerks provided any
3 written sexual harassment policy?
4   A. In 1996, I don't think there was anything
5 distributed in 1996, but I really don't recall.
6   Q. As you sit here today do you know whether
7 there was at any time a sexual harassment policy
8 distributed to judicial clerks?
9   A. From today backwards you mean or what period
10 of time are you talking about?
11   Q. From 1996 to the present, do you know
12 whether there was at any time a sexual harassment
13 policy distributed to judicial clerks?
14   A. I know that one was given to Mrs. Robinson
15 sometime in late '96, and then later. And I don't
16 remember whether it was -- at least a couple of years
17 ago a copy was distributed to everyone, and they
18 acknowledged receipt of it and a copy went in their
19 personnel file.
20   Q. You mentioned that you knew that one was
21 given to Mrs. Robinson in late 1996. Who gave that
22 policy to Mrs. Robinson?
23   A. I believe it was Janice Shonkwiler.
24   Q. Was this after Mrs. Robinson resigned from

Page 16

1 her position as a judicial clerk?
2   A. I don't recall the timing. She was still
3 employed by the court at the time.
4   Q. Did you direct Mrs. Shonkwiler to provide
5 that policy to Mrs. Robinson?
6   A. Yes.
7   Q. Why did you direct Mrs. Shonkwiler to do so?
8   A. I did not know if she had any complaints
9 about sexual harassment, and I wanted her to know
10 what the policy was. I asked Janice if she had made
11 any sexual harassment complaints, Janice said she
12 didn't know. And I said give her the policy.
13   Q. Can you tell me what else you recall about
14 what prompted the issue of whether Mrs. Robinson had
15 any complaints about sexual harassment?
16   A. I believe it was after I informed her that I
17 was going to move her to Courtroom 1.
18   Q. Is that by her -- I'm sorry, is that Mrs.
19 Robinson?
20   A. I'm sorry, I don't understand the question.
21   Q. You were informing Mrs. Robinson that you
22 were going to move her to Courtroom 1?
23   A. Yes.
24   Q. What else prompted the decision to give Ms.

Page 101

Q. Okay. And when did Shonkwiler tell you that?
A. I have no idea. Obviously we're in an area where I have no memory of any specific conversations.
Q. In relation to the transfer, was it around the transfer time?
A. Well, I know at the time of the transfer she told me that they weren't doing a lot of talking. Any other time I don't remember conversations. And all this could have been much later.
Q. Other than what you've indicated you communicated to Judge Shonkwiler, have you had other communications, either verbally or in writing, with Judge Shonkwiler concerning Mrs. Robinson and Judge Sappington?
A. I had no communications in writing. We from time to time mentioned it as we both know we have depositions scheduled. He and I rode over together to visit his attorneys one evening in Springfield, and we talked about the case. That's the only time that I recall we have talked at any length about the case itself.
Q. Is there anything else, either in those conversations or at any time that you shared with

Page 102

Judge Shonkwiler as far as knowledge you had about Judge Sappington and Mrs. Robinson?
A. Can't think of anything.
Q. When Mrs. Robinson left her position, did you communicate that in some fashion to Judge Shonkwiler?
A. I'm sure I made an oral -- informed him orally sometime about it. Probably very soon thereafter.
Q. And what would you have indicated to him?
A. Just the facts. I mean, each county operates independently, and we just keep the chief judge informed as to generally what's going on. He lets each court run itself administratively.
Q. But by the facts as far as Mrs. Robinson's departure, what would you have indicated?
A. That she resigned.
Q. And would that have been the extent of what you would indicate to Judge Shonkwiler?
A. I can't imagine anything else I said to him. There wouldn't have been anything else to say.
Q. Did Judge Sappington communicate to you a reason for his decision to retire?
A. He did not.

Page 103

Q. Other than your discussions that we've talked about today, and excluding any discussions with your counsel, are there others you have spoken with about this case?
A. Whoever the attorneys were in the meeting in Champaign -- excuse me, in Springfield. I was invited to the Judicial Inquiry Board to discuss it with them. I really can't think of anybody else that I have talked to about it.
Q. Did you talk with anyone from the ARDC?
A. Not that I recall.
MS. McGRATH: I don't have any further questions for you, Judge. Thank you.
MS. BARON: No questions.
MR. BLODGETT: No questions.
MR. CASSIDY: I have a few, Judge.
EXAMINATION
BY MR. CASSIDY:
Q. I represent Macon County in this case. First of all, does anybody need a break? I am not going to be very long I don't think. Good. The first question I want to ask, Judge, is you indicated that if there is a report of harassment, you would go right up the chain of command. Can you identify the

Page 104

chain of command that you had in mind when you said that?
A. The policy I think just talks about reporting it to supervisors. And the way we are set up, a clerk or court reporter would report it to her judge, or she could report it to me or to the chief judge, skip over any step in between.
Q. Okay. And then of course the chief judge would be -- I'm sorry, Macon County is in which judicial circuit?
A. Sixth.
Q. And Chief Judge Shonkwiler is located in what county?
A. Piatt.
Q. So after it gets to you within Macon County as presiding judge, the next step up would be chief judge of the Sixth Judicial Circuit; is that correct?
A. Talking about the administrative structure of the court?
Q. Right, or the reporting policy also, the chain of command.
A. Well, as they say, there is no written policy other than the Supreme Court one which talks about reporting to a supervisor. And I think it says

Page 105

1 something like if you don't want to report it to that
2 supervisor, you go up or eventually get up to the
3 Administrative Office of Illinois Courts. I'm not
4 sure if I'm answering your question.
5   Q. You are. And it does essentially get up to
6 the Administrative Office. They talk about the equal
7 employment officer with the Administrative Office of
8 Illinois Courts which is located in Springfield; is
9 that correct?
10   A. Correct.
11   Q. And how about not so much the reporting
12 process, but what about the administrative structure?
13 Can you talk about that after it gets past the chief
14 judge?
15   A. After it gets past the chief judge?
16   Q. Right.
17   A. Well, there's Administrative Office of
18 Illinois Courts. I mean, the structure is Supreme
19 Court here, their administrative arm, the
20 Administrative Office of Illinois Courts right over
21 here, and then there's really nothing below the
22 Administrative Office, but all their departmental
23 structure. Then you go down from the Supreme Court
24 to administratively -- I don't think you will find

Page 106

1 written anywhere a structure below the Supreme Court.
2 Statute says every circuit will have a chief judge.
3 And I'm not sure if it's in the statute, I know it's
4 in our rules, it says every chief judge will appoint
5 a presiding judge for each county. It's a real
6 hodgepodge of administrative structure. I would
7 hesitate to say there is any structure to it.
8   Q. Would you agree based upon your experience
9 that this court system, which drops from the Supreme
10 Court down all the way through the clerks and court
11 reporters that work at the county level, is a system
12 that is distinct and separate from the county board
13 and the county structure otherwise?
14   MS. McNAUGHT: Not that you are asking for
15 any kind of a legal conclusion, but I will object.
16   MR. CASSIDY: Based upon his experience.
17   THE WITNESS: I think they have nothing to do
18 with each other organizationally and structure-wise.
19 BY MR. CASSIDY:
20   Q. Okay. The court's judicial branch is a
21 constitutionally separate branch of government?
22   A. Correct.
23   Q. It's your understanding that the court
24 system is set up as a separate branch; is that

Page 107

1 correct?
2   A. By the constitution, yes.
3   Q. We talked about the reporting of harassment
4 right up the chain of command. One thing you didn't
5 mention is that you or anybody else would be going to
6 the county board. Is it your understanding that they
7 are not within that chain of command at any level?
8   A. My understanding is they are not.
9   Q. Okay. Now, what are the duties of a
10 judicial clerk?
11   A. We don't have a written job description.
12   Q. Right.
13   A. It's to assist the judge with secretarial
14 work, serve as a courtroom clerk, do any work
15 requested by the court that is necessary for the
16 operation of the court to assist the judge.
17   Q. We talked about this court system earlier.
18 It's your understanding that a judicial clerk falls
19 within the court system and does not fall within the
20 structure of the county and the county board; is that
21 a correct statement?
22   MS. McNAUGHT: Once again to the extent that
23 you are asking for any type of a legal conclusion, I
24 will object.

Page 108

1   THE WITNESS: I can tell you the fact is you
2 won't find any county organizational chart anywhere.
3 BY MR. CASSIDY:
4   Q. But certainly within the court system
5 organizational chart, in other words, the judicial
6 clerk answers directly to the judge he or she is
7 assigned to, and the next level up would be the
8 presiding judge, etcetera; is that correct?
9   A. Part of it is correct. You won't find
10 judicial clerks on any organizational chart. A lot
11 of counties don't have any such position. But in
12 Macon County they are a position that are created to
13 be the judge's secretary, courtroom clerk, perform
14 those duties.
15   Q. Who controls the job responsibilities or
16 duties of a judicial clerk on a day-to-day basis?
17   A. The judge in the courtroom to whom the clerk
18 is assigned.
19   Q. And does the county board or the county
20 system outside of the judicial system have any say
21 whatsoever with what a judicial clerk does in regards
22 to her job functions?
23   A. No.
24   Q. Now, let's assume that a judicial clerk for

Page 109

1 whatever reason is being harassed by a non-employee
2 of the judicial or court system, be it another
3 attorney or just a witness or anything of that
4 nature. Is it your expectation that the judicial
5 clerk should report that to personnel within the
6 judicial system that we talked about?
7    A. Yes.
8    Q. And you would expect either her direct
9 supervisor, the judge, or the presiding judge to
10 address those issues; is that correct?
11    A. Yes.
12    Q. And would you also agree that concerning
13 non-employees, you would not expect the clerk -- I'm
14 sorry, the county board or county to have any
15 responsibility in that regard. Is that a fair
16 statement?
17    A. If it was a county employee it would be
18 reported to that employee's supervisor.
19    Q. Let's assume it's not a county employee,
20 just a non-employee.
21    A. What is your question again now? I'm sorry,
22 I lost it.
23    Q. Let me rephrase it. If it's not directly a
24 county employee, would you agree that if a

Page 110

1 non-employee is involved in harassment, that the
2 county board and the county would not get involved in
3 addressing that issue?
4    A. Correct.
5    Q. Would you agree if the person who is
6 responsible for harassment is a judge, as it's
7 alleged in this case, that you would not expect the
8 county board or county to get involved in that issue?
9    A. Correct.
10    Q. In this particular case we spoke of a sexual
11 harassment policy and procedures. It's been marked
12 as Exhibit Number 1 on Janice Shonkwiler's
13 deposition. I would ask you to take a look at that.
14    A. I have looked at that.
15    Q. When we spoke earlier a number of times
16 during the course of your direct testimony about the
17 sexual harassment policies from the Supreme Court, is
18 that the document you are speaking of?
19    A. Yes, it is.
20    Q. And that is handed down from the Supreme
21 Court through the Administrative Office; is that
22 correct?
23    A. I don't know how it's distributed, but that
24 would be a real good guess.

Page 111

1    Q. It's handed down through the court system as
2 opposed to the county system?
3    A. Correct.
4    Q. That is where you would expect such
5 documents to come from based upon your experience?
6    A. From the Supreme Court, yes, it would be
7 distributed through the court system.
8    Q. You would not expect the county board or
9 county to be issuing any such policies, I take it; is
10 that correct?
11    A. Not this policy, no.
12    Q. Now, you indicated that when the first
13 complaint was made by Mrs. Robinson pursuant to the
14 telephone call, that she indicated that she was going
15 to take a couple of days off and you gave approval
16 for that it sounds like?
17    A. I told her to take a couple of days off.
18    Q. You didn't feel a need to contact the county
19 board or county to get permission for that; is that
20 correct?
21    A. That's correct.
22    Q. When you decided to pay her during the word
23 I believe used was administrative leave, but you said
24 you were not sure you would call it that, the few

Page 112

1 days or weeks that she stayed on but didn't come to
2 work before termination, that again was your
3 determination to pay her and you didn't feel any
4 requirement or obligation to contact the county
5 board?
6    A. That's correct.
7    Q. Is it fair to state then that as far as you
8 understand it, that the county board and Macon County
9 was not responsible for either investigating or
10 providing policy regarding sexual harassment in
11 regards to the allegations for this lawsuit?
12       MS. McNAUGHT: To the extent that it asks for
13 a legal conclusion, I will object.
14       MR. CASSIDY: Again, I am asking him his
15 understanding.
16       THE WITNESS: It's my understanding they
17 would not be obligated to; is that right?
18       MR. CASSIDY: Right.
19       THE WITNESS: They would not be obligated to.
20 BY MR. CASSIDY:
21    Q. Finally, there is a statute -- I thought I
22 brought everything and I haven't brought it in this
23 case -- that requires the state to set the salaries
24 of the administrator of the county and to be paid by

Page 113

1 the state. In fact I have cited it in one of my
2 briefs.
3    A. I'm sorry?
4    Q. Have you read that statute?
5    A. Is it chief judges administrative.
6    Q. I believe it's the court administrator hired
7 by the chief judge. In this case it's Janice
8 Shonkwiler; is that correct?
9    A. No.
10    Q. Who is the court administrator?
11    A. Jane -- I just can't think of it now. I
12 want to say MacAvoy, but it's not.
13    Q. I'm not sure it's important. But I think
14 it's where I got confused is Janice Shonkwiler is
15 administrator of the Macon County court system?
16    A. She was my judicial clerk, and we have no
17 administrative assistants in the court, no human
18 relations people, no nothing. We just get a lot of
19 inquiries from the public and things that have to be
20 taken care of. And when I'm on the bench I can't do
21 it. So sometime probably in '96 they said we can't
22 get this work done, split her job off to help with
23 the administrative part of it, to have somebody to be
24 alive in the court for people to talk to when

Page 114

1 everybody was in court. And then we created a
2 judicial clerk. We used to have secretaries for the
3 judges. When we went to automation those jobs were
4 folded into this judicial clerk job. So there was
5 nobody present to respond to anybody wanting to talk
6 to the court when we were all in court.
7    Q. I thought that it might be the
8 administrative clerk of the Sixth Judicial Circuit.
9    A. That is a different position.
10    Q. Who sets the salary of judicial clerk?
11    A. Who does?
12    Q. Who determines how much a judicial clerk is
13 going to be paid?
14    A. The presiding judge does.
15    Q. And do you have any leeway on that?
16    A. The county board and I talk about finances
17 every year, and they approve a line item for total
18 salaries. Then the court decides how those are going
19 to be fairly apportioned among the staff.
20    Q. So the actual payment is through the county
21 but it's for a total line item of the court system.
22 But as far as how those payments are distributed
23 between the various employees within the court system
24 of Macon County, that is determined by the presiding

Page 115

1 judge. Is that correct?
2    A. Correct, the court sets their salaries.
3    Q. The county board doesn't get involved on the
4 particulars?
5    A. That's correct.
6       MR. CASSIDY: I don't think I have anything
7 else.
8       EXAMINATION
9 BY MS. McNAUGHT:
10    Q. We need to clear up a few things.
11    A. Okay, clear away.
12    Q. During your direct examination by Ms.
13 McGrath you talked about the Human Relations
14 Commission?
15    A. Yes.
16    Q. And your testimony in a nutshell with regard
17 to that was that was the first time that you knew
18 about a sexual harassment complaint of Ms. Robinson?
19    A. Correct. I mean, I was surprised that there
20 was a complaint. Not that she filed it, but that
21 there was one. I was surprised.
22    Q. When you were speaking of the Human
23 Relations Commission, were you speaking of the
24 Illinois Department of Human Rights which culminated

Page 116

1 in an investigation or a fact-finding conference that
2 you participated in?
3    A. Correct.
4    Q. Judge Sappington was an associate judge of
5 the Sixth Judicial Circuit?
6    A. Correct.
7    Q. He sat in Macon County?
8    A. Yes.
9    Q. Judge Davis was a circuit court judge of the
10 Sixth Judicial Circuit?
11    A. Correct.
12    Q. And he also sat in Macon County?
13    A. Correct.
14    Q. Judge Davis is an elected judge?
15    A. Correct.
16    Q. Judge Sappington was appointed?
17    A. Correct.
18    Q. Do you recall Judge Davis criticizing any
19 other judicial clerk other than Melissa Schroeder
20 Robinson?
21    A. I cannot recite any specific incident, but
22 it happened with other clerks and circuit clerk
23 employees.
24    Q. Because of the complaints that Judge Davis