E-FILED
Tuesday, 18 January, 2005  03:41:48 PM
Clerk, U.S. District Court, ILCD

# JUDGE JOHN SHONKWILER


## Page 1

```
           IN THE UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS
                    URBANA DIVISION

MELISSA ROBINSON,                )
(f/k/a MELISSA SCHROEDER),       )
                                 )
         Plaintiff,              )
                                 )
    -vs-                         )  No. 99-2266
                                 )
JUDGE WARREN A. SAPPINGTON, SIXTH)
JUDICIAL CIRCUIT (IN OFFICIAL    )
CAPACITY AND INDIVIDUALLY),      )
                                 )
         Defendant,              )
                                 )
MACON COUNTY,                    )
                                 )
JOHN P. SHONKWILER, CHIEF JUDGE, )
SIXTH JUDICIAL CIRCUIT, MACON    )
COUNTY CIRCUIT COURT, MACON COUNTY)
(IN OFFICIAL CAPACITY AND NOT    )
INDIVIDUALLY),                   )
                                 )
         Defendant.              )

                    DEPOSITION
```

The deposition of JOHN P. SHONKWILER, taken on behalf of the Plaintiff on May 11, 2001, commencing at 1:05 p.m., at the Piatt County Courthouse, 101 West Washington Street, Monticello, Illinois, before Fran Anderson, CSR, License No. 084-002930.

Appearances:

    Melissa M. McGrath, Attorney
    Thomson & Weintraub
    105 North Center Street
    Bloomington, IL 61702-3577
    309-829-7069
    On behalf of Plaintiff

## Page 2

    Diane M. Baron, Attorney
    Clausen Miller, P.C.
    10 South LaSalle Street
    Chicago, IL 60603-1098
    312-855-1010
    On behalf of Defendant Sappington

    John E. Cassidy, Attorney
    Cassidy & Mueller
    1510 Savings Center Tower
    Peoria, IL 61602
    309-676-0591
    On behalf of Defendant Macon County

    Robert Gillespie, Attorney
    Hinshaw & Culbertson
    400 South Ninth, Suite 200
    Springfield, L 62701
    217-528-7375
    On behalf of Defendant John P. Shonkwiler

    Karen L. McNaught, Attorney
    Assistant Attorney General
    500 South Second Street
    Springfield, IL 62706
    217-782-1090
    On behalf of Defendant John P. Shonkwiler

MALCOM REPORTING SERVICE
1310 Ironwood CC Drive
Normal, IL 61761
(309) 454-3378
Fax (309) 454-8286

## Page 3

                         I N D E X
                                                    Page
WITNESS

  John Shonkwiler

      Examination by Ms. McGrath.......... 4

      Examination by Mr. Cassidy......... 46

      Examination by Ms. McNaught........ 54

EXHIBITS

      Exhibit 1.......................... 8
      (Administrative Directive)

      Exhibit 2.......................... 12
      (Circuit Administrative Order 95-6)

      Exhibit 3.......................... 34
      (Answers to Interrogatories)

RECEIVED
JUN - 1 2001
CASSIDY & MUELLER

## Page 4

1       JOHN P. SHONKWILER,
2  the deponent herein, called as a witness, after
3  having been first duly sworn, was examined and
4  testified as follows:
5            EXAMINATION
6  BY MS. McGRATH:
7    Q. Your Honor, I'm going to be asking you some
8  questions today. If I ask you something wordy or
9  that you don't understand, please ask me to reword
10 it, okay?
11   A. Okay.
12   Q. You are represented today, Your Honor, by
13 Mr. Gillespie and Ms. McNaught?
14   A. I am.
15   Q. And you recognize that the lawsuit being
16 brought -- which has been brought by the plaintiff
17 has been brought against you only in your official
18 capacity?
19   A. Yes.
20   Q. And that official capacity, Your Honor, is
21 as the Chief Judge --
22   A. Of the Sixth Judicial Circuit.
23   Q. As the Chief Judge of the Sixth Judicial
24 Circuit, do you have certain responsibilities in

Page 5

1 supervising the judges within the circuit?
2   A. I do, yes. I -- part of our rules indicate
3 that I have general administrative duties of the
4 judicial departments. One of those duties include
5 the appointment of presiding judges, and there's one
6 in each of the six counties within the circuit.
7 Those presiding judges then have administrative
8 duties within their particular county.
9   Q. If we could focus, Your Honor, on Macon
10 County during the time period July 1996 to January
11 1997, who was the presiding judge in that county?
12   A. Judge Greanius.
13   Q. If Judge Greanius, during that time period,
14 had received any information that a judicial clerk
15 was expressing concerns about the behaviors of a
16 judge, did he have any obligation to report that
17 concern to you as the chief judge?
18   A. I -- I'm not sure that I would use the term
19 obligation. Normally, a presiding judge would do
20 that. They would also communicate to me if there was
21 a personnel problem, and that has happened in the
22 past.
23   Q. If Judge Greanius became aware of behaviors
24 which could be characterized as sexually harassing

Page 6

1 behaviors by a judge, is that a situation that should
2 have been reported to you as the chief judge?
3   A. If he --
4       MS. McNAUGHT: I want to object to that
5 question as being -- it lacks foundation, it does not
6 accurately portray any evidence that I think will be
7 submitted at trial, but subject to those objections
8 go ahead and answer.
9       MR. GILLESPIE: I would further object on
10 the basis that you need to define for the judge what
11 you mean by sexually harassing behavior, because that
12 can mean so many things.
13       THE WITNESS: I think if Judge Greanius
14 perceived something as inappropriate sexual behavior
15 by one of his judges, they would -- he would report
16 that.
17 BY MS. McGRATH:
18   Q. Did he have a duty to report that to you as
19 a chief judge?
20       MS. McNAUGHT: I'll object as to the form of
21 the question.
22       THE WITNESS: It's not one of his enumerated
23 duties, but normally, in the general scheme of
24 things, he would have.

Page 7

1 BY MS. McGRATH:
2   Q. Okay. Let me ask you this, Your Honor. Is
3 it true that you as the Chief Judge of the Sixth
4 Judicial Circuit have the ultimate responsibility for
5 following up with concerns expressed about behaviors
6 of a judge within your circuit?
7       MS. McNAUGHT: Object as to the form of the
8 question.
9       THE WITNESS: I would think as being the
10 chief administrator I would have -- I should follow
11 up on that, yes.
12 BY MS. McGRATH:
13   Q. During the time period July 1996 through
14 January 1997, are you aware of there being a sexual
15 harassment policy in existence which applied to
16 judicial clerks?
17   A. To all judicial personnel. The policy is
18 set down by the Supreme Court.
19   Q. And as the chief judge, have you distributed
20 such a policy within your circuit?
21   A. Yes. The chief judge prior to me, Judge
22 Scott, distributed the policy and directed it be
23 posted on all bulletin boards at all courthouses
24 within the circuit. As far as I know, they were.

Page 8

1       Then in -- when I -- I became chief judge, I
2 think, in January of 1994, I would review -- I was in
3 a policy of reviewing past orders files. And in
4 reading -- in reading the Supreme Court's policy, I
5 felt that it was somewhat lacking concerning a road
6 map on how a person who is charged with sexual
7 harassment would appeal a decision of the supervisor
8 to the chief judge.
9       So in 1995 I wrote an Administrative Order
10 giving a road map so everyone knew where they stood
11 on how to conduct an appeal to the chief judge if
12 there is a sexual harassment charge and they were not
13 happy with the results of the investigation. And
14 then that was distributed to -- it was distributed to
15 all presiding judges and all clerks. It was not
16 distributed to all judicial personnel. I followed
17 the normal procedures of distribution of
18 administrative orders.
19       (Whereupon Deposition Exhibit No. 1 was
20       marked for identification by the court
21       reporter.)
22 BY MS. McGRATH:
23   Q. Judge, if you would take a look at Exhibit
24 1.

### Page 9

1  A. Yes.
2  Q. Can you -- I'm sorry. Tell me when you've
3  had a chance to look at it.
4  A. This is a directive by the Acting Director
5  of the Administrative Office in 1993, who was Bill
6  Madden. Attached to the directive is the Supreme
7  Court's sexual harassment policy and procedures.
8  That was sent to all chief judges, and in this case
9  would have been sent to Judge Scott, who, according
10 to the exhibit, received it on May the 3rd, 1993.
11 And there's a note the same date to his
12 administrative assistant directing that a copy of
13 this be sent to each presiding judge. I cannot read
14 what the bottom line says.
15 Q. Judge, if you would point out to me what
16 you're referring to as far as Exhibit 1 indicating
17 that Judge Scott had received it on May 3rd of 1993.
18 A. Yes. I recognize Judge Scott's handwriting.
19 Q. And that is in the upper right-hand corner
20 of the first page of this exhibit?
21 A. Yes, and in the writing at the bottom of the
22 Administrative Directive.
23 Q. And by in the writing at the bottom, meaning
24 that the handwritten materials at the bottom of Page

### Page 10

1  1 is also Judge Scott's handwriting?
2  A. Yes, I believe it is.
3  Q. Is the attached sexual harassment policy the
4  policy that you referred to when you earlier
5  indicated that Judge Scott had distributed such a
6  policy?
7  A. Yes.
8  Q. The additional handwritten material on
9  Exhibit 1 on the right side of the exhibit, just
10 below the masthead there, is that also Judge Scott's
11 handwriting?
12 A. No, that's my handwriting. I've written
13 received and posted in Piatt County May 6th, 1993.
14 Q. And when did you write that onto the Exhibit
15 1, at the -- on that date or on a different date?
16 A. Oh, no, on that date.
17 Q. You became the Chief Judge of the Sixth
18 Judicial Circuit in January 1993, you indicated --
19 I'm sorry, January 1994?
20 A. Yes.
21 Q. Prior to that, were you a circuit court
22 judge here in Piatt County?
23 A. I was.
24 Q. Did you post this policy on May 6th of 1993

### Page 11

1  in the Piatt County Courthouse?
2  A. I did. Each courtroom has its own bulletin
3  board, we have two courtrooms in the courthouse, and
4  I posted it on each board, bulletin board.
5  Q. Do you have any knowledge as to whether this
6  policy was posted in courthouses within the Sixth
7  Judicial Circuit, other than in the Piatt County
8  Courthouse?
9  A. I have no knowledge. I would presume that
10 each presiding judge would do as directed by the
11 chief judge. But it's just a presumption.
12 Q. In 1996 and 1997 -- well, strike that. As
13 the chief judge, do you periodically visit the other
14 courthouses?
15 A. Only if I'm assign -- if I assign myself to
16 a case. I do not conduct an administrative
17 inspection, if that's what you're saying.
18 Q. Okay. Are there times when you hear cases
19 in Macon County at that courthouse?
20 A. Mm-hmm, yes, but it's on a case-by-case
21 basis.
22 Q. I understand. Had you, in 1996 or anytime
23 prior to January of 1997, noted a sexual harassment
24 policy having been posted anywhere in that

### Page 12

1  courthouse?
2       MS. McNAUGHT: I'll object to the form of
3  the question.
4       THE WITNESS: I didn't note it, but I didn't
5  look.
6       (Whereupon Deposition Exhibit No. 2 was
7        marked for identification by the court
8        reporter.)
9  BY MS. McGRATH:
10 Q. Your Honor, would you take a look at Exhibit
11 2, which has been handed to you, and let me know when
12 you've had enough time to review that.
13 A. I've looked at it.
14 Q. And what is Exhibit 2?
15 A. Exhibit 2 consists of three different
16 items. Item number one is a letter from me dated
17 October 23rd, 1995, addressed to all presiding judges
18 and circuit clerks of the Sixth Circuit concerning
19 the Circuit Administrative Order 95-6.
20 Q. Can we perhaps focus on that first, if
21 that's all right with you?
22 A. Sure.
23 Q. The clerks who are referred to in the first
24 page of this exhibit, that would be circuit clerks?

Page 13

1  A. Circuit clerks, yes.
2  Q. I'm sorry. Go ahead.
3  A. Item two is my Administrative Order 95-6
4  which accompanied the transmittal letter entered --
5  signed on October 23rd, 1995, and it was effective
6  November 1, 1995, which basically was the appellate
7  procedure after a sexual harassment investigation.
8  This is the road map.
9      The third item, which is also connected with
10 the packet, is the Supreme Court's sexual harassment
11 policy and procedures, upon which the Administrative
12 Order 95-6 is based.
13  Q. And did you prepare the Administrative Order
14 with regard to the Appellate procedure?
15  A. I did.
16  Q. And I believe you indicated before, but
17 would you tell me again, who the Administrative Order
18 was distributed to?
19  A. It was distributed to all presiding judges
20 and all circuit clerks within the Sixth Judicial
21 Circuit.
22  Q. But am I understanding you correctly, Your
23 Honor, that the Administrative Order was to apply to
24 individuals against whom a sexual harassment claim

Page 14

1 had been brought?
2  A. It was written to specifically address Item
3 E on page six and seven of the policy.
4  Q. The sexual harassment policy?
5  A. Yes.
6  Q. And so am I correct that you prepared the
7 Administrative Order intending it to also apply,
8 then, to not only individuals who a sexual harassment
9 charge was brought against but individuals who had
10 brought that sexual harassment charge?
11  A. Well, it -- in reading Section E of the
12 policy it was my view that it did not supply the
13 average individual that had brought a complaint and
14 wanted to appeal the finding of the supervisor to the
15 chief judge, it did not provide them a proper road
16 map and procedures on how to do it. So that's why
17 the one-page Administrative Order was filed, to
18 supplement, not to change, but to supplement
19 Paragraph E of the policy.
20  Q. Do you know whether the Administrative Order
21 was communicated to employees other than the circuit
22 clerks and the presiding judge of each county?
23  A. I do not know. I did not direct that it be
24 distributed. In other words, this was handled the

Page 15

1 same as any Administrative Order.
2  Q. And why didn't you direct that it be
3 distributed to other employees, other than the
4 presiding judge and the circuit -- and the clerks?
5  A. Because if -- if I believe that a presiding
6 judge feels that the Administrative Order should be
7 presented or other action taken about it, I -- I
8 would assume they would do it. Again, I did not
9 order it distributed to all employees.
10  Q. Do you have any knowledge as to whether the
11 Administrative Order within Exhibit 2 was distributed
12 to employees other than the presiding judges --
13  A. I do not have such knowledge.
14  Q. -- or the circuit clerks? One thing I
15 forgot to mention, Your Honor, is sometimes I am
16 long-winded or I speak slowly and you know what I'm
17 going to ask you before I've gotten the whole
18 question out --
19  A. I will try not to answer prior to your
20 finishing.
21  Q. I would appreciate that, Your Honor.
22  A. Very well.
23  Q. If I can refer you to the sexual harassment
24 policy itself within Exhibit 2, page one, the third

Page 16

1 paragraph of the policy refers to all judicial and
2 nonjudicial supervisory personnel within the judicial
3 branch. Do you see that?
4  A. When it starts out the Supreme Court directs
5 all judicial and nonjudicial supervisor within the
6 judicial branch to assure workplaces are free from
7 sexual harassment, I see that.
8  Q. What is your understanding of the
9 distinction between judicial and nonjudicial
10 supervisory personnel in that paragraph?
11  A. I would presume that the judicial personnel
12 would be judges and nonjudicial personnel;
13 supervisory personnel would be clerks, court
14 reporters, et cetera.
15      MR. CASSIDY: May I clear that up?
16      MS. McGRATH: Go right ahead.
17      MR. CASSIDY: You've used the word clerk
18 twice, once for the circuit clerk.
19      THE WITNESS: Yeah.
20      MR. CASSIDY: Who did you mean then by
21 clerk?
22      THE WITNESS: Minute clerks, court clerks.
23      MR. CASSIDY: Judicial clerks.
24      THE WITNESS: Judicial clerks. The term is

Page 17

1  used differently in different counties. The clerk of
2  the court usually is the constitutional officer and
3  her -- and his deputies. Minute clerks have been
4  described as those people in the courtroom who will
5  write up, record other docket entries.
6      So I -- in clarifying your question, and it
7  should be clarified, the clerk of the court is its
8  own constitutional office. So the court would not be
9  over that, as such. Judicial clerks, minute clerks
10 would be nonjudicial personnel.
11 BY MS. McGRATH:
12   Q. And minute clerk is synonymous with judicial
13 clerk?
14   A. Well, depends on what county you're in, but
15 a clerk who, or a person who -- whose function is to
16 write a docket entry on each case would be a record
17 clerk or a docket clerk or a minute clerk.
18   Q. And I'm sorry, I just want to make sure I'm
19 following you. And would an alternative title for
20 that position be a judicial clerk?
21   MS. McNAUGHT: Object to the form of the
22 question. If you want to ask him if judicial clerk
23 in Macon County is synonymous with a minute clerk as
24 he's described it, I won't object to that question.

Page 18

1  But I think that he's already answered the question
2  about what his description of a law clerk can be --
3  or a judicial clerk, I'm sorry.
4      MS. McGRATH: And I'm not trying to be
5  difficult, Your Honor.
6      THE WITNESS: Yeah.
7      MS. McGRATH: I'm just trying to understand
8  if there is a distinction. And subject to her
9  objection, let me strike the question and ask you a
10 different question.
11 BY MS. McGRATH:
12   Q. Are you aware as to whether there is any
13 distinction within Macon County as to whether a
14 judicial clerk is the same as a minute clerk?
15   A. My impression is the two would be
16 synonymous.
17   Q. Okay. And are you aware of Missy Schroeder,
18 whose name is now Missy Robinson, serving in that
19 role as either a judicial clerk or a minute clerk in
20 Macon County?
21   A. I was aware that she was hired as such, yes.
22   Q. What is your understanding of what Janice
23 Shonkwiler's duties were in Macon County in
24 1996-1997?

Page 19

1    A. Janice Shonkwiler was Judge Greanius'
2  administrative assistant. What her specific duties
3  are, I do not know.
4    Q. And did not know as far as 1996 and 1997?
5    A. No, I didn't know.
6    Q. Is she related to you in any fashion, Your
7  Honor?
8    A. Not that I know of. We have the same last
9  name, but if we're related, I have no knowledge of
10 that.
11   Q. Okay. Before you became aware of Missy
12 Schroeder's complaint in this case, had you received
13 information from anyone that Missy Schroeder had
14 raised concerns about Judge Sappington's behavior
15 towards her?
16   A. I don't believe so. I -- I do remember
17 being in Decatur prior to January of '97, talking to
18 Judge Sappington, and he brought up a matter in which
19 he said he was conducting court, Mrs. Schroeder was
20 his clerk, and a lawyer named Frank Beyers came in
21 and started talking to her and basically bothering
22 her and deflecting her attention from the Court to
23 the lawyer, that he got bothered about that, because
24 it's a fast-moving court, and he asked Mr. Beyers to

Page 20

1  leave, which he did, and he indicated that Mrs.
2  Schroeder got upset.
3      I was surprised the matter even came up
4  because it happened so much and lawyers are asked not
5  to bother the clerk because we need to get the cases
6  through, why it was even discussed. But it was on
7  his mind. And looking back, I think it was not too
8  soon after what I later learned to be the October
9  incident with Mr. Beyers. So in trying to answer
10 your question with an example, this is, to the best
11 of my knowledge, the only thing I can come up with,
12 in answer to your question.
13   Q. Okay. You said that it happened so much, by
14 that did you mean -- I'm sorry, what did you mean by
15 that?
16   A. It happens among all judges, particularly in
17 the fast-moving courts. Lawyers need information
18 from the clerk, the judge needs cases and information
19 from the clerk, and the clerk can't do two things at
20 once. So the judge sometimes asks the lawyer to wait
21 until he gets done with the case, and basically this
22 is what I thought the situation was.
23   Q. Can you give me any time range as far as
24 when you think this conversation happened?

Page 21

1  A. I -- in looking back, I think it probably
2  happened sometime after that October incident,
3  because it -- it obviously was on his mind. It could
4  have been October the 20th or it could have been
5  November 1st or sometime after. I just don't know,
6  exactly.
7  Q. And what are you referring to when you say
8  sometime after the October incident?
9  A. The Frank -- where he asked Frank Beyers to
10 leave the courtroom. At least that's the story I got
11 from Judge Sappington.
12 Q. Did Judge Sappington tell you anything else
13 that you recall about that incident?
14 A. No, except that she seemed to be upset. And
15 why I remember that, I don't know, but I just do.
16 Q. If it happens frequently with judges, and I
17 can certainly understand how it very likely does, do
18 you have any understanding of why Judge Sappington
19 would have seen it as such an issue that he would
20 have brought it up to you?
21 A. No.
22 Q. Did Judge Greanius ever share with you that
23 Missy Schroeder had talked with him about behaviors
24 of Judge Sappington?

Page 22

1  A. I --
2      MS. McNAUGHT: I'll object to the form of
3  the question.
4      MS. McGRATH: And let me limit the time.
5  When I say ever talked to you, I'm limiting my
6  questions to you to the time period when Missy
7  Schroeder was employed at Macon County.
8      MS. McNAUGHT: I'll still object to the form
9  of the question.
10     THE WITNESS: I remember one conversation by
11 phone, and again, when I would talk to Judge
12 Greanius, we would talk about a number of different
13 matters. And I recall on this one occasion he said
14 that she had visited him, and I cannot remember his
15 exact words, but something to the effect I don't know
16 whether she's alleging any kind of harassment or
17 not. He wasn't sure. He said just to be on the safe
18 side he asked Janice Shonkwiler to give her a copy of
19 the sexual harassment policy -- court's sexual
20 harassment policy.
21 BY MS. McGRATH:
22 Q. Did he -- do you have any other recollection
23 of anything he told you in that conversation about
24 what Missy Schroeder had shared with him?

Page 23

1  A. No. I think he -- he looked upon this --
2  well, I don't know how he -- but my impression was
3  that it was a personnel matter, a personality problem
4  that he was trying to deal with, and one of many
5  personnel and personality problems that he constantly
6  dealt with.
7  Q. Can you tell me when this conversation may
8  have taken place, a month, a year?
9  A. I have no idea.
10 Q. Okay.
11 A. I didn't take a note of it. I know -- I
12 happened to remember the context of this
13 particular -- by phone, and that's all I remember.
14 Q. Were you ever made aware -- and again, when
15 I say ever, I'm directing my questions to the time
16 period that Missy Schroeder was employed at Macon
17 County -- that there had been comments about Judge
18 Sappington and Missy Schroeder going to lunch
19 together?
20     MR. CASSIDY: I'm going to object to the
21 form of the question.
22     THE WITNESS: I have read the findings of
23 the hearing officer, and I, you know, I read that
24 that was one of the findings, but I do not remember

Page 24

1  any conversation from anybody about their having
2  lunch together. I don't remember anything like
3  that.
4  BY MS. McGRATH:
5  Q. And when you were just mentioning findings,
6  are you referring to findings by the Illinois
7  Department of Human Rights?
8  A. I am.
9  Q. But while Missy was employed at Macon
10 County, you have no knowledge of any comments about
11 that?
12 A. No.
13     MR. CASSIDY: I'm going to object to the
14 form of the question.
15 BY MS. McGRATH:
16 Q. Did you have conversations with Judge
17 Greanius about Missy Schroeder departing from her
18 position at Macon County?
19     MR. CASSIDY: Object to the form of the
20 question.
21     THE WITNESS: Yes.
22     MR. GILLESPIE: Excuse me. Just to clarify,
23 the time now is both before and after she left?
24     MS. McGRATH: I'm referring to

Page 25

1 conversations, Your Honor, before she departed from
2 her position.
3      THE WITNESS: Okay. He talked to me by
4 phone about this. And it appeared as though, because
5 of the personality problems, as I think he perceived
6 them, he felt transfer would be in order and said
7 that he would most likely follow through with the
8 transfer.
9 BY MS. McGRATH:
10    Q. And Your Honor, when you're referring to
11 "he," who are you referring to?
12    A. Judge Greanius. I then got a call from him
13 indicating, I think, he was going to transfer Mrs.
14 Schroeder to Judge Francis, and he called and said
15 Judge Francis objected. And I think he was again
16 rethinking the process at that time.
17    Q. The personality problems that you've
18 referenced --
19    A. Yeah.
20    Q. -- who are those personnel problems between?
21    A. My understanding is they were between Judge
22 Sappington and Ms. Schroeder.
23    Q. Did you have any specific knowledge as to
24 what those personality problems were?

Page 26

1    A. No.
2    Q. Did Judge Greanius characterize the problems
3 as personality problems to you?
4    A. I don't know whether he used that term, but
5 that was the impression that I got from his
6 statements, it was more of a personnel matter that --
7 and again, there are many that he has to deal with,
8 and this was just one of those.
9    Q. What was it that Judge Greanius said to you
10 that caused you to perceive the problems as personnel
11 matters?
12    A. I do not remember his words. I just
13 remember my impression of those words.
14    Q. And can you tell me when this conversation
15 by phone with Judge Greanius took place?
16    A. No, I can't.
17    Q. Did you discuss with Judge Greanius why
18 Judge Francis was objecting to the transfer?
19    A. I think he felt Judge Francis and his staff
20 work well together. That was my impression of why
21 there was resistance by Judge Francis. Also, he
22 brought up Judge Davis. And Judge Davis was, I
23 understand, among other things, unhappy in that he
24 thought Mrs. Schroeder was providing too much advice

Page 27

1 or information to people that came in the office.
2    Q. Is this in the single conversation that you
3 had with Judge Greanius, that he shared information
4 about Judge Davis?
5    A. It might have been, but I'm not sure. Yeah,
6 I think he -- Judge Davis felt that Judge Sappington
7 wasn't exercising enough supervision or control over
8 Mrs. Schroeder. But that was Judge Davis'
9 perception. I don't know whether it was Judge
10 Greanius' perception or not.
11    Q. When Judge Greanius brought this
12 conversation up to you, you didn't discuss with Judge
13 Greanius what his perception was?
14    A. I really didn't. I have had, and have,
15 complete confidence in Judge Greanius' leadership and
16 management ability.
17    Q. Just so I'm sure I'm understanding you, is
18 it your testimony that Judge Greanius was considering
19 transferring Missy Schoeder to Judge Francis for two
20 reasons, one, personality problems between she and
21 Judge Sappington --
22    A. Mm-hmm.
23    Q. -- and two, concerns bought up by Judge
24 Davis?

Page 28

1    A. I believe so.
2    Q. Were there any other reasons that Judge
3 Greanius communicated to you for his transfer
4 consideration?
5    A. Not that I can recall.
6    Q. Do you know what happened in regards to
7 Judge Greanius considering transferring Mrs.
8 Schroeder?
9    A. Whether she was transferred?
10    Q. Yes.
11    A. I'm not sure the transfer went through.
12    Q. Did you have any other conversations with
13 Judge Greanius considering Missy Schroeder during the
14 time she was employed at Macon County?
15      MR. CASSIDY: Object to the form of the
16 question.
17      THE WITNESS: I'm pulling from memory. We
18 may have had four or five short conversations. I
19 don't know when. That's just from memory.
20 BY MS. McGRATH:
21    Q. What can you tell me about the additional
22 conversations between you and Judge Greanius
23 concerning Missy Schroeder? You have told me about a
24 conversation concerning a transfer --

Page 29

1  A. Yeah.
2  Q. -- you've told me about a conversation with
3  Judge Greanius where you indicate that Judge Greanius
4  had stated he was directing someone to provide a
5  sexual harassment policy to Missy Schroeder.
6  A. Mm-hmm.
7  Q. Can you tell me about any other
8  conversations that you had with Judge Greanius with
9  regard to Missy Schroeder?
10  A. There was a conversation that Missy didn't
11  know whether she wanted to be transferred and
12  something to the effect that Judge Greanius told her
13  she would have to, somehow, sometime, make up her
14  mind what she wanted to do.
15  Q. Did Judge Greanius tell you why Missy wasn't
16  sure why she wanted the transfer?
17  A. Not that I recall.
18  Q. And can you tell me anything else about that
19  conversation with Judge Greanius where Missy,
20  according to Judge Greanius, did not know whether she
21  wanted to be transferred?
22  A. No, I don't recall that.
23  Q. Do you know whether Missy was provided a
24  sexual harassment policy at any time during her

Page 30

1  employment as a clerk?
2  A. I think she was. As I recall, Judge
3  Greanius asked Janice Shonkwiler to provide her a
4  copy. Whether she was actually provided a copy, I
5  don't know.
6  Q. Any other conversations you had with Judge
7  Greanius that you can relate to me concerning Missy
8  Schroeder while she was a judicial clerk?
9  A. No. I've tried to pull out everything I can
10  remember.
11  Q. Okay. Did Janice Shonkwiler ever discuss
12  with you concerns Missy Schroeder expressed to her
13  about Judge Sappington's behaviors?
14  A. She wouldn't -- no, she didn't.
15  Q. Did any other members of the judiciary in
16  the Sixth Circuit share with you concerns about Judge
17  Sappington's behaviors towards Missy Schroeder while
18  she was employed there?
19  MS. McNAUGHT: Object to the form of the
20  question.
21  THE WITNESS: No, they didn't.
22  BY MS. McGRATH:
23  Q. While Missy Schroeder was employed as a
24  clerk, did Judge Sappington's wife, Sheryl

Page 31

1  Sappington, ever phone you to discuss concerns about
2  Missy Schroeder?
3  A. Not that I recall.
4  Q. Did Judge Greanius ever share with you
5  during that time period any concerns raised to him by
6  Mrs. Sappington about Missy Schroeder?
7  MS. McNAUGHT: Objection, calls for about
8  two levels or three levels of hearsay.
9  MS. McGRATH: Let me strike the question and
10  I'll ask you another one.
11  BY MS. McGRATH:
12  Q. Did Judge Greanius ever tell you, Your
13  Honor, about concerns that Sheryl Sappington raised
14  to him --
15  MS. McNAUGHT: Same objection.
16  MS. McGRATH: -- with regard to Missy
17  Schroeder?
18  THE WITNESS: No.
19  BY MS. McGRATH:
20  Q. While Missy Schroeder was employed as a
21  clerk, did you at any time learn of a comment by
22  Judge Davis concerning Missy Schroeder which was of a
23  sexual nature?
24  MS. McNAUGHT: Object as to the vagueness of

Page 32

1  the question.
2  THE WITNESS: I learned of the comment, but
3  I think it was after she left.
4  BY MS. McGRATH:
5  Q. The comment, are we both referring to the
6  same comment relating to --
7  A. Face.
8  Q. Face?
9  A. Yeah.
10  Q. But you think you learned about it after her
11  employment ended?
12  A. I think so.
13  Q. Who -- do you remember who you learned about
14  it from?
15  MR. GILLESPIE: You don't have to relate any
16  conversations with your lawyers.
17  THE WITNESS: Well, I may have read it in
18  the hearing officer's finding. I just don't recall.
19  BY MS. McGRATH:
20  Q. Once you learned about the comment, wherever
21  you learned about it from --
22  A. Mm-hmm.
23  Q. -- did you investigate that comment any
24  further?

Page 33

1  A. No, I didn't. Again, I think it may have --
2     MR. GILLESPIE: No question pending.
3  BY MS. McGRATH:
4  Q. Okay. Did you at some point learn that
5  Missy Schroeder resigned from her position?
6  A. Yes.
7  Q. Who did you learn that from?
8  A. I think Judge Greanius.
9  Q. What did Judge Greanius tell you about Missy
10 Schroeder resigning from her position?
11 A. I do not remember the details of the
12 conversation.
13 Q. Did the conversation with Judge Greanius
14 concerning Missy's resignation relate in any way --
15 in any manner to Missy complaining about Judge
16 Sappington's behaviors?
17 A. No, I don't believe so.
18 Q. Did you have an understanding of what the
19 reason was for Missy's resignation at that point?
20 A. I believe, at that point, I felt it was
21 still a personality problem.
22 Q. Can you tell me anything else about what
23 caused you to perceive the problems between Judge
24 Sappington and Missy Schroeder was a personality

Page 34

1  problem?
2  A. I think my discussions with Judge Greanius.
3  Q. And other than what you've told me to date,
4  is there anything else that Judge Greanius said to
5  you or you said to him in these conversations that
6  led you to perceive it was a personality problem?
7     MS. McNAUGHT: Object to the form of the
8  question. He's testified there have been lots of
9  other parts of the conversation. He just doesn't
10 recall them all.
11    THE WITNESS: I -- I perceived the
12 difficulty between the two as, for some reason, not
13 being able to work together, and that Judge Greanius
14 was doing the best he could to resolve that problem.
15 BY MS. McGRATH:
16 Q. You never had any conversations with Missy
17 Schroeder, did you, about any problems she may or may
18 not have had with Judge Sappington?
19 A. I don't remember having any conversations
20 with Mrs. Schroeder about anything.
21    (Whereupon Deposition Exhibit No. 3 was
22    marked for identification by the court
23    reporter.)
24

Page 35

1  BY MS. McGRATH:
2  Q. Your Honor, I've handed you what's been
3  marked Exhibit 3. Do you recognize this document?
4  A. I do.
5  Q. And is this document your response to
6  Interrogatory questions sent --
7  A. It is.
8  Q. -- to you by the plaintiff?
9  A. Yes.
10 Q. Do you have any additions to make to your
11 response to Interrogatory Number 1?
12 A. Item number six.
13 Q. Oh, I'm sorry, I wanted to go through -- I
14 was referring you only to --
15 A. One by one?
16 Q. Interrogatory Number 1, yes.
17 A. No.
18 Q. Jane Ivey --
19 A. Evey.
20 Q. I'm sorry, Jane Evey, E-v-e-y, is she your
21 current administrative assistant?
22 A. She is.
23 Q. Is she, then, in a role similar to Janice
24 Shonkwiler's role as administration assistant in

Page 36

1  Macon County?
2  A. I don't know what Janice Shonkwiler's role
3  particularly is. But she is my administrative
4  assistant as chief judge.
5  Q. Is there any job description within the
6  circuit for administrative assistants?
7  A. I don't believe --
8     MS. McNAUGHT: I'll object to the form of
9  the question because I think you're talking about two
10 different kinds of administrative assistants, one to
11 the chief judge and one to the presiding judge. And
12 I think that there's -- I think the statute provides
13 for one and not the other. So to that extent I'll
14 object.
15    MS. McGRATH: You can answer, Your Honor.
16    THE WITNESS: Janice Shonkwiler is paid by
17 Macon County. Jane Evey is paid by the State of
18 Illinois. She has various -- Jane Evey has various
19 duties as to court reporters, checking the time
20 sheets, checking medical excuses, reporting such
21 things to the AOIC, typing letters on my behalf to
22 various people concerning the administration of the
23 court. She keeps the -- she's the keeper of the
24 files.

Page 37

BY MS. McGRATH:
Q. So what is the AOIC?
A. Administrative Office of the Illinois Courts.
Q. Do her functions relate to the entire circuit as opposed to just Piatt County?
A. It -- it relates to the administration of the circuit and also to Piatt County.
Q. Is there a job description for her position?
A. There may be with the Administrative Office of the Illinois Courts, but I'm not sure what it is.
Q. And are you aware as to whether there is a job description for the administrative assistant job which Janice Shonkwiler holds?
A. I am not aware.
Q. In Ms. Evey's functions as they relate to Piatt County, would she be an individual who an employee could appropriately report a claim of sexual harassment to?
MS. McNAUGHT: Object to the form of the question.
THE WITNESS: You mean an employee in Piatt County?
MS. McGRATH: Yes.

Page 38

THE WITNESS: Within the judicial department, or anyone? In the County Recorder's office, what --
BY MS. McGRATH:
Q. Well, let me ask you this. First of all, do you have judicial clerks here in Piatt County, minute clerks?
A. No.
Q. Do you have court reporters?
A. I have one.
Q. Would it be appropriate for a court reporter to report a concern about sexually harassing behaviors to Ms. Evey as your administrative assistant?
MS. McNAUGHT: Object to the form of the question.
THE WITNESS: Who would the complaint be coming from?
MS. McGRATH: The court reporter.
THE WITNESS: She could very well report something like that, yes.
MR. GILLESPIE: Well, you know, I would object to the extent that -- the order of the Supreme Court as to whom the harassing behaviors can be

Page 39

reported to because it speaks for itself. So if you want the witness to define which of the employees fit in which of the categories, I have no objection.
MS. McNAUGHT: The problem is, at least as I see it, if the Fed Ex man comes to sexually harass the court reporter, does the sexual harassment policy allow the court reporter to make the complaint to someone up the State of Illinois' chain of command. That's the problem with the form of your question.
MS. McGRATH: And in asking Your Honor the question, I was referring to the court reporter being the individual who had the complaint of sexual harassment.
MS. McNAUGHT: The court reporter is the sexual harasser? That's what I'm talking about. Who is the sexual harasser, a judicial employer or the Fed Ex man.
MS. McGRATH: I see your point.
THE WITNESS: Yeah, we need to know who the harasser is.
BY MS. McGRATH:
Q. In answering the question, were you making any assumptions as to the harasser being within the judicial system?

Page 40

A. Well, I had asked where was the harasser from, from the Recorder's office or where, or who was the harassee. We have to sort of narrow the scope of the question, and I'll try to answer it.
Q. Okay. And maybe answering this way may be simpler, and if not, I'm sure you'll let me know. Under what circumstances would someone be able to appropriately report a concern about sexual harassment to Ms. Evey?
MS. McNAUGHT: Object to the form of the question.
THE WITNESS: I would think that if anyone in the Judicial Department felt that they were being harassed they could contact Jane Evey. They could contact me. They could contact the EEOC. The policy lays out who the contact can be with.
BY MS. McGRATH:
Q. And what job titles fall within the Judicial Department?
A. In what county?
Q. Let's talk about Piatt County first.
A. Jane Evey would fall under the judicial department. The court reporter would fall under the judicial department. And that's about it. The

Page 41

1 bailiff would not; the bailiff is sheriff. The
2 deputy clerks would not because they fall under the
3 auspices or the control of the Clerk of the Circuit
4 Court.
5    Q. In other counties within the circuit, do
6 judicial clerks fall within the judicial department?
7    A. I think they would.
8    Q. Do you have anything to add, Your Honor, to
9 your response to paragraph two, Interrogatory 2?
10   A. Management personnel. No, no, I think that
11 would be the same. I would not consider,
12 necessarily, Janice Shonkwiler being in management.
13   Q. I'd like to direct your attention to your
14 response to Interrogatory Number 3 for a moment. Can
15 you tell me, other than what you've have already
16 indicated to me today concerning your conversations
17 with Judge Greanius, what knowledge Judge Greanius
18 would have with regard to the plaintiff's complaint?
19   A. I don't, except what Melissa Schroeder told
20 him. I know the policy, the Supreme Court's policy
21 on sexual harassment, is very sensitive to
22 confidentiality. I think it also calls for a written
23 complaint, if at all possible. And a written
24 complaint focuses on a particular gravamen of the

Page 42

1 complaint. I don't -- I don't believe an
2 investigation was started on that basis.
3    Q. Well, Your Honor, if I might --
4    A. Sure.
5    Q. -- I'm directing your attention to
6 Interrogatory Number 3.
7    A. Right.
8    Q. I'm asking if you have anything additional
9 to add in regard to that inquiry with Judge Greanius.
10 Why have you entered Jerry L. Patton there, Circuit
11 Judge; what knowledge does Judge Patton have?
12   A. Judge Patton was a judge within the
13 temporary facility. I don't know if he was on the
14 same floor, but by listing all of the judges I listed
15 anyone that possibly could have any knowledge about
16 the event. I don't know whether they do or not. I
17 just listed them to be as complete as I could.
18   Q. Okay, I understand. Then you have no either
19 general or specific knowledge about what any of these
20 individuals --
21   A. No.
22   Q. -- identified in Interrogatory Number 3 may
23 have?
24   A. No. Just that they were in the area.

Page 43

1    Q. Okay. And you're also reading my questions
2 again, Your Honor, before I can get them out.
3    A. I'm sorry about that.
4    Q. Do you have anything to add, Your Honor, to
5 your response to Interrogatory Number 4?
6    A. No.
7    Q. I believe, Your Honor, you indicated you did
8 have something to add to your response to
9 Interrogatory Number 6?
10   A. Yes.
11   Q. And what would that addition be?
12   A. Judicial personnel have received training at
13 this point.
14   Q. Can you tell me when that training occurred,
15 Your Honor?
16   A. Yes. The training finally took place on --
17 in June of last year. If I can add a caveat to that
18 --
19   Q. That's fine.
20   A. -- when I wrote the Administrative Order,
21 I'd called the Administrative Office and asked them
22 if they would provide training for this, for sexual
23 harassment. Now, I noted that the chief judges were
24 responsible for training. I also noted that they are

Page 44

1 responsible for the support of the training. It did
2 not specifically say they're responsible to train. I
3 had no knowledge how to train people in this field.
4 I requested the Administrative Office if they would
5 conduct training for my personnel, and they said they
6 did not, they would not.
7        Subsequently, I pursued the matter again.
8 They suggested I contact the Attorney General, and I
9 did, and the Attorney General felt that they could
10 not. I had a CMO in Decatur that said that he
11 would -- the Chief Managing Officer of the Probation
12 Department -- he said they would conduct training,
13 and we purchased training books. He subsequently
14 read where trainers can be sued for improper training
15 so he backed out, had to return the books. There was
16 a suggestion that CMS would do it. I contacted them.
17   Q. What is CMS?
18   A. Central Management Services. They would not
19 do it. I finally contacted the Department of Human
20 Rights. They said that they would conduct training.
21 I then notified the AOIC to see if any other circuits
22 would want to be involved in the training. I got a
23 call back saying that the -- department from the
24 AOIC -- saying the department would not conduct the

**Page 45**

1 training. So the AOIC came up with their own
2 individual, and that's how we got the training.
3   Q. The contacts that you've talked about, Your
4 Honor --
5     MS. McNAUGHT: Just a minute. To the extent
6 that that can be considered any kind of subsequent
7 remedial measure, I object and I ask that it be
8 stricken.
9 BY MS. McGRATH:
10   Q. And I just want to clarify when the training
11 took place, Your Honor -- or, I'm sorry when the
12 contacts were made by you. My understanding that the
13 initial time you requested --
14   A. Was sometime --
15   Q. -- additional training --
16   A. Was sometime in 1995.
17   Q. I'm sorry?
18   A. 1995, when I came out with the
19 Administrative Order, the AO. After that, it was
20 after the event that I again pursued the matter.
21   Q. Okay. And by the event, was it after Ms. --
22   A. Yes.
23   Q. -- Schroeder, you're reading my mind again,
24 was it after Mrs. Schroeder had filed a complaint?

**Page 46**

1   A. Yes.
2   Q. Thank you, Your Honor. Do you have anything
3 to add to your response to Interrogatory Number 7,
4 Your Honor?
5   A. No.
6   Q. Do you have anything to add to any of the
7 additional interrogatories in Exhibit Number 3?
8   A. No.
9   Q. Your Honor, did you bring any additional
10 documentation with you today to the deposition
11 pursuant to our notice of deposition with the
12 exception of anything that has already been provided
13 in discovery?
14   A. I did not.
15     MS. McGRATH: I have nothing further. Thank
16 you, Your Honor.
17     MS. McNAUGHT: Anybody else?
18     MR. CASSIDY: Yes.
19     MS. McNAUGHT: Can we take a break?
20     (Whereupon a brief recess was taken.)
21         EXAMINATION
22 BY MR. CASSIDY:
23   Q. Judge, the first thing I want to do is go to
24 the -- I don't know if we marked it, was it Exhibit

**Page 47**

1 1? -- it's the Administrative Directive of the
2 Supreme Court. The first question I have is -- I
3 don't know if you can read it, mine is cut off. Can
4 you tell what that last sentence says with the
5 handwritten part at the bottom?
6   A. I can't, no. I know that I can read
7 Rodney A. Scott's initials.
8   Q. Right. Now, when it -- at this point in
9 time he, Judge Scott was the chief judge; is that
10 correct?
11   A. He was.
12   Q. And where was he assigned then, to what
13 county?
14   A. Judge Scott was in Macon County.
15   Q. Okay. And it says to his administrative
16 assistant, that would be -- would that be the
17 administrative assistant that is -- that would have
18 been paid by the State, similar to Miss Evey, or
19 would that have been an administrative assistant
20 similar to Janice Shonkwiler, who receives her
21 payments through the county, or do you know?
22   A. I don't know. Jane Evey was in Macon County
23 prior to coming to Piatt County. It may or may not
24 have been her. I just don't know.

**Page 48**

1   Q. Do all of the -- strike that. Judge
2 Greanius has an administrative assistant --
3   A. Right.
4   Q. -- who we've identified as Janice
5 Shonkwiler?
6   A. Mm-hmm.
7   Q. Do all the counties having presiding judges
8 have administrative assistants?
9   A. Some do and some don't.
10   Q. And on what basis is it determined whether
11 or not a presiding judge gets an administrative
12 assistant?
13   A. Normally, the size of the county.
14   Q. Okay. Which counties do have administrative
15 assistants?
16   A. I believe Champaign and Macon County have
17 administrative assistants to the presiding judge.
18 The other four rural counties within the circuit do
19 not.
20   Q. Okay. And how -- what is the process that,
21 if you know, that was set forth that allowed
22 presiding judges to obtain administrative assistants
23 that are different from your -- the chief judge's
24 administrative assistant?

Page 49

1  A. That would be between the presiding judge
2  and his county board.
3  Q. Okay. So each presiding judge, that is not
4  something that's discussed with the chief judge?
5  A. No.
6  Q. Would the same situation be true for
7  judicial clerks; would that be between the County
8  Board on how many they're willing to pay and the
9  judiciary in that particular county?
10 A. Yes.
11 Q. Now, you were asked a question about who --
12 whether or not you believed Missy Schroeder was a
13 nonjudicial personnel. Do you recall that question
14 as it relates to the --
15 A. Yes.
16 Q. -- Supreme Court policy?
17 A. Right.
18 Q. And you indicated that judicial clerks were,
19 in your opinion, nonjudicial personnel as we find
20 under that policy; is that correct?
21 A. Yes.
22 Q. Would it be your opinion that Janice
23 Shonkwiler, as an administrative assistant, would
24 also be nonjudicial personnel?

Page 50

1  A. I believe so.
2  Q. And can you tell me what the basis of that
3  opinion is?
4  A. They are under -- not under any other
5  constitutional officer, like the Clerk of the Circuit
6  Court. They are not paid by the judiciary, judicial
7  branch, of course, but I believe judicial clerks
8  would be hired and fired by the judicial department.
9  Q. How about administrative assistants similar
10 to Janice Shonkwiler?
11 A. I think she would be hired and fired by the
12 presiding judge.
13 Q. And is it also your understanding that
14 administrative assistants similar to Janice
15 Shonkwiler would also be under the exclusive control
16 and supervision of the judiciary in that county?
17     MS. McNAUGHT: I'll object to the question
18 to the extent it asks for any sort of legal opinion.
19 If you're asking a personal opinion, that's fine.
20     MR. CASSIDY: I'm asking a personal
21 opinion.
22     THE WITNESS: Yes.
23 BY MR. CASSIDY:
24 Q. And the reason for that, would you agree,

Page 51

1  Judge, is because the judicial branch is a separate
2  branch of -- constitutional branch of government, the
3  judiciary, that requires, because of that, that they
4  be separate and distinct from the other branches; do
5  you understand what I'm saying?
6      MS. McNAUGHT: To the extent that calls for
7  a legal conclusion, I'll object.
8      THE WITNESS: It's a separate branch of
9  government.
10 BY MR. CASSIDY:
11 Q. Let me -- that was a bad question. You're
12 familiar with separation of powers, the general
13 theory?
14 A. I am.
15 Q. And you understand it applies to both the
16 federal government and the state government?
17 A. Correct.
18 Q. And you understand that the creation of
19 counties and the executive offices in each county are
20 constitutionally created?
21 A. Mm-hmm.
22 Q. Correct?
23 A. (Nodding head.)
24 Q. And there's also the judicial branch; is

Page 52

1  that correct?
2  A. That's correct.
3  Q. And is it your understanding that the
4  separation of power issue applies between those two
5  branches?
6  A. Yeah.
7      MS. McNAUGHT: Objection to the extent it
8  calls for a legal conclusion.
9      THE WITNESS: Yes.
10 BY MR. CASSIDY:
11 Q. And is that one of the reasons why you
12 believe that Janice Shonkwiler's administrative
13 assistant should be controlled exclusively within the
14 judicial branch?
15     MS. McNAUGHT: Same objection.
16     THE WITNESS: One of the reasons.
17 BY MR. CASSIDY:
18 Q. What are some of the other reasons?
19 A. Who controls and pays. For example, the
20 bailiff is supposed to take direction from the
21 court. He's there to protect the court. But in many
22 counties the bailiff is hired, fired, and also
23 controlled by the sheriff. So while there is a
24 separation of powers, there is a merging, to some

### Page 53

1  degree, of that particular function.
2  Q. That would be true under bailiffs, but you
3  would agree, though, judicial clerks such as Missy
4  Schroeder, when she was there, wasn't hired and fired
5  by a separate branch of the county but rather was
6  hired and fired by the judiciary?
7  A. Right. As I understand it.
8  Q. Right. And the same would be true for
9  Janice Shonkwiler in her position as the
10 administrative assistant to Judge Greanius?
11 A. Yes.
12 Q. So other than the fact of payment and
13 benefits, would you agree that all other aspects of
14 Janice Shonkwiler's employment appeared to have
15 fallen under the judicial branch?
16 A. I think so.
17 Q. And would you agree that the same would be
18 true concerning Missy Schroeder when she was employed
19 as Judge Sappington's judicial clerk?
20 A. I believe so.
21    MS. BARON: No questions.
22    MS. McNAUGHT: I think I want to ask some
23 follow-ups.
24

### Page 54

1         EXAMINATION
2  BY MS. McNAUGHT:
3  Q. What are the other rural counties in your
4  circuit?
5  A. Dewitt, Douglas, Piatt, and Moultrie.
6  Q. And if there isn't a presiding judge in
7  those counties, who would have the obligation to put
8  up the sexual harassment policy?
9  A. If there was no presiding judge?
10 Q. Right.
11 A. I would presume that the chief judge would
12 request the clerk of the court post it, or request
13 whoever was the judge in that county post it.
14 Q. When you talked about personality problems
15 between Missy Schroeder and Judge Sappington, were
16 you differentiating between sexual harassment?
17 A. Yes.
18    MS. McNAUGHT: I have nothing further.
19    MS. McGRATH: I don't have anything further,
20 other than what's going to happen with signature.
21    MR. GILLESPIE: He'll read.
22    REPORTER: Are you ordering a copy; shall I
23 send errata sheets to you?
24      .

### Page 55

1    MR. GILLESPIE: Sure.
2    MR. CASSIDY: Can I get a condensed with an
3 index?
4    MS. McGRATH: Same.
5    MS. BARON: Same.
6    MS. McNAUGHT: Regular, index, no
7 condensed.
8    (Whereupon the deposition concluded at 2:45
9 p.m.)

### Page 56

1 STATE OF ILLINOIS  )
                    ) SS.
2 COUNTY OF McLEAN   )
3     IN THE UNITED STATES DISTRICT COURT
4         CENTRAL DISTRICT OF ILLINOIS
5              URBANA DIVISION
6
  MELISSA ROBINSON, (f/k/a)  )
7 MELISSA SCHROEDER),        )
                             )
8    Plaintiff,              )
                             )
9    -vs-                    ) No. 99-2266
                             )
10 JUDGE WARREN A. SAPPINGTON,)
   ET AL.,                   )
11                           )
   Defendant.                )
12
13 FEDERAL RULE OF CIVIL PROCEDURE 30(e) STATEMENT
14    I hereby state that I have read the
   foregoing transcript of my deposition given at the
15 time and place aforesaid and that I have recorded the
   changes in form or substance and the reason(s) given
16 therefore as they appear on the attached signed
   correction sheet(s).
17
          _____ correction sheet(s) attached.
18
19    _____
20         JOHN P. SHONKWILER
21 SUBSCRIBED AND SWORN to
22 before me this    day
   of
23    A.D., 2001.
24 Notary Public

| ROBINSON VS. SAPPINGTON | CondenseIt!™ | JOHN SHONKWILER |

Page 57

```
STATE OF ILLINOIS  )
                   ) SS.
COUNTY OF McLEAN   )
```

FEDERAL RULE OF CIVIL PROCEDURE
RULE 30(f)(1) CERTIFICATE

I, Fran Anderson, a Certified Shorthand Reporter and Notary Public in and for the County of McLean and State of Illinois, do hereby certify that heretofore on, to wit, on May 11, 2001, personally appeared before me at Piatt County Courthouse, 101 West Washington, Monticello, Illinois, John P. Shonkwiler, produced as a witness in said cause.

I further certify that said witness, John P. Shonkwiler, was by me first duly sworn to testify the truth, the whole truth, and nothing but the truth in the cause aforesaid before the taking of the deposition; that the testimony was reduced to writing in the presence of said witness by means of machine shorthand and afterwards transcribed into typewriting, and that the foregoing is a true and correct record of the testimony given by said witness.

I further certify that review of the transcript was requested by the witness or by a party before completion of the deposition and that any

Page 58

changes made by the witness are appended hereto in the form of a Rule 30(e) Statement.

I further certify that there were present at the taking of said deposition Melissa McGrath, on behalf of Plaintiff; Diane Baron, on behalf of Defendant Sappington; John Cassidy, on behalf of Defendant Macon County; Robert Gillespie, on behalf of Defendant Shonkwiler; and Karen McNaught, on behalf of Defendant Shonkwiler.

I further certify that my certificate annexed hereto applies to the original transcript and copies thereof, signed and certified by me only. I assume no responsibility for the accuracy of any reproduced copies not made under my control or direction.

In testimony whereof, I have hereunto set my hand and affixed my notarial seal this 29th day of May, 2001.

Page 59

*Fran Anderson*
Fran Anderson, CSR
6 Rock Garden Court
Unit 1
Bloomington, IL 61704
(309) 664-7389

Notary Public - CSR No. 084-002930

"OFFICIAL SEAL"
FRAN A. ANDERSON
NOTARY PUBLIC STATE OF ILLINOIS
COMMISSION EXPIRES 04/02/05