# ROBIN JOHNSON

RECEIVED
NOV 21 2001
CASSIDY & MUELLER

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MELISSA ROBINSON, (f/k/a )
MELISSA SCHROEDER), )
    Plaintiff, )
    -vs- ) No. 99-2097
JUDGE WARREN A. SAPPINGTON, )
SIXTH JUDICIAL CIRCUIT, (IN )
OFFICIAL CAPACITY AND )
INDIVIDUALLY) )
    Defendant, )
MACON COUNTY, )
JOHN P. SHONKWILER, CHIEF )
JUDGE, SIXTH JUDICIAL )
CIRCUIT, MACON COUNTY CIRCUIT)
COURT, MACON COUNTY (IN )
OFFICIAL CAPACITY AND NOT )
INDIVIDUALLY) )
    Defendant. )

    Deposition taken of ROBIN JOHNSON on the 22nd day of October, A.D., 2001, at Macon County Courthouse, 253 E. Wood Street, Fifth Floor, Decatur, Illinois, commencing at 9:15 a.m., before Kitty L. Malcom, a Certified Shorthand Reporter, License No. 084-002106, pursuant to Notice.

APPEARANCES:

    Ms. Melissa M. McGrath, Esq.
    THOMSON & WEINTRAUB
    105 North Center St., P.O. Box 3577
    Bloomington, IL 61702-3577
    309/829-7069
        On behalf of Plaintiff

Page 2

    Ms. Karen McNaught
    Assistant Attorney General
    OFFICE OF THE ATTORNEY GENERAL
    500 So. Second Street
    Springfield, IL 62706
    217/782-5819
        On behalf of Warren Sappington

    Ms. Diane Baron, Esq.
    CLAUSEN MILLER, P.C.
    10 So. LaSalle Street
    Chicago, IL 60603-1098
    312/855-1010
        On behalf of Warren Sappington

    Mr. Robert Gillespie, Esq.
    HINSHAW & CULBERTSON
    400 So. Ninth Street, Suite 200
    Springfield, IL 62701
    217/528-7375
        On behalf of Judge Shonkwiler

    Mr. John E. Cassidy, Esq.
    CASSIDY & MUELLER
    323 Commerce Bank Bldg.
    416 Main Street
    Peoria, IL 61602
    309/676-0591
        On behalf of Macon County

************************************

I N D E X

WITNESS:
ROBIN JOHNSON

    Examination by Ms. McGrath............ 3
    Examination by Mr. Cassidy............ 20
    Examination by Ms. McNaught........... 26
    Examination by Ms. McGrath............ 27
    Examination by Mr. Cassidy............ 29

EXHIBITS:

    None marked

Page 3

1    ROBIN JOHNSON,
2 called as a witness, after being first duly sworn,
3 was examined and testified upon her oath as follows:
4
5    EXAMINATION
6 BY MS. McGRATH:
7    Q. Would you state and spell your name for the
8 reporter?
9    A. Robin, R-O-B-I-N, Johnson, J-O-H-N-S-O-N.
10    Q. What is your current address?
11    A. 341 South Hayworth Avenue, H-A-Y-W-O-R-T-H,
12 Decatur, 62522.
13    Q. Ms. Johnson, I'm going to be asking you some
14 questions. If I ask you something that you don't
15 understand, please just ask me to reword it. Okay?
16    A. Yes.
17    Q. I am going to be asking you questions that
18 you're probably going to know the answer to before I
19 even complete the question. If you can try to wait
20 and bear with me and let me get the question out
21 before you answer so that the court reporter can
22 record both of us. Okay?
23    A. Yes.
24    Q. Where are you currently employed?

Page 4

1    A. Macon County.
2    Q. In what capacity?
3    A. Judicial clerk for Judge A.G. Webber.
4    Q. How long have you been a judicial clerk for
5 Judge Webber?
6    A. I have been a judicial clerk for Judge
7 Webber since July 2nd, 2001, when he was appointed.
8    Q. Were you a judicial clerk before July 2nd,
9 2001?
10    A. I have worked for Macon County for 19 years.
11    Q. Were you appointed or did you work as a
12 judicial clerk with Judge Diamond for a period of
13 time?
14    A. I was his secretary.
15    Q. And during what period were you Judge
16 Diamond's secretary?
17    A. Perhaps from October of 1983 until October
18 of 1998 or '99.
19    Q. As a secretary to Judge Diamond, were your
20 duties different than they are as a judicial clerk?
21    A. No. They were the same. Sometime during
22 that period Judge Greanias changed our titles to
23 judicial clerks.
24    Q. If I can focus you in on the time period

Page 17

1  Q. I guess what I am trying to understand is if
2  you recall any particular time when you saw her
3  upset?
4  A. No, no.
5  Q. While you were at the Ambassador building,
6  were there occasions when you would see Judge
7  Sappington angry?
8  A. I can't recall. I can't recall.
9  Q. No incident stands out in your mind?
10  A. No.
11  Q. I think you indicated that you thought Missy
12  Schroeder quit her job, resigned. Did you indicate
13  that?
14  A. Yes.
15  Q. What caused you to think that?
16  A. It's very rare that a clerk leaves. We're
17  lifers here.
18  Q. While you worked with Judge Sappington did
19  you and he ever go to lunch?
20  A. No.
21  Q. You have been here 19 years I think you
22  indicated?
23  A. Yes.
24  Q. Throughout that time are you aware of anyone

Page 18

1  expressing concerns about Judge Sappington's
2  behaviors towards women?
3  A. No.
4  Q. Have you had any conversations with Judge
5  Greanias concerning Missy Schroeder?
6  A. Not that I can recall.
7  Q. Have you had any conversations with Judge
8  Diamond about Missy Schroeder?
9  A. No.
10  Q. Have you had any conversations with Judge
11  Shonkwiler about Missy Schroeder?
12  A. No.
13  Q. Any conversations with Janice Shonkwiler
14  about Missy Schroeder?
15  A. Well, if you consider this to be a
16  conversation about her, yes.
17  Q. I'm sorry, by this do you mean your
18  deposition?
19  A. Yes.
20  Q. When did you have conversations with Janice
21  Shonkwiler about your deposition?
22  A. This morning when she came and told me that
23  I had to come and do this.
24  Q. Did you know before this morning that you

Page 19

1  were disclosed as a possible witness in this case?
2  A. I have spoken with counsel. We had an
3  appointment one day. But I really wasn't expecting
4  this.
5      MR. CASSIDY: What counsel?
6      MS. McNAUGHT: McNaught.
7      THE WITNESS: Yes, I'm sorry.
8  BY MS. McGRATH:
9  Q. Did you also know Ruth Young while she
10  worked here?
11  A. Yes.
12  Q. How would you describe your working
13  relationship with Ms. Young?
14  A. I did not have one.
15  Q. You didn't have a working relationship with
16  Ms. Young?
17  A. I never had to deal with her. We didn't --
18  "hi" was about as much as we said.
19  Q. Did you ever notice anything unusual about
20  the behaviors between Judge Sappington and Missy
21  Schroeder?
22  A. No.
23      MS. McGRATH: I don't have anything further.
24  Thank you.

Page 20

1      EXAMINATION
2  BY MR. CASSIDY:
3  Q. I have a couple of questions. You were
4  hired in 1983; is that correct?
5  A. Yes.
6  Q. How did you put your application in? What
7  was the process when you were hired; do you recall?
8  A. When I graduated from high school my first
9  summer, 1981, I began working in the Circuit Clerk's
10  Office. For two summers I worked there. I was Judge
11  Diamond's clerk. And when his secretary left,
12  because he knew that I took shorthand at Richland he
13  asked me if I wanted the job.
14  Q. So, as far as learning that there was a job
15  opening and who you dealt with in getting hired, it
16  would have been Judge Diamond; is that correct?
17  A. Yes.
18  Q. Who was the presiding judge at that time?
19  A. Scott.
20  Q. Do you know whether or not Judge Scott
21  needed to approve your hiring or not?
22  A. No.
23  Q. Do you know if anybody from the Macon County
24  board was involved in that process?

Page 21

1  A. No.
2  Q. You don't know or they weren't?
3  A. They weren't. Judge Diamond asked me if I
4  wanted the job and I accepted it.
5  Q. And then from the beginning up until the
6  present, as far as your day-to-day duties, you
7  indicated I think that Judge Diamond originally gave
8  you all your directions when you worked for him and I
9  assume it has been Judge Webber since that time?
10  A. No. From the period that I left Judge
11  Diamond until July of this year I was administrative
12  judicial clerk.
13  Q. What is that?
14  A. It was a position that Judge Greanias
15  created that had me in charge of all the judicial
16  clerks and also liaison between the courts and the
17  Circuit Clerk's Office.
18  Q. And who did you take your directions from
19  when you held that position?
20  A. Judge Greanias.
21  Q. And then after that, since you're with Judge
22  Webber since July of this year, you have been taking
23  your directions from him; is that correct?
24  A. That's correct.

Page 22

1  Q. And you indicated that the only other person
2  that has given you directions would have been Janice
3  Shonkwiler, is that correct, during your 19 years of
4  employment?
5  A. No, that's not correct.
6  Q. Who else would have?
7  A. Only the judges give us direction.
8  Q. So, again, no one from the county board or
9  anybody with Macon County itself would get involved
10  in your day-to-day directions but rather would be the
11  judges; is that correct?
12  A. That's correct.
13  Q. Now, concerning decisions on -- well, sounds
14  like if you are given that position of administrative
15  judicial clerk or so it might not have been an issue,
16  but if there was a question of suspension, would that
17  also be a decision of the judges?
18  A. Yes.
19  Q. How about over the years I assume you
20  received some raises; is that correct? You're
21  laughing; maybe not too many?
22  A. That's correct.
23  Q. Who makes those decisions?
24  A. Judge Greanias.

Page 23

1  Q. What is your understanding as far as a
2  decision to let someone go in your position, would
3  that also be Judge Greanias or one of the judges?
4  A. I would imagine that would be one of the
5  judges.
6  Q. Again, as far as you're aware, the county
7  board and people outside the judiciary would not get
8  involved in that decision; is that correct?
9  A. That is correct.
10  Q. Now, the reason I ask these questions, you
11  indicated that you were hired by Macon County, you
12  are employed by Macon County. Is it fair to state
13  that a more accurate description would be that you
14  were hired by and you work for the judicial branch of
15  Macon County?
16  A. That would be correct, but they sign my
17  checks.
18  Q. That is my next question. Is it fair to say
19  that the only thing that you're aware that Macon
20  County itself gets involved in is providing you with
21  a paycheck and benefits such as insurance?
22  A. Well, they decide whether or not we get
23  raises or not.
24  Q. You indicated earlier that Judge Greanias

Page 24

1  made that decision?
2  A. He put us in some step plan that indicated
3  with your years of service what your salary would be.
4  But, of course, by the time he made that schedule I
5  had already topped out of it, so --
6  Q. So you just indicated that Macon County
7  makes the decision on raises?
8  A. He has to present his budget to the board
9  and they approve or decline.
10  Q. But is it your understanding that that is
11  just the total budget, but Judge Greanias decides how
12  much of that total budget is divied up?
13  A. Yes.
14  Q. So, the county board makes a decision on the
15  total budget, but as to how much within the judicial
16  branch people receive, that would be a decision of
17  the presiding judge?
18  A. Yes.
19  Q. Now, you talked about the sexual harassment
20  policy. Is it your understanding that that written
21  policy came through the Supreme Court of the United
22  States -- not the United States -- of Illinois?
23  A. Yes.
24  Q. And the program that was put on, Judge

Page 25

1 Greanias put that together?
2   A. I don't know if he did or the probation
3 office did.
4   Q. You're not sure on that?
5   A. I'm not sure.
6   Q. So, from my understanding is although that
7 you receive your paychecks on Macon County checks and
8 your benefits, insurance and so forth which would
9 come from Macon County, all decisions about raises
10 and control and discipline, hiring and firing and
11 things of that nature all had come from the judicial
12 branch; is that correct? Is that your understanding?
13   A. I want to say yes, but I'm not sure where
14 you are going.
15   Q. It's a legal issue, but we just need to get
16 the facts. I just want your understanding. Your
17 answer is yes?
18   A. Yes.
19   Q. Now, the last thing that I want to ask you
20 is you were asked a question about Ruth Young. Can
21 you describe her personality or character? Did you
22 get an impression of that?
23   A. Yes.
24   Q. What is your impression?

Page 26

1   A. She was different.
2   Q. Kind of a busy body?
3   A. Perhaps.
4   Q. Kind of interjected herself into other
5 people's affairs a little bit?
6   A. Perhaps.
7     MR. CASSIDY: Okay. Thank you.
8     MS. BARON: No questions.
9     MR. GILLESPIE: No questions.
10     MS. McGRATH: I have a couple of follow-up
11 questions for you.
12     MS. McNAUGHT: Actually can I go first?
13     MS. McGRATH: Sure. Go ahead. Sorry.
14     EXAMINATION
15 BY MS. McNAUGHT:
16   Q. When you said that when you were gone for
17 the month of October of 1996, other people, other
18 judicial clerks were expected to help in your
19 absence?
20   A. Yes.
21   Q. Was that unusual for everyone to assist
22 another judge --
23   A. No.
24   Q. -- in the absence of their judicial clerk?

Page 27

1   A. No.
2   Q. And, likewise, were you expected to help out
3 other judicial clerks when they couldn't meet their
4 assigned duties?
5   A. Yes.
6   Q. Were you ever Janice Shonkwiler's assistant?
7   A. Never.
8   Q. Did you ever see Judge Sappington subject
9 anyone to any kind of a sexually harassing
10 environment?
11   A. No.
12     MS. McNAUGHT: Nothing further.
13     EXAMINATION
14 BY MS. McGRATH:
15   Q. What do you mean when you say perhaps Miss
16 Young could be characterized as a busy buddy?
17   A. Perhaps she could.
18   Q. What does busy body mean to you?
19   A. Into other people's business, nosey.
20   Q. And am I correct that there's others that
21 work here at Macon County and have worked here during
22 1996 that you could characterize as busy bodies?
23   A. Yes.
24   Q. Who would those individuals be?

Page 28

1   A. Everyone. I am a very quiet person. I stay
2 to myself, so almost everyone.
3   Q. The sexual harassment seminar that you
4 attended, I got the idea from questioning by Mr.
5 Cassidy that the probation office also attended that?
6   A. Yes, they did.
7   Q. Who else, what other departments, if you
8 will, were in attendance at that seminar?
9   A. I believe the State's Attorney's Office.
10 There were even people here from out of town that
11 came to that.
12   Q. Do you know where these out-of-town people
13 worked?
14   A. No, I don't remember.
15   Q. Are there any other seminars or training
16 that you can recall attending where people from other
17 departments attended?
18   A. No. That is the only one that we have ever
19 had.
20   Q. Is that the only training in anything that
21 you have attended?
22   A. Well, not me. I went to a seminar in
23 Springfield on administrative stuff when I was doing
24 that, but since I have been here that's the only

Page 29

1 seminar that I have ever taken.
2   Q. Just so you understand what I am asking
3 about, are there times when a group of employees here
4 at the courthouse will have scheduled meetings to
5 discuss a certain topic?
6   A. Only if there is like perhaps an opening for
7 new insurance enrollees, something like that. That
8 would be the only thing.
9   Q. Other than the sexual harassment handbook,
10 have you been provided any other types of personnel
11 handbooks or policies?
12   A. No.
13   Q. No?
14   A. No.
15      MS. McGRATH: I don't have anything further.
16 Thank you.
17      EXAMINATION
18 BY MR. CASSIDY:
19   Q. Just a few follow-up questions. This
20 program that you indicated the probation office may
21 have attended and also the State's Attorney's Office,
22 it appears that the program was available to a number
23 of people; is that correct?
24   A. Yes.

Page 30

1   Q. But who was it that directed you to go to
2 it? Was it from Judge Greanias?
3   A. Yes.
4   Q. Again, the actual written policy itself came
5 from the court system, Supreme Court of Illinois?
6   A. I don't know. I saw it from Judge
7 Shonkwiler hanging up on our board downstairs.
8   Q. Do you know was the same direction or same
9 notice given to the probation department from Judge
10 Greanias regarding sexual harassment training?
11   A. I don't know.
12      MR. CASSIDY: Thank you.
13      MS. McNAUGHT: You have the right to review
14 the transcript to make sure that the court reporter
15 has recorded your answers accurately. You can
16 indicate that you do want to review the transcript,
17 in which case the court reporter will send that to
18 you and you would need to get it back to the court
19 reporter. Alternatively you can say I trust that the
20 court reporter recorded my answers right and I waive
21 signing off on the transcript.
22      THE WITNESS: Well, as far as I would love to
23 see it, I would trust she got it all down correctly.
24      MS. McNAUGHT: So you will waive signature?

Page 31

1      THE WITNESS: I will waive.

Page 32

1 STATE OF ILLINOIS  )
                    )
2 COUNTY OF McLEAN   )
     FEDERAL RULE OF CIVIL PROCEDURE RULE
3         30(f)(1) CERTIFICATE
4      I, KITTY L. MALCOM, C.S.R., a notary public
5 in and for the County of McLean and State of
6 Illinois, do hereby certify that on the 22nd day of
7 October, 2001, personally appeared before me at 253
8 East Wood Street, Decatur, Illinois, ROBIN JOHNSON,
9 produced as a witness in said cause.
10     I further certify that said witness was by
11 me first duly sworn to testify the whole truth in the
12 cause aforesaid before the taking of the deposition;
13 that the testimony was reduced to writing in the
14 presence of said witness by means of machine
15 shorthand and afterwards transcribed into
16 typewriting; and that the foregoing is a true and
17 correct record of the testimony given by said
18 witness.
19     I further certify that I am neither counsel
20 for nor related to counsel for any of the parties to
21 this suit, nor am I in any way related to any of the
22 parties to this suit, nor am I in any way interested
23 in the outcome thereof.
24     I further certify that my certificate

SCHROEDER v. SAPPINGTON, et al     CondenseIt!™     ROBIN JOHNSON

Page 33

1 annexed hereto applies to the original transcript and
2 copies thereof, signed and certified by me only. I
3 assume no responsibility for the accuracy of any
4 reproduced copies not made under my control or
5 direction.
6
7      IN WITNESS WHEREOF, I have hereunto set my
8 hand and affixed my notarial seal this 17th day of
9 November, 2001.
10
11
12      *Kitty L. Malcom*
     Kitty L. Malcom, CSR-RPR
13      1310 E. Ironwood CC Dr.
     Normal, IL 61761
14      (309)454-3378
15
16
17      OFFICIAL SEAL
18      KITTY L. MALCOM
     NOTARY PUBLIC, STATE OF ILLINOIS
19      MY COMMISSION EXPIRES 7-20-2005
20
21
22
23
24