**E-FILED**
Monday, 07 February, 2005  03:30:40 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 1

Deposition of Janice Shonkwiler

**Page 1**

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MELISSA ROBINSON,
(p/k/a MELISSA SCHROEDER),        )
                                  )
        Plaintiff,                )
                                  )
    vs.                           )   Case No. 99-2266
                                  )
JUDGE WARREN A. SAPPINGTON,       )
SIXTH JUDICIAL CIRCUIT,           )
(IN OFFICIAL CAPACITY AND         )
INDIVIDUALLY), and MACON          )
COUNTY,                           )
                                  )
        Defendants.               )

ORIGINAL

        THE DEPOSITION of JANICE SHONKWILER, a witness,
called by the Plaintiff for examination pursuant to
notice and pursuant to the Federal Rules of Civil
Procedure pertaining to the taking of depositions, taken
before Rose M. LaBerdia, CSR, RDR, CRR, License No.
084-001506, a Notary Public in and for the County of
Peoria and State of Illinois, at 105 N. Center Street, in
the City of Bloomington, County of McLean, and State of
Illinois, on the 19th day of July, A.D. 2000, commencing
at 9:10 a.m.

**Page 2**

APPEARANCES:

        MELISSA M. McGRATH, ESQ.
        THOMSON & WEINTRAUB
        105 N. Center Street
        Bloomington, Illinois 61701
            On Behalf of the Plaintiff.

        KAREN McNAUGHT, ESQ.
        Assistant Attorney General
        500 South Second Street
        Springfield, Illinois 62706
            On Behalf of the Defendant Sappington.

        RICHARD CHAPIN, ESQ.
        HINSHAW & CULBERTSON
        1802 Fox Drive
        Champaign, Illinois 61820
            On Behalf of the Defendant Macon County.

            I N D E X

WITNESS:

                                            Page

    JANICE SHONKWILER

        Examination by Ms. McGrath  .   .   .   3
        Examination by Ms. Chapin  .   .   .  115
        Examination by Mr. McNaught  .   .   . 138
        Further Examination by Ms. McGrath  . 141

EXHIBITS:                              Page Marked

    Exhibit No. 1 .     .    .    .    .    15
        Supreme Court Policy

    Exhibit No. 2 .     .    .    .    .    23
        Drawing/Diagram

    Exhibit No. 3 .     .    .    .    .    27
        Redacted Notes

**Page 3**

1           JANICE SHONKWILER,
2   called as a witness, after being first duly sworn, was
3   examined and testified upon her oath as follows:
4                   EXAMINATION
5             BY MS. McGRATH:
6       Q.  Would you spell your name for the court
7   reporter?
8       A.  Janice, J-A-N-I-C-E, Shonkwiler,
9   S-H-O-N-K-W-I-L-E-R.
10      Q.  Thank you.  Do you mind if I call you Janice
11  while we're --
12      A.  That's fine.
13      Q.  -- talking?  Have you had your deposition taken
14  before, Janice?
15      A.  No.
16      Q.  Okay.  Let me just tell you -- give you a little
17  bit of ground rules.  I'm going to be asking you
18  questions.  I'm going to admit right up front that
19  sometimes I get wordy with my questions.  If you don't
20  understand something I say, feel free to say, "You've
21  confused me" or --
22      A.  Okay.
23      Q.  -- or, "Please reword the question."  If you're
24  going to answer yes or no, we need for you to not just

**Page 4**

1   nod your head but to speak your answer --
2       A.  Right.
3       Q.  -- so that the Court reporter can get down what
4   you're saying.  Also, try to wait.  Sometimes I'm going
5   to ask you a question, and you're going to know what I'm
6   asking you before I even finish the question.
7       A.  Okay.
8       Q.  Try to wait until I've asked you the whole
9   question so that the court reporter can get both of us
10  down in the record.
11      A.  Okay.
12      Q.  Okay.  I don't expect to go a very long time
13  today, but if at any time you need to take a break, just
14  let me know.  If you decide you'd like some coffee or
15  water, just let me know.
16      A.  Okay.
17      Q.  Okay?  Just for the record, are you represented
18  today by counsel?
19      A.  No.
20      Q.  Okay.  What is your present address?
21      A.  My home address?
22      Q.  Yes, your home address.
23      A.  2765 Cherokee Drive.
24      Q.  Could you spell Cherokee?

5

1      A. C-H-E-R-O-K-E-E. And that's at Decatur, 62521.
2      Q. Did you see the notice of deposition scheduling
3 the deposition today?
4      A. Yes. I have that with me.
5      Q. Okay. The notice of deposition asked you to
6 bring with you "any and all notes, memoranda or material
7 in any written form or verbal form which in any way
8 relate to Plaintiff's claim of sexual harassment." Did
9 you bring anything with you today?
10      A. I brought a calendar with me. It doesn't really
11 relate to her claim of sexual harassment, but I had
12 written some notes on it just of events that had occurred
13 at work.
14      Q. Does this calendar relate back to the time when
15 Melissa Schroeder worked at the same place of employment?
16      A. Yes.
17      Q. Okay. And do those notes of events – do those
18 events relate to Missy Schroeder in any way?
19      A. Yes.
20      Q. Okay. Can I see what you've brought with you?
21      A. Sure. And what I – I might explain that this
22 is just a calendar. It's kind of like my personal diary
23 of things that have taken place. I did make copies of
24 the pages where I had made any reference to Missy, and I

6

1 blacked out all the rest. So if you want to look at
2 that. And the calendar.
3      Q. Okay. So you have handed me a photocopy of the
4 original of what you've brought with you, which is a
5 spiral, kind of like a stenographer's notebook. Am I
6 understanding you correctly that you've copied all the
7 pages, blacked everything out with the exception of any
8 reference to Missy Schroeder?
9      A. That's correct.
10      Q. Okay.
11      A. And there's not much there.
12      Q. Okay. Well, I tell you what. I'll – during a
13 break, I'll take a look at those materials, and we can
14 talk about those then.
15      A. Okay.
16      MR. CHAPIN: May I go ahead and take a look at
17 them?
18      Q. Anything else you brought with you?
19      A. I just have a few notes of some dates that I
20 thought you might ask me about. I looked a few things
21 up, because I didn't remember when Missy started work, or
22 her termination date for sure.
23      Q. Okay. And is that the –
24      A. It's a piece of paper.

7

1      Q. That you have in front of you –
2      A. Yes.
3      Q. – right now? We'll see if that doesn't help
4 you out as I'm asking you questions. Okay?
5      A. Okay.
6      Q. Who is your present employer?
7      A. My present employer is Macon County.
8      Q. I'm sorry. Go ahead.
9      A. I work under Judge Greanias.
10      Q. What is your job title?
11      A. I'm the court administrative assistant.
12      Q. When did you – how long have you held that
13 position?
14      A. I started doing that in December of '95, so five
15 years, four and a half.
16      Q. Since you, for your convenience have noted when
17 the plaintiff – you know the plaintiff by Missy
18 Schroeder?
19      A. Yes.
20      Q. Since you have noted when Missy Schroeder began
21 working at the same place as you, can you indicate that
22 on the record?
23      A. Missy started on March 28th, 1994.
24      Q. And are you also aware of her termination date?

8

1      A. I'm not sure of the exact date. I think it was
2 December the 13th. Her actual termination date, as far
3 as papers, was January 10, 1997. And that was because
4 she had accrued vacation and personal days that she
5 hadn't used, so it actually went on past her last day of
6 work.
7      Q. December 13th would have been of '96?
8      A. Right. And that would have been, I think, about
9 her last day of work.
10      Q. Were you employed with Macon County before you
11 became the court administrative assistant in December
12 '95?
13      A. Yes.
14      Q. What was your position prior to that position?
15      A. I was Judge Greanias' secretary.
16      Q. When did you begin in that role?
17      A. March 12, 1987.
18      Q. Have your responsibilities as the court
19 administrative assistant remained the same throughout
20 your tenure in that position?
21      A. Yes.
22      Q. Okay. Can you tell me what your
23 responsibilities are?
24      A. I'm responsible for payroll. I do the personnel

9

1  matters. I have possession of all the personnel files.
2  I make sure there's staffing in all the courtrooms. Just
3  recently, we've hired another person, and she kind of
4  does that on a share basis with me, but we coordinate the
5  staff in the courtrooms. I do all the jobs around the
6  courthouse nobody else wants to do. Clear the paper jams
7  and things like that.
8      Q. What job titles — well, strike that.
9          Do you have supervisory roles in that job?
10     A. We don't have any supervisors.
11     Q. So is there any other employee who you are
12  responsible for supervising?
13     A. Actually, I'm over all of the court staff. So
14  there are bailiffs that I'm over. We have a couple of
15  county paid court reporters, and I am over them. That's
16  it. And the judicial clerks.
17     Q. What do you mean by judicial clerks?
18     A. Each judge has a court reporter and a judicial
19  clerk. And in the past, the judicial clerks were
20  actually the judges' secretaries. At one point in time,
21  the secretaries were all renamed judicial clerks, because
22  they started going in the courtroom with the judge when
23  he's in court sessions. And when they are not in court,
24  she's at her desk performing secretarial duties.

10

1      Q. Do you know when that change in title came
2  about?
3      A. I think it was about the same time that I became
4  the administrative assistant. Probably, I would say,
5  probably December of '95.
6      Q. Am I correct that there's only one court
7  administrative assistant?
8      A. Right.
9      Q. And was throughout your tenure?
10     A. Right.
11     Q. And by tenure, I mean since December of '95?
12     A. Yes.
13     Q. Would there then be an administrator over and
14  above you?
15     A. No. Judge Greanias is the only one above me.
16  He's the presiding judge for the county.
17     Q. Has he been the presiding judge since December
18  '95?
19     A. Yes.
20     Q. Do you know when he became the presiding judge?
21     A. I'm not sure. Judge Scott — it was when Judge
22  Scott retired. That may have been October, but I'm not
23  positive of the date. It was when Judge Scott retired.
24     Q. Okay. But when you say October, are you

11

1  referring to October of '95?
2      A. Yes.
3      Q. Okay. As far as your responsibilities for
4  payroll, what job titles — I mean, whose payroll are you
5  responsible for?
6      A. I prepare the payroll sheets for the judicial
7  clerks, the two county paid reporters, the bailiffs. We
8  also have jury commissioners that get paid just
9  quarterly. I prepare payroll sheets for them. We have a
10  law librarian, a court technology person. I think that's
11  it.
12     Q. Do you hire the judicial clerks?
13     A. Yes.
14     Q. You interview the clerks?
15     A. Yes.
16     Q. And, again, these job duties would have been the
17  same from December '95 —
18     A. Correct.
19     Q. — forward? Okay. Are you the sole decision-
20  maker as far as —
21     A. No.
22     Q. — who gets hired?
23     A. No. Usually, I interview the persons.
24  Sometimes Judge Greanias sits in on the interviews,

12

1  sometimes he doesn't. Depends on his schedule. But I
2  always confer with him before making a final decision.
3      Q. If a particular judge — judge's judicial clerk
4  leaves, do they have — does that judge have any input
5  into the hiring of — who is hired as a judicial clerk?
6      A. Occasionally. Sometimes they have somebody in
7  mind that they would like to have interviewed or hired.
8  Sometimes they just say find me someone. So it depends
9  if they have someone in mind for that job.
10     Q. Okay. Tell me more about what you meant when
11  you said one of your responsibilities was to coordinate
12  the staff in the courtrooms?
13     A. I just have to make sure there's a judge — I
14  mean not a judge, a court reporter and a clerk in the
15  courtroom at all times with the judge. We have nine
16  judges, so we have nine court reporters and clerks, and
17  there's always somebody who's sick, their kids are sick,
18  or they are on vacation. So I just make sure that each
19  courtroom is fully staffed for the day, and that they
20  don't need for me to find help from somewhere else.
21     Q. And as far as your responsibility for personnel
22  matters, I bet that's probably a whole gamut of issues
23  that might come up?
24     A. Right.

13

1    Q.  Okay.  As a Macon County employee, is there a
2  sexual harassment policy in place presently that you're
3  aware of?
4    A.  It's just the Supreme Court policy.  We have a
5  copy of that that we give to everyone.
6    Q.  Was there a sexual harassment policy in place in
7  July of 1996 through – I'm sorry, through January of
8  1997?
9    A.  We had copies in the office.  I don't think they
10  were ever personally distributed to each person, but we
11  did have copies available in the office.
12    Q.  When a judicial clerk was hired during that time
13  period, were there certain policies that were provided to
14  the clerks?
15    A.  We didn't have any written policies.  We haven't
16  had a written handbook for years and years.  It's just
17  word of mouth, I think.  We do have one sheet that we
18  would give to the new hire that would tell how many
19  vacation days, personal days, and sick days they were
20  allowed per year, but there was no handbook.
21    Q.  Was there any kind of orientation that someone
22  went through when they began working for Macon County?
23    A.  As a new hire?  Do you mean as training or –
24    Q.  Let's just talk about judicial clerks.  Once a

14

1  decision was made to hire a judicial clerk, was there any
2  kind of process that they went through at the onset of
3  their employment?  And if it would be training, then I'd
4  like to hear about the training.
5    A.  There wasn't any orientation, that I know of.
6  The administrative assistant, I guess, would do all the
7  paperwork to get them actually settled in, get them
8  signed up for payroll.  The actual training part, as far
9  as their job, was conducted by the secretary leaving, or
10  possibly the court reporter and judge from that staff who
11  would train the person as to what her job duties were.
12    Q.  Now, the sexual harassment policy that you
13  mentioned, you referred to it as the Supreme Court
14  policy?
15    A.  Yes.
16    Q.  Did I hear you right?  Okay.  If I showed you a
17  copy of that policy, is that something you could
18  identify?
19    A.  Yes.
20    Q.  Okay.  Is there – if you recall, is there any
21  introductory sheet or cover sheet to this policy, or do
22  you recall it?
23    A.  No.
24    Q.  Just beginning out as a policy?

15

1    A.  It just began as a policy.
2        (Whereupon the court reporter marked Exhibit No.
3  1 for identification.)
4    Q.  I'm going to ask you to take a look at what I've
5  marked as Exhibit 1, Janice.  And take your time.  I'd
6  like to know if that is the sexual harassment policy that
7  you have referred to?
8    A.  Yes, this looks like the copies that we hand
9  out.
10    Q.  Am I correct that this policy wasn't posted
11  anywhere within the courthouse?
12    A.  I don't believe it was posted, but like I said,
13  we did have copies.  I know we had copies somewhere
14  around the office.  We had moved from the courthouse over
15  to temporary facilities while the courthouse was being
16  remodeled, and I know we had copies around somewhere.
17  I'm not sure if they were posted on boards or not.
18    Q.  What time period were you in temporary
19  facilities or the temporary facility, as best you recall?
20    A.  I can't remember for sure.
21    Q.  Were you in –
22    A.  I think maybe it was like November of '95 to
23  January of '97.  I'm not positive.  But it was like a
24  two-year period that we were over there.

16

1    Q.  So you were in the temporary facility when you
2  began as the administrative assistant?
3    A.  Yes.
4    Q.  Okay.  Now, you mentioned one of your
5  responsibilities being for personnel matters.  Would
6  those personnel matters include if some employee reported
7  a concern about sexual harassment?
8    A.  Yes.
9    Q.  Who else, if anyone, would have had
10  responsibilities for addressing a concern that was raised
11  about sexual harassment?
12    A.  Judge Greanias.
13    Q.  Have you been given – since you began as the
14  administrative assistant in December '95, have you been
15  provided any particular training on sexual harassment and
16  how to address a complaint?
17    A.  I don't recall any training in the past years.
18  I did have the manual to read through or the policy.  I
19  have just had training recently.
20    Q.  By the policy, you you're referring to what we
21  marked as Exhibit 1?
22    A.  Right.
23    Q.  Okay.  How recently did you have training?
24    A.  First of June, I went to a sexual harassment

113

1  know one you at least can't identify.
2      A.  Christina.  Her last name is Boarman now.  It
3  was Lees at the time.  Do you want me to name all the
4  clerks?
5      Q.  Yeah, if you would.
6      A.  Jeannine Sheets.
7      Q.  Okay.
8      A.  Angie Webner, W-E-B-N-E-R; Shelly Creek; Dory,
9  D-O-R-Y, Pasquale, P-A-S-Q-U-A-L-E.  How many clerks have
10  I given you so far?
11      Q.  Six.
12      A.  And is that counting Missy?
13      Q.  That counts Missy.
14      A.  And Ruth.
15      Q.  Oh, and Ruth.  That's seven.
16      A.  Seven.  Then there would have been one more.
17  Sue Hale.
18      Q.  Sue Hale?
19      A.  H-A-L-E.
20      Q.  And out of those clerks, which ones do you
21  believe thought the same way about Ruth Young as you did?
22      A.  I think most of them came to know her for what
23  she was.
24      Q.  Well, we don't know what she was.  Right?  What

114

1  she was was what you think she was.
2      A.  What I perceived her to be.
3      MR. CHAPIN:  Since this is a federal deposition,
4  I guess I'm going to object.  This has gone on for some
5  extended time now, and I don't see what relevance it has,
6  unless you can tie it into the case which involves a
7  different person, and it's hearsay.  You're asking her to
8  speculate as to what other people think.  Then you take
9  issue with her when she tells you what she thinks other
10  people think when she obviously doesn't know what other
11  people think.  So I just don't see the relevance of this
12  line of inquiry.  But that's for the judge to decide
13  later.
14      MS. McGRATH:  Speaking objections are also
15  generally not used in federal proceedings, but I just
16  have a few more questions on it.
17      A.  Okay.
18      Q.  On that topic, because I'm trying to understand
19  your answer.  You've indicated that you thought most of
20  those clerks would view Ruth Young in that -- in the same
21  fashion.  Am I correct?
22      A.  Yes.
23      Q.  Out of the seven who you've named, are there any
24  that you would identify as perhaps not holding that view?

115

1      MR. CHAPIN:  Objection.  Relevance.  Objection.
2  Requires her to speculate as to a state of mind of
3  another.
4      Q.  But you can go ahead and answer.
5      A.  I would say possibly Dory Pasquale.  I don't
6  think she worked very closely with her.  Possibly Angie
7  Webner, because like said, I believe she was over in the
8  other building, I think.  Maybe Sue Hale, because I know
9  that she did have lunch with her on occasion.
10      Q.  Is that it?
11      A.  That's it.
12      MS. McGRATH:  Okay.  I don't have anything
13  further.  Thank you.
14          EXAMINATION
15        BY MR. CHAPIN:
16      Q.  Janice, I note in your diaries there's a record
17  that Lois Durbin was hired to fill this position that
18  Missy had; is that right?
19      A.  Yes.
20      Q.  And who made that decision to hire Lois Durbin?
21      A.  Actually, I guess I was the one who hired her,
22  but Judge Greanias also had input on that.
23      Q.  When you realized there was going to be an
24  opening, did you have to post to receive applications?

116

1      A.  I don't recall if she -- if she submitted a
2  resume or not.  She had been working in the circuit
3  clerk's office, and was looking for a different job.  So
4  I don't recall if somebody gave her name to me, or if she
5  submitted a letter and a resume.  I don't recall how that
6  came about but --
7      Q.  Was there any posting or advertising of the
8  position being open?
9      A.  I don't recall if there was.
10      Q.  Did the county board in any way consider Lois
11  Durbin's request to be considered for this position?
12      A.  No.
13      Q.  Did the county board have any input in the
14  hiring decision?
15      A.  No.
16      Q.  The diary that you've brought with you today --
17  and we've had some excerpts there, I think they are
18  Deposition Exhibit No. 3 -- is that basically your
19  personal diary?
20      A.  Yes.
21      Q.  It's not something you're required to keep as a
22  part of your job?
23      A.  No.
24      Q.  Do you make those entries at home or at the

117

1  office?
2      A. At home.
3      Q. And you don't leave a copy at the office or make
4  a copy as a part of your job?
5      A. No.
6      Q. The things you have blacked out, I looked very
7  briefly at a couple of entries. It looks like they're
8  largely personal and family in nature; is that right?
9      A. Yes.
10     Q. These things that you noted regarding the job
11 were just sort of things that were of interest, sort of
12 out-of-the-ordinary type of things. Correct?
13     A. Right. They are just sentences that I happened
14 to mention Missy.
15     Q. Things going on in your life –
16     A. Right.
17     Q. – of interest. Okay. The option to transfer
18 Missy to Judge Francis, that was an option presented to
19 her by Judge Greanias; is that right?
20     A. Yes.
21     Q. Do you know who Judge Greanias spoke with before
22 he developed that as a possible option here for Missy?
23     A. No, I don't.
24     Q. Do you know if he ever discussed it with the

118

1  county board?
2      A. I don't know that he did. I don't know why he
3  would have.
4      Q. Okay. To your understanding of how things
5  worked, he would have had the authority to make a
6  decision as to whether or not to transfer her; is that
7  correct –
8      A. Yes.
9      Q. – without the county board input?
10     A. Right.
11     Q. Do you know if he contacted any other
12 representative of Macon County relative to offering a
13 transfer?
14     A. I don't know if he did or not.
15     Q. There's been produced under a cover of a
16 certificate of service from Karen McNaught a copy of the
17 personnel file of Melissa Schroeder. Now, did you
18 provide a copy of that to Karen McNaught?
19     A. Yes.
20     Q. And that was a request she made to you?
21     A. Yes.
22     Q. Okay. And you went to a file someplace and made
23 a copy of the materials contained in that file; is that
24 right?

119

1      A. Correct.
2      Q. Where did you go to get the personnel file of
3  Melissa Schroeder?
4      A. I have that in my office.
5      Q. Okay. And your office – who else would you
6  have personnel files for in your office?
7      A. I have personnel files for all of the judicial
8  clerks, for the two – well, actually for all of the
9  court reporters, both county and state. I have personnel
10 files for the bailiffs, the court technologists, the law
11 librarian; I believe that's it.
12     Q. Are these all courthouse personnel, I mean?
13     A. They are court – considered court staff.
14     Q. Considered court staff?
15     A. Yes.
16     Q. Okay. You don't have all the personnel files of
17 all county employees in your office, do you?
18     A. No.
19     Q. Is there a separate place where the county keeps
20 personnel files for its employees?
21     MS. McGRATH: Objection as to this witness'
22 knowledge.
23     Q. Do you have any knowledge as to whether or not
24 there is a place where the county maintains the records

120

1  of its employees?
2      A. I believe it's up to each office to keep their
3  own files. I'm not aware of any place where all files
4  are kept.
5      Q. Okay. Now, you wrote a letter to Melissa
6  McGrath where you enclosed a copy of Melissa Schroeder's
7  personnel file that was in response to a request you
8  received from Miss McGrath; is that right?
9      A. Yes.
10     Q. That was on stationery titled – looks like it
11 is Judge Greanias' stationery?
12     A. Yes.
13     Q. Do you have separate stationery that bears a
14 Macon County logo or heading?
15     A. No.
16     Q. Your stationery is all under Judge Greanias?
17     A. Yes.
18     Q. When you first received a request for the
19 personnel file of Melissa Schroeder it was regarding her
20 employment as a – well, you wrote a letter on April 4,
21 '97, to Ms. McGrath in response to a request of the
22 personnel file of Melissa Schroeder, and you said that
23 Miss Schroeder was employed by the court and not by the
24 circuit clerk; is that right?

121

1    A. Yes, I believe she had indicated that she
2 thought she was a circuit clerk employee.
3    Q. The letter she wrote said – quotes – and it's
4 dated March 24, 1997, and it was directed to the Macon
5 County Circuit Clerk's Office, "To whom it may concern:
6 I write on behalf of Melissa Schroeder who was employed
7 by Macon County from March 1994 to January 1997," and
8 then makes the request. Signed Melissa McGrath.
9        And you wrote back and said she was employed by
10 the court, not by the circuit clerk. Right?
11    A. Right. I believe the circuit clerk's office
12 forwarded that letter to me.
13    Q. And Judge Greanias, in a letter dated December
14 3, 1996, wrote a letter to Melissa Schroeder and signed
15 that letter regarding her resignation and her unused
16 vacation pay and being part of her final compensation; is
17 that right?
18    A. That's correct.
19    Q. And that was under his stationery as presiding
20 judge. Right?
21    A. Yes.
22        MS. McNAUGHT: Do you want to look at that
23 before you answer the question?
24        MS. McGRATH: I'd like to see the other one,

122

1 too, you asked her about.
2    A. I saw it.
3    Q. It was your impression, certainly, that Judge
4 Greanias had the authority to deal with Melissa Schroeder
5 regarding the termination of her employment. Right?
6    A. Yes.
7    Q. And it wasn't necessary for the county board or
8 a representative of the county to get involved in that
9 decision. Correct?
10    A. No.
11    Q. Would the county have a separate personnel file
12 or anything in addition to what you have in the personnel
13 file that you maintain as court administrator for Melissa
14 Schroeder, to your knowledge?
15    A. There shouldn't be any separate files, except
16 there would be payroll records in the auditor's office.
17    Q. Okay. Now, payroll, that's something that the
18 county does handle for the court staff, right, courthouse
19 staff?
20    A. Right.
21    Q. They issue the check. Correct?
22    A. That's correct.
23    Q. You provide them with the information regarding
24 hours and everything like that; the county cuts the

123

1 check?
2    A. Correct.
3    Q. Okay. Now, do you know if the county gets
4 reimbursed for any of – by any other state or county
5 agency or anything?
6    A. I don't know how that works.
7    Q. Who sets salaries for courthouse staff?
8    A. Judge Greanias.
9    Q. Who sets the hours of employment?
10    A. Judge Greanias.
11    Q. Judge Greanias makes the assignment of who works
12 in what – for what judge. Correct?
13    A. Some of the court reporters and clerks actually
14 came into the building with the particular judge they are
15 with, and they've served with that judge from the time
16 they came until the present time.
17    Q. Okay.
18    A. We have made some changes, but it's because
19 people have left or people have requested changes, or for
20 various reasons that some people did actually come in
21 with the judges they started with, and they are still
22 there.
23    Q. Okay. With regard to Missy Schroeder going to
24 lunch with Judge Sappington, you made notes in your diary

124

1 a couple of times about Missy and Ruth and the Judge
2 going together, and also apparently there were times when
3 just Missy and the Judge went together; is that right?
4    A. Yes.
5    Q. Did you ever hear Missy complain about, "Oh,
6 I've got to go to go to lunch with the judge again," or "the
7 judge asked me to go to lunch, I guess I better go with
8 him," anything like that?
9    A. No.
10    Q. Did you ever hear Missy asking the judge, you
11 know, "Do you want to go to lunch today," or anything
12 like that?
13    A. No.
14    Q. Okay. Did you ever hear Missy asking Ruth,
15 "Hey, will you go with us? I've got to go to lunch with
16 the judge. Will you go along," or anything like that?
17    A. No.
18    Q. Did you ever hear Missy complain about going to
19 lunch with the judge in any way?
20    A. No.
21    Q. When she first spoke to you about complaints she
22 had about Judge Sappington's behavior toward her, did you
23 ever tell her she needed to go talk to a representative
24 of the county board?

129

1        MS. McGRATH: Objection as to witness'
2    qualifications.
3        A. I don't think she was getting preferential
4    treatment. I think she just felt comfortable around him.
5        Q. Okay. During the time that all this took place,
6    and I guess focusing on the October – what was that
7    date – October 16 when she first spoke to you about it,
8    about her concerns about Judge Sappington's behavior,
9    until the time that she terminated and left her
10    employment with the circuit court, do you recall any
11    county representative being involved for any reason?
12        A. No.
13        Q. Or being consulted?
14        A. I didn't consult anyone. I don't know if Judge
15    Greanias would have. I'm not aware of that.
16        Q. Do you draft or type memos that Judge Greanias
17    would do?
18        A. Yes.
19        Q. You don't recall doing any letters or memos to
20    the county board or a county official regarding Judge
21    Sappington and Melissa Schroeder?
22        A. No.
23        Q. You said that after this series of events with
24    Missy Schroeder and Judge Sappington that the sexual

130

1    harassment policy was passed out, and there was a
2    requirement that all the employees acknowledge receipt of
3    it. Correct?
4        A. Yes.
5        Q. Now, who required this or directed this be done?
6        A. Judge Greanias.
7        Q. And who had to receive a copy of the sexual
8    harassment policy under that directive?
9        A. I gave it to all of our court staff, which would
10    have included the clerks, the reporters, the bailiffs,
11    court technologist.
12        Q. Okay. You didn't go to the county clerk's
13    office and pass it out?
14        A. No.
15        Q. You didn't go to the county recorder of deeds
16    office?
17        A. No, just court staff.
18        Q. Did you report to the county board then that had
19    been done?
20        A. No.
21        Q. Did you think that that was something you were
22    supposed to do?
23        A. Report to the county board?
24        Q. Right.

131

1        A. No.
2        Q. Just report back to Judge Greanias?
3        A. Right.
4        Q. Now, how long – you testified at the start of
5    your deposition that you're an employee of the county?
6        A. Correct.
7        Q. When did you first become hired by the county?
8        A. March 12th, 1987.
9        Q. And what was your first job with the county?
10        A. I was Judge Greanias' secretary.
11        Q. Okay. Now, who did you interview with or who –
12    yeah, did you have to go to an interview?
13        A. No.
14        Q. Did you have to submit an application?
15        A. No.
16        Q. How did you come about becoming employed by the
17    county?
18        A. I worked for Judge Greanias in private practice.
19    He was appointed to fill the judgeship, and he asked if I
20    would go to the courthouse and be his secretary.
21        Q. Okay. So you had a personal in with Judge
22    Greanias because of your prior experiences –
23        A. Right.
24        Q. – as his secretary? So Judge Greanias hired

132

1    you?
2        A. Yes.
3        Q. Did you ever meet with anyone from Macon County
4    with regard to your initial hiring?
5        A. No.
6        Q. Never even submitted an application to Macon
7    County?
8        A. No.
9        Q. And your terms of employment were set for you by
10    Judge Greanias; is that right?
11        A. What do you mean by terms of employment?
12        Q. How much you're going to be paid. Did he tell
13    you how much you'd be paid?
14        A. He told me how much I would be paid, but that
15    was already decided. I mean there's like a pay scale,
16    and that would have been a pay scale that the previous –
17    well, Judge Scott and his administrative assistant would
18    have had possession of that. They would have told Judge
19    Greanias how much money he could offer me to come in as
20    his secretary.
21        Q. Okay. All the time you've been employed then,
22    you have been with the circuit court staff, is that
23    right, a part of the circuit court staff?
24        A. No.

133

1    Q.   Okay.   What other jobs have you held that
2   weren't circuit court related?
3    A.   It's just court related, not --
4    Q.   Okay.
5    A.   Okay.   Maybe I misunderstood.   I was thinking
6   about the circuit clerk's office.
7    Q.   You have the circuit clerk's office, but the
8   court is generally the circuit court, but if I dropped
9   that, all your employment has been with the court?
10    A.   Yes.
11    Q.   And the court staff?
12    A.   Yes.
13    Q.   Okay.   And do you know who does your -- I mean
14   do you get a salary review periodically?
15    A.   No.
16    Q.   Do you get a raise every so often?
17    A.   Yes.
18    Q.   Who tells you about that?
19    A.   Judge Greanias has a recommended pay scale from
20   the state, I believe it is, and he revises it every year
21   according to how much money we have in the budget.   And
22   then he is the one who makes up the pay scale and I
23   just --
24    Q.   Get whatever?

134

1    A.   I get whatever there is; whatever he allows me
2   to have.
3    Q.   Now, is Kathy Hott still the circuit clerk;
4   isn't she?
5    A.   Yes.
6    Q.   She has been, what, now eight years?
7    A.   That's probably right.   She's up for election
8   this year.
9    Q.   I think she won the first time Clinton was
10   elected; isn't that right?
11    A.   I think so.
12    Q.   Then she got re-elected.   Now, the judicial
13   clerks are not a part of her office; is that true?
14    A.   No, they are not.
15    Q.   Okay.   So she doesn't control any of -- make
16   assignments to them or anything like that?
17    A.   No.
18    Q.   Shelly Creek used to be with Kathy Hott's
19   office; isn't that true?
20    A.   No.
21    Q.   Do you know?   She didn't?
22    A.   No.
23    Q.   Okay.
24    A.   Jeannine Sheets used to be with the circuit

135

1   clerk's office.
2    Q.   Now, you do payroll sheets for the court staff.
3   Right?
4    A.   Yes.
5    Q.   And you send those over to the county?
6    A.   Yes.
7    Q.   County auditor?
8    A.   Yes.
9    Q.   Okay.   Is that the only communication you have
10   with the county or the county office regarding the court
11   staff?   Is everything else up to Judge Greanias?   Do you
12   understand what I mean?
13    A.   No.
14    Q.   I mean, is payroll the only thing that goes to
15   the county regarding the employment of the court staff?
16   For instance, hiring you said is done by Judge Greanias?
17    A.   Yes.
18    Q.   Judge Greanias controls assignments?
19    A.   Yes.
20    Q.   He can fire and hire people?
21    A.   Yes.
22    Q.   Can you think of anything, other than payroll,
23   where the county gets consulted?
24    A.   The insurance.

136

1    Q.   Okay.
2    A.   Or worker's comp claims.
3    Q.   Okay.   And then I imagine equipment and office
4   space, is that --
5    A.   There's like a purchasing department that we
6   order supplies through.   There's like IMRF retirement.
7   That's also through the auditors's office.
8    Q.   Okay.   So --
9    A.   I think that's it.
10    Q.   So who hires the court reporters?   You talk
11   about -- you said there's some county court reporters.
12   Who hires those?
13    A.   Actually, I've never hired a court reporter.
14   We've always had county reporters in place, and what
15   happens is as a state reporter retires or leaves, we move
16   a county reporter into their spot.   And there's usually
17   somebody there, already there, that we can move into the
18   county reporter's spot.   For instance, Shelly Creek,
19   although she is a reporter, she started out as a judicial
20   clerk because there was an opening there.   And as soon as
21   there was an opening for a reporter, she moved from a
22   judicial clerk position to a county paid reporter.
23    Q.   Who hires bailiffs?
24    A.   Our bailiffs have been around for years and

Plaintiff's Exhibit 2

# EMPLOYMENT ELIGIBILITY VERIFICATION (Form I-9)

**1. EMPLOYEE INFORMATION AND VERIFICATION:** (To be completed and signed by employee.)

| Name: (Print or Type)  Last | First | Middle | Birth Name |
|---|---|---|---|
| SCHROEDER | MELISSA | LYNN | SCHWENGEL |

| Address: Street Name and Number | City | State | ZIP Code |
|---|---|---|---|
| 4093 CAMELOT DR. | DECATUR | IL | 62526 |

| Date of Birth (Month/ Day/ Year) | Social Security Number |
|---|---|
| 2.4.72 | 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 |

I attest, under penalty of perjury, that I am (check a box):

☒ 1. A citizen or national of the United States.

☐ 2. An alien lawfully admitted for permanent residence (Alien Number A _____ )

☐ 3. An alien authorized by the Immigration and Naturalization Service to work in the United States (Alien Number A _____
or Admission Number _____ . expiration of employment authorization, if any _____ ).

I attest, under penalty of perjury, the documents that I have presented as evidence of identity and employment eligibility are genuine and relate to me. I am aware that federal law provides for imprisonment and/or fine for any false statements or use of false documents in connection with this certificate.

| Signature | Date (Month/ Day/ Year) |
|---|---|
| Melissa L. Schroeder | 3.28.94 |

PREPARER TRANSLATOR CERTIFICATION (To be completed if prepared by person other than the employee). I attest, under penalty of perjury, that the above was prepared by me at the request of the named individual and is based on all information of which I have any knowledge.

| Signature | Name (Print or Type) | | |
|---|---|---|---|
| Address (Street Name and Number) | City | State | Zip Code |

**2. EMPLOYER REVIEW AND VERIFICATION:** (To be completed and signed by employer.)

Instructions:

Examine one document from List A and check the appropriate box. *OR* examine one document from List B *and* one from List C and check the appropriate boxes. Provide the *Document Identification Number* and *Expiration Date* for the document checked.

| List A<br>Documents that Establish<br>Identity and Employment Eligibility | List B<br>Documents that Establish<br>Identity | and | List C<br>Documents that Establish<br>Employment Eligibility |
|---|---|---|---|
| ☐ 1. United States Passport | ☒ 1. A State-issued driver's license or a State-issued I.D. card with a photograph, or information, including name, sex, date of birth, height, weight, and color of eyes. (Specify State) ___I L___ | | ☒ 1. Original Social Security Number Card (other than a card stating it is not valid for employment) |
| ☐ 2. Certificate of United States Citizenship | ☐ 2. U.S. Military Card | | ☐ 2. A birth certificate issued by State, county, or municipal authority bearing a seal or other certification |
| ☐ 3. Certificate of Naturalization | ☐ 3. Other (Specify document and issuing authority) | | ☐ 3. Unexpired INS Employment Authorization Specify form # _____ |
| ☐ 4. Unexpired foreign passport with attached Employment Authorization | | | |
| ☐ 5. Alien Registration Card with photograph | | | |
| *Document Identification*<br># | *Document Identification*<br># 5636-5527-2635 | | *Document Identification*<br># 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 |
| *Expiration Date (if any)* | *Expiration Date (if any)*<br>2-4-98 | | *Expiration Date (if any)* |

**CERTIFICATION:** I attest, under penalty of perjury, that I have examined the documents presented by the above individual, that they appear to be genuine and to relate to the individual named, and that the individual, to the best of my knowledge, is eligible to work in the United States.

| Signature | Name (Print or Type) | Title |
|---|---|---|
| Stephen M Bean | STEPHEN M. BEAN | MACON COUNTY CLERK |
| Employer Name<br>COUNTY OF MACON | Address<br>253 E. WOOD ST.  DECATUR, IL  62523 | Date |

Form I-9 (05/07/87)
OMB No. 1115-0136

U.S. Department of Justice
Immigration and Naturalization Service

# EXHIBIT 3

Macon County New Employee Sheet

## MACON COUNTY NEW EMPLOYEE SHEET

EMPLOYEE #: __3715__

DEPARTMENT: __CIRCUIT COURT__

STARTING DATE: __MARCH 28, 1994__

PAYROLL DATE: __APRIL 15, 1994__

NAME (F-M-L): __MELISSA__      __L.__      __SCHROEDER__

ADDRESS: __4093 CAMELOT DR__      __DECATUR__      __IL 62526__
Street                              City              State/Zip

BIRTH DATE: __2-4-72__

MARITAL STATUS: ____Single    _X_ Married    ____Married But Withhold at Higher Single Rate

SEX: ____Male    _x_ Female

SALARY CLASS: ____Hourly    _x_ Salaried    ____Permanent    ____Temporary    ____Other

PAY FREQUENCE: _x_ Bi-Weekly    ____Monthly    ____Quarterly    ____Per Diem    ____Other

RACE CLASS: _x_ White    ____Black    ____Hispanic    ____Am Indian    ____Other

EEO JOB CATEGORY:

Descriptions on      ____Administration    ____Protective Service Worker    ____Skilled Craft
reverse side.        ____Professional       ____Paraprofessional            ____Service-Maintenance
                     ____Techicians         ____Administrative Support

ACCOUNT NUMBER(S): __1-064-13__

TITLE CODE: __CLERK STENO__

SOCIAL SECURITY #: __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__

RATE OF PAY: ($ __15,200.00__ ) ($ __584.61__ )
                    annual              bi-weekly/hourly

FEDERAL EXEMPTIONS: __0__

ADDITIONAL AMOUNT OF FEDERAL WITHHOLDING TAX: $ _____

STATE EXEMPTIONS: __0__

ADDITIONAL AMOUNT OF STATE WITHHOLING TAX: $ _____

employee whose position requires work in excess of 600 hours per year, (an average of over __ hours per week), should begin IMRF participation from the date of hire.

IMRF/SLEP - START PARTICIPATION (yes/no) __Yes__

HEALTH INSURANCE: ____ $ _____    __$ 105.99/a.__    ____ $ _____
                    Regular Coverage    125 Plan Coverage    Life Only (regular)
(F/1  F/2)

EMPLOYEE SIGNATURE: _____    PAYROLL SIGNATURE: _____

DEPARTMENT SIGNATURE: _Mary     n. D._

EMPLOYEE #: ___3715___

DEPARTMENT: ___Circuit Court___

EMPLOYEE NAME: ___Melissa Schroder___

PAYROLL DATE: ___12/31/94 - 1/13/95___

EFFECTIVE DATE: ___January 3, 1995___

<u>CHANGE THE FOLLOWING TO:</u>

NAME:

ADDRESS: (F) _____ (M) _____ (L) _____

(street)            (city)            (state/zip)

BIRTH DATE: _____

| | | | | | |
|---|---|---|---|---|---|
| MARITAL STATUS: | ___ Single | ___ Married | ___ Married withholding at higher single rate | | |
| SEX: | ⨯ Male | ___ Female | | | |
| EEO CLASS: | ___ White | ___ Black | ___ Hispanic | ___ Am Indian | ___ Other |
| EMPLOYEE STATUS: | X Active | ___ On Leave | ___ Terminated | ___ Lay Off | ___ Other |
| SALARY CLASS: | ___ Hourly | ___ Salaried | ___ Permanent | ___ Parttime | ___ Other |
| PAY FREQUENCY: | ___ Bi-weekly | ___ Monthly | ___ Quarterly | ___ Per Diem | ___ Other |

ACCOUNT NUMBER(S): _____

SOCIAL SECURITY #: _____

FEDERAL EXEMPTIONS: _____

STATE EXEMPTIONS: _____

TITLE CODE: _____

RATE OF PAY: [ _____ ] [ _____ ]
                annual      bi-weekly or hourly

ADDITIONAL FEDERAL WITHHOLDING TAX: $ _____

ADDITIONAL STATE WITHHOLDING TAX: $ _____

| DEDUCTION | PERIOD | AMOUNT | DEDUCTION | PERIOD | AMOUNT |
|---|---|---|---|---|---|
| CREDIT UNION | 0 | $ | LIFE INS  IMRF | 2 | $ |
| PARKING DUES | | $ | AFSCME UNION | 2 | $ |
| UNITED WAY | 0 | $ | HEALTH INSURANCE | 1 | $ |
| PLATT CO WAGE | 0 | $ | COLONIAL INS | 2 | $ |
| | | $ | IMRF  (start date) | 0 | |
| IL DEPT OF REVENUE | 0 | $ | SLEP  (start date) | 0 | |
| WAGE ASSIGNMENT | 0 | $ | DEFERRED COMP | 0 | $ |
| CHILD SUPPORT | 0 | $ | SANGAMON CO WAGE | 0 | $ |
| SHERIFF UNION | 1 | $ | 125 HEALTH INS | 1 | $ |
| IRS DEDUCTION | 0 | $ | 125 COLONIAL INS | 2 | $ |

NOTE:

EMPLOYEE SIGNATURE:

DEPARTMENT SIGNATURE:

PAYROLL CLERK SIGN.:

AUDITOR'S SIGNATURE:

# EXHIBIT 4

Personnel File Documents

## MACON COUNTY EMPLOYEE STATUS CHANGE SHEET

PLOYEE #:      3715                    PAYROLL DATE:    January 17, 1997

ARTMENT:    CIRCUIT COURT              EFFECTIVE DATE:    January 10, 1997

PLOYEE NAME:   MELISSA SCHROEDER

### CHANGE THE FOLLOWING INFORMATION TO:
(Note Only The Information To Be Changed)

E (F-M-L): _____  _____  _____

RESS: _____

Y/STATE/ZIP: _____

LOYEE STATUS: ___Active  _X_Terminated  ___On Leave  ___Lay Off  ___Other

ARY CLASS:    ___Salaried  ___Hourly  ___Permanent  ___Temporary  ___Other

FREQUENCY:   ___Bi-Weekly  ___Monthly  ___Quarterly  ___Per Diem  ___Other

TAL STATUS:  ___Single  ___Married  ___Married, withhold at higher single rate

ederal Exemptions  _____   Additional Federal Withholding Tax $_____

ate Exemptions  _____   Additional State Withholding Tax  $_____

OUNT NUMBER _____   RATE OF PAY: ($_____)($_____)
                                                  annual       bi-weekly/hourly

E/POSITION _____
                                         (Reason for rate change)

.O. JOB CATEGORY      (Equal Employment Opportunity):
scription on Back)

___Administration       ___Administrative Support    ___Professional
___Technician           ___Protective Service Worker ___Paraprofessional
___Skilled Craft        ___Service Maintenance        ___Exempt

TIONS: _____

_____

OYEE SIGNATURE _____        PAYROLL SIGNATURE _____

RTMENT SIGNATURE _____      AUDITOR'S SIGNATURE _____

## MACON COUNTY EMPLOYEE STATUS CHANGE SHEET

MPLOYEE #:     3715                    PAYROLL DATE:  December 6, 1996

PARTMENT:     CIRCUIT COURT            EFFECTIVE DATE:   11/25/96

MPLOYEE NAME:  MELISSA SCHROEDER

### CHANGE THE FOLLOWING INFORMATION TO:
(Note Only The Information To Be Changed)

ME (F-M-L): _____  _____  _____

DDRESS: _____

TY/STATE/ZIP: _____

PLOYEE STATUS: ___Active ___Terminated ___On Leave ___Lay Off ___Other

LARY CLASS: ___Salaried ___Hourly ___Permanent ___Temporary ___Other

Y FREQUENCY: ___Bi-Weekly ___Monthly ___Quarterly ___Per Diem ___Other

RITAL STATUS: ___Single ___Married ___Married, withhold at higher single rate

Federal Exemptions _____  Additional Federal Withholding Tax $_____

State Exemptions _____  Additional State Withholding Tax $_____

COUNT NUMBER _____  RATE OF PAY: ($ 19,300      )($ 742.30 OTO .20 )
                                              annual        bi-weekly/hourly

LE/POSITION _____      ___Salary Increase
                                              (Reason for rate change)

.O. JOB CATEGORY    (Equal Employment Opportunity):
scription on Back)

___Administration      ___Administrative Support    ___Professional
___Technician          ___Protective Service Worker ___Paraprofessional
___Skilled Craft       ___Service Maintenance        ___Exempt

ATIONS: _____

_____

_____

LOYEE SIGNATURE  *Melissa J Schroeder*      PAYROLL SIGNATURE _____

ARTMENT SIGNATURE: _____        AUDITOR'S SIGNATURE _____

## MACON COUNTY EMPLOYER STATUS CHANG SHEET

EMPLOYEE #: _____3715_____                   PAYROLL DATE: _March 1, 1996_

DEPARTMENT: __CIRCUIT COURT__                EFFECTIVE DATE: _December 1, 1995_

EMPLOYEE NAME: __MELISSA SCHROEDER__

---

### CHANGE THE FOLLOWING INFORMATION TO:
#### (Note Only The Information To Be Changed)

NAME (F-M-L): _____   _____

ADDRESS: _____

CITY/STATE/ZIP: _____

EMPLOYEE STATUS: ___Active ___Terminated ___On Leave ___Lay Off ___Other

SALARY CLASS: ___Salaried ___Hourly ___Permanent ___Temporary ___Other

PAY FREQUENCY: ___Bi-Weekly ___Monthly ___Quarterly ___Per Diem ___Other

MARITAL STATUS: ___Single ___Married ___Married, withhold at higher single rate

Federal Exemptions _____   Additional Federal Withholding Tax $_____

State Exemptions _____   Additional State Withholding Tax $_____

ACCOUNT NUMBER _____   RATE OF PAY: ($_____)($_____)
                                              annual    bi-weekly/hourly

TITLE/POSITION __JUDICIAL CLERK__    _____
                                    (Reason for rate change)

E.E.O. JOB CATEGORY       (Equal Employment Opportunity):
(Description on Back)

___Administration      ___Administrative Support    ___Professional
___Technician          ___Protective Service Worker ___Paraprofessional
___Skilled Craft       ___Service Maintenance       ___Exempt

LOCATIONS: _____

_____

EMPLOYEE SIGNATURE _Melissa L. Schroeder_ PAYROLL SIGNATURE _____

DEPARTMENT SIGNATURE: _____    AUDITOR'S SIGNATURE _____

## MACON COUNTY EMPLOYEE STATUS CHANGE SHEET

EMPLOYEE #:        3715                    PAYROLL DATE:    December 8, 1995

DEPARTMENT:    Circuit Court              EFFECTIVE DATE:    December 1, 1995

EMPLOYEE NAME:    Melissa Schroeder

---

### CHANGE THE FOLLOWING INFORMATION TO:
### (Note Only The Information To Be Changed)

NAME (F-M-L): _____    _____    _____

ADDRESS: _____

CITY/STATE/ZIP: _____

EMPLOYEE STATUS:  ___Active  ___Terminated  ___On Leave  ___Lay Off  ___Other

SALARY CLASS:  ___Salaried  ___Hourly  ___Permanent  ___Temporary  ___Other

PAY FREQUENCY:  ___Bi-Weekly  ___Monthly  ___Quarterly  ___Per Diem  ___Other

MARITAL STATUS:  ___Single  ___Married  ___Married, withhold at higher single rate

Federal Exemptions _____        Additional Federal Withholding Tax $_____

State Exemptions _____        Additional State Withholding Tax  $_____

ACCOUNT NUMBER _____    RATE OF PAY: ($ 18,500 _____ )($ 711.53 OTO .22 )
                                                        annual              bi-weekly/hourly

TITLE/POSITION _____

                                            _____
                                            (Reason for rate change)

E.E.O. JOB CATEGORY        (Equal Employment Opportunity):
(Description on Back)

___Administration        ___Administrative Support        ___Professional
___Technician            ___Protective Service Worker     ___Paraprofessional
___Skilled Craft         ___Service Maintenance           ___Exempt

STATIONS: _____

---

EMPLOYEE SIGNATURE _____    PAYROLL SIGNATURE _____

DEPARTMENT SIGNATURE: _____    AUDITOR'S SIGNATURE _____

# EXHIBIT 5

Macon County Payroll Change Sheet

DEP #:      3715

PAYROLL DATE:     12-9-94

DEPARTMENT:    CIRCUIT COURT

EFFECTIVE DATE:    12-2-94

EMPLOYEE NAME:    MELISSA L. SCHROEDER

<u>CHANGE THE FOLLOWING TO:</u>

NAME: _____

| (F) | (M) | (L) |

ADDRESS: _____

| (street) | (city) | (state/zip) |

BIRTH DATE: _____

MARITAL STATUS: ____ Single    ____ Married    ____ Married withholding at higher single rate

SEX: ____ Male    ____ Female

EEO CLASS: ____ White    ____ Black    ____ Hispanic    ____ Am Indian    ____ Other Specify

EMPLOYEE STATUS: ____ Active    _x_ On Leave    ____ Terminated    ____ Lay Off    ____ Other Specify

SALARY CLASS: ____ Hourly    ____ Salaried    ____ Permanent    ____ Parttime    ____ Other Specify

PAY FREQUENCY: ____ Bi-weekly    ____ Monthly    ____ Quarterly    ____ Per Diem    ____ Other Specify

ACCOUNT NUMBER(S): _____

TITLE CODE: _____

SOCIAL SECURITY #: _____

RATE OF PAY: [          ] [          ]
                  annual        bi-weekly or hourly

FEDERAL EXEMPTIONS: _____

ADDITIONAL FEDERAL WITHHOLDING TAX: $_____

STATE EXEMPTIONS: _____

ADDITIONAL STATE WITHHOLDING TAX: $_____

| 1ST PAY PERIOD | | 2ND PAY PERIOD | |
|---|---|---|---|
| CREDIT UNION | $ | CREDIT UNION | $ |
| UNITED FUND | $ | UNITED FUND | $ |
| SAVINGS BONDS | $ | SAVINGS BONDS | $ |
| WAGE ASSIGNMENT | $ | WAGE ASSIGNMENT | $ |
| SHERIFF UNION | $ | AFSCME UNION | $ |
| AETNA INSURANCE | $ | COLONIAL INS. | $ |
| DEFERRED COMP | $ | DEFERRED COMP | $ |
| | $ | | $ |

[          ]              [          ]                    [          ]
IMRF Starting Date    SLEP Starting Date         SECTION 125 Starting date

| PAYROLL TO DATE | CURRENT | QUARTER _____ | YEAR TO DATE _____ |
|---|---|---|---|
| GROSS: | $ | $ | $ |
| FICA: | $ | $ | $ |
| FED WITHHOLDING TAX | $ | $ | $ |
| STATE WITHHOLDING TAX | $ | $ | $ |
| SOCIAL SECURITY | $ | $ | $ |
| PENSION | $ | $ | $ |
| OTHER | $ | $ | $ |

EMPLOYEE SIGNATURE _____

PAYROLL CLERK SIGN. _Maryne McGreevY_

DEPARTMENT SIGNATURE _____

AUDITOR SIGNATURE _____

0081

# EXHIBIT 6

Deposition of Plaintiff

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        THE CENTRAL DISTRICT OF ILLINOIS
 3                  URBANA DIVISION
 4
 5
 6   MELISSA ROBINSON,              )
     (p/k/a MELISSA SCHROEDER),     )
 7                                  )
               Plaintiff,           )
 8                                  )
          - vs -                    ) NO. 99-2266
 9                                  )
     JUDGE WARREN A. SAPPINGTON,    )
10   SIXTH JUDICIAL CIRCUIT,        )
     (IN OFFICIAL CAPACITY AND      )
11   INDIVIDUALLY),                 )
12               Defendant,         )
13   MACON COUNTY,                  )
14               Defendant,         )
15   JOHN P. SHONKWILER, CHIEF JUDGE,)
     SIXTH JUDICIAL CIRCUIT, MACON  )
16   COUNTY CIRCUIT COURT, MACON    )
     COUNTY, (IN OFFICIAL CAPACITY  )
17   AND NOT INDIVIDUALLY),         )
18               Defendant.         )
19
20              DEPOSITION OF
21
22              MELISSA ROBINSON
23
24
```

**Page 2**

```
 1                 DEPOSITION
 2
 3        The deposition of MELISSA ROBINSON, taken
 4   by the Defendant, on the 12th day of March, 2001,
 5   at the law office of Hinshaw & Culbertson, 400
 6   South Ninth Street, Suite 200, Springfield,
 7   Illinois, before Tamara C. Leesman, Certified
 8   Shorthand Reporter of the State of Illinois,
 9   pursuant to notice.
10                    CSR #84-3929
11
12
13
14                 APPEARANCES
15   Thomson & Weintraub
     Attorneys at Law
16   105 North Center Street
     P.O. Box 3577
17   Bloomington, Illinois  61702-3577
18        BY:  Ms. Melissa M. McGrath
               Appearing on behalf of Plaintiff
19
     Clausen Miller
20   Attorneys at Law
     10 South LaSalle Street
21   Chicago, Illinois  60603-1098
22        BY:  Ms. Diane M. Baron
               Appearing on behalf of
23             Judge Warren A. Sappington
24
```

**Page 3**

```
 1               APPEARANCES CONTINUED
 2   Cassidy & Mueller
     Attorneys at Law
 3   323 Commerce Bank Building
     Peoria, Illinois  61602
 4
 5        BY:  Mr. John Cassidy
               Appearing on behalf of Macon County
 6   Hinshaw & Culbertson
     Attorneys at Law
 7   400 South Ninth Street, Suite 200
     Springfield, Illinois  62701
 8
 9        BY:  Mr. Robert E. Gillespie
               Appearing on behalf of
10             Judge John P. Shonkwiler
     State of Illinois
11   Office of the Attorney General
     500 South Second Street
12   Springfield, Illinois  62706
13        BY:  Ms. Karen L. McNaught
               Appearing on behalf of
14             Judge Warren A. Sappington and
               Judge John P. Shonkwiler
15
16                    INDEX
17   Direct Examination by Mr. Gillespie      4
     Cross-Examination by Ms. McNaught      154
18   Cross-Examination by Mr. Cassidy       267
19                  EXHIBITS
20                              Identified
21   Deposition Exhibit No. 1        9
     Deposition Exhibit No. 2       35
22   Deposition Exhibit No. 4      152
23
24
```

**Page 4**

```
 1        MELISSA ROBINSON,
 2   a witness, having been first duly sworn upon her
 3   oath, testified as follows:
 4        DIRECT EXAMINATION CONDUCTED
 5        BY MR. GILLESPIE:
 6   Q  Would you state your name for the record
 7   please.
 8   A  Melissa Lynn Robinson.
 9   Q  May I call you Melissa?
10   A  I like Missy.
11   Q  Missy.  Okay.  Missy.  Missy, have you
12   ever had your deposition taken before?
13   A  No.
14   Q  Okay.  As you know, when they take a
15   deposition, this young woman here has to write down
16   what you say --
17   A  Right.
18   Q  -- so that it's necessary that you answer
19   the questions, and when you have a question that
20   calls for a yes or no, to answer it yes or no
21   rather than uh-huh or huh-uh so that the transcript
22   makes sense.  Is that okay with you?
23   A  Yes.
24   Q  If at any time you want to take a break
```

Page 141

1  friends, best friends.
2      Q  Okay.  So if I could sort all this out in
3  terms of time and place, at the time you had a
4  conversation with Judge Greanias about transferring
5  to -- out of the building to another courtroom, he
6  also told you that he had been discussing this
7  matter with Judge Shonkwiler, is that correct?
8      A  Yes, he did.
9      Q  Did he indicate to you when he had
10  discussed it and what he said?
11      A  No, he did not.
12      Q  Okay.  Your further knowledge of that is
13  that you talked to Janice Shonkwiler, who's not
14  related to Judge Shonkwiler?
15      A  Only by marriage.
16      Q  Okay.  And she told you that Judge
17  Shonkwiler had been calling?
18      A  Correct.
19      Q  And what period of time did she refer to?
20      A  It was all around that same time.  From
21  the time I was given to move until the time I had
22  to give my resignation was only like a two week
23  period.  I believe it was around the time I gave my
24  resignation that Janice indicated that she knew

Page 142

1  that Judge Greanias was under a lot of pressure,
2  and that he was also having to discuss the issue
3  with Judge Shonkwiler because Judge Shonkwiler was
4  calling often during that time period, and she just
5  verbalized that she was aware that it was about
6  this situation.
7      Q  Okay.  How would she be aware of what
8  they were talking about?
9      A  I don't know, but she would be.
10      Q  And you also heard a rumor that Judge
11  Shonkwiler had been contacted by Mrs. Sappington
12  who had tried to persuade him to terminate you, is
13  that correct?
14      A  Yes.
15      Q  You don't have any first-hand knowledge
16  that that ever took place, do you?
17      A  No, I do not.
18      Q  Now do you have any other knowledge with
19  respect to the involvement of Judge Shonkwiler in
20  any of these matters?
21      A  Only the occurrence when Attorney
22  Kirchner contacted him with me present to set up a
23  time to meet regarding the case.
24      Q  And when was that?

Page 143

1      A  Oh, I believe it would've been December
2  of 1996.
3      Q  Before you resigned?
4      A  I was still employed there, but I was no
5  longer working there even though they were paying
6  me.
7      Q  All right.  Did that meeting ever take
8  place?
9      A  Yes, it did.
10      Q  And tell me about that meeting, what
11  happened?
12      A  I wasn't there.
13      Q  Well, would you care to inform me what
14  your attorney told you about the meeting?
15      MS. MCGRATH:  Objection, attorney/client.
16      MR. GILLESPIE:  I don't think that's
17  attorney/client.
18      Q  You're talking about an alleged meeting
19  with Judge Shonkwiler, is that correct?
20      A  I don't even know who was present at it.
21  I know Judge Greanias was present.  I want to say
22  maybe Judge Shonkwiler wasn't present at that
23  meeting, but Judge Shonkwiler was the one he
24  contacted.

Page 144

1      Q  Okay.  When you worked as a clerk, as I
2  understand it your check was originated from the
3  county, is that right?
4      A  Yes.
5      Q  But the county had nothing to do with
6  your job in any way, did it?
7      A  I was always told I was a county
8  employee.
9      Q  Okay.  Did anyone from the county ever
10  give you instructions or directions on what to do?
11      A  The judges gave me directions.
12      Q  Okay.  I'm sure there will be other
13  questions in that regard.
14      A  And Janice Shonkwiler actually gave me
15  primary direction.
16      Q  Okay.  Did you ever discuss this matter
17  with Judge Diamond?
18      A  No.
19      Q  When you were told you had to leave the
20  building or resign, did you discuss that option
21  with anybody at the courthouse other than Judge
22  Greanias?
23      A  Ruth Young, maybe Janice Shonkwiler.
24      Q  Okay.  And do you recall what the

MELISSA ROBINSON                                    ConcenseIt™                                    3/12/2001

Page 273

1 never, in the entire time that you were there, you
2 never received any instruction from anybody with
3 Macon County?
4     A  Just Janice Shonkwiler, who always told
5 me she was a county employee, not a state employee.
6     Q  Okay.  Well, you were present at Judge
7 Greanias's deposition, correct?
8     A  Correct.
9     Q  Okay.  And do you recall Judge Greanias
10 saying that Janice Shonkwiler was originally hired
11 as his legal secretary?
12     A  Yes.
13     Q  Okay.  And later she was named the
14 administrative assistant of the judicial branch of
15 Macon County, correct?
16     A  Correct.
17     Q  So basically Janice Shonkwiler was also
18 always within the judicial branch also.  Would you
19 agree with that?
20     MS. MCGRATH:  Objection as to any testimony
21 with regard to any legal conclusion she might draw.
22     MR. CASSIDY:  Well, I'm just asking her
23 understanding, not a legal conclusion.
24     A  It was always my understanding that the

Page 274

1 clerks were county employees, the court reporters
2 were state employees, with the exception of two
3 court reporters who were county employees.  I
4 always considered myself a county employee.
5     Q  Okay.  Let me ask you about that.  Who
6 told you you were a county employee?
7     A  Judge Sappington.
8     Q  Okay.  And in regard to being a county
9 employee, is that because that's where you received
10 your check from, the county?
11     A  I was told I was a county employee
12 because I fell under the county's insurance and
13 their IMRF.
14     Q  Okay.  So you receive your check from the
15 county, and you receive your benefits from the
16 county, is that correct?
17     A  To the best of my recollection.
18     Q  Is it safe to say that other than that
19 you had absolutely no other contact with the
20 county?
21     A  Correct.
22     Q  Okay.  That even though someone may have
23 told you you were a county employee, all control
24 was exercised outside of the county but rather

Page 275

1 within the judicial branch, is that correct?
2     A  Oh, to the best of my knowledge.
3     Q  That's a yes?
4     A  Yes.
5     Q  Okay.  And when this policy concerning
6 sexual harassment came up and was handed to you,
7 that was a sexual harassment policy that was issued
8 by the Supreme Court of the State of Illinois, is
9 that correct?
10     A  If I recall, yes, it was.
11     Q  Okay.  Well, you looked at it earlier,
12 and I want you to look at it again to make sure
13 we're identifying it correctly.
14     A  I barely looked at it.
15     Q  I want you to look at it and make sure
16 it's the same one.
17     A  Well, I'm saying I barely looked at it
18 the first time.  I gave it to my attorney I believe
19 that same day.
20     Q  Okay.
21     A  I believe that's it though.
22     Q  Okay.  And by that's it, we're talking
23 about Exhibit No. 1 on the Janice Shonkwiler
24 deposition, is that correct?

Page 276

1     A  Correct.
2     Q  And the one that you just looked to is
3 entitled Supreme Court of Illinois, Sexual
4 Harassment Policies and Procedures, correct?
5     A  Correct.
6     Q  Now you listed under your Answers to
7 Interrogatories Number 5, you're requested to list
8 each occurrence when you complained to an employee
9 of the State of Illinois about alleged sexual
10 harassment by Judge Sappington, and you've listed,
11 I think 18 if I'm counting right, 18 different
12 occurrences, is that correct?
13     A  To the best of my recollection.
14     Q  So if I understand this right, you
15 understood the question to mean that all these
16 people you identified in here were employees of the
17 State of Illinois, is that correct?
18     A  The times I went to Ruth Young, I believe
19 Ruth Young was a county employee, and at the time I
20 thought Janice Shonkwiler was a county employee.
21     Q  Okay.  Other than that, correct?
22     A  Correct.
23     Q  Now let me ask you this.  Since this
24 question only asks you about employees of the State

# EXHIBIT 7

Deposition of Judge Patton

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

MELISSA ROBINSON,(f/k/a )
MELISSA SCHROEDER,       )
                         )
        Plaintiff,       )
                         )
        -vs-             )    No. 99-2097
                         )
JUDGE WARREN A. SAPPINGTON, )
SIXTH JUDICIAL CIRCUIT, (IN )
OFFICIAL CAPACITY AND    )
INDIVIDUALLY)            )
        - Defendant.     )
                         )
MACON COUNTY,            )
JOHN P. SHONKWILER, CHIEF )
JUDGE, SIXTH JUDICIAL    )
CIRCUIT, MACON COUNTY CIRCUIT )
COURT, MACON COUNTY (IN  )
OFFICIAL CAPACITY AND NOT )
INDIVIDUALLY)            )
                         )
        Defendant.       )

        Deposition taken of JERRY PATTON, on the
25nd day of October, A.D., 2001, at Macon County
Courthouse, 253 E. Wood Street, Fifth Floor, Decatur,
Illinois, commencing at 10:05 a.m., before Kitty L.
Malcom, a Certified Shorthand Reporter, License No.
084-002106, pursuant to Notice.

APPEARANCES:
        Ms. Melissa M. McGrath, Esq.
        THOMSON & WEINTRAUB
        105 North Center St., P.O. Box 3577
        Bloomington, IL  61702-3577
        309/829-7069
        On behalf of Plaintiff

**Page 2**

        Ms. Karen McNaught
        Assistant Attorney General
        OFFICE OF THE ATTORNEY GENERAL
        500 So. Second Street
        Springfield, IL  62706
        217/782-5819
        On behalf of Warren Sappington

        Ms. Diane Baron, Esq.
        CLAUSEN MILLER, P.C.
        10 So. LaSalle Street
        Chicago, IL  60603-1098
        312/855-1010
        On behalf of Warren Sappington

        Mr. Robert Gillespie, Esq.
        HINSHAW & CULBERTSON
        400 So. Ninth Street, Suite 200
        Springfield, IL  62701
        217/528-7375
        On behalf of Judge Shonkwiler

        Mr. John E. Cassidy, Esq.
        CASSIDY & MUELLER
        323 Commerce Bank Bldg.
        416 Main Street
        Peoria, IL  61602
        309/676-0591
        On behalf of Macon County

*************************************************

        I N D E X
WITNESS:
JERRY PATTON
    Examination by Ms. McGrath........... 3
    Examination by Mr. Cassidy........... 15
    Examination by Ms. McNaught.......... 22
    Examination by Ms. McGrath........... 24
    Examination by Mr. Cassidy........... 26

EXHIBITS:
    None marked

**Page 3**

1    JERRY PATTON
2  called as a witness, after being first duly sworn,
3  was examined and testified upon his oath as follows:
4
5        EXAMINATION
6  BY MS. McGRATH:
7    Q. Judge, would you spell your name for the
8  court reporter?
9    A. Jerry Patton.  P as in Paul, A-T-T-O-N.
10    Q. And how long have you been a judge here in
11  Macon County?
12    A. Approximately 26 and a half years.
13    Q. Did you recently retire?
14    A. I retired approximately a year and two or
15  three months ago.
16    Q. Are you represented by Ms. NcNaught in this
17  deposition today?
18    A. Yes.
19    Q. I'm going to be asking you some questions.
20  There are times when I get wordy.  If you don't
21  understand something, please ask me to reword it.
22  Okay?
23    A. That's fine.
24    Q. During the period 1996 was your office

**Page 4**

1  located in the Ambassador building?
2    A. I think we moved over in early 1996.
3    Q. And during the time you were located in the
4  Ambassador building can you tell me on what floor
5  your chambers were?
6    A. I think the sixth.  I don't remember the
7  floor.
8    Q. That's fine.  Were there other judges'
9  chambers on the same floor?
10    A. Yes.  Judge Sappington's office was west of
11  me and Judge Greanias's office was south of me.
12    Q. Did you have a court reporter who worked
13  with you at that time?
14    A. That's correct.
15    Q. What was your court reporter's name?
16    A. Gina Jones.
17    Q. And did you have a judicial clerk who worked
18  with you at that time?
19    A. Actually then we called them secretaries.
20    Q. Okay.  Can you tell me your secretary's name
21  at that time?
22    A. I had two.  I had Jamie Mesnard, and Jamie
23  retired or quit about the middle of the year.  And
24  then I hired Christina Lees, who later became -- she

Page 13

1 and myself.
2    Q. Okay. But other than on an occasion like
3 that, you hadn't observed the judge and Missy going
4 to lunch?
5    A. No, I had not.
6    Q. Did Judge Greanias ever discuss with you the
7 reason that Missy Schroeder left her job?
8    A. He probably did, but I can't remember
9 exactly what the discussion was. I thought -- I
10 thought he told me that he assured her if she wanted
11 to continue to work that he would have a job for her.
12 And I don't know exactly what reason she gave him for
13 leaving. I don't know.
14    Q. Okay. But Judge Greanias told you that he
15 had told Missy that if she wanted to continue to
16 work, he would have a job for her?
17    A. That is my understanding, yes.
18    Q. Were there occasions that Missy was in Judge
19 Sappington's chambers that you would note that the
20 door was closed?
21    A. I don't know. It's possible, but I honestly
22 can't say.
23    Q. Did you ever have any discussions with Judge
24 Sappington concerning an attorney whose name was

Page 14

1 Frank Byers?
2    A. I think at some point I did, yes.
3    Q. Your discussion with Judge Sappington
4 concerning Frank Byers, did that relate to an
5 incident that took place in Judge Sappington's
6 courtroom?
7    A. I don't believe so.
8    Q. Tell me about the conversation you had
9 concerning Frank Byers?
10    A. I think that Art said something about he had
11 heard that Missy had met Frank Byers out of town, in
12 another town.
13    Q. What else did the judge tell you about that?
14    A. I think he said he was going to call her in
15 and talk to her and tell her that that was
16 inappropriate because she was married and Frank Byers
17 was married.
18    Q. Did you have any other discussions with
19 Judge Sappington where Missy Schroeder was mentioned?
20    A. I don't remember.
21    MS. McGRATH: I don't have anything further
22 for you, Judge. Thank you.
23    EXAMINATION
24 BY MR. CASSIDY:

Page 15

1    Q. My name is John Cassidy and I represent
2 Macon County. You were a circuit judge; is that
3 correct?
4    A. Correct.
5    Q. You indicated that you were Judge Greanias's
6 I think you used the word right-hand man to the
7 effect that you helped him and assisted in
8 administrative matters; is that correct?
9    A. Correct.
10    Q. Each year Judge Greanias submits a budget to
11 the Macon County Board; is that correct?
12    A. Correct.
13    Q. Are you familiar with that process?
14    A. Sure. The last few years that Judge Scott
15 was the chief judge here, he didn't particularly like
16 to do that, so I did it.
17    Q. Obviously there's a lot of things that go
18 into the judicial budget; the library, the equipment,
19 staff and so forth. When you submitted a budget to
20 the Macon County Board, would you just submit a
21 single bottom line figure?
22    A. No. You normally break it down. At least I
23 did. You would have your different categories, your
24 jury expenses for the juries each month, your

Page 16

1 expenses for the bailiffs, your expenses for the
2 secretaries, your expenses for the county court
3 reporters and you would use -- I would normally show
4 last year's budget and the proposed increase for the
5 next year.
6    Q. And those would just be general. Would the
7 board get involved in the decision making as to how
8 much each bailiff made?
9    A. Absolutely not.
10    Q. Or secretary?
11    A. No. That was within our discretion when he
12 proposed the budget.
13    Q. So basically there would be a total for
14 bailiffs, or a total for judicial clerks, or
15 secretaries, but as far as who and how much each one
16 got would be a decision that was made within the
17 judiciary?
18    A. Correct.
19    Q. Did the board ever deny a budget request
20 that you're aware of?
21    A. In the years past when money was tight, yes.
22 There was a year or two that the staff didn't get any
23 raises I don't think at all or maybe one percent.
24    Q. Under those circumstances or one percent --