**E-FILED**
Monday, 07 February, 2005  03:33:46 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 8

Deposition of Judge Davis

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

MELISSA ROBINSON, (f/k/a )
MELISSA SCHROEDER), )
                      )
   Plaintiff, )
                      )
  -vs- )    No. 99-2097
                      )
JUDGE WARREN A. SAPPINGTON, )
SIXTH JUDICIAL CIRCUIT, (IN )
OFFICIAL CAPACITY AND )
INDIVIDUALLY) )
   Defendant, )
                      )
MACON COUNTY, )
JOHN P. SHONKWILER, CHIEF )
JUDGE, SIXTH JUDICIAL )
CIRCUIT, MACON COUNTY CIRCUIT)
COURT, MACON COUNTY (IN )
OFFICIAL CAPACITY AND NOT )
INDIVIDUALLY) )
   Defendant. )

     Deposition taken of JOHN DAVIS, on the 13th
day of February, A.D., 2001, at 105 North Center
Street, Bloomington, Illinois, commencing at
approximately 9:00 a.m., before Kitty L. Malcom, a
Notary Public, and Certified Shorthand Reporter,
License No. 084-002106, pursuant to Notice.

### MALCOM REPORTING SERVICE
1310 Ironwood CC Drive
Normal, IL 61761
(309) 454-3378
Fax (309) 454-8286

---

**Page 2**

APPEARANCES:

Ms. Melissa M. McGrath, Esq.
THOMSON & WEINTRAUB
105 North Center St., P.O. Box 3577
Bloomington, IL 61702-3577
309/829-7069
  On behalf of Plaintiff

Ms. Karen McNaught
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
500 So. Second Street
Springfield, IL 62706
217/782-5819
  On behalf of Deponent Greanias

Ms. Diane Baron, Esq.
CLAUSEN MILLER, P.C.
10 So. LaSalle Street
Chicago, IL 60603-1098
312/855-1010
  On behalf of Judge Shonkwiler

Mr. Robert Gillespie, Esq.
HINSHAW & CULBERTSON
400 So. Ninth Street, Suite 200
Springfield, IL 62701
217/528-7375
  On behalf of Judge Shonkwiler

Mr. John E. Cassidy, Esq.
CASSIDY & MUELLER
323 Commerce Bank Bldg.
416 Main Street
Peoria, IL 61602
309/676/0591
  On behalf of Macon County

---

**Page 3**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### INDEX

WITNESS:

JOHN GREANIAS

Examination by Ms. McGrath........... 4

Examination by Mr. Cassidy........... 47

Examination by Ms. McGrath........... 64

Examination by Ms. McNaught.......... 69

Examination by Mr. Cassidy........... 70

Examination by Ms. McGrath........... 75

EXHIBITS:

Exibit Number 1 ...................... Attached

---

**Page 4**

1     JOHN DAVIS
2  called as a witness, after being first duly sworn,
3  was examined and testified upon his oath as follows:
4
5     EXAMINATION
6  BY MS. McGRATH:
7    Q. Sir, could you state your name for the court
8  reporter?
9    A. John Davis.
10    Q. And you are here today, are you not, under
11  subpoena which was served upon you as Judge John
12  Davis?
13    A. It's addressed to The Honorable Judge John
14  L. Davis and it was not served upon me personally.
15    Q. Okay.
16    A. I did not receipt for it.
17    Q. I'm sorry?
18    A. I did not receipt for it.
19    Q. Let me indicate for the record I'm going to
20  be asking you a series of questions. If I ask you
21  something that you don't understand, please ask me to
22  reword it. Okay?
23    A. Yes.
24    Q. If you want to take a break at any time,

CondenseIt!™                                    JOHN DAVIS

---

Page 57

1  would get involved in in regards to running the
2  judicial portion?
3      A. The county board never attempted to
4  intervene in how the courts were run.
5      Q. Would it be fair to say that -- well, this
6  is a basic question, but would you agree obviously
7  the judicial branch is a separate branch of
8  government, one of three branches under Illinois law?
9      A. I would agree with that.
10     Q. Pretty basic. And you would agree then that
11 there might be separation of power problems if the
12 county board started directing judges on what they
13 could and couldn't do and things of that nature as
14 far as running their staff and their courtrooms?
15     A. Most definitely.
16         MS. McNAUGHT: Objection to the extent that
17 it asks for a legal conclusion.
18 BY MR. CASSIDY:
19     Q. I believe, objection noted. And there's a
20 legitimate separation of powers issue involved why
21 that must be so. Would you agree with that?
22         MS. McNAUGHT: Same objection.
23         MR. CASSIDY: You can answer.
24         THE WITNESS: Yes.

Page 58

1  BY MR. CASSIDY:
2      Q. And in regards to policies such as sexual
3  harassment, would you agree that the county board
4  didn't get involved in that also?
5          MS. McNAUGHT: Same objection.
6          THE WITNESS: I don't believe -- I don't
7  believe the county board did. I don't believe they
8  did. With respect to other county offices, I don't
9  know. With the judicial area, no.
10 BY MR. CASSIDY:
11     Q. I'm only speaking of the judicial branch and
12 non-judicial members such as staff and clerks.
13     A. I don't recall anything coming from the
14 county board with respect to sexual harassment.
15     Q. But you do recall The Administrative Office
16 issuing its sexual harassment policy?
17     A. I think that's where it came from. I'm
18 sure.
19     Q. I am going to show you what has been
20 previously marked Exhibit Number 1 in Janice
21 Shonkwiler's deposition and ask you if this is the
22 policy you referred to earlier in your deposition?
23     A. Yes, I believe it is.
24     Q. Now, that particular policy as you note is

Page 59

1  dated May of '93; is that correct?
2      A. Down here at the bottom of Page 1, yes.
3      Q. In fact every page has that date on it.
4      A. Okay.
5      Q. Does that in any way help you recall when
6  that might have been passed out?
7      A. I'm sure it would have been at the time that
8  we received it, which would have been about that
9  date.
10     Q. Then when you received it, you indicated
11 that the clerk and the non-judicial members of your
12 branch, the bailiffs and staff and so forth, would
13 have become aware of it either through posting or
14 directly having them handed it?
15     A. Yes.
16     Q. It's your recollection that it would have
17 been in 1993 or sometime in that area?
18     A. Again, if that is what the date bears, so
19 I'm assuming that's when it was distributed.
20     Q. You're sure that members of the staff such
21 as judicial clerks and so forth received it because
22 you remember them joking about some of the provisions
23 in there and so forth?
24     A. That is my recollection.

Page 60

1      Q. Now, concerning disciplining judges, in this
2  case as you know Judge Sappington is being accused of
3  sexual harassment.
4      A. Yes.
5      Q. Concerning disciplining a judge in regards
6  to his conduct towards one of his staff members, in
7  this case I believe you testified that Mrs. Schroeder
8  was assigned to act as judicial clerk. Would you
9  agree that that disciplinary action would go through
10 the presiding judge and would not involve the county
11 board?
12     A. I would agree that it would not involve the
13 county board.
14     Q. I believe the way you indicated or at least
15 on that memo, there was a pecking order that you
16 thought when a judge needed to be corrected or
17 disciplined, that you would take it up the line. In
18 this case the memo was written to Judge Greanias as
19 presiding judge.
20     A. I hope I did not give the impression by this
21 memo that I intended for Judge Greanias or would
22 suggest that Judge Greanias had any disciplinary
23 authority. If I inferred that, that was not my
24 intent. I don't believe that Judge Greanias had

---

Page 69

1  A. Uh-huh. I believe we're talking about the
2  same person.
3  Q. As opposed to a Ruth Young?
4  A. You're right. I'm sorry. Ruth Young.
5  Q. It would have been Ruth Young who went to
6  lunch with Judge Sappington?
7  A. Now I've got them straight. It was Ruth
8  Young who went to lunch. She was I think Judge
9  Greanias' clerk. Janice Shonkwiler is Judge
10  Greanias' administrative assistant. Right? Now I've
11  got them straight.
12  Q. Having gotten them straight, can you
13  indicate any further as far as any knowledge that you
14  would have with regard to Janice Shonkwiler's
15  responsibilities in investigating claims of sexual
16  harassment?
17  A. No.
18  MS. McGRATH: I have nothing further.
19  EXAMINATION
20  BY MS. McNAUGHT:
21  Q. I want to clear up a couple of things.
22  Kathy Hott is the -- or was the circuit clerk of
23  Macon County in or about the 1996 time frame?
24  A. I am pretty sure he was.

Page 70

1  Q. Joe Shelasy was the name of the director of
2  the Administrative Office of the Illinois Courts?
3  A. Right.
4  Q. When you were being asked questions by
5  Mr. Cassidy about whether judicial clerks were county
6  employees or state employees, you weren't trying to
7  give any kind of a legal opinion, were you?
8  A. No. They were never state employees. The
9  only state employees were court reporters, and not
10  all of them were.
11  Q. If you had seen any kind of inappropriate
12  behavior by Judge Sappington towards any female,
13  would you have talked to Judge Sappington about it?
14  A. I think that I would. I felt that I -- I
15  think I knew him well enough personally that I would
16  have done that, yes.
17  MS. McNAUGHT: Nothing further.
18  EXAMINATION
19  BY MR. CASSIDY:
20  Q. A few follow-up questions. Concerning
21  judicial clerks, then you indicated they weren't state
22  employees, they were county employees, or you said
23  you are not sure. What are you basing that on; just
24  who they receive their paychecks from?

Page 71

1  A. Yes.
2  Q. Is there anything else that you are basing
3  that upon beyond who they receive their paycheck
4  from?
5  A. So far as whether they were state or county
6  employees?
7  Q. Yes.
8  A. The only state employees in the judiciary at
9  the circuit court level are judges and court
10  reporters.
11  Q. Okay. And is that based upon where -- when
12  you use the word state employees, are you just basing
13  that upon who provides their paycheck?
14  A. No. I am basing it on the fact of who their
15  employers are.
16  Q. Then what do you mean by who their employers
17  are? I know it's a very -- this is a complicated
18  area and I understand that.
19  A. With respect to judges it's kind of easy
20  because we are constitutionally elected or appointed
21  officers, so our employer is the state of Illinois.
22  Court reporters is a position created by an
23  administrative rule of the Supreme Court and they are
24  or most of them were state employees.

Page 72

1  Q. By that you mean the state paid them?
2  A. They paid them. They also were subject to
3  The Administrative Office and their rules of conduct,
4  their professionalism. They were required to attend
5  an annual seminar just like we were. It was all
6  through The Administrative Office.
7  Q. Let's go to judicial clerks. Let's not go
8  to the issue of pay, who paid them because I think we
9  understand where that comes from. Let's go to the
10  question of control. Would you agree that the person
11  who gave the day-to-day directives to the judicial
12  clerk would be the judge who they were assigned to?
13  A. Again, that became a gray area after Judge
14  Scott retired. When Judge Scott was the chief judge,
15  the answer to your question would have been easy. It
16  would have been an absolute yes. We had control over
17  them.
18  Q. Each circuit judge?
19  A. Each circuit judge. But at that time they
20  also weren't employed through the Circuit Clerk's
21  Office I don't believe. We had the power to hire our
22  own secretary, we had the power to fire our own
23  secretary.
24  Q. And --

# EXHIBIT 9

## Deposition of Judge Sappington

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

MELISSA ROBINSON,(f/k/a           )
MELISSA SCHROEDER),               )
                                  )
        Plaintiff,                )
                                  )
    -vs-                          )   No. 99-2097
                                  )
JUDGE WARREN A. SAPPINGTON,       )
SIXTH JUDICIAL CIRCUIT, (IN       )
OFFICIAL CAPACITY AND             )
INDIVIDUALLY)                     )
        Defendant,                )
                                  )
MACON COUNTY,                     )
JOHN P. SHONKWILER, CHIEF         )
JUDGE, SIXTH JUDICIAL             )
CIRCUIT, MACON COUNTY CIRCUIT)    )
COURT, MACON COUNTY (IN           )
OFFICIAL CAPACITY AND NOT         )
INDIVIDUALLY)                     )
                                  )
        Defendant.                )

ORIGINAL

        Deposition taken of WARREN A. SAPPINGTON, on
the 13th day of March, A.D., 2001, at 105 North
Center Street, Bloomington, Illinois, commencing at
10:33 a.m., before Kitty L. Malcom, a Notary Public
and Certified Shorthand Reporter, License No.
084-002106, pursuant to Notice.

**MALCOM REPORTING SERVICE**
**1310 Ironwood CC Drive**
**Normal, IL 61761**
**(309) 454-3378**
**Fax (309) 454-8286**

---

**Page 2**

APPEARANCES:

    Ms. Melissa M. McGrath, Esq.
    THOMSON & WEINTRAUB
    105 North Center St., P.O. Box 3577
    Bloomington, IL 61702-3577
    309/829-7069
        On behalf of Plaintiff

    Ms. Karen McNaught
    Assistant Attorney General
    OFFICE OF THE ATTORNEY GENERAL
    500 So. Second Street
    Springfield, IL 62706
    217/782-5819
        On behalf of Deponent Greanias

    Ms. Diane Baron, Esq.
    CLAUSEN MILLER, P.C.
    10 So. LaSalle Street
    Chicago, IL 60603-1098
    312/855-1010
        On behalf of Judge Shonkwiler

    Mr. Robert Gillespie, Esq.
    HINSHAW & CULBERTSON
    400 So. Ninth Street, Suite 200
    Springfield, IL 62701
    217/528-7375
        On behalf of Judge Shonkwiler

    Mr. John E. Cassidy, Esq.
    CASSIDY & MUELLER
    323 Commerce Bank Bldg.
    416 Main Street
    Peoria, IL 61602
    309/676-0591
        On behalf of Macon County

---

**Page 3**

**************************************************

**I N D E X**

WITNESS:

WARREN A. SAPPINGTON

Examination by Ms. McGrath............   4
Examination by Mr. Cassidy...........  149
Examination by Ms. McGrath........... 177
Examination by Mr. Cassidy........... 178


EXHIBITS:

Exhibit Number 1 ....................31
Exhibit Number 2 ....................74
Exhibit Number 3 ....................74

---

**Page 4**

1        WARREN A. SAPPINGTON

2 called as a witness, after being first duly sworn,

3 was examined and testified upon his oath as follows:

4

5        EXAMINATION

6 BY MS. McGRATH:

7    Q.  Sir, would you state and spell your full

8 name for the court reporter?

9    A.  First name is Warren, W-A-R-R-E-N, initial

10 is "A" for Arthur, and my last name is Sappington,

11 S-A-P-P-I-N-G-T-O-N.  May I make one short statement?

12    Q.  Yes sir.

13    A.  I wear a brace for TMJ I think they call it,

14 and if I lisp, or you do not understand, I will not

15 be offended in any way if you will ask me to repeat

16 it.

17    Q.  That's fine.  I appreciate that.  As you

18 know you are here for your deposition today?

19    A.  Yes.

20    Q.  If I get too wordy in a question so that you

21 don't understand, even though I don't think I have a

22 lisp today, would you let me know so that I can

23 clarify?

24    A.  Yes.

Page 9

1  She was born in 1956, so she's about 43. That's all.
2      Q. Where does Ms. Sappington Spicer or Mrs.
3  Sappington Spicer reside?
4      A. In Oreana.
5      Q. I'm sorry?
6      A. I have to stop and think. Oreana, Illinois.
7  I can give you the zip but I don't know it offhand.
8      Q. You would not know her specific address
9  offhand either, or actual address?
10     A. No.
11     Q. Were you married previously before marrying
12  Cheryl?
13     A. Yes.
14     Q. To whom?
15     A. Anna, A-N-N-A, M-A-R-I-E, Black. And then
16  of course Sappington when we were married.
17     Q. When did you marry Anna Marie?
18     A. 1949.
19     Q. And did a divorce result from that marriage?
20     A. Yes, we were divorced.
21     Q. Can you tell me when you were divorced?
22     A. I think the divorce was signed in 1979. No,
23  wait a minute. Let me take that back. Yes, it was
24  '79.

Page 10

1      Q. I may have misunderstood you -- no. Strike
2  that. Okay. 1979 you believe?
3      A. Yes, ma'am.
4      Q. Sir, you are aware that there are
5  allegations pending in federal court by a Melissa
6  Robinson who was known earlier as Melissa Schroeder
7  alleging sexual harassment?
8      A. Yes, ma'am.
9      Q. Did you know Ms. Schroeder to be called or
10  to go by the name Missy while she worked with you?
11     A. Yes.
12     Q. So if I ask you questions today and use that
13  name, we'll both understand who we're talking about?
14     A. Yes.
15     Q. Did Missy work with you while you were an
16  associate judge?
17     A. Yes.
18     Q. Can you tell me when she began working with
19  you?
20     A. I think in March of 1994.
21     Q. And can you tell me how she came about
22  beginning to work for you?
23     A. I can't recall whether he published an ad in
24  the paper or published a notice in the courthouse,

Page 11

1  but she and some others applied for the position.
2      Q. Did you interview her for the position?
3      A. Yes.
4      Q. Did anyone else interview her for the
5  position?
6      A. My court reporter, Leona Miller, was with me
7  when I interviewed her.
8      Q. And who made the decision to offer Missy
9  Schroeder a position?
10     A. I think that was Judge Greanias who made the
11  decision to hire her.
12     Q. Was she interviewing to work with you?
13     A. Yes.
14     Q. Why would Judge Greanias have been the one
15  to make the decision as to whether she was hired if
16  she was going to be working with you?
17     A. He was the presiding judge.
18     Q. And Missy worked for you for how long? Let
19  me ask you this, it may be simpler. When did Missy
20  stop working for you, if you recall?
21     A. As I recall it was the end of December, the
22  30th of December.
23     Q. Can you tell me what year?
24     A. '96. I'm sorry.

Page 12

1      Q. Now, while Missy worked for you what was her
2  job title?
3      A. Let me take that back. I resigned the 10th
4  of December. She resigned as of January the 10th. I
5  don't think that's the correct date. Want me to
6  explain?
7      Q. Sure.
8      A. Because she came into my office, could not
9  talk, and said, "I'm out of here." I said okay. I
10  think that's the last time I saw her. So I don't
11  think that was December 30th because I wouldn't have
12  been there December 30th unless my dates are mixed
13  up.
14     Q. Okay. And am I correct that perhaps you're
15  not clear, or am I correct that you're not clear of
16  when her last day of employment was?
17     A. That's right.
18     Q. Okay.
19     A. Yes.
20     Q. While Missy was employed, worked with you,
21  did you understand her to be a county employee?
22     A. Yes.
23     Q. And did you in fact indicate to Missy
24  Schroeder that she was a county employee?

Page 13

1   A. I'm sure I did.
2   Q. Sir, while Missy worked for you, did you
3 ever provide to her any written policy with regard to
4 what someone should do if they believed they were
5 being sexually harassed?
6   A. I don't know whether I did or not. I don't
7 know whether I did or not, okay?
8   Q. How would you describe your work
9 relationship with Missy while she worked for you?
10    MS. McNAUGHT: Do you want to specify a time
11 period?
12 BY MS. McGRATH:
13   Q. Well, let me ask you this, sir. Did your
14 work relationship with Missy vary from one time to
15 the other during the time she was employed by you?
16   A. I don't think it did.
17   Q. How would you describe that relationship
18 between you and Missy during the time she worked for
19 you?
20   A. Let me ask counsel a question.
21    MS. McGRATH: While you confer with counsel,
22 sir, I'm going to go off the record for a moment to
23 obtain some documents.
24    (Whereupon discussion was held off the

Page 14

1 record; 10:50 a.m. to 10:53 a.m.)
2 BY MS. McGRATH:
3   Q. Sir, have you had sufficient time to confer
4 with counsel?
5   A. Yes.
6    (WHEREUPON, THE REQUESTED PORTION OF THE
7    RECORD WAS READ BACK BY THE REPORTER.)
8    THE WITNESS: Basically good.
9 BY MS. McGRATH:
10   Q. Now, you indicate sir, basically good. Is
11 there anything that was not good?
12   A. Well, it changed. The first two years she
13 had her own office.
14   Q. What time period?
15   A. I'm sorry. The first two years she worked
16 for me, '94 and '95, she had her own separate office.
17 And our contact was to walk by each other, walk down
18 the steps to the courtroom and back. The last year
19 we were in the former motel and of course we were on
20 the same floor. And she came to my office and then
21 we would go down the steps together two flights into
22 the courtroom -- no, over to Judge Steadman's staff's
23 office and then into the courtroom that we were
24 assigned to. And during that period of time we

Page 15

1 talked more.
2   Q. And so are you referring to from January
3 1996 forward that the change in the relationship
4 happened?
5   A. Yes. We were -- we became friends.
6   Q. Okay. When you were in the -- you indicated
7 in the motel, was that -- do you remember the name of
8 what that motel was as a temporary court?
9   A. Well, it was known as the Ambassador before.
10   Q. Right. Okay.
11   A. 141 -- you don't want that.
12   Q. When you were located in the Ambassador, am
13 I understanding that Missy did not then have her own
14 office?
15   A. That's correct.
16   Q. Was she located on the same floor as your
17 chambers?
18   A. Yes.
19   Q. Were there other judges' chambers on that
20 floor?
21   A. Yes.
22   Q. Whose chambers were on that floor?
23   A. Presiding Judge John K. Greanias, Circuit
24 Judge Jerry Patton, and I was there.

Page 16

1   Q. Okay. And am I correct that Missy was
2 located then in more of a cubicle type setup outside
3 of the chambers?
4   A. No, she was not.
5   Q. Tell me where she was located.
6   A. She was at a desk next to the office of
7 Presiding Judge John K. Greanias. Okay.
8   Q. And at this time, sir, was her title
9 judicial clerk, if you know?
10   A. Yes.
11   Q. Were there other individuals located in the
12 same area as Missy's desk?
13   A. Yes.
14   Q. Who were those individuals?
15   A. Directly across was judicial clerk for John
16 Greanias -- and want her name?
17   Q. Yes sir, please.
18   A. Ruth Long.
19   Q. Was that Long or Young?
20   A. I'm sorry, Ruth Young. And to the left, or
21 west, of the plaintiff's desk I think was my court
22 reporter Leona Miller's desk.
23   Q. Okay.
24   A. And then behind either the plaintiff or

Page 157

1  Q. That's your recollection?
2  A. Yes. That's because they wanted the Circuit
3  Clerk's Office and the court system to be open on the
4  same days at the same time.
5  Q. Okay. But my question is, though, did the
6  board actually decide this judicial secretary is
7  going to work this number of hours, this one is going
8  to work some other hours, this one is going to
9  receive this amount of vacation, or was that
10 something that was determined within the judicial
11 branch of government?
12 A. I thought the county board did it.
13 Q. How about -- let me ask you this. Wouldn't
14 you agree that your judicial secretary, later
15 judicial clerk, had to be working the same hours that
16 your courtroom was open?
17 A. Correct.
18 Q. So their hours are dictated by the hours
19 that the judiciary determines that the courtrooms are
20 going to be open; is that correct?
21     MS. McNAUGHT: Objection. It could be
22 exactly the opposite. I'm not sure that he --
23     MR. CASSIDY: That's what I am asking.
24     MS. McNAUGHT: I'm not sure that he has the

Page 158

1  capability of answering that question since he was
2  never the presiding judge or even the chief judge of
3  the circuit. Well, anyway, go ahead if you know.
4      THE WITNESS: Well, I don't really know. I
5  thought that the administrative courts determined the
6  days that courthouses were open and the hours, and
7  the courts had to abide by them. And whether the
8  county boards had to abide by them or not, they did.
9  BY MR. CASSIDY:
10 Q. So it's your understanding that The
11 Administrative Office of the Supreme Court determined
12 the days that the courts were open; is that correct?
13 A. Yes.
14 Q. And you would agree --
15 A. Generally.
16 Q. And you would agree then that the hours and
17 the vacation time of the judicial clerks or judicial
18 secretaries had to coincide with those dates?
19 A. Yes.
20 Q. So, it wouldn't be the county board that
21 would determining this information but rather was
22 being determined within the judicial branch, correct?
23     MS. McNAUGHT: I object. It's based upon the
24 wrong premise of the law. I mean, the General

Page 159

1  Assembly establishes some of the court holidays.
2      MR. CASSIDY: You can go ahead and answer.
3      THE WITNESS: All I know is that the chairman
4  of the various committees on the county board got
5  together and they decided on the hours and the days
6  and the salaries and the vacation periods for all
7  county employees and that that included the people who
8  worked in the court system.
9  BY MR. CASSIDY:
10 Q. Okay. And with that decision concerning the
11 people that -- would that decision by the county
12 board be based upon information that the county board
13 received from the presiding judge?
14 A. They would use that. They would consider
15 that.
16 Q. And are you aware of ever a situation where
17 they went against the information, the county board
18 went against the information provided by the
19 judiciary in setting those hours, vacation and sick
20 leave?
21 A. Yes. I think Columbus Day is a national
22 holiday and a court holiday, and the courthouse in
23 Macon County has remained open on that day. In lieu
24 of that holiday the county employees were not

Page 160

1  required to work the day after Thanksgiving.
2  Q. Okay. I'm not sure I followed you. First
3  you were talking about Columbus Day and now you are
4  talking about the day after Thanksgiving.
5  A. Columbus Day. In street language the
6  employees of the county wanted to trade the day after
7  Thanksgiving for Columbus Day.
8  Q. Did that include judicial clerks?
9  A. Yes.
10 Q. So if the court was open and you had court
11 hearings that day, you would have no judicial clerk
12 on that day?
13 A. No, wouldn't be open.
14 Q. So, this would be a day that -- I'm not sure
15 I followed you. Maybe we better start from the
16 beginning just so the record is clear.
17 A. Okay.
18 Q. My question is: Can you recall of any time
19 that the county board did not accept the
20 recommendation of the judicial branch when setting
21 hours, vacation and sick leave?
22 A. The judicial branch in Macon County?
23 Q. Yes, the presiding judge.
24 A. No.

# EXHIBIT 10

Deposition of Nathan Maddox

1

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE CENTRAL DISTRICT OF ILLINOIS


   MELISSA ROBINSON, f/k/a          )
   MELISSA SCHROEDER,               )
              Plaintiff,            )
                                    )
              vs                    ) No. 99-2266
                                    )
   JUDGE WARREN A. SAPPINGTON,      )
   et al.,                          )
              Defendants.           )
```

             Discovery deposition of NATHAN MADDOX,

taken before Mary K. Beyers, CSR, and Notary

Public, on the 15th day of November, 2001, at the

hour of 1:00 P.M., at the Office of the Attorney

General, 3000 Montvale, Springfield, Illinois,

pursuant to attached stipulation.

                  ASSOCIATED COURT REPORTERS
                      1-800-252-9915
     404 East Main Cross   315 National City Bank Ctr.
   Taylorville, Illinois 62568      P.O. Box 3243
      (217) 824-5717      Springfield, Illinois 62705

19

1    form of the question.  You talked about the Chief

2    Judge of Macon County, and there is no such thing.

3    If you want to rephrase that to mean the Chief

4    Judge of the 6th Judicial Circuit, I would withdraw

5    my objection.

6                    MS. MCGRATH:  And I would like

7    to do that.  Thank you.

8         A.    That would be an avenue available for

9    clarification of the policy, yes.

10        Q.    You don't have any knowledge, do you, of

11   the Chief Judge of the 6th Judicial Circuit coming

12   to the Illinois Administrative Office of the Courts

13   and making such an inquiry?

14        A.    I'm not aware of that.

15        Q.    The different circuits across the State

16   of Illinois employ judicial clerks to work with the

17   judges at times?

18        A.    Yes.

19        Q.    Are there times when those judicial

20   clerks are employed by the county within which that

21   circuit sits?

22        A.    Yes.

23        Q.    And are you aware as to whether in Macon

24   County in 1996, the judicial clerks were employed

ASSOCIATED COURT REPORTERS

20

1    by the State of Illinois or employed by Macon

2    County?

3        A.    I believe they were, what we would have

4    classified, as non-state paid judicial branch

5    employees.  I believe they were paid by the county

6    and working in the judicial branch.

7        Q.    And so in that sense, they would have

8    been employed by both the State of Illinois as well

9    as Macon County?

10        A.    I'm not trying to be evasive.  That's

11    always been a difficult question.  I think that

12    probably, you know, they were paid by the county

13    and worked under the supervision of the judicial

14    officers.  And I don't know what the correct legal

15    classification of their employment would be, but

16    that would be the practical overview of what was

17    going on.

18        Q.    Okay.  Do you agree that the Chief Judge

19    of the 6th Judicial Circuit, in his role

20    administering functions within that circuit,

21    represents the State of Illinois?

22                    MS. MCNAUGHT: Objection to the

23    extent that it calls for a legal conclusion.

24        A.    I think probably so.

ASSOCIATED COURT REPORTERS

# EXHIBIT 11

## Deposition of David Drobisch

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

MELISSA ROBINSON, (f/k/a    )
MELISSA SCHROEDER),          )
                             )
        Plaintiff,           )
                             )
    -vs-                     )    No. 99-2097
                             )
JUDGE WARREN A. SAPPINGTON,  )
SIXTH JUDICIAL CIRCUIT, (IN  )
OFFICIAL CAPACITY AND        )
INDIVIDUALLY)                )
        Defendant,           )
                             )
MACON COUNTY,                )
JOHN P. SHONKWILER, CHIEF    )
JUDGE, SIXTH JUDICIAL        )
CIRCUIT, MACON COUNTY CIRCUIT)
COURT, MACON COUNTY (IN      )
OFFICIAL CAPACITY AND NOT    )
INDIVIDUALLY)                )
                             )
        Defendant.           )

**ORIGINAL**

        Deposition taken of DAVID M. DROBISCH, on
the 13th day of December, A.D., 2001, at 500 Millikin
Court, Decatur, Illinois, commencing at 2:00 p.m.,
before Kitty L. Malcom, a Certified Shorthand
Reporter, License No. 084-002106, pursuant to Notice.

Page 2

APPEARANCES:

    Ms. Melissa M. McGrath, Esq.
    THOMSON & WEINTRAUB
    105 North Center St., P.O. Box 3577
    Bloomington, IL 61702-3577
    309/829-7069
        On behalf of Plaintiff

    Mr. Matthew Bilinsky
    Assistant Attorney General
    OFFICE OF THE ATTORNEY GENERAL
    500 So. Second Street
    Springfield, IL 62706
    217/782-5819
        On behalf of Judge Sappington

    Ms. Diane Baron, Esq.
    CLAUSEN MILLER, P.C.
    10 So. LaSalle Street
    Chicago, IL 60603-1098
    312/855-1010
        On behalf of Judge Sappington

    Mr. Andrew Ramage, Esq.
    HINSHAW & CULBERTSON
    400 So. Ninth Street, Suite 200
    Springfield, IL 62701
    217/528-7375
        On behalf of Judge Shonkwiler

    Mr. John E. Cassidy, Esq.
    CASSIDY & MUELLER
    323 Commerce Bank Bldg.
    416 Main Street
    Peoria, IL 61602
    309/676-0591
        On behalf of Macon County

MALCOM REPORTING SERVICE
1310 Ironwood CC Drive
Normal, IL 61761
(309) 454-3378
Fax (309) 454-8286

Page 3

**********************************************************

I N D E X

WITNESS:

    DAVID DROBISCH

    Examination by Ms. McGrath............  3

    Examination by Mr. Bilinsky...........  31

    Examination By Mr. Cassidy............  41

    Examination by Ms. McGrath............  44

EXHIBITS:

    None marked

Page 4

1        DAVID M. DROBISCH
2  called as a witness, after being first duly sworn,
3  was examined and testified upon his oath as follows:
4
5        EXAMINATION
6  BY MS. McGRATH:
7    Q. Would you state your full name for the court
8  reporter?
9    A. David M. Drobisch.
10   Q. Mr. Drobisch, are you represented by Mr.
11 Cassidy here today?
12   A. Yes, ma'am.
13   Q. I am going to be asking you some questions.
14 If I get wordy or you don't understand a question,
15 please ask me to reword it.
16   A. Okay.
17   Q. Next, instead of shaking your head, if you
18 would answer yes or no?
19   A. Oh yes.  Sorry.
20      MR. CASSIDY: Everything is going to be put
21 on the record.
22      THE WITNESS: You can't put a head nod on
23 there.
24      MR. CASSIDY: She may say is that a yes or

CondenseIt!™                                                    DAVID M. DROBISCH

Page 9

1    A. Well, it's sheriff, coroner, the courts,
2  state's attorney, public defender, and there's
3  probably a couple of others that I can't recall at
4  this point.
5    Q. How does the budget process on an annual
6  basis come before your committee, and let me direct
7  your attention specifically for the courts.
8    A. The courts submit to the Justice Committee
9  their request of what they feel like it's going to
10  cost to run that portion of the courts. We just make
11  a determination on lump sum. In other words, we
12  don't get into line items and specifics. We simply
13  say we have this amount of money to spend in the
14  general fund, and any items coming under the general
15  fund coming under these categories, this is what you
16  have. They can break it down any way they want. We
17  give them a lump sum amount and it's up to them to
18  spend it however they want within those budgetary
19  restraints.
20    Q. When your committee is looking to a dollar
21  amount for the courts, are you reviewing a budget
22  that has certain line items within that budget?
23    A. They submit it that way. However, when we
24  make a decision as to how much to appropriate, we

Page 10

1  appropriate a bottom line amount, we don't go into
2  specifics, take this line item and cut it by ten
3  percent and increase this one by ten percent. We
4  give them a flat dollar amount and that's it. If
5  they request more than we have available to spend,
6  then we say to them you need to make these amount of
7  cuts total dollarwise to stay within these budget
8  restraints that we have given you.
9    Q. Is there ever a time, though, that the
10  Justice Committee within its meeting looks to those
11  different line items in the budget to consider the
12  dollar amount that the committee is going to
13  authorize?
14    A. No. I mean, let's say that they come in and
15  they are over on the telephone line, what has been
16  appropriated to pay for the telephones and the cost
17  of that service, we don't get into specifics how many
18  telephones do you have. We're only going to allocate
19  you this amount. If it's within that, services, the
20  administrative, whatever general line it comes under,
21  that's all that we give them. We don't tell them you
22  can only have ten phones. We just say this is the
23  amount, total amount, you go back and figure out how
24  you want to spend it as long as you don't exceed this

Page 11

1  amount.
2    Q. Okay. Is there ever a time, though, that
3  the court -- well, let me ask you this so we're clear
4  on the record, too. Does a particular individual
5  from the courts present their budget request to your
6  committee?
7    A. Usually it is the chief judge or his
8  appointee. Now, the chief judge --
9      MR. CASSIDY: Well --
10  BY MS. McGRATH:
11    Q. By chief judge?
12    A. The chief judge of Macon County, the head
13  judge here in Macon County.
14      MR. CASSIDY: Presiding.
15      THE WITNESS: Judge Greanias.
16  BY MS. McGRATH:
17    Q. It's typically Judge Greanias?
18    A. It would be typically. If he is the chief
19  judge, then he is the one that would appear or one of
20  his designees. It's usually always him. Now, we
21  have -- he has a man, like a court administrator that
22  he just recently, I guess, made that position.
23    Q. Okay.
24    A. And another person then, Don Meyer, who is

Page 12

1  also head of Court Services took on that
2  responsibility. This is the first year that that's
3  ever been done, though.
4    Q. Can you give me a ball park dollar amount of
5  the last budget that was granted to the courts?
6    A. No, not without going back and looking at
7  the actual budget format that we used. I don't have
8  that with me.
9    Q. Okay. Has the court, has Judge Greanias
10  ever come to you seeking a certain dollar amount and
11  the committee looks at that dollar amount --
12    A. At a line item or overall amount?
13    Q. As an overall amount.
14    A. Yes. He does that when he submits his
15  budget.
16    Q. Okay.
17    A. So if he has a quarter of a million dollars
18  to run the administrative part of his office, that is
19  what he requests, but he doesn't give us an
20  individual breakdown.
21    Q. Let me use that figure. Let's say Judge
22  Greanias comes to you with a quarter of a million
23  dollar request for administration of the courts here
24  in Macon County Court.

Page 17

1 have a sexual harassment policy?

2    A. Yes, they do.

3    Q. How long has Macon County had a sexual

4 harassment policy?

5    A. I don't remember. I don't recall. Again, I

6 would have to look it up. I don't even want to

7 venture a guess. I know we have one because I

8 remember passing it on a county board resolution, but

9 I don't remember what the date was or when it was.

10    Q. Do you remember who presented that

11 resolution to the county board?

12    A. No. It came out of a committee because the

13 county board operates by committee. So whatever the

14 appropriate committee, and the names of these

15 committees have changed over the years.

16    Q. Who is in charge of investigating claims of

17 sexual harassment under this Macon County sexual

18 harassment policy?

19       MR. CASSIDY: Objection.

20       THE WITNESS: I --

21       MR. CASSIDY: My objection is that I am sure

22 that the policy speaks for itself.

23       THE WITNESS: There is a procedure to follow,

24 but I can't recall who does it. Usually -- I mean, I

Page 18

1 thought all sexual stuff that had to be filed either

2 through the state or the federal to hear a complaint,

3 but we as the county board again never hear a

4 complaint.

5 BY MS. McGRATH:

6    Q. Do you know who has control of that sexual

7 harassment policy? Who distributes it to Macon

8 County employees -- let me ask you that -- do you

9 know?

10    A. At the time that the employee is hired or a

11 new policy is put in place, it's generally

12 distributed through the Auditor's Office or through

13 the County Clerk's Office. Depends on who is

14 assigned that responsibility. When we make a policy,

15 one of the people in the -- the administration of the

16 county functions gives -- if you came to work for the

17 county you would be given a number of booklets

18 including benefits, policies, leave of absences,

19 probably sexual harassment. I mean the whole gamut

20 of a packet would be given to you as an employee, and

21 then you would probably sign something that you have

22 read and understand those policies. Again, I don't

23 know who did it, who does it.

24    Q. Are there policies, Macon County policies

Page 19

1 distributed to employees who are strictly paid by the

2 county and given benefits by the county?

3       MR. CASSIDY: Show my objection. It calls

4 for -- it assumes something that is not a fact,

5 number one that are strictly paid and get benefits.

6 You indicated they are employees. And I believe that

7 is the major issue in this case and that's my

8 objection to the question.

9       THE WITNESS: What I am saying to you -- I

10 don't know what the judiciary does. I know what the

11 county board does and the county, but what the

12 executive branch of the county -- I don't know what

13 the judiciary or what their process is in handling

14 those types of disclosures. I have no idea. That is

15 taken care of by the judiciary. They don't come to

16 Macon County and say we're going to do this. They

17 just do it.

18 BY MS. McGRATH:

19    Q. My understanding of your testimony, correct

20 me if I'm wrong, is that there are certain

21 individuals who receive their pay and receive

22 benefits through Macon County?

23    A. Yes.

24    Q. Am I correct so far?

Page 20

1    A. That's correct.

2    Q. Do these individuals whose only relationship

3 with Macon County according to your testimony is that

4 they receive pay and benefits, okay -- do those

5 individuals receive policies from Macon County?

6    A. No. I don't know. I can't tell you that.

7 I am not knowledgeable in that.

8    Q. Again, back to the budgetary discussions

9 with regard to the Macon County judiciary, okay?

10 Does the Justice Committee discuss policies with

11 regard to vacation and sick time for those

12 individuals?

13    A. No.

14    Q. No?

15    A. No. The county really -- again, that's the

16 judiciary. That's their own part of government. We

17 have nothing to do -- probably the only thing that is

18 related from judiciary to Macon County, the executive

19 side of it, is that they turn in those people's

20 salaries, the dates they are to be paid, and the

21 benefits they are to receive and that's it period.

22    Q. And those people receive paychecks that are

23 identified as Macon County paychecks, correct?

24    A. Yes.

Page 21

1  Q. And they receive benefits from Macon County?
2  A. That's correct.
3  Q. Who within --
4    MR. CASSIDY: I just want to make clear.
5  When you say those people, I assume we're talking
6  about judicial clerks now?
7    MS. McGRATH: Yes.
8  BY MS. McGRATH:
9  Q. Did you understand me to mean that?
10  A. I assumed that.
11    MR. CASSIDY: Because obviously the court
12  reporters and that are a different situation, but --
13  BY MS. McGRATH:
14  Q. When judicial clerks begin working, begin
15  receiving paychecks from Macon County, begin
16  receiving benefits from Macon County, who within the
17  administrative office, if anyone, at Macon County
18  tells them that they are not employed by Macon
19  County?
20  A. I don't understand what you are saying.
21  Q. Well, does anyone let the judicial clerks --
22  you agree the judicial clerks receive a check that
23  says Macon County on it, right?
24  A. Yes.

Page 22

1  Q. And they receive Macon County benefits,
2  right?
3  A. That's correct.
4  Q. How is it that they are supposed to know
5  then that they are not employed by Macon County?
6  A. I don't know how they are supposed to know.
7  I have no idea what the judiciary tells their
8  employees.
9  Q. No one within Macon County that you know of
10  clarifies to them that they are only receiving their
11  paychecks and their benefits from Macon County but
12  they are not in fact employed by Macon County?
13  A. I don't know what they are told. I have no
14  idea on that. All I know is that --
15    MR. CASSIDY: That's enough. You answered
16  it.
17  BY MS. McGRATH:
18  Q. In your role as a county board member,
19  within any of the committees that you have talked
20  about, okay, or subcommittees, have you been involved
21  in discussions concerning training of Macon County
22  employees?
23  A. Are you talking about judiciary or are you
24  talking about the executive side of it?

Page 23

1  Q. Let me ask you this. In your role as a
2  Macon County Board member, are you involved in any
3  discussions concerning training of employees?
4    MR. CASSIDY: I am going to object to the
5  question in that it's vague. And from his last
6  comment, he obviously doesn't understand it in that
7  you have taken the position judicial clerks are
8  employees and we have taken the position they are
9  not. So it's vague to the extent that he doesn't
10  know what you're referring to.
11  BY MS. McGRATH:
12  Q. I am referring at this moment, sir, to any
13  discussions you have had as a county board member of
14  training individuals, whether they be people you
15  believe to be employees, okay, or people you don't
16  believe to be employees. I am asking an overall
17  question of have you had the discussion?
18    MR. CASSIDY: It sounds pretty vague. Do you
19  understand the question? If you don't understand the
20  question --
21    THE WITNESS: The only think I can think, I
22  can say is that office holders, elected office
23  holders -- because, again, we don't even have control
24  over the elected office holders, we only have them

Page 24

1  over the appointed -- they have training lines within
2  their budget. We give them a bottom line. If they
3  want to send someone to training then they
4  appropriate that money. The only time that we have
5  any control over them is if they overspend their
6  budget and they come to us, then we have the ability
7  to give them the additional dollars they need or deny
8  it. That's it. Specifically if I am an employee and
9  I want to go to a seminar, I go to my direct
10  supervisor and say, I want to go to this because I
11  think it will enhance my job performance. It's up to
12  that office holder or that appointed person as to
13  whether or not they want to send me. That doesn't
14  come to the county board.
15  BY MS. McGRATH.
16  Q. Okay.
17  A. We have nothing to do with that.
18  Q. Bear with me for another minute. Has the
19  county board ever had discussions about sending
20  county employees to sexual harassment training?
21    MR. CASSIDY: Show my objection as to it
22  being vague. It doesn't define who a county employee
23  is. Do you include judicial clerks in there who I
24  believe his testimony is they are not employees?

CondenseIt!™

DAVID M. DROBISCH

Page 29

1 budget, meaning is it in one of these three
2 categories, and has the bottom line been exceeded.
3    Q. I understand that, but if the bottom line is
4 exceeded, the judiciary is still to come to the
5 Finance Committee for approval?
6    A. Well, we will not pay a bill that has been,
7 whatever the reason, if it is larger than the amount
8 that was budgeted in those categories. We just won't
9 do it. Now, we have done what they call general
10 bookkeeping at the end of the budget year, and they
11 have $2,000 over here that they didn't spend, and
12 they need the $2,000 over here, then in the form of a
13 resolution we transfer that money from here over to
14 here to cover those lines. (Indicating.)
15    Q. And by here to here, are you talking about
16 different lines within the budget?
17    A. No, different lines within those categories;
18 administrative, salary and services.
19    Q. Okay. Just so that I'm clear, if the
20 judiciary overspends, they have to bring that to the
21 attention of the Finance Committee, correct?
22    A. Yeah, or they don't get the bill paid.
23    Q. Ever since you've been on the Finance
24 Committee, has there been a time that you recall that

Page 30

1 the judiciary came to you seeking monies over and
2 above that which was allocated?
3    A. Yes.
4    Q. When is the last time you remember that
5 happening, can you give me a time?
6    A. I don't recall the date. It occurs from
7 time to time and, like I say, if they come with a
8 solution, and it's moving money from this category to
9 this category, we'll probably approve it as long as
10 it doesn't exceed that bottom line we've given them.
11    Q. But it is up to the Finance Committee to
12 approve or disapprove?
13    A. That's right. As long as the bottom lines
14 aren't exceeded. Now, if the bottom line is
15 exceeded, they may appropriate the money, but they
16 want to know why it was exceeded. Why is this person
17 not doing the job that we told them they needed to do
18 with these amounts. Like I say, the only control
19 that we have over judiciary is the budgeting process.
20 We give them X number of dollars, and if they don't
21 exceed those amounts we don't have any problem. Once
22 they exceed it, then they come to us for a solution.
23 It's up to us whether or not we want to grant it.
24    MS. McGRATH: Okay. I have nothing further.

Page 31

1 Thank you, sir.
2    EXAMINATION BY
3 MR. BILINSKY:
4    Q. Couple of questions. Who do you believe are
5 employees of Macon County as you understand the term
6 employee?
7    A. That's a person that we have the right to
8 hire, fire, discipline, educate.
9    Q. As we sit here today who are those people?
10    A. Individually?
11    Q. You can define them by office, agency.
12    A. Well, that would be an employee that would
13 be in the ESDA, the emergency services, that's an
14 appointed office. The Coroner is an elected office,
15 however the county provides them with certain staff.
16    Q. Sheriff deputies?
17    A. Sheriff deputies to the extent that under
18 their rules and regulations, which they have certain
19 rules and regulations they have to go by, but we
20 can't even really discipline them. They are all
21 under a union. They are under a union contract, so
22 that pretty much is covered by those contracts,
23 agreements.
24    Q. Is a Macon County deputy sheriff a Macon

Page 32

1 County employee as you understand it?
2    MR. CASSIDY: Show my objection. This goes
3 beyond his knowledge. The answer it's my
4 understanding is the Illinois Supreme court Moy
5 decision is they are not. This is strictly a legal
6 question. And there is a Supreme Court decision
7 right on that point, sheriff's office. So my
8 objection to that is a legal question that goes
9 beyond his expertise.
10    MR. BILINSKY: I believe the question was to
11 his understanding based upon terminology.
12    MR. CASSIDY: As long as you limit to it his
13 understanding as opposed to what the actual legal
14 answer is.
15    THE WITNESS: A deputy is an employee. Now,
16 how they are disciplined is generally up to the
17 sheriff. Then again the sheriff would come to the
18 oversight committee, but he doesn't even come to us
19 if he fires a deputy. He just does it. Now, he
20 probably then notifies the Auditor's Office that this
21 person is no longer an employee so the benefits stop,
22 his pay will stop, so on and so forth.
23 BY MR. BILINSKY:
24    Q. Are there assistant coroners in Macon County

Page 33

1 or is there just one coroner?

2    A. There is an assistant corner part-time, and

3 that selection is made by the coroner himself. If he is

4 coroner himself is an elected position. If he is

5 going to have a deputy coroner, he selects his own.

6    Q. Is the deputy coroner an employee of Macon

7 County?

8    A. Yes, from the standpoint --

9        MR. CASSIDY: Show my objection.

10        THE WITNESS: As it is limited under the

11 statute.

12        MR. CASSIDY: Again, to the extent of all

13 those questions, are you asking for his understanding

14 versus a legal conclusion?

15        MR. BILINSKY: Correct.

16        THE WITNESS: For instance, lately the

17 coroner just had a secretary. He no longer has a

18 secretary. The reason is that we had budget cuts we

19 had to make. We said this is the amount that we have

20 given you under these three categories and he chose

21 to get rid of that position. We did not tell him to.

22 He just did it for budgetary reasons.

23 BY MR. BILINSKY:

24    Q. Now, when we have had these discussions

Page 34

1 about budget, I want to make sure I understand

2 something. When any of these -- for purposes of our

3 discussion I am going to refer to them as county

4 agencies -- I'm not sure how you refer to them

5 internally. Whenever these county agencies, such as

6 the Sheriff's Department, the Coroner's Office, or

7 the Macon County courts gets approval of their

8 budget, they ask for a million dollars or two million

9 dollars, you don't actually transfer to them the two

10 million dollars. You just approve them to spend

11 that?

12    A. We appropriate that amount of money to be

13 spent as long as we have that amount of money

14 available. In the middle of the year if we run out

15 of funds in a certain line or category, that's all

16 there is, we tell them you are going to have to

17 adjust whatever you need to do. We don't exceed that

18 bottom line.

19    Q. In a simple term to me it's you give them

20 credit limits in certain areas?

21    A. That's right.

22    Q. And when they make a purchase in an area,

23 they buy copy paper or whatever, they actually submit

24 to it the county and the county pays it assuming that

Page 35

1 they still have credit left within that line?

2    A. That's correct.

3    Q. Okay. So there is never an actual transfer

4 of county money to these various agencies?

5    A. No.

6    Q. That is just permission to spend?

7    A. Absolutely.

8    Q. And the county maintains control over

9 whether actual payment is issued based on the budget?

10    A. Yes.

11    Q. Okay. Who signs the checks?

12    A. Two signatures, the auditor and the

13 treasurer.

14    Q. Do the auditor and the treasurer sign the

15 county checks that are used to pay judicial clerks?

16    A. Yes, I believe that's correct.

17    Q. The benefits that go to the judicial clerks,

18 their health insurance, who selects the health

19 insurance plan?

20    A. The county board.

21    Q. Okay. Does the county board have a hiring

22 committee or hiring subcommittee that does the

23 interviews for ESDA?

24    A. For the position of director of ESDA?

Page 36

1    Q. For the positions under the director, under

2 the appointed position.

3    A. No.

4    Q. So the county board, when you need a

5 director for ESDA, you will have a search committee

6 and whatnot, and you will find somebody and make them

7 director; is that correct?

8    A. That's correct.

9    Q. But then the director of ESDA is given

10 control over who that person hires and fires within

11 that person's staff; is that correct?

12    A. Yes, as long as it's been budgeted for.

13    Q. As long as there is money to pay for those

14 people?

15    A. Yes.

16    Q. But the employees under the director of ESDA

17 as you understand the term employee would be a Macon

18 County employee?

19    A. That's correct.

20    Q. Even though it's the ESDA director who is

21 responsible for hiring and firing them?

22    A. Yes.

23        MR. CASSIDY: Well, show my objection to the

24 nature of that, even though, because the director of

Page 37

1  ESDA is also a direct employee of Illinois judges or
2  state employee.
3  BY MR. BILINSKY:
4      Q. Is there written down a series of county
5  ordinances or regulations?
6      A. Yes.
7      Q. Anywhere in those county ordinances or
8  regulations is there a definition of county
9  employees?
10     A. I don't know.
11     Q. Okay. Does the county -- strike that. The
12 county's budget comes from collecting various taxes
13 within the county; is that correct?
14     A. Taxes and fees.
15     Q. And the taxes and fees, the money that is
16 generated from that is what is the overall budget for
17 Macon County; is that correct?
18     A. Well, you could have a general budget,
19 general fund, you have a highway fund which is under
20 a separate levy, so the general fund, the monies are
21 collected, like 25 million goes to the general fund,
22 okay? And then another million will go -- another
23 certain amount will go to like the highway for
24 highway purposes. There's different levies. There's

Page 38

1  I believe 16 different levies that the county levies
2  for, but not all that goes to the county. Some of
3  that is for schools, city of Decatur, library
4  district.
5      Q. These are all divisions or offices of the
6  county?
7      A. No, not all of them. We simply are a
8  receiver of the money through the taxing process.
9      Q. Other than the director of ESDA, are there
10 any other appointed positions as opposed to elected
11 positions?
12     A. Supervisor of Assessments is appointed,
13 Board of Review is appointed, Zoning Board of Appeals
14 is appointed, drainage districts are appointed, fire
15 districts are appointed. But it's because the
16 statute says we have to appoint them.
17     Q. When you make an appointment, when you
18 appoint someone as supervisor of assessments, is that
19 for a limited period of time?
20     A. Some are contract employees, some are
21 appointed for a specific time.
22     Q. Is that covered by county regulations or
23 rules or is that just decided on?
24     A. No. That is just done at the time the

Page 39

1  person is hired if that's one of the criteria under
2  the hiring procedure.
3      Q. Within these various appointed positions,
4  these persons then have staff or can have staff of
5  varying numbers?
6      A. Not necessarily. Depends again under their
7  levy and who oversees that levy and those monies.
8  There's probably some sort of a board that oversees
9  that, but the county board itself or the county
10 doesn't have anything. We simply make the
11 appointment and it's up to them how they want to
12 proceed, either under statute or rules that have been
13 established.
14     Q. Since you've been on the county board, has
15 the county board ever fired someone other than one of
16 these appointed positions?
17     A. Yes.
18     Q. And which persons, which positions do you
19 recall them terminating other than appointed
20 positions?
21     A. This was under a hiring. He was the county
22 superintendent of highways, which is a contracted
23 position, and we terminated him before the end of his
24 contract. That's the only one that I know of or that

Page 40

1  I recall. There may have been others, but most of
2  them run to the end of their appointment time or
3  contract time or just not rehired or the contract is
4  not renewed.
5      Q. Other than the appointed positions that we
6  have discussed, is there a hiring committee for the
7  county board that hires the secretaries?
8      A. No.
9      Q. Is there a committee or any group that does
10 hiring for the people who work for these appointed
11 positions or who work for any of the elected
12 positions?
13     A. No, not unless that appointed person comes
14 to the county and asks that we be involved.
15     Q. So the normal method of operation is the
16 people who are in charge of the various offices or
17 divisions, if they have the money for personnel in
18 their budget, they take care of hiring and firing
19 their personnel?
20     A. That's correct.
21     MR. BILINSKY: I have no further questions.
22     MR. RAMAGE: No questions.
23     MS. BARON: No questions.
24     MR. CASSIDY: I have a few follow-up

Page 41

1  questions to that.
2      EXAMINATION
3  BY MR. CASSIDY:
4      Q. The judicial branch would be different than
5  these appointed committees?
6      A. Yes.
7      Q. For instance, the appointed people, the head
8  of these appointed committees are appointed by the
9  county board?
10     A. From time to time there may be.
11     Q. And to a certain extent they serve at the
12  pleasure of the county board?
13     A. Yes.
14     Q. But as far as judges are concerned, that
15  would be absolutely not true; would you agree with
16  that?
17     A. No. We have nothing -- most judges are
18  either appointed by the judiciary, something to do
19  with the state under the statute, and the rest of
20  them are elected.
21     Q. Are you familiar with the term separation of
22  powers?
23     A. Yes.
24     Q. And is it your understanding that that

Page 42

1  particular constitutional separation of powers
2  applies between the county and the judicial branch?
3      MS. McGRATH: I object to the form of the
4  question. I think it's a little disingenuous to
5  complain about questions that ask for a legal
6  conclusion and then ask him to interpret the
7  constitution and the separation of powers.
8  BY MR. CASSIDY:
9      Q. Okay. Now, in regard to the judicial
10  branch, you were asked a number of questions
11  concerning what if the judicial branch goes over
12  budget. Correct?
13     A. Yes.
14     Q. And am I correct in understanding that there
15  was one occasion where they went over budget or there
16  was a problem in that regard, and one of the judges
17  indicated that they could simply issue an order and
18  direct you to cover the budget or something to that
19  nature?
20     A. Yes.
21     Q. That actually occurred?
22     A. The threat was made. I don't remember
23  whether it actually occurred or not.
24     Q. Okay. Now, I am talking about the threat,

Page 43

1  not as far as --
2      A. The threat was made, but I don't remember
3  whether it occurred or not. He was angry at the
4  time.
5      Q. At least to your understanding the judge who
6  did this felt that they had the power to issue an
7  order concerning a budgetary matter and direct you to
8  cover that budgetary matter?
9      A. Yes.
10     MR. BILINSKY: I object to the form of the
11  question. Asking this witness to testify to the
12  state of mind and thought process of a judge and what
13  that judge's belief was. It's improper.
14  BY MR. CASSIDY:
15     Q. Would you agree that none of these other
16  appointed committees or anybody else would have the
17  power to issue a court order that would direct the
18  county board to cover a budgetary matter?
19     MR. BILINSKY: Object to the question.
20  Assumes facts not in evidence, and assuming the judge
21  has the power to order the county to pay or disburse
22  money which the county chooses not to do.
23     MR. CASSIDY: Go ahead and answer.
24     THE WITNESS: Repeat the question.

Page 44

1  BY MR. CASSIDY:
2      Q. Is it correct in stating that none of these
3  other appointed offices or heads of these different
4  agencies have any such similar order to issue a court
5  -- issue an order directing the county board to cover
6  budgetary deficits?
7      A. No, they don't have any power.
8      Q. But if a court were to do that, there would
9  certainly be a legal question as to whether or not
10  that was valid? As far as you know you are not sure
11  whether they could do that or not?
12     A. We would probably go to the state's attorney
13  and have him --
14     MR. BILINSKY: The state's attorney whose
15  budget you oversee.
16     THE WITNESS: That's correct.
17     MR. CASSIDY: That is also a separate branch.
18  But, at any rate, that's the only thing I wanted to
19  clear up.
20     EXAMINATION
21  BY MS. McGRATH:
22     Q. I did want to ask you, sir, about the
23  state's attorney. Is it your position, your
24  understanding that assistant state's attorneys are

Page 45

1 county employees?
2        MR. CASSIDY: Again, calls for a legal
3 conclusion.
4        MS. McGRATH: Just to the extent -- I am just
5 asking what your understanding is of that.
6        THE WITNESS: I think they are -- again,
7 their pay is submitted to the Auditor's Office. Now,
8 I have no idea. I believe that their positions are
9 reimbursed by the state. To what extent I don't
10 know. You would have to find that out from the
11 auditor, but --
12        MR. CASSIDY: Okay.
13 BY MS. McGRATH:
14    Q. Is it your understanding that they are not
15 county employees or that they are county employees?
16 That is what I am trying to find out.
17    A. I have no idea what their status is, their
18 legal status.
19        MS. McGRATH: I don't have anything further.
20        MR. BILINSKY: Nothing further.
21        (Whereupon signature was discussed off the
22 record.)
23        THE WITNESS: I'll waive it.
24

Page 46

STATE OF ILLINOIS                      )
1                                       )
COUNTY OF McLEAN                        )
2        FEDERAL RULE OF CIVIL PROCEDURE RULE
3            30(f)(1) CERTIFICATE
4        I, KITTY L. MALCOM, C.S.R., a notary public
5 in and for the County of McLean and State of
6 Illinois, do hereby certify that on the 13th day of
7 December, 2001, personally appeared before me at 500
8 Milikin Court, Decatur, Illinois, DAVID M. DROBISCH,
9 produced as a witness in said cause.
10        I further certify that said witness was by
11 me first duly sworn to testify the whole truth in the
12 cause aforesaid before the taking of the deposition;
13 that the testimony was reduced to writing in the
14 presence of said witness by means of machine
15 shorthand and afterwards transcribed into
16 typewriting; and that the foregoing is a true and
17 correct record of the testimony given by said
18 witness.
19        I further certify that review of the
20 transcript by a party before completion of the
21 deposition and that any changes made by the witness
22 are appended hereto in the form of a Rule 30(e)
23 Statement.
24        I further certify that I am neither counsel

Page 47

1 for nor related to counsel for any of the parties to
2 this suit, nor am I in any way related to any of the
3 parties to this suit, nor am I in any way interested
4 in the outcome thereof.
5        I further certify that my certificate
6 annexed hereto applies to the original transcript and
7 copies thereof, signed and certified by me only. I
8 assume no responsibility for the accuracy of any
9 reproduced copies not made under my control or
10 direction.
11
12        IN WITNESS WHEREOF, I have hereunto set my
13 hand and affixed my notarial seal this 7th day of
14 January, 2002.
15
16
17    Kitty L. Malcom, CSR-RPR
18    1310 E. Ironwood CC Dr.
       Normal, IL 61761
19        (309)454-3378
20
21        OFFICIAL SEAL
       KITTY L. MALCOM
22    NOTARY PUBLIC, STATE OF ILLINOIS
       MY COMMISSION EXPIRES 7-20-2005
23
24