**E-FILED**
Monday, 07 February, 2005  03:35:35 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT 12

## Deposition of Melenie Milliman

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MELISSA ROBINSON, (f/k/a      )
MELISSA SCHROEDER),           )
                              )
        Plaintiff,            )
                              )
     -vs-                     )   No. 99-2097
                              )
JUDGE WARREN A. SAPPINGTON,   )
SIXTH JUDICIAL CIRCUIT, (IN   )
OFFICIAL CAPACITY AND         )
INDIVIDUALLY)                 )
        Defendant,            )
                              )
MACON COUNTY,                 )
JOHN P. SHONKWILER, CHIEF     )
JUDGE, SIXTH JUDICIAL         )
CIRCUIT, MACON COUNTY CIRCUIT)
COURT, MACON COUNTY (IN       )
OFFICIAL CAPACITY AND NOT     )
INDIVIDUALLY)                 )
        Defendant.            )

    Deposition taken of MELENIE MILLIMAN on the 12th day of October, A.D., 2001, at Macon County Courthouse, 253 E. Wood Street, Fifth Floor, Decatur, Illinois, commencing at 1:15 p.m., before Kitty L. Malcom, a Certified Shorthand Reporter, License No. 084-002106, pursuant to Notice.

APPEARANCES:
        Ms. Melissa M. McGrath, Esq.
        THOMSON & WEINTRAUB
        105 North Center St., P.O. Box 3577
        Bloomington, IL 61702-3577
        309/829-7069
           On behalf of Plaintiff

**Page 2**

        Ms. Karen McNaught
        Assistant Attorney General
        OFFICE OF THE ATTORNEY GENERAL
        500 So. Second Street
        Springfield, IL 62706
        217/782-5819
           On behalf of Warren Sappington

        Ms. Diane Baron, Esq.
        CLAUSEN MILLER, P.C.
        10 So. LaSalle Street
        Chicago, IL 60603-1098
        312/855-1010
           On behalf of Warren Sappington

        Mr. Andrew Ramage, Esq.
        HINSHAW & CULBERTSON
        400 So. Ninth Street, Suite 200
        Springfield, IL 62701
        217/528-7375
           On behalf of Judge Shonkwiler

        Mr. John E. Cassidy, Esq.
        CASSIDY & MUELLER
        323 Commerce Bank Bldg.
        416 Main Street
        Peoria, IL 61602
        309/676-0591
           On behalf of Macon County

* * * * * * * * * * * * * * * * * * * * * * * * * *

            I N D E X

WITNESS:
    MELENIE MILLIMAN

    Examination by Ms. McGrath..........  3
    Examination by Mr. Cassidy.......... 17
    Examination by Ms. McGrath.......... 23
    Examination by Mr. Cassidy.......... 23
    Examination by Ms. McGrath.......... 24

EXHIBITS:
    None marked

**Page 3**

1            MELENIE MILLIMAN
2  called as a witness, after being first duly sworn,
3  was examined and testified upon her oath as follows:
4
5            EXAMINATION
6  BY MS. McGRATH: Will you state and spell your name
7  for the record.
8     A. Melenie Milliman, M-E-L-E-N-I-E,
9  M-I-L-L-I-M-A-N.
10    Q. And what is your home address?
11    A. 1910 Venus Court. That is in Decatur.
12       MS. McGRATH: Ms. McNaught, are you
13 representing her? You work for the county, don't
14 you?
15       THE WITNESS: Yes.
16       MS. McNAUGHT: No, I do not.
17 BY MS. McGRATH:
18    Q. You don't have an attorney representing you
19 here?
20    A. No.
21    Q. I am going to be asking you some questions.
22 Just trying to learn what you know about a lawsuit
23 that is pending in federal court. If I ask you
24 something -- sometimes I get wordy. If I ask you

**Page 4**

1  something that you don't understand, please ask me to
2  reword it. Okay?
3     A. Okay.
4     Q. There is going to be times you are going to
5  know what I'm asking you before I even finish the
6  question, but try to wait until I've asked the full
7  question so that the court reporter can get both of
8  us down. Okay?
9     A. Okay.
10    Q. And also do try to answer verbally as
11 opposed to nodding your head. Okay?
12    A. Okay.
13    Q. Who is your current employer?
14    A. Macon County.
15    Q. And what is your job title?
16    A. Court technology administrator.
17    Q. How long have you held that title?
18    A. It will be six years in January.
19    Q. So mid 1995?
20    A. January -- '95, yes, I think that's right.
21 Right, that's correct.
22    Q. Where were you employed or were you employed
23 before your job title of court technology
24 administrator?

Page 5

1 A. I was employed at IMI Cash Valve. This is
2 the only position I have held here at the county.
3 Q. In the course of your employment at the
4 county, did you come to know a Missy Schroeder?
5 A. Yes, I did.
6 Q. How did you know Missy Schroeder?
7 A. It was my job to train everyone on the new
8 computer system, and Missy was one of them that I
9 trained.
10 Q. Do you remember when you trained her?
11 A. Oh, it would be just a rough idea. It would
12 probably be maybe the spring of '95.
13 Q. Okay. In the course of working here and
14 knowing Missy Schroeder, did you have occasion to see
15 Missy Schroeder relating with Judge Sappington?
16 A. Yes.
17 Q. And what would bring that about?
18 A. Mainly because I would be just in that
19 general area, in the chamber area.
20 Q. How often would you be in the chamber area?
21 A. That is kind of hard to say because I move
22 around a lot just because I do a lot of
23 troubleshooting, so when someone had a problem I
24 would be there. The way it used to be set up, we

Page 6

1 were in temporary facilities in the other building so
2 there were several people all in one area.
3 Q. Okay. If I can direct your attention to
4 when you were in the other building, can you tell me
5 any better how often you would be in the chamber area
6 where you would see Missy and Judge Sappington?
7 A. I would say a couple of times a week.
8 Q. And your purpose in being in the chamber
9 area would be?
10 A. Troubleshooting, or could possibly be in
11 training as well. We train people on a gradual
12 basis.
13 Q. Did you at any time hear Judge Sappington
14 make any comments about Missy Schroeder's physical
15 appearance?
16 A. No.
17 Q. Did you ever see the judge, Judge
18 Sappington, shake Missy's hand?
19 A. I really don't remember seeing that.
20 Q. Okay. Just so that I'm certain that you
21 understood the question, did you ever hear the judge
22 refer to Missy as a goddess?
23 A. No.
24 Q. Or say she was beautiful?

Page 7

1 A. No.
2 Q. Did you ever see any behavior between Judge
3 Sappington and Missy that you thought was out of the
4 ordinary?
5 A. I'm not sure how to answer that. I think
6 they spent a lot of time together. I saw Missy in
7 his office a great deal. Whether anything was
8 inappropriate, that I don't know. I just know that
9 she spent a lot of time in his office.
10 Q. And when you're indicating that she spent a
11 lot of time in his office, what time period are you
12 referring to?
13 A. I would say in '95, you know, when I was
14 first here. When I was -- because I spent more time
15 over there when I first started.
16 Q. The time period that you are referring to,
17 is that when you were located in the other building?
18 A. Yes.
19 Q. Okay.
20 A. My office was not in that building itself,
21 so I was in another temporary facility on Church
22 Street, but I had to come over quite often.
23 Q. I think you indicated you might have been in
24 the chambers a couple of times a week?

Page 8

1 A. Yes.
2 Q. In those couple times a week, how often
3 would you notice that Missy was in Judge Sappington's
4 office?
5 A. Quite often. She was not at her desk very
6 much.
7 Q. Do you have any knowledge as to what she was
8 doing in the judge's office?
9 A. Lots of times when I would pass by they were
10 just talking and joking, that kind of a thing. There
11 were times it was business as well.
12 Q. Were you ever involved in conversations with
13 the judge and Missy in his chambers?
14 A. Just in regards to some training or some
15 problems maybe the judge was having.
16 Q. How often did that occur?
17 A. Not that often.
18 Q. Can you give me a number of times from the
19 time you relocated over to the other building how
20 often you would be in the chambers with Missy and
21 Judge Sappington?
22 A. Are you saying like on a weekly basis or
23 just in total while we were in the temporary
24 facilities?

Page 9

1  Q. If it's easier for you to answer on a weekly
2  basis or in total. Whatever is easiest for you.
3  A. I would probably say in total maybe four or
4  five times.
5  Q. Now, the other times -- well, strike that.
6  Can you give me a number of times you saw Missy in
7  the judge's chamber?
8  A. That's difficult to say because lots of
9  times I would just pass by the door because I would
10 be there working with someone else. It just seemed
11 like most of the time when I was over there she was
12 in and out of his office.
13 Q. And was this the entire time -- let me ask
14 you this. In July through October of 1996, can you
15 tell me whether or not the number of times you saw
16 Missy Schroeder in the judge's chambers was different
17 from other times that you would have noticed?
18 A. I didn't notice any difference, no.
19 Q. You don't have any knowledge, do you, as to
20 why Missy was in the judge's chambers?
21 A. No.
22 Q. Did you learn any time in 1996 that Missy
23 was going to be transferred to work with a different
24 judge?

Page 10

1  A. I had heard that, yes.
2  Q. Who had you heard that from?
3  A. I believe it was Leona Miller.
4  Q. And did you learn why Missy was going to be
5  transferred to a different job from Leona?
6  A. No, I did not.
7  Q. Did you notice any of the other employees
8  being aggravated by the possible transfer of Missy to
9  a different job?
10 A. Yes.
11 Q. And which employees would have been
12 aggravated by that?
13 A. Leona Miller and Julie Jewell.
14 Q. Anyone else?
15 A. Not that I can really remember, but I didn't
16 get in on a lot of it. The position I'm in, I am not
17 there on an everyday basis.
18 Q. Did Leona express to you why she was angry
19 about Missy's transfer?
20 A. No.
21 Q. Did Julie Jewell express to you why she was
22 angry about Missy's transfer?
23 A. No.
24 Q. Did you notice any difference in how Leona

Page 11

1  communicated or worked with Missy after this transfer
2  had been talked about?
3  A. I think so. I think that there was somewhat
4  of a distance between them. I think there was some
5  hard feelings. Like I said I didn't really get into
6  that. You just observe when you are in the room.
7  small little remarks or things like that.
8  Q. Do you remember any small little remarks
9  that you can share with us?
10 A. I probably won't remember anything.
11 Q. I just want you to take your time. Think
12 about it as long as you need so that you can let us
13 know if you do remember any of the remarks.
14 A. Okay. I just don't think I can think of
15 anything specific. It was just more of a feeling
16 based on things that were being said.
17 Q. Okay. What kinds of things were being said
18 that you recall?
19 A. Maybe something like "Missy always gets her
20 way."
21 Q. Do you remember who said that?
22 A. Not really. It's just hard to remember back
23 that far.
24 Q. Any other things that were being said that

Page 12

1  you recall?
2  A. Not that I can really think of specifically.
3  Q. Anything you can think of just in general
4  that was being said?
5  A. I just got the feeling that there were
6  problems. I had no idea what it was about. And I
7  always try to stay out of that, but I just knew there
8  were some unhappy people on that floor.
9  Q. Did you ever see Missy appear upset at work?
10 A. Yes.
11 Q. How often?
12 A. Not that often. I can really only remember
13 of one time in particular where she was crying. She
14 had come back to her desk, she had been crying, she
15 had Kleenex. But I have no idea what it was about or
16 anything.
17 Q. You didn't speak with her about it?
18 A. No.
19 Q. Can you give me any time period when you saw
20 that?
21 A. I can't even remember the period of time
22 that Missy was there or when she left. So it would
23 have been probably '95, '96. I'm guessing. I said I
24 can't really remember. Did she leave in '96?

Page 13

1  Q. Yes.
2  A. So it would have been '95, '96.
3  Q. Was it close to the time that you remember
4  her employment ending?
5  A. I would say yes.
6  Q. You mentioned that you trained Missy on the
7  new computer system, correct?
8  A. Yes.
9  Q. Was it your responsibility to train all of
10 the judicial clerks?
11 A. Yes.
12 Q. And I take it from your testimony also part
13 of your job is to troubleshoot with the computer
14 system also?
15 A. Yes.
16 Q. How often did you provide training to the
17 judicial clerks?
18 A. Well, around-the-clock type thing. If they
19 had a question, something they didn't understand, or
20 they were trying to do something new they hadn't done
21 before, I would come over and show them, or if they
22 needed a little extra help.
23 Q. Did you provide the judicial clerks any
24 other support or training other than in the area of

Page 14

1  the computers?
2  A. No. Just computers.
3  Q. Do you recall receiving a policy with regard
4  to sexual harassment any time before December of
5  1996?
6  A. I don't recall that.
7  Q. As you sit here today have you received a
8  sexual harassment policy?
9  A. Yes.
10 Q. Who provided that policy to you?
11 A. I believe it came from Judge Greanias.
12 Q. When did you receive that policy?
13 A. I really don't remember.
14 Q. Can you give me a year of when you received
15 it?
16 A. I'm just guessing. I would say at least two
17 years ago. It could have possibly been longer, but I
18 would say at least two years ago.
19 Q. Do you remember if Missy was no longer
20 employed here when you got that policy?
21 A. I don't believe she was here, but I'm not
22 positive about that.
23 Q. Okay. When you received that policy, did
24 you also receive some type of training with regard to

Page 15

1  sexual harassment?
2  A. Let's see. I was thinking we did have a
3  seminar. I believe we did have a seminar.
4  Q. And do you believe that that seminar
5  happened around the same time you got the sexual
6  harassment policy?
7  A. Yes.
8  Q. When you would observe or since you had an
9  opportunity to observe Missy and Judge Sappington,
10 did you observe them going to lunch together?
11 A. Yes.
12 Q. Did you observe them going to lunch with
13 Ruth Young?
14 A. Yes.
15 Q. Did other judges go to lunch with their
16 judicial clerks that you observed?
17 A. Not that I was aware of.
18 Q. Were there any behaviors between Judge
19 Sappington and Missy Schroeder that you viewed as out
20 of the ordinary?
21 A. Not really.
22 Q. Just so that I'm certain as to what you mean
23 by that because you said "not really," was there
24 anything out of the ordinary that you observed?

Page 16

1  A. The only thing that I can say is it just
2  seemed like Missy had a lot of spare time that she
3  wasn't really working.
4  Q. What makes you say that?
5  A. Just because she was laughing and sitting in
6  a relaxed position in the judge's office, you could
7  tell that it was a casual conversation, it was not
8  business related.
9  Q. And how often would you see these casual
10 conversations?
11 A. I would say quite often. Most of the time
12 when I was there in the building.
13 Q. So the two times -- you indicated you might
14 have been in the chambers a couple of times a week.
15 You're indicating that most of the time you would
16 observe that?
17 A. Uh-huh.
18 Q. Yes?
19 A. Yes.
20 Q. Were there times when you were in the
21 chamber area that the door to the judge's chamber,
22 Judge Sappington's office was closed?
23 A. I don't really remember seeing it closed
24 very often when I was there.

Page 17

1  Q. Were there times when it was closed when you
2  were there?
3  A. I don't know that I really remember seeing
4  it closed.
5  Q. Okay. So it may have been, but you don't
6  recall?
7  A. I really don't recall probably I should say.
8  Q. You would have no idea, would you, as to why
9  Missy would be in the judge's office?
10 A. No.
11   MS. McGRATH: I don't have anything further.
12   EXAMINATION
13 BY MR. CASSIDY:
14 Q. You indicated that you're a court technology
15 administrator?
16 A. Yes.
17 Q. And how many people work in that department
18 or is it a department?
19 A. It's just myself.
20 Q. Okay. And what are the functions of the
21 court technology administrator?
22 A. I do all of the installation, training and
23 troubleshooting of the system; the circuit clerk's
24 AS400 and Novell works.

Page 18

1  Q. Are they an interconnected network?
2  A. Yes.
3  Q. Does that computer system network with any
4  other departments or entities?
5  A. Yes, the probation department and the
6  sheriff's office and also the State's Attorney's
7  Office.
8  Q. Okay. And do you train all of those
9  different departments?
10 A. Yes. I would say at least on our system.
11 Q. So you get involved with the sheriff's
12 department?
13 A. Yes.
14 Q. Circuit clerk, the judiciary, the probation
15 department. Am I missing one?
16 A. The state's attorney.
17 Q. Okay, state's attorney. Now, when were you
18 hired?
19 A. January of '95.
20 Q. And to whom did you submit your application
21 or how is it the hiring process started; do you
22 recall?
23 A. Judge Greanias had called me and told me
24 about the position and asked me if I would be

Page 19

1  interested.
2  Q. So, it was Judge Greanias that contacted you
3  and that is who you submitted an application to?
4  A. Yes.
5  Q. Who did you have the interview process with?
6  A. Judge Greanias.
7  Q. And on a day-to-day basis who do you take
8  directions from, who is your supervisor?
9  A. Judge Greanias.
10 Q. For instance, if you were to do something
11 that you shouldn't do and you needed to be
12 disciplined, who would discipline you?
13 A. Judge Greanias.
14 Q. He has the power to fire you; is that
15 correct?
16 A. That's correct.
17 Q. Does anybody else have any power over you to
18 give directions or discipline you as far as you know?
19 A. As far as I know, no. I mean I would
20 respect any of the judges that ask me for something,
21 but --
22 Q. Who determines your salary?
23 A. Judge Greanias.
24 Q. Has he given you raises?

Page 20

1  A. Yes.
2  Q. How about evaluation of job performance?
3  A. Not a formal evaluation, but when he gave me
4  a raise he would tell me you are doing a good job and
5  I appreciate your work.
6  Q. Why is it that you don't take any directions
7  from the state's attorney or the circuit clerk; do
8  you know?
9  A. No, other than I was just told that I report
10 directly to the presiding judge.
11 Q. What type of information is kept on this
12 computer?
13 A. All of the case information.
14 Q. The court information?
15 A. Yes.
16 Q. Things that are generated in the judicial
17 branch and maintained by the judicial branch; is that
18 correct?
19 A. That's correct.
20 Q. Is any other type of information contained
21 on there?
22 A. I mean we have a -- it's all pretty much
23 contained to work stations. So as far as the main
24 system, it is pretty much just related to the court

Page 21

1 system and the cases.
2  Q. Has anybody from the county board ever given
3 you any direction about your employment?
4  A. No.
5  Q. Now, you indicated earlier that you're
6 employed by Macon County. And it appears that all
7 the control over you is from Judge Greanias and the
8 decision about your hiring and firing. The amount
9 you receive in employment compensation and so forth
10 comes from the judicial branch?
11  A. That's correct.
12  Q. What is the basis of your opinion that you
13 are employed by Macon County?
14  A. Since I work for Judge Greanias I assume
15 that I was employed by the Macon County Circuit
16 Court. I guess I should have said it's Macon County
17 Circuit Court.
18  Q. So when you said that you were employed by
19 Macon County, you meant the Macon County Circuit
20 Court?
21  A. Yes.
22  Q. Now, do you receive your paycheck from the
23 county?
24  A. Yes, I do.

Page 22

1  Q. And you receive your benefits from the
2 county?
3  A. Yes.
4  Q. Are you aware of anything else that you
5 receive directly from the county in relation to your
6 employment?
7  A. No.
8  Q. Now, you indicated that it appeared to you
9 when you saw Missy in Judge Sappington's office that
10 they would be having conversation and laughing and it
11 was more casual than of a working nature. You said
12 she had a lot of time on her hands; is that correct?
13  A. Yes.
14  Q. Would you agree that from what you observed
15 that it did not appear that Missy was experiencing a
16 hostile work environment?
17  A. Not at all.
18   MR. CASSIDY: I have nothing further.
19   MS. BARON: No questions.
20   MR. RAMAGE: No questions.
21   MS. McGRATH: I have a couple of follow-up
22 questions.
23   EXAMINATION
24 BY MS. McGRATH:

Page 23

1  Q. Is there any occasion when you take
2 direction from Janice Shonkwiler?
3  A. Well, I guess I would have to say yes, but
4 through the judge. I mean, the judge would ask her
5 to tell me something, but I would say most times it
6 would come directly from the judge through her.
7  Q. But are there occasions when it comes
8 through Janice Shonkwiler to you, that being any
9 direction?
10  A. Yes.
11  Q. Okay. And if you were to note a problem
12 with one of the judicial collection clerks, would you
13 report something like that to Janice Shonkwiler?
14  A. I probably would to Judge Greanias.
15  Q. You wouldn't have any knowledge, would you,
16 as to Missy Schroeder's feeling of being in a hostile
17 environment as Mr. Cassidy characterized it on
18 occasions when you weren't in the chamber area, would
19 you?
20  A. No.
21   MS. McGRATH: I don't have anything further.
22   EXAMINATION
23 BY MR. CASSIDY:
24  Q. Just a follow-up question. Who is Janice

Page 24

1 Shonkwiler?
2  A. She is administrative assistant to Judge
3 Greanias.
4  Q. So she works for Judge Greanias?
5  A. Yes.
6  Q. Is it your understanding that she is
7 employed by the Macon County Circuit Court also,
8 correct?
9  A. Yes.
10   MR. CASSIDY: I have nothing further.
11   MS. McNAUGHT: No questions.
12   EXAMINATION
13 BY MS. McGRATH:
14  Q. Is that just your personal opinion that you
15 believe Janice Shonkwiler is employed by the Macon
16 County Circuit Court?
17  A. I guess I would have to say that no one has
18 actually said Janice Shonkwiler works for the Macon
19 County Circuit Court. That has always been my
20 impression.
21   MS. McGRATH: Nothing further. You have a
22 right to review the transcript of your deposition
23 just for accuracy, not to add any -- well, I take
24 that back. Strike that. You have a right to review

Page 25

1  the transcript of the deposition. You can choose to
2  review it in which case the court reporter will send
3  it to you. Alternatively, you can indicate that you
4  don't want to review it and you would then be waiving
5  your signature on it. That's a choice you need to
6  indicate to us.
7      MS. McNAUGHT: If you review it for accuracy
8  you review it for Kitty's accuracy in taking down
9  your answers. So, in other words, if you said no and
10 she put down N-O and you really meant K-N-O-W, you
11 get to change the spelling. But if you said no, and
12 what you really meant to say was yes but you didn't
13 say yes, you can't change your answer.
14     THE WITNESS: Sure, I understand. I guess I
15 wouldn't mind reviewing it.
16     MS. McNAUGHT: Reserve.
17
18
19
20
21
22
23
24

Page 27

1       ERRATA SHEET
2    I, WARREN A. SAPPINGTON, wish to make the
  following corrections and/or amendments to my
3  deposition of March 13, 2001:
4
   Page:_____ Line:_____
5  Change:_____
   _____
6  Page:_____ Line:_____
   Change:_____
7  _____
   Page:_____ Line:_____
8  Change:_____
   _____
9  Page:_____ Line:_____
   Change:_____
10 _____
   Page:_____ Line:_____
11 Change:_____
   _____
12 Page:_____ Line:_____
   Change:_____
13 _____
   Page:_____ Line:_____
14 Change:_____
   _____
15 Page:_____ Line:_____
   Change:_____
16 _____
   Page:_____ Line:_____
17 Change:_____
   _____
18 Page:_____ Line:_____
   Change:_____
19 _____
20
21        MELENIE MILLIMAN
22     Date:_____
23
24

Page 26

1  STATE OF ILLINOIS  )
                     ) SS:
2  COUNTY OF McLEAN  )
3      IN THE UNITED STATES DISTRICT COURT
       FOR THE CENTRAL DISTRICT OF ILLINOIS
4           Urbana Division
5  MELISSA ROBINSON,    )
                        )
6      Plaintiff,       )
                        )
7      -vs-             ) No. 99-2097
                        )
8  JUDGE WARREN A. SAPPINGTON, )
   ET AL,               )
9      Defendants       )
10    FEDERAL RULE OF CIVIL PROCEDURE 30(e) STATEMENT
11     I hereby state that I have read the
12 foregoing transcript of my deposition given at the
13 time and place aforesaid and that I have recorded the
14 changes in form or substance and the reason(s) given
15 therefore as they appear on the attached signed
16 correction sheet(s).
17     _____ correction sheet(s) attached.
18
19     _____
              MELENIE MILLIMEN
20
   Subscribed and Sworn to
21 before me this ___ day
   of _____
22 A.D., 2001
23
24  _____
       Notary Public

Page 28

1  STATE OF ILLINOIS  )
                     )
2  COUNTY OF McLEAN  )
       FEDERAL RULE OF CIVIL PROCEDURE RULE
3           30(f)(1) CERTIFICATE
4
5      I, KITTY L. MALCOM, C.S.R., a notary public
6  in and for the County of McLean and State of
7  Illinois, do hereby certify that on the 12th day of
8  October, 2001, personally appeared before me at 253
9  East Wood Street, Decatur, Illinois, MELENIE
10 MILLIMAN, produced as a witness in said cause.
11     I further certify that said witness was by
12 me first duly sworn to testify the whole truth in the
13 cause aforesaid before the taking of the deposition;
14 that the testimony was reduced to writing in the
15 presence of said witness by means of machine
16 shorthand and afterwards transcribed into
17 typewriting; and that the foregoing is a true and
18 correct record of the testimony given by said
19 witness.
20     I further certify that review of the
21 transcript by a party before completion of the
22 deposition and that any changes made by the witness
23 are appended hereto in the form of a Rule 30(e)
24 Statement.

Page 29

1     I further certify that I am neither counsel
2 for nor related to counsel for any of the parties to
3 this suit, nor am I in any way related to any of the
4 parties to this suit, nor am I in any way interested
5 in the outcome thereof.
6     I further certify that my certificate
7 annexed hereto applies to the original transcript and
8 copies thereof, signed and certified by me only. I
9 assume no responsibility for the accuracy of any
10 reproduced copies not made under my control or
11 direction.
12
13     IN WITNESS WHEREOF, I have hereunto set my
14 hand and affixed my notarial seal this 15th day of
15 November, 2001.
16
17 *[signature: Kitty L. Malcom]*
18 Kitty L. Malcom, CSR-RPR
   1310 E. Ironwood CC Dr.
19 Normal, IL 61761
20    (309)454-3378
21
22
23 OFFICIAL SEAL
   KITTY L. MALCOM
24 NOTARY PUBLIC, STATE OF ILLINOIS
   MY COMMISSION EXPIRES 7-20-2005

# EXHIBIT 13

Deposition of Judge Shonkwiler

ORIGINAL

1

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

URBANA DIVISION

| | |
|---|---|
| MELISSA ROBINSON, <br> (f/k/a MELISSA SCHROEDER), <br><br> Plaintiff, <br><br> -vs- <br><br> JUDGE WARREN A. SAPPINGTON, SIXTH <br> JUDICIAL CIRCUIT (IN OFFICIAL <br> CAPACITY AND INDIVIDUALLY), <br><br> Defendant, <br><br> MACON COUNTY, <br><br> JOHN P. SHONKWILER, CHIEF JUDGE, <br> SIXTH JUDICIAL CIRCUIT, MACON <br> COUNTY CIRCUIT COURT, MACON COUNTY <br> (IN OFFICIAL CAPACITY AND NOT <br> INDIVIDUALLY), <br><br> Defendant. | No. 99-2266 |

DEPOSITION

The deposition of JOHN P. SHONKWILER, taken on behalf of the Plaintiff on May 11, 2001, commencing at 1:05 p.m., at the Piatt County Courthouse, 101 West Washington Street, Monticello, Illinois, before Fran Anderson, CSR, License No. 084-002930.

Appearances:

    Melissa M. McGrath, Attorney
    Thomson & Weintraub
    105 North Center Street
    Bloomington, IL  61702-3577
    309-829-7069
    On behalf of Plaintiff

2

Diane M. Baron, Attorney
Clausen Miller, P.C.
10 South LaSalle Street
Chicago, IL  60603-1098
312-855-1010
On behalf of Defendant Sappington


John E. Cassidy, Attorney
Cassidy & Mueller
1510 Savings Center Tower
Peoria, IL  61602
309-676-0591
On behalf of Defendant Macon County

Robert Gillespie, Attorney
Hinshaw & Culbertson
400 South Ninth, Suite 200
Springfield, L  62701
217-528-7375
On behalf of Defendant John P. Shonkwiler

Karen L. McNaught, Attorney
Assistant Attorney General
500 South Second Street
Springfield, IL  62706
217-782-1090
On behalf of Defendant John P. Shonkwiler

1    A.    Well, I had asked where was the harasser
2  from, from the Recorder's office or where, or who was
3  the harassee.  We have to sort of narrow the scope of
4  the question, and I'll try to answer it.
5    Q.    Okay.  And maybe answering this way may be
6  simpler, and if not, I'm sure you'll let me know.
7  Under what circumstances would someone be able to
8  appropriately report a concern about sexual
9  harassment to Ms. Evey?
10        MS. McNAUGHT:  Object to the form of the
11 question.
12        THE WITNESS:  I would think that if anyone
13 in the Judicial Department felt that they were being
14 harassed they could contact Jane Evey.  They could
15 contact me.  They could contact the EEOC.  The policy
16 lays out who the contact can be with.
17 BY MS. McGRATH:
18   Q.    And what job titles fall within the Judicial
19 Department?
20   A.    In what county?
21   Q.    Let's talk about Piatt County first.
22   A.    Jane Evey would fall under the judicial
23 department.  The court reporter would fall under the
24 judicial department.  And that's about it.  The

41

   1  bailiff would not; the bailiff is sheriff.  The

   2  deputy clerks would not because they fall under the

   3  auspices or the control of the Clerk of the Circuit

   4  Court.

   5       Q.   In other counties within the circuit, do

   6  judicial clerks fall within the judicial department?

   7       A.   I think they would.

   8       Q.   Do you have anything to add, Your Honor, to

   9  your response to paragraph two, Interrogatory 2?

  10       A.   Management personnel.  No, no, I think that

  11  would be the same.  I would not consider,

  12  necessarily, Janice Shonkwiler being in management.

  13       Q.   I'd like to direct your attention to your

  14  response to Interrogatory Number 3 for a moment.  Can

  15  you tell me, other than what you've have already

  16  indicated to me today concerning your conversations

  17  with Judge Greanius, what knowledge Judge Greanius

  18  would have with regard to the plaintiff's complaint?

  19       A.   I don't, except what Melissa Schroeder told

  20  him.  I know the policy, the Supreme Court's policy

  21  on sexual harassment, is very sensitive to

  22  confidentiality.  I think it also calls for a written

  23  complaint, if at all possible.  And a written

  24  complaint focuses on a particular gravamen of the

    A.    That would be between the presiding judge and his county board.

    Q.    Okay. So each presiding judge, that is not something that's discussed with the chief judge?

    A.    No.

    Q.    Would the same situation be true for judicial clerks; would that be between the County Board on how many they're willing to pay and the judiciary in that particular county?

    A.    Yes.

    Q.    Now, you were asked a question about who -- whether or not you believed Missy Schroeder was a nonjudicial personnel. Do you recall that question as it relates to the --

    A.    Yes.

    Q.    -- Supreme Court policy?

    A.    Right.

    Q.    And you indicated that judicial clerks were, in your opinion, nonjudicial personnel as we find under that policy; is that correct?

    A.    Yes.

    Q.    Would it be your opinion that Janice Shonkwiler, as an administrative assistant, would also be nonjudicial personnel?

1     A.    I believe so.

2     Q.    And can you tell me what the basis of that
3 opinion is?

4     A.    They are under -- not under any other
5 constitutional officer, like the Clerk of the Circuit
6 Court. They are not paid by the judiciary, judicial
7 branch, of course, but I believe judicial clerks
8 would be hired and fired by the judicial department.

9     Q.    How about administrative assistants similar
10 to Janice Shonkwiler?

11     A.    I think she would be hired and fired by the
12 presiding judge.

13     Q.    And is it also your understanding that
14 administrative assistants similar to Janice
15 Shonkwiler would also be under the exclusive control
16 and supervision of the judiciary in that county?

17     MS. McNAUGHT: I'll object to the question
18 to the extent it asks for any sort of legal opinion.
19 If you're asking a personal opinion, that's fine.

20     MR. CASSIDY: I'm asking a personal
21 opinion.

22     THE WITNESS: Yes.
23 BY MR. CASSIDY:

24     Q.    And the reason for that, would you agree,

53

1  degree, of that particular function.
2      Q.   That would be true under bailiffs, but you
3  would agree, though, judicial clerks such as Missy
4  Schroeder, when she was there, wasn't hired and fired
5  by a separate branch of the county but rather was
6  hired and fired by the judiciary?
7      A.   Right.  As I understand it.
8      Q.   Right.  And the same would be true for
9  Janice Shonkwiler in her position as the
10 administrative assistant to Judge Greanius?
11     A.   Yes.
12     Q.   So other than the fact of payment and
13 benefits, would you agree that all other aspects of
14 Janice Shonkwiler's employment appeared to have
15 fallen under the judicial branch?
16     A.   I think so.
17     Q.   And would you agree that the same would be
18 true concerning Missy Schroeder when she was employed
19 as Judge Sappington's judicial clerk?
20     A.   I believe so.
21          MS. BARON:  No questions.
22          MS. McNAUGHT:  I think I want to ask some
23 follow-ups.
24