**E-FILED**
Friday, 08 April, 2005  03:26:02 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

MELISSA ROBINSON,                          )
(p/k/a MELISSA SCHROEDER)                   )
                                            )
                        Plaintiff,          )
                                            )        Case No. 1:04-cv-1360
        vs.                                 )
                                            )
JUDGE WARREN A. SAPPINGTON                  )
SIXTH JUDICIAL CIRCUIT,                      )
(IN OFFICIAL CAPACITY) and                   )
MACON COUNTY,                                )
                                            )
                        Defendants.         )

## PLAINTIFF'S MOTION IN LIMINE TO BAR EXHIBITS PROFFERED BY DEFENDANT, MACON COUNTY

Plaintiff, MELISSA ROBINSON (p/k/a MELISSA SCHROEDER), ("Plaintiff"), by her

attorneys Thomson & Weintraub,  moves *in limine*, to exclude certain inadmissable evidence as

follows[1]:

1.  **In Limine #1 - Warren and Cheryl Sappington's notes re:**
    **Complaints:**
    **Macon County's Exhibit 46:**

    Bases for Exclusion: Fed. R. Evid., 401(Relevance); 403(Prejudicial Impact
    Outweighs Probative Value); 801 (Hearsay), 803.

Exhibit 46, consists of a compilation of notes reportedly prepared by Judge Sappington

and his spouse, Cheryl Sappington.  The notes date back to January 1994, include numerous

hearsay statements from individuals never disclosed as witnesses and include general

---

[1] Plaintiff has attached Macon County's Exhibits which she seeks to have excluded.  To
facilitate identification of these exhibits, Plaintiff has typed the exhibit number given by Macon
County directly below their exhibit label.

observations by either Cheryl Sappington or Judge Sappington. According to Cheryl

Sappington's deposition testimony the notes were not prepared until the first part of May 1997

and some were prepared as late as July 20, 2000. Behaviors at issue in this lawsuit began in July

1996. Plaintiff was forced to resign in December 1996. Notes prepared in May 1997 to July

2000 are not admissible under any hearsay exception.

2.    **In Limine #2 - W. Sappington's Phone Records:**
      **Macon County's Exhibit 47:**

      Bases for Exclusion: Fed. R. Evid., 401(Relevance); 403(Prejudicial Impact
      Outweighs Probative Value).

Exhibit 47 is a phone bill from Ameritech for service in the name of Warren Sappington.

The bill is incomplete as it has certain telephone calls deleted. Judge Sappington would

apparently testify that the telephone bills somehow establish he did not make phone calls to

Plaintiff during times when she claimed he did. As Judge Sappington could have made

telephone calls to Plaintiff from any telephone number the exhibit is irrelevant and unduly

prejudicial. Additionally, as an incomplete document it should be barred.

3.    **In Limine #3 - W. Sappington's Crown Olds Records:**
      **Macon County's Exhibit 48:**

      Bases for Exclusion: Fed. R. Evid., 401(Relevance), 403 (Waste of Time).

Exhibit 48, consists of several receipts from a Toyota dealer as well as invoices for

repairs apparently performed on Judge Sappington's Toyota Camry. The exhibit is irrelevant.

4.   **In Limine #4 - Records from 1993, Conference of Chief Judges with Appendix of various Circuits, harassment policies: Macon County's Exhibit 49:**

**Bases for Exclusion**: Fed. R. Evid., 401(Relevance); 403(Prejudicial Impact Outweighs Probative Value, Waste of Time, Confusion).

Exhibit 49, consists of a survey of the varying circuit courts in the State of Illinois concerning the existence of sexual harassment and procedures as of June 18, 1993.  This survey is not relevant to the trial of this matter.  The survey was performed three (3) years before Judge Sappington began harassing Plaintiff.  Moreover, existence or non-existence of sexual harassment policies in circuits other than the Sixth Judicial Circuit is not relevant to this matter. The prejudicial impact outweighs the probative value.

5.   **In Limine #5 - Plaintiff's Sangamon State University School Records: Macon County's Exhibit 50:**

**Bases for Exclusion**: Fed. R. Evid., 401(Relevance).

Exhibit 50 includes irrelevant school records from Sangamon State, Lincoln College, Robert Morris College and the University of Illinois and not merely Sangamon State.  These records date back to 1990, and concern Plaintiff's educational endeavors.

6.   **In Limine # - Plaintiff's IDHR Complaint No. 1997SF0777: Macon County's Exhibit 55:**

**Bases for Exclusion**: Fed. R. Evid., 802; 803(8)(c).

Plaintiff's Complaint filed with the Illinois Department of Human Rights is inadmissable because it is not a factual finding resulting from an investigation made pursuant to authority granted by law.  Additionally, the probative value is outweighed by the possible prejudicial effect.

3

7. **Motion in Limine #7 - Macon County's Answer to Plaintiff's IDHR Complaint:**
**Macon County's Exhibit 56:**

Bases for Exclusion: Fed. R. Evid., 802; 803(8)(c).

Plaintiff's Complaint filed with the Illinois Department of Human Rights is inadmissable because it is not a factual finding resulting from an investigation made pursuant to authority granted by law. Additionally, the probative value is outweighed by the possible prejudicial effect.

8. **In Limine #8 - Macon County's Answer To IDHR Questionnaire:**
**Macon County's Exhibit 57:**

Bases for Exclusion: Fed. R. Evid., 802; 803(8)(c).

Plaintiff's Complaint filed with the Illinois Department of Human Rights is inadmissable because it is not a factual finding resulting from an investigation made pursuant to authority granted by law. Additionally, the probative value is outweighed by the possible prejudicial effect.

9. **In Limine #9 - W. Sappington and Administrative Office of Illinois Courts' Response to IDHR Questionnaire:**
**Macon County's Exhibit 58:**

Bases for Exclusion: Fed. R. Evid., 802; 803(8)(c).

Plaintiff's Complaint filed with the Illinois Department of Human Rights is inadmissable because it is not a factual finding resulting from an investigation made pursuant to authority granted by law. Additionally, the probative value is outweighed by the possible prejudicial effect.

10. **In Limine #10 - IDHR Notice of Dismissal of Plaintiff's Complaint against Macon County:**
    **Macon County's Exhibit 60:**

    Bases for Exclusion: Fed. R. Evid., 401(Relevance); 403(Prejudicial Impact Outweighs Probative Value); 802; 803(8)(c).

The prejudicial impact of the Notice of Dismissal, dismissing Macon County from the claim filed in the Department of Human Rights outweighs its probative value. Shortly thereafter Plaintiff initiated her lawsuit in this venue. Moreover, Exhibit 60 misrepresents the record in this matter. Plaintiff's counsel filed a Request for Review of the ruling dismissing Macon County. (Plf. Ex. 1). As such, Macon County's Exhibit 60, does not represent a final factual finding and should be barred.

11. **In Limine #11 - Case of Orenic v. Illinois State Labor Relations Board, 127 Ill. 2d 453, 480 (Ill. 1989):**
    **Macon County's Exhibit 62:**

    Bases for Exclusion: Fed. R. Evid., 401(Relevance); 403(Prejudicial Impact Outweighs Probative Value).

The prejudicial impact of submission of State of Illinois case law to a jury outweighs its probative value. Moreover, submission of this case law is not relevant under Federal law as to the issue of whether Macon County can be considered a joint employer. Robinson v. Sappington, 317 F3d 353 (7th Cir. 2003).

12. **In Limine #12 - Case of Warren v. Stone, 958 F.2d 1419 (7th Cir. 1992):**
    **Macon County's Exhibit 63:**

    Bases for Exclusion: Fed. R. Evid., 401(Relevance); 403(Prejudicial Impact Outweighs Probative Value).

The prejudicial impact of submission of State of Illinois case law to a jury outweighs its probative value. Moreover, submission of this case law is not relevant under Federal law as to

the issue of whether Macon County can be considered a joint employer.  Robinson v.

Sappington, 317 F3d 353 (7th Cir. 2003).

13.  **In Limine #13 - Case of Drury v. County of McLean, 89 Ill. 2d 417, 425 (1982):**
     **Macon County's Exhibit 64:**

Bases for Exclusion: Fed. R. Evid., 401(Relevance); 403(Prejudicial Impact Outweighs Probative Value).

The prejudicial impact of submission of State of Illinois case law to a jury outweighs its

probative value.  Moreover, submission of this case law is not relevant under Federal law as to

the issue of whether Macon County can be considered a joint employer.  Robinson v.

Sappington, 317 F3d 353 (7th Cir. 2003).

<div style="margin-left: 40%;">

Respectfully submitted,
By: s/ Melissa M. McGrath
Melissa M. McGrath Attorney Bar No. 6207263
Attorney for Plaintiff
Thomson & Weintraub
105 North Center Street
Bloomington, Illinois 61701
Phone: (309) 829-7069
Fax: (309) 827-3458
E-mail: mmcgrath@tnwlaw.com

</div>

Subscribed and sworn to before me
this ___8th___ day of April, 2005.

_____
Notary Public

> **"OFFICIAL SEAL"**
> **Angela M. Park**
> Notary Public, State of Illinois
> My Commission Exp. 10/21/2008

6

**NOTICE OF FILING**

I hereby certify that on April 8th, 2005, I presented the foregoing document to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

Mr. John Cassidy
CASSIDY & MUELLER
323 Commerce Bank Bldg.
416 Main Street
Peoria, IL 61602

Ms. Karen McNaught
Chief, General Law Bureau
500 S. Second Street
Springfield, Illinois 62706

Ms. Diane M. Barron, Esq.
Clausen Miller PC
10 South La Salle Street
Chicago, Illinois 60603-1098

By: s/ Melissa M. McGrath
Melissa M. McGrath Attorney Bar No. 6207263
Attorney for Plaintiff
Thomson & Weintraub
105 North Center Street
Bloomington, Illinois 61701
Phone: (309) 829-7069
Fax: (309) 827-3458
E-mail: mmcgrath@tnwlaw.com

Subscribed and sworn to before me
this ___8th___ day of April, 2005.

_____
Notary Public

"OFFICIAL SEAL"
Angela M. Park
Notary Public, State of Illinois
My Commission Exp. 10/21/2008

7

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| MELISSA SCHROEDER, | ) |
| | ) |
| COMPLAINANT, | ) |
| AND | ) |
| | ) |
| 1.  MACON COUNTY, | ) |
| 2.  ILLINOIS ADMINISTRATIVE | ) |
| OFFICE OF THE COURTS, | ) |
| 3.  JUDGE WARREN SAPPINGTON, | ) |
| 4.  JOHN P. SHONKWILER, CHIEF | ) |
| JUDGE OF THE SIXTH JUDICIAL | ) |
| CIRCUIT/MACON COUNTY CIRCUIT | ) |
| COURT, | ) |
| RESPONDENT. | ) |

CHARGE NO.  1997SF0777
EEOC NO.  21B972090

<u>REQUEST FOR REVIEW</u>

| | | |
|---|---|---|
| Melissa M. McGrath<br>Thomson & Weintraub<br>Attorneys at Law<br>105 North Center<br>Bloomington, IL<br>61701 | Lawrence Fichter<br>State's Attorney<br>of Macon County<br>101 South Main<br>Decatur, IL<br>62523 | Karen McNaught<br>Asst. Attorney General<br>500 South 2nd Street<br>Springfield, IL 62706 |

TO:   Ms. Melissa Schroeder

DATE:  August 3, 1998

REQUEST FOR REVIEW FILING DEADLINE:  September 8, 1998

    I hereby request that the Department of Human Rights' dismissal of the charge be reviewed by the Chief Legal Counsel of the Department.

    IN THE SPACE PROVIDED BELOW, YOU <u>MUST</u> LIST AND DESCRIBE THE SPECIFIC REASONS THAT THE CHARGE SHOULD NOT HAVE BEEN DISMISSED.  If applicable, you may write on the back of this form or attach information or documents, which support your Request for Review.

_____

SIGNATURE, Counsel for Complainant                    September 7, 1998
                                                                          DATE

See attached for reasons for Request for Review

<u>YOU MUST ENCLOSE THE ORIGINAL AND THREE COPIES OF YOUR ENTIRE REQUEST</u>
<u>AND SIGN, DATE AND HAVE THIS FORM POSTMARKED OR HAND DELIVERED BY THE</u>
<u>FILING DEADLINE DATE ABOVE, TO:</u>

Chief Legal Counsel, Illinois Department of Human Rights,
100 West Randolph Street, Suite 10-100, Chicago, IL  60601.

THIS FORM MAY NOT BE SENT VIA TELEFAX.

NOD/SE
12/97

Plaintiff's Exhibit 1

STATE OF ILLINOIS
ILLINOIS DEPARTMENT OF HUMAN RIGHTS

MELISSA SCHROEDER, n/k/a )
MELISSA ROBINSON, )
)
          Complainant, )
)
     v. )     IDHR Charge No.: 1997SF0777
)
Macon County, State of Illinois c\o )
Illinois Administrative Office, Judge )
Warren Sappington, and John P. )
Shonkwiler, Chief Judge of the Sixth )
Judicial Circuit/Macon County )
Circuit Court, )
)
          Respondents. )

## REQUEST FOR REVIEW

**Respondent #2**

**Issue/Basis:**  **B. Sexual Harassment**

      The Investigative Report dismissed Complainant's allegations concerning liability for sexual harassment against the Illinois Administrative Office of the Courts based on lack of jurisdiction.  The Investigative Report concluded, based on indications from Nathan Maddox, Assistant Director of the Administrative Office of the Illinois Courts, that Complainant was not employed by Respondent.

      Throughout the investigation of Complainant's Complaint, initially filed on April 11, 1997, Complainant identified Respondent #2 as, "State of Illinois, c\o Illinois Administrative Office of the Courts." (See attached, Complainant's Exhibit 1) Complainant has throughout these proceedings contended the State of Illinois was Respondent #2 and directed her Complaint merely to the "care of" the Illinois Administrative Office of the Courts.

      In the course of technical amendments drafted by the Illinois Department of

1

Human Rights (IDHR) staff, the identity of Complainant's Respondent #2 was revised, identifying only the Illinois Administrative Office of the Courts as Respondent #2.

Although Complainant executed technical amendments as directed by representatives of the IDHR, Counsel for Complainant continuously communicated to representatives of the IDHR that Complainant intended the State of Illinois to be identified as Respondent #2 (See attached correspondence directed to investigator, dated October 31, 1997, identified as Complainant's Exhibit 2). Moreover, Complainant's Complaint, unlike the Cover Sheet to each technical amendment provided by the IDHR, has consistently identified the "State of Illinois" as Respondent #2.

The Investigative Report also, pursuant to an additional technical amendment, includes Respondent #4, John P. Shonkwiler, Chief Judge of the Sixth Judicial Circuit/Macon County Circuit Court. The Investigative Report further finds substantial evidence for Complainant's allegations concerning sexual harassment and constructive discharge against Respondent #4. (See Issue/Basis "D" and "H" of Complainant's Exhibit 3).

The identity of John P. Shonkwiler, Chief Judge of the Sixth Judicial Circuit/Macon County Circuit Court, resulted from the Illinois Supreme Court ruling in Orenic v. State Labor Relations Bd., 127 Ill.2d 453, 537 N.E.2d 784, 795 (1989), wherein the Illinois Supreme Court concluded the State, personified by the Chief Judge of each Circuit, is the employer of Circuit Court clerks. The Orenic court further concluded clerks of the Circuit Court are non-judicial members of the judicial branch of State government and are not county officers. Orenic, 127 Ill.2d at   , 537 N.E.2d at 795. Similarly, because Complainant was employed as an assistant to a

2

Macon County Circuit Court Judge, the Chief Judge of Macon County personifies the State.

It is for this reason Complainant asks the IDHR to review it's dismissal of Respondent #2, consistently identified by Complainant as the State of Illinois. Complainant believes the State of Illinois is a proper party to her claims of sexual harassment and constructive discharge as outlined in Case No. 1997SF0777.

For the above reasons, Complainant respectfully asks the IDHR to reverse it's conclusion of lack of jurisdiction with regard to Respondent #2 and add Respondent #2, the "State of Illinois" as a proper party to the above numbered claim filed by Complainant.

Respectfully submitted,

MELISSA M. McGRATH

MELISSA M. McGRATH
Thomson & Weintraub
105 North Center Street
P.O. Box 3577
Bloomington, IL 61702-3577
(309) 829-7069

3

**January 1994:**
The plaintiff started work as a secretary, replacing Sherrie Randle, who had worked with Leona Miller and me for fifteen years because Sherrie did not know how to operate the new computers. Leona and I interviewed the plaintiff and another applicant. I asked Leona which one she would prefer to work with and she said the plaintiff and I said that's fine. Later, Judge Davis called and said that he was sorry that I didn't hire Jeannine Sheets who had worked with Judge Davis' wife in Attorney Joseph Vigneri's office.

**Date Uncertain: Complaint:** "Comments about her body." This allegedly occurred in the old courthouse before we moved in January 1996 probably fall 1995.

**WAS:** Glenn Fuller came up to her (as I recall, she was at her clerk's desk in the courtroom) and said something to the effect that "either your judicial clerk, or the plaintiff," is a beautiful girl and I don't want to say it so it can be used against me, so I am saying it publicly. I didn't say anything at that time. The plaintiff seemed to have an inferiority complex and when I would want to encourage her about school, or anything else, I would remind her that Glen had said that she was beautiful. I do not recall ever saying anything about her body. Much later, the plaintiff made a voluntary statement about having breast reduction surgery.

**January 15, 1996:**
**WAS:** The office was moved from the old courthouse building to the Ambassador Motel. The plaintiff said something about going in over the weekend and working and I said don't do that, I'm not going to. The plaintiff went in and straightened the office anyway.

**January 19, 1996:**
Crown Toyota

**January 30, 1996:**
Crown Toyota

**February 5, 1996:**
Leona and WAS bought a birthday cake for the plaintiff's birthday, which was on February 2.

**February 13, 1996:**
**WAS:** Ming Auto Body estimate prepared by Don Schroeder, in the amount of $316.13, repair and paint 1995 Toyota Camry.

**Mid February 1996:**
The plaintiff, Don, Kelly and Jeff Geisler went to St. Louis, Missouri for a weekend get away. They stayed at Embassy Suites. CES called the toll free number to pay for the plaintiff and Don's room, as a surprise, since the plaintiff moved and unpacked Art's entire office in January. They said that we would have to call the hotel direct. WAS called the hotel direct and guaranteed their room with our credit card. The plaintiff never did say anything about this; consequently, WAS asked her about it. She said that when she went down to check out, she didn't recognize the credit card number and so she had the hotel change the charge to her card.

The plaintiff brought a Xerox copy of pornographic remarks about men and their penises and brains to the office to distribute to Kelly, Shelley and WAS. About the same time, the plaintiff was talking to Kelly in Judge

Steadman's staff room where Kelly and Shelley sit and where WAS and the plaintiff would have to wait to get into their courtroom. The plaintiff said something to Kelly about a "blow job."

February 19, 1996:
Crown Toyota

March 07, 1996:
WAS: Paid $316.13, check #2359, to Ming Auto Body, for repair work, per invoice #42695.

March-April 1996:
The plaintiff asked WAS to have lunch with her and Ruth so they could discuss their problems with Leona (court reporter). WAS wrote a letter to Chief Judge Shonkwiler, dated April 4, 1996, about a problem that he had had with Leona. Shortly thereafter, Leona was reassigned to Judge Greanias, after indicating that she hated the plaintiff and didn't want to work for Judge WAS any longer.

The plaintiff said that she wanted to talk to WAS about her mother and father, who were separated, and the fact that she wanted a divorce herself. After that, she was in WAS' office to talk when they were not in court and when WAS was not writing decisions (continuously), to the point where Judge Patton said that she "lived" in my office. All she talked about was that she wanted a divorce, she wanted to go on a vacation, she needed at least a ten-day vacation with the boys (she didn't say who the boys were). She also said during the time that she would talk with me that she was always sweet, innocent, backward and shy until she started working at the courthouse. She would tell me on a number of occasions that she was invited to go out of town for a weekend. She didn't tell me by whom, and I didn't ask. Every time that she would say something about going out of town for a weekend or going on a vacation, I would always tell her to please wait until she got divorced because if she goes out of town instead of spending time with her children, when she was working and going to school, that this could be construed as an indication that she did not care for her children. At one time, she said that she was going to give Don custody, and I told her that she had better think about that. She was always saying that she needed a ten-day vacation with the boys.

At some time, the plaintiff was all upset one morning. She said that her mother told her that one of her dad's best friends had come to see her mother to tell her mother that Ralph had threatened to kill her mother and he (the friend) really believed that Ralph was sincere. She told me that she believed her father's friend because her father had been a point man in the army in Viet Nam and was one of two people in that squad that lived. The plaintiff asked what shall I do? I told the plaintiff, your mother better go see a lawyer and if she doesn't want to go see a lawyer in this town, see the lawyer that your sister works for in Champaign, about an order of protection. I think that I asked the plaintiff about it later and the plaintiff said that her mother had talked to a lawyer in Champaign.

April 19, 1996:
Tornado in Decatur, Illinois.

April 20, 1996:
The plaintiff called either 4/19 or 4/20 and told WAS that her father's place of business was hit by the tornado, that he left St. Louis and drove back to

Decatur and did not have any sleep on the night of the tornado.  The
plaintiff asked me to check on him since he hadn't had any sleep and the
family had not talked to him—and I did.

April 24, 1996:
Crown Toyota

Mid 1996:
Per Complaint:  Goodbye kiss.
WAS:  The plaintiff and I talked about Judge Davis and Judge Hendrian and the
possible rumors that there was something between us and I said well, when you
leave and I leave here in 1999, we'll say our goodbye right there in front of
everyone and I'll give you a little hug and kiss.  We laughed about it.  We
thought it was ridiculous.

Summer 1996:
WAS:  We had new front door and side light delivered to Ming Auto Body for
painting.  Due to a tornado that hit Decatur's north side on April 19, 1996,
there was a delay in getting the door painted.  Finally, it was completed and
CES went to look at it, to make sure the color was correct.  While CES was
talking to Don, she asked him about obtaining a bill and he said that the
plaintiff's mother would send us one.  We never did receive a bill and on
October 31, 1996, WAS phoned two auto body shops to receive estimates of the
cost to paint one door and side light in two colors.  Then, on October 31,
1996, WAS sent a letter to the plaintiff's dad and Don, along with a check in
the amount of $200.00.

June 1996:
On April 20, 1996, CES ordered a Longaberger basket that holds
address/telephone cards as a thank you for the plaintiff for helping move the
office in January 1996.  Normally, it would take approximately two months to
receive the basket, but since it was the special Father's Day basket, it was
received prior to that date.  WAS and CES delivered it to the plaintiff's
home on June 16, Father's Day weekend.  The plaintiff's father and mother
were at her house when we stopped by.  The plaintiff's family had gone to
dinner earlier in the evening.  Don, The plaintiff and at least one of their
daughter's were in the front yard when we arrived.  We did not get out of the
car.  The plaintiff told WAS later that her mother really liked the basket
and wanted one.

WAS--OUT OF THE OFFICE, CHICAGO COURT ASSIGNMENT, JULY 1 THRU JULY 5, 1996.

WAS--OUT OF THE OFFICE, TRIP TO CHINA, JULY 10 THRU JULY 25, 1996.

July 25, 1996:
WAS went to Dr. Greg Totel regarding E coli illness.

July 26, 1996:
Complaint:  WAS inquired about the plaintiff's marriage.
WAS:  This was the first day that WAS returned to work, after attending his
stepson's wedding in China.  He had been to see Dr. Totel on July 25, 1996,
and also had blood work done at Decatur Memorial Hospital, all because of the
E coli food poisoning that he picked up in China.  Did not feel completely
recovered for about a month.  Further, WAS lost 20 pounds from the food
poisoning.

I said how are you doing, are you and Don any better or any worse?

**July 29, 1996:**
Complaint:  WAS told the plaintiff that he would purchase a sexual device for her.

WAS:  The plaintiff said something to the effect that she had not had relations for six or seven months (at least) and I said please don't do that. There are always other devices that can be used.

**End of July 1996:**
CES had purchased dresses (one dress for each daughter) for the plaintiff's daughters.  WAS took them to work to give to the plaintiff.  Received thank you note from the plaintiff.

**July 31, 1996:**
Plaintiff asked WAS to eat lunch with her.

**August 12-15, 1996:**
Judge Davis complained to Judge Greanias about the mother of a child in a juvenile case testifying that she had talked to the plaintiff about what she should do.  As I recall, the plaintiff told her to do what her lawyer and the representatives of DCFS said to do in order to get her child or children back.

**Middle of August 1996:**
WAS:  The plaintiff told me that she wanted to take me and Cheryl out for a birthday drink.  She said later on that we couldn't go because Ruth or someone else at the courthouse could not go.

**August 19, 1996:**
WAS:  Shortly after she met Frank Byers, Jr. at the beer tent at the Illinois State Fair.  About a couple of weeks later, she told me that Byers had fondled her arms, at either her desk or in the courtroom.  This is when I told her that the rules that apply to Judges also apply to staff, in regard to fidelity and diligence, and I read the rules to her.  She appeared to be angry.  I told her that Frank was not to come into the courtroom to talk with her in the future and she said that she would take care of it.  This didn't stop.

WAS:  The plaintiff volunteered to transport WAS to Crown Toyota to pick up 1988 Toyota Camry.

**August 24, 1996:**
CES:  Spoke with The plaintiff by phone on Saturday morning about custody and other misc. divorce considerations.  For example, we discussed how a certain amount of control is lost when a new stepmother enters the picture.  She said that Don is the one that wanted children.  Then, I told her about my experience with Christopher.  I also told her that she won't necessarily know the effect that "giving up custody" of her children would have until many years after the fact.  She then said, "I know" and said that she would not give up custody of her children.  She also asked me if I was glad that I got divorced and married Art.  I told her "absolutely"--that I wouldn't have missed it for the world.

**AUGUST 26, 1996:**
OUTPATIENT PROCEDURE, DECATUR MEMORIAL HOSPITAL, COLON CANCER FOLLOW-UP.  OUT OF THE OFFICE ALL DAY.

**September 1996:**
CES: The plaintiff asked WAS for help with a homework assignment. WAS brought it home to me and asked me to read it and tell him what I thought. I read it and we discussed some pointers concerning the different pros and cons of funding school districts via taxes. The topic of this assignment had to do with funding school districts and the different taxing mechanisms that could be used to fund the schools better.

**Mid September 1996:**
Complaint: Comments made to Judge Davis and Judge Hendrian. The plaintiff brought up the subject with WAS.

Complaint: WAS complained about the plaintiff helping Judge Diamond.

**September 09, 1996:**
Complaint: Threatened to kill the plaintiff if she shacked up.
WAS: The plaintiff was talking to me about going out after she got divorced. I told her to be careful, that there are a lot of nuts out there. I told her that if she got in trouble and didn't want to call her parents, to give me a call and I would do what I could. She asked me if I would come and get her if she were abandoned in a motel. I told her that I would if I could, but I won't promise you that I won't give you a lecture.

The plaintiff told me the statue that she had ordered for me for my birthday had not arrived. I told her that CES had purchased it for me. She said that she would cancel her order, but asked that I select another item that she could buy. After a couple of weeks or so, I picked out a tie.

CES phoned Art & Artifact catalog company and cancelled the statue. Customer service phone number 800-950-9540

**September 12, 1996:**
Julie Jewell replaced Leona Miller after the plaintiff and Ruth Long reported that Leona Miller was keeping a record or "book" on the times plaintiff would arrive and leave in the morning, at lunch and in the evening.

**September 17, 1996:**
Received a memo from Judge Davis.

**September 18, 1996:**
The plaintiff volunteered to transport WAS to Crown Toyota to pick up 1988 Toyota Camry.

**September 24, 1996**
WAS: The plaintiff volunteered to transport WAS to Crown Toyota to pick up 1988 Toyota Camry.

**September 26, 1996:**
WAS: The plaintiff volunteered to transport WAS to Crown Toyota to pick up 1995 Toyota Camry.

The plaintiff complained that Don went out and bought a mountain bike for $400 and gave the old one to the people who lived across the street. Her parents had purchased the old bike for Don, some time in 1996, and she was upset about this and the fact that he spent the money because they had such a tight budget. Some time after that she told me that she was really upset

with Don because she had found out that the bike cost $1,400 instead of $400, about the fact what Judge Davis had said bad things to Richard Hopp about her to the point that Richard Hopp came down and told us about it, and then some time after the Hopp incident, we were told by Jennifer Cavaness (Assistant State's Attorney) and Kevin Kehoe (Assistant Public Defender) that Judge Davis went after Mrs. "S" like a starving dog going after a bone.  The plaintiff came in on Monday morning and was upset about everything that had been said--she was upset about her parents, Davis, the bike, her divorce, and she asked Don for a hug and he wouldn't even give her a hug and she said that she would have to see her counselor.  I said, well I can't do that.  All I can do is give you a professional handshake and wish you the best.

**Either late September or early October 1996:**
WAS:  Judge Greanias received a letter from Judge Davis that criticized the plaintiff's work.  I spoke with the plaintiff about the letter and she said, "fuck Judge Davis."

**AFTER OCTOBER 01, 1996:**
WAS:  Ceased going to lunch with the plaintiff and Ruth.

**October 1996:**
Complaint:  WAS glared at the plaintiff.

**October 03, 1996:**
Complaint:  Murder?
I do not recall talking about the Karen Slover murder, or any murder case with the plaintiff and/or the Assistant State's Attorney.  I do remember the plaintiff telling me about one black guy and one white guy pulling up in a van when she was standing on the corner at the stoplight, waiting to go home, and she thought that they were going to grab her.  She was frightened, or said that she was.

**First Week in October 1996:**
CES:  I phoned Art's office at 4:30 and the plaintiff answered the phone.  I asked her how she was and she replied that she was at her wit's end.  We discussed briefly that between the death of Don's dad, school, etc., she had had a lot to deal with lately.  This is the last time that I spoke with the plaintiff.

**October 04, 1996:**
WAS:  The plaintiff and WAS were to exchange vehicles in order for us to pick up a TV in Springfield.  Since Don's dad died, Don had to use the truck to transport tables, chairs, etc.  We picked up the TV and WAS phoned the plaintiff to tell her that we didn't need to use the truck.  This message was left on her answering machine.

Judge Greanias talked to WAS about comments that Judge Davis had made to him regarding the rumors that were circulating around the courthouse.  "What is going on between Sappington and the plaintiff?"  Nothing was said about Judge Francis and his staff eating lunch together every day.

The plaintiff stood in the office with tears in her eyes saying that she had talked to her counselor about her father and her mother being separated, the pressure of school, her divorce and Judge Davis' complaints.  She said that she was at her wits end.

The plaintiff took $20 out of an envelope that I had in a filing cabinet and left wrote an IOU for it on the envelope.  This was never repaid.

Date:
WAS:  I saw the plaintiff talking with Frank Byers, Jr. on several occasions and suspected that she was giving him preferential treatment.


Date:
WAS:  Called Jeff Justice, Secretary of Decatur Bar Association and asked him to put a notice in the monthly newsletter that no one was to interrupt my court proceedings.  They are to leave a message on the plaintiff's answering machine if she isn't in her office or doesn't answer the phone.

October 06, 1996:
WAS:  WAS and CES went to Brintlinger's Funeral Home to pay condolences to Don.  The plaintiff was not present at the funeral home.  We wrote check at the memorial service in memory of Don's father.

October 07, 1996:
WAS:  I told The plaintiff that Cheryl and I had gone to the funeral home on Sunday evening and didn't see her there.  She said that one of her daughters had kicked her in the stomach so bad that her mother thought that she should go to the hospital.

October 09 or 10, 1996:
WAS:  The plaintiff told me that Don was going to receive some money from his dad's estate and that he was going to put it in their joint account and that he was starting to fix the house up.

Sometime prior to October 11, 1996:
WAS:  Frank Byers, Jr. had come into my courtroom four to five times, interrupting court proceedings by talking to the plaintiff to the point that I could not hear the witnesses.

October 11, 1996:
Complaint:  Byers situation in courtroom.
WAS:  Frank Byers came into the courtroom and went over to the plaintiff and was talking to her.  The plaintiff then left the courtroom and went to Judge Steadman's office staff area, without saying anything.  After the witness stopped talking, I recessed and went into Judge Steadman's office staff area, where the plaintiff and Frank Byers, Jr. were talking.  I told Frank that I wanted to talk to him in my office right now.  I did not say anything to the plaintiff.  When we arrived in my office, I told Frank that you have been in my courtroom four to five times during the last two weeks, interrupting proceedings.  I just don't want you in my courtroom.  I also recused myself from his cases.  Frank did not deny anything.  I recall that he said all right.  After I went back into court to continue the proceeding, Ruth handed me a note that said the plaintiff had gone home sick.  When the plaintiff returned to work, she told me that she had gone shopping that afternoon.  I did not see the plaintiff again until Tuesday of the following week.  Monday was Columbus Day holiday.  Judge Greanias called the plaintiff and told her not to come in on Tuesday.  On Wednesday, we had a mental hearing at the hospital.  The plaintiff sat at one end of the table and I sat at the other end, next to the court reporter.  When I walked in the plaintiff was reading a newspaper (which she had not done before).  She did not speak and kept reading the newspaper.  After the hearing, we went back to the courthouse.

Judge Greanias talked to the plaintiff and then ask me "how do you feel about working with her?" I said she was awfully cold and Judge Greanias said that the plaintiff said that I was cold. He asked if I thought that I could work with her and I said that I thought I could. He had talked with the plaintiff and she said that she could work with me. As I recall, Julia was the court reporter.

**Sunday, October 13, 1996:**
WAS and Judge Greanias discussed the Byers incident. Judge Greanias said that he was going to reassign the plaintiff to another Judge after Davis complained again when Julie Jewell went to tell Judge Davis what happened in the courtroom on October 11. He gave the plaintiff a couple of days off and she also worked a couple of days part time for Judge Diamond this week.

**Some time after October 13, 1996:**
WAS: Judge Greanias assigned the plaintiff to work for Judge Diamond part time until Robin Johnson returned from sick leave. At this time, the plaintiff was working for Judge Diamond and me. When Robin Johnson came back to work, Judge Greanias decided to assign the plaintiff to Judge Francis. The plaintiff came to me and said that Don had told her that he had heard Judge Francis' had telephoned defendants. The defendants had gotten the impression that Judge Francis was "coming on" to them. She told me that she didn't want to go to work for Judge Francis and asked me if I would go with her to speak with Judge Greanias about her concerns of sexual harassment. We spoke with Judge Greanias about this.

**October 1996:**
WAS: Ruth asked WAS if he could ever go to lunch with "them" again. WAS replied no.

Mrs. Shonkwiler asked the plaintiff if she minded working for WAS and she said no, that she respected him professionally.

**Approximately the end of October 1996:**
WAS: I was talking with an individual who was complaining about problems working with another employee. The plaintiff walked in with a file or telephone message and waited until the conversation ended. At this point, I said well, we've had our disagreements and have gotten past them. The plaintiff didn't respond or disagree.

**November 04, 1996:**
The plaintiff refused to type a draft of a resignation letter for me.

**November 06 or 07, 1996:**
The plaintiff told WAS that the Champaign lawyer that her sister works for commented about the plaintiff not being the fat girl that she was in the past.

**November 08, 1996:**
The plaintiff said that "we work well together, don't we?" and I said yes.

**November 09, 1996:**
WAS: The plaintiff called and left message on home answering machine saying that she was calling about a homework assignment dealing with private school systems. This phone call was not returned.

ˊ𝐴

**November 10, 1996:**
WAS:  Purchased caller ID for home phone and answering machine for WAS' phone at the office.  CES had left a message on the plaintiff's voice mail for WAS to meet her for lunch, however, this message was never delivered to WAS. There were other individuals who also had left messages for WAS on the plaintiff's E-mail, but I didn't receive them.

**November 11, 1996:**
CES:  Phoned Ameritech and ordered caller identification, "name and number." This service was ordered about 8:00 a.m. and was functional by 9:00 a.m., when the first telephone call to be identified was received.  At approximately 11:40 a.m., the phone began ringing and the caller was identified as Don Schroeder's phone number, (217) 875-6133.  About five calls from this number were received.  The last call was some time in the mid afternoon.  The caller did not leave a message, and hung up each time before the answering machine picked up.

**November 12-13, 1996:**
WAS:  Told the plaintiff that he had had a bad weekend and that he couldn't return her phone call.  He also told her that he couldn't talk to her about anything "personal" at any time, at any place, for any reason—except court business.

**November 15, 1996:**
The plaintiff started using the coat rack near her desk instead of the coat rack in WAS' office that she had used since January 16, 1996.  In addition, the plaintiff started walking up and down the south stairwell between the courtroom and WAS' office instead of the north stairwell that she had been using with WAS since January 16, 1996.

**Some time in November or December 1996:**
WAS:  Judge Greanias asked me to give the salary and insurance papers to the plaintiff.  She said that she didn't know if she was going to sign them—that she wanted to talk with Don.

**November 27, 1996:**
WAS:  The plaintiff wasn't in courtroom when I started the call, but I finished the call without her and went upstairs to her desk and asked her why she wasn't in court and she said that she resigned and I said oh hell, I've got a plane to catch and left.

**WAS - OUT THE OF THE OFFICE FROM THE AFTERNOON OF NOVEMBER 27, 1996 THRU DECEMBER 02, 1996.**

**December 02, 1996:**
WAS:  Date that Judge Greanias set for WAS to begin working with Kelly Geisler and the plaintiff to begin working for Judge Francis.

**December 03, 1996:**
The plaintiff came into my office when Attorney Richard Hopp and I were talking and he said he heard that she had quit.  She fixed his tie and said yes that she was going to finish her degree and that she had gone to Carlos O'Kelly's when she resigned and had four black Russians and she did not feel them at all.

After January 29, 1997:
WAS: The plaintiff asked Ruth to ask WAS if he would write a letter of recommendation for the plaintiff and I told Ruth Long that I couldn't do that, that she would have to go through her attorney. And you know that.

March 1997:
Requests from Sangamon County Court Administrator's Office:
WAS: Lois told me when I returned from Baltimore, Maryland, that someone from the Court Administrator's Office phoned some time during the week of March 10, 1997. He called back during the week of March 17, 1997. Harold Tenney drafted a letter (approved by Attorney Carol Poplowski) that was mailed to him; however, he phoned the office after receiving it and requested additional information. I asked Lois to request that he send a letter, to which he replied that he was going to make a decision without further inquiry.

MISCELLANEOUS (WAS)
The plaintiff told me that her dad thinks that she is having an affair.

February or March 1997:
Ruth told me that the plaintiff was divorced.

Date not determined:
WAS: The plaintiff showed me her driver's license and told me how much she had changed in appearance. She said that Don told her that he wanted the old plaintiff back.

The plaintiff told me that she thought that Don was seeing the girl who works at the motorcycle shop. He doesn't come home at night.

The plaintiff kept her purse and jacket in my office. She also brought in a coffee pot and placed it in my office.

Jim Brinkoetter received a letter from the plaintiff's lawyer, requesting that he be a witness in her sexual harassment case against me. He came to my office and said that he was angry and that if there was any sexual harassment, it was the other way around. He indicated that he would testify on my behalf.

Jennifer Cavaness brought court orders to my office. She believes that she gave these to the plaintiff, but they hadn't been signed.

Kevin Kehoe, Jennifer Cavaness, Lisa White and Richard Hopkins have indicated a willingness to testify on my behalf. Carol Dellert, my first court reporter from 1977, came to my office and asked me how Cheryl and I were doing. She said that she thought that the plaintiff was trying to weasel her way into my life and push Cheryl out the back door.

The plaintiff told me that she thought the whole thing had blown over.

MISCELLANEOUS
Plaintiff was upset a lot.

> She was upset with Leona Miller and asked my husband if she and Ruth could talk with him about the problems over lunch.

She was upset over the death of her first child.  She said that she was going to counseling.

She was upset over money problems in her marriage and that Don purchased a motorcycle when they did not have the money to do so.

She was upset over having to cook family dinners when she needed to study.

She was upset over her own marital problems--she suspected Don of having an affair when he was staying out late into the early morning hours.

She was upset over her parents' marital problems and that her father had threatened to kill her mother.

She was upset regarding her decision to divorce Don.  She didn't want custody of her two young daughters.

The last time I spoke with her was after Don's father had died in October 1996.  She said that she was at her wit's end.

**Things that seemed unusual and/or inappropriate:**

Going to my husband with most of her personal problems, not just large or unusual ones that would seem to warrant advice.

Asking me for assistance regarding two college homework assignments.

Purchasing family pictures of her, Don and their children for us as a Christmas present.

Purchasing a statue for my husband's birthday of one male and one female (nude) in an embrace.  The cost of this gift was $125 before tax and shipping.  Not only did the connotation of the gift seem inappropriate, but also the price was extremely high considering her salary and the office gift exchange practices in the past.

Plaintiff told me that when she graduated from University of Illinois at Springfield, she would be a psychiatrist.  I asked her if she was certain about this, because as I understood it, a psychiatrist is a medical doctor who specializes in psychiatry—and that you have to attend medical school first.  She stated emphatically that she was in a special program that trained psychiatrists that do not attend medical school.  I remember thinking that this sounded very strange, but did not question her further.

After moving to the temporary courthouse (formerly the Ambassador Hotel), phone calls placed to my husband regarding luncheon dates (but captured by plaintiff's voice mail) were not given to him until after the plaintiff, Ruth and my husband had returned from lunch together.  This problem with phone messages had not occurred prior to the move, but occurred on two or three occasions after the move.  My husband and I discussed this problem and purchased an answering machine that was placed on his telephone.  He never missed another phone message and I never left another message on the plaintiff's voice mail system.

Attire:  Plaintiff always wore a jacket that looked like a military or
cadet type coat and skirt.  On one occasion in the fall of 1996, she
wore a beige blouse that was "satin" in appearance.  You could see her
nipples through the blouse and she wore this to court one time.  My
husband told me about the blouse that appeared to be tight-fitting,
that the courtroom was cold, that her nipples showed, and my husband
asked her to put on a jacket, which she did.



217 428-8773 637

**AMERITECH**                                    May 12, 1997

AB 01 005314 26472 B 49 A
WARREN SAPPINGTON            3&
3246 VINING DR
DECATUR IL 62521

62521-4848

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Dear Valued Customer,

Enclosed is the duplicate statement you requested.
If you have requested other statements, each will arrive
in a separate envelope.

Thank you for letting Ameritech be of service.





Macon County
47

721704280877363733055001003200000000000000035673

|||.||....|||.|.|..|.|.|.|.|..|||..||.|

ACIS

**AMERITECH**
P. O. Box 4520
Carol Stream, IL 60197-4520

**Account Number**
217 428-8773   637 0

DEC 25, 1996

|.||...|.|.|..|.|...|..||..|.|.|.|.|.|.|...|.|..|.||..|.|

35673

WARREN SAPPINGTON
3246 VINING DR
DECATUR, IL 62521-4848

AMOUNT
IF PAID AFTER
JAN 23, 1997 ...   **362.30**

AMOUNT
IF PAID ON OR BEFORE
JAN 23, 1997 ...   **356.73**

↰ Detach and mail top section with your check payable to Ameritech. Write account number on check.    ↱
**PLEASE ALLOW FIVE DAYS WHEN PAYING BY MAIL OR AT AN AUTHORIZED AGENCY.**
Mail payments to: Ameritech, P. O. Box 4520, Carol Stream, IL 60197-4520

## CONSUMER SERVICES
## BILLING SUMMARY          -

217 428-8773   637 0

DEC 25, 1996

| Previous Bill | Payments Thank You | Adjustments | Balance | Current Charges | Total Amount Due |
|---|---|---|---|---|---|
| 83.64 | 83.64 | 0.00 | 0.00 | 356.73 | 356.73 |

WARREN SAPPINGTON                3246 VINING DR                DECATUR, IL 62521-4848

## SUMMARY OF CURRENT CHARGES

AMERITECH
For Detailed Charges - See Page 2
Monthly Service ........................................... 22.47
Local Calls ............................................... 2.86
Other Charges and Credits ................................. 5.00
Long Distance ............................................. 1.08
Local and State Additional Charges ..................... -  1.20
Taxes (Fed     .94  )(III     1.57  ) ..................... 2.51
AMERITECH CURRENT CHARGES ................................ 35.12

IBS V002 (10/95)



To contact your Ameritech Service Rep. call 1 800 244-4444
Monday through Saturday, 7:00 AM - 7:00 PM.
Nationwide, call 1 800 451-2761
To request bill balance, payment arrangements, or duplicate
bill copy, call our Automated Billing Service on 1 800 873-5501.

217 428-8773 637 0

DEC 25, 1996

## SUMMARY OF CURRENT CHARGES - continued

```
AT&T
For Detailed Charges - See Page 5
Monthly Service .......................................         3.00
Long Distance .........................................       294.59
Local and State Additional Charges ....................          .27
Taxes (Fed   8.94  )(St    14.81  ) ...................        23.75
AT&T CURRENT CHARGES ..................................       321.61

TOTAL CURRENT CHARGES                                         356.73
```



## DETAILED CHARGES

Page    **3**

ACIS

To contact your Ameritech Service Rep. call 1 800 244-4444
Monday through Saturday, 7:00 AM - 7:00 PM.
Nationwide, call 1 800 451-2761
To request bill balance, payment arrangements, or duplicate
bill copy, call our Automated Billing Service on 1 800 873-5501.

217 428-8773 637 0

DEC 25, 1996

## IMPORTANT INFORMATION

Ameritech simplifies local toll rates
 Beginning December 17, 1996, Ameritech takes the confusion out of
residential local toll calling (Band C calls over 15 miles). Now you
pay just 4 cents-per-minute for all your local toll calls rather than
different rates based on time of day or day of week. It's one flat rate
no matter when you call or how long you talk. Depending on your calling
habits, you may see a decrease or an increase in your overall bill.
CallPack calling plans will not be affected by this change. (Note:
Please disregard the "peak rate" and "discount period" information in
the "Local Calls - Calls over 15 Miles" section of your bill.---We will
be adjusting our billing statement to reflect the new flat-rate pricing
for these calls.)


 More calls are received on Monday than any other day. In order to
serve you better, please call our Service Centers between Tuesday and
Saturday. Thank you for helping us serve you better.

### CHANGES IN INTERNATIONAL DIALING
To help you complete your international calls quickly and easily,
Ameritech is upgrading its telephone switching equipment to handle
changes in international dialing. Beginning January 1, 1997, the
maximum number of digits in an international telephone number will
increase from 12 to 15. Some countries, including Germany, Austria,
Finland and Hong Kong have already begun using the expanded numbers.
To determine if the people or businesses to whom you place international
calls will be using a new telephone number, please contact them
directly.
This upgrade will be completed by June 30, 1997. If you encounter
problems when dialing an international number which has more than 12
digits during this transition period, you may need to complete your call
using an international operator. Please contact your international long
distance carrier for more information.

IBS V002 (10/95)    **FOR CALLING CODES PLEASE SEE THE BACK OF THE FIRST PAGE**



## DETAILED CHARGES

Page    4

ACIS

To contact your Ameritech Service Rep. call 1 800 244-4444
Monday through Saturday, 7:00 AM - 7:00 PM.
Nationwide, call 1 800 451-2761
To request bill balance, payment arrangements, or duplicate
bill copy, call our Automated Billing Service on 1 800 873-5501.

217 428-8773 637 0

DEC 25, 1996

## CURRENT CHARGES

**Monthly Service - Dec 25 thru Jan 24**

| | |
|---|---:|
| Caller Identification | 6.00 |
| Caller ID With Name | 2.50 |
| Non-Published Service | 1.40 |
| Line Charge | 9.07 |
| Mandatory Charge per FCC Order | 3.50 |

**Total Monthly Service Charges** .......................... 22.47

**Local Calls**
  Measured Service
  Summary:

| Billed | Standard Rate 9am-11am 2pm-8pm | | 10% Discount 8am-9am 11am-2pm 8pm-9pm | | 40% Discount 9pm-8am & Sat-Sun- Holiday | | |
|---|---|---|---|---|---|---|---:|
| | Mins. | Calls | Mins. | Calls | Mins. | Calls | |
| Local Area | 353 | 22 | 120 | 10 | 225 | 27 | 2.64 |
| Over 8 mi | 0 | 0 | 0 | 0 | 0 | 0 | .00 |
| Over 15 mi | 5 | 1 | 0 | 0 | 0 | 0 | .22 |

        60 Total Call(s) --- Averaging $.048 per call

  Total Measured Service ................................. 2.86

**Total Local Calls** ..................................... 2.86

**Other Charges and Credits**
  This section of the bill reflects charges or credits
  resulting from recent account activity.

  1 Charge to Change IntraLata
     Long Distance Carrier ............................. 5.00

**Total Other Charges and Credits** ...................... 5.00

IBS V002 (10/95)      **FOR CALLING CODES PLEASE SEE THE BACK OF THE FIRST PAGE**



## DETAILED CHARGES

Page     5

ACIS

To contact your Ameritech Service Rep. call 1 800 244-4444
Monday through Saturday, 7:00 AM - 7:00 PM.
Nationwide, call 1 800 451-2761

217 428-8773 637 0

To request bill balance, payment arrangements, or duplicate
bill copy, call our Automated Billing Service on 1 800 873-5501.

DEC 25, 1996

**Long Distance**

| No. | Date | Time | Place Called | | Number | Code | Min | Amount |
|-----|------|------|------|------|--------|------|-----|--------|
| 1 | 12-04 | 539P | MOWEAQUA | IL 217 | 768-5553 | E | 3 | .23 |
| 2 | 12-07 | 1139A | MOUNT ZION | IL 217 | 864-4938 | N | 1 | .05 |
| 3 | 12-08 | 1249P | OREANA | IL 217 | 468-2026 | N | 6 | .20 |
| 4 | 12-13 | 631P | OREANA | IL 217 | 468-2026 | E | 1 | .08 |
| 5 | 12-16 | 525P | MOUNT ZION | IL 217 | 864-5114 | E | 2 | .12 |
| 6 | 12-21 | 742A | OREANA | IL 217 | 468-2026 | N | 7 | .23 |
| 7 | 12-24 | 932A | OREANA | IL 217 | 468-2026 | D | 3 | .17 |

**Total Long Distance Charges** ........................... 1.08

**Local and State Additional Charges**
    State Additional Charges ............................... .02
    Municipal Additional Charges ........................ 1.18

**Total Local and State Additional Charges** ............... 1.20

**Taxes**
    Federal at 3% ........................................ .94
    Illinois at 5% ....................................... 1.57

**TOTAL AMERITECH CURRENT CHARGES**      35.12

IBS V002 (10/95)     **FOR CALLING CODES PLEASE SEE THE BACK OF THE FIRST PAGE**

 AT&T

# DETAILED CHARGES

Page    6

ACIS

For questions regarding AT&T charges, call 1 800 222-0300.
For 900 billing questions, call 1 800 642-2708.

217 428-8773 637 0

DEC 25, 1996

## IMPORTANT INFORMATION

This portion of your bill is provided as a service to AT&T.  There is no
connection between Ameritech and AT&T.  You may choose another company
for your long distance telephone calls while still receiving your local
telephone service from Ameritech.

## CURRENT CHARGES

AT&T Invoice Charges For Period Ending DEC 18, 1996

Automated calling card and collect calls save you money;
Whenever possible, use automation to place your calls.

**Monthly Service**

| No. | Description | | | | | |
|-----|-------------|---|---|---|---|---|
| 1 | AT&T TrueWorld (SM) Savings | | | | | |
| | DEC 18 thru JAN 17 | | | | | 3.00 |

Total Monthly Service Charges ........................... 3.00

**Long Distance**

| No. | Date | Time | Place Called | Number | Code | Min | Amount |
|-----|------|------|--------------|--------|------|-----|--------|
| 2 | 11-23 | 1204P | DODGEVILLE WI | 608 935-6170 | N | 20< | 2.80 |
| 3 | 12-03 | 752P | MONTICELLO IL | 217 762-7543 | E | 1< | .15 |
| 4 | 12-04 | 908P | MONTICELLO IL | 217 762-7543 | E | 1< | .15 |
| 5 | 12-07 | 901A | STONINGTON IL | 217 325-4182 | N | 1< | .11 |
| 6 | 12-14 | 813A | CHICAGO IL | 773 274-3213 | N | 1< | .14 |
| 7 | 12-15 | 426P | CHICAGO IL | 773 274-3213 | N | 22< | 3.08 |
| | Total Itemized Calls | | ........................... | | | | .00 |

Calling Card Calls

Calling Card 4288

| No. | Date | Time | Place Called | Number | Code | Min | Amount |
|-----|------|------|--------------|--------|------|-----|--------|
| 8 | 11-18 | 1054A | SULLIVAN IL | 217 728-7375 | DC | 4< | 1.31 |

IBS V002 (10/95)    **FOR CALLING CODES PLEASE SEE THE BACK OF THE FIRST PAGE**

 **AT&T**

# DETAILED CHARGES

Page    7

ACIS

For questions regarding AT&T charges, call 1 800 222-0300.    217 428-8773 637 0
For 900 billing questions, call 1 800 642-2708.

DEC 25, 1996

| No. | Date | Time | Place Called | | Number | Code | Min | Amount |
|-----|------|------|-------------|--|--------|------|-----|--------|
| 1 | 11-19 | 1206P | BRANSON | MO | 417 336-2691 | DC | 2< | 1.57 |
| | | | FROM DECATUR | IL | 217 424-1443 | | | |
| 2 | 11-19 | 1210P | MILLEDGEVL | OH | 614 948-2345 | DC | 7< | 3.37 |
| | | | FROM DECATUR | IL | 217 424-1443 | | | |
| 3 | 11-29 | 1240P | DECATUR | IL | 217 428-8773 | RC | 1@ | 4.08 |
| | | | FROM CHINA USA | | 0860222 | | | |
| 4 | 11-29 | 957P | DECATUR | IL | 217 428-8773 | RC | 1@ | 4.08 |
| | | | FROM CHINA USA | | 0860222 | | | |
| 5 | 11-29 | 1005P | DIR ASST | IL | 217 555-1212 | RC | 1 | 3.45 |
| | | | FROM CHINA USA | | 0860222 | | | |
| 6 | 11-29 | 1013P | DECATUR | IL | 217 429-6628 | RC | 48@ | 66.59 |
| | | | FROM CHINA USA | | 0860222 | | | |
| | | | Completed via AT&T Intl DIRECTory LINK(sm) | | | | | |
| 7 | 11-29 | 1103P | DECATUR | IL | 217 422-6409 | RC | 106@ | 142.05 |
| | | | FROM CHINA USA | | 0860222 | | | |
| 8 | 11-30 | 1151A | ALEXANDRIA | VA | 703 780-2000 | NC | 4< | 1.63 |
| | | | FROM WILLIAMSBG | VA | 757 220-5856 | | | |
| 9 | 12-04 | 954A | DECATUR | IL | 217 428-8773 | RC | 38@ | 52.70 |
| | | | FROM CHINA USA | | 0860222 | | | |
| 10 | 12-04 | 1030A | MACON | IL | 217 764-3332 | DC | 2< | .97 |
| 11 | 12-04 | 1135A | OREANA | IL | 217 468-2026 | DC | 1< | .92 |
| | | | FROM DECATUR | IL | 217 424-1443 | | | |
| 12 | 12-09 | 337P | OREANA | IL | 217 468-2026 | DC | 2< | .97 |
| | | | FROM DECATUR | IL | 217 424-1443 | | | |
| 13 | 12-11 | 317P | CLERMONT | OH | 513 735-9000 | DC | 3< | 2.09 |
| | | | FROM DECATUR | IL | 217 424-1443 | | | |
| 14 | 12-16 | 824A | DECATUR | IL | 217 422-6409 | RC | 1@ | 4.08 |
| | | | FROM CHINA USA | | 0860222 | | | |
| 15 | 12-17 | 803A | DECATUR | IL | 217 422-6409 | RC | 1@ | 4.08 |
| | | | FROM CHINA USA | | 0860222 | | | |

Calling Card 4288 Subtotal .......................    281.11
Total Calling Card Calls .......................    281.11

 AT&T

# DETAILED CHARGES

Page    8

ACIS

For questions regarding AT&T charges, call 1 800 222-0300.
For 900 billing questions, call 1 800 642-2708.

217 428-8773 637 0

DEC 25, 1996

You are enrolled in the following promotion(s):
AT&T TrueReach Int'l        Valid OCT 19 - APR 16
Please note: You are now enrolled in our new
savings plan AT&T TrueReach International
Savings (SM) which can save you on all of your
international and domestic calls.  It's the
simplest calling plan in the world!  Our billing
statement will soon reflect our new name.
NOTE: You have saved   182.03 over regular AT&T
        rates with AT&T TrueWorld (SM) Savings this
        month.


NOTE: You have saved    5.78 with
        AT&T True USA (SM) this month.

Remember, with AT&T True USA (SM) Savings, any
month you spend at least $25 on AT&T Long Distance
you'll save 20% off your domestic AT&T calls.
Or save 10% if you spend at least $10.

@ AT&T TrueWorld (SM) Calls

<'Calls Eligible for AT&T True USA (SM) Savings.

AT&T TrueWorld (SM) Savings Summary

  1 Domestic Call Discount          0.00 @ 40%            .00
Total Charges for AT&T TrueWorld (SM) Savings           .00


AT&T True USA (SM) Savings Summary

    Total Calls Eligible for True USA    19.26

  2 Calls Eligible for Discount     19.26 Disc @ 30%       13.48

Total charges for AT&T True USA (SM) Savings             13.48



# DETAILED CHARGES

Page    9*

ACIS

For questions regarding AT&T charges, call 1 800 222-0300.    217 428-8773 637 0
For 900 billing questions, call 1 800 642-2708.

DEC 25, 1996

```
Total Long Distance Charges ...........................       294.59

Local and State Additional Charges
    1 Municipal Utility Tax Surcharge.....................          .26
    2 Illinois PUC Surcharge...........................          .01

Taxes
    3 Federal Tax @ 3%...................................         8.94
    4 State and Local ..................................        14.81

Total AT&T Invoice Charges ...........................       321.61

TOTAL AT&T CURRENT CHARGES                                    321.61
```

RES    NOV 25, 1996    BO 13200  C1 10 CS01 NF IL D    217 428-8773 637
217 428-8773 637 4 CS MNN    ZAC 3 ZS CSM    TAX    Page 00
                            TRAN JRNL PYNT  BATCH

DATE      AMOUNT    CODE CLASS TYPE  NO
11996     87.09     01    SI25
72170 4280873632320220010032000000000000008364

                                        ACCOUNT NUMBER
Anni  Box 4520                          217 428-8773 637 0
Carol Stream, IL  60197-4520

WARREN SAPPINGTON                       NOV 25, 1996
B624 STARVING DR
B624 STARVING DR
CURRENT CHARGES L 82221-4848            **CO 70
PAST DUE AFTER...DEC 23, 1996                     TOTAL
                                                  AMOUNT DUE
BILLING SUMMARY

PREVIOUS      PAYMENTS    ADJUSTMENTS    BALANCE    87.64
BILL                                               217 428-8773 637 0
87.09         87.09       0.00           0.00

SUMMARY OF CURRENT CHARGES              NOV 25, 1996  TOTAL
                                        CURRENT       AMOUNT DUE
                                        CHARGES 83.64
AMERITECH

AMERITECH                                        NOV 25, 1996
Monthly Service....................... 1 800 244-4444
For Detailed Charges - See Page 3                         PAGE 2

DETAILED CHARGES
NOV 25, 1996

AMERITECH
Monthly Service......................
For Detailed Charges - See Page 3
Federal and State Additional Charges                22.47
Local Distance Charges and Credits                   5.51
Local and State Additional Charges                  13.20
ATST CURRENT CHARGES                                 3.72
                                                     2.13

TOTAL CURRENT CHARGES                               83.64

DETAILED CHARGES
NOV 25, 1996                                        Page    3

AMERITECH
Monthly Service....................... 1 800 244-4444
                                                     3.00
                                                    25.600
                                                    35.08
                                                    35.00

TOTAL CURRENT CHARGES                               83.64

*** D 19 ***

AMERITECH

RES Monthly Service    NOV. 25, 1996    BD 13200    CS 18 0501 MF ILB    217 662-9773 637 FS NE 0083

1 Monthly Service                                                          10.00    5
2 Service Order Processing                                                  .01     D

DETAILED CHARGES
NOV 25, 1996
Service Period NOV 25, 1996

No.  Description                                    Qty.    Monthly Charge    Amount    A    R S Taxes    Tar Ord B    Serial No    Grp    D-N

DETAILED CHARGES
NOV 25, 1996

217 428-9773 637

Page 7

| No | Date | Place Called | Number Called | Min | Code | Amount | R A S | Taxes | TAR | L Serial No | MCHA |
|----|------|-------------|---------------|-----|------|--------|-------|-------|-----|-------------|------|
| 1 | 10-17 | FROM DECATUR | | 5< | DC | 1.11 | 2 | 0 | | S 16 | |
| 2 | 10-23 | FROM DECATUR | | 1< | EC | .97 | 2 | 0 | | S 16 | |
| 3 | 10-23 | FROM DUQUAXE | | 1< | EC | .74 | 2 | 0 | | S 16 | |
| 4 | 10-23 | FROM DECATUR | | 72< | EC | 19.57 | 2 | 1 | | 2 16 | |
| 5 | 11-14 | FROM DECATUR | | 2< | DC | 1.20 | 2 | 1 | | 2 16 | |
| 6 | 11-15 | FROM CHAMPAIGN IL 217 384-9500 | | 2< | DC | 1.20 | 2 | 0 | | 2 16 | |

AT&T

DETAILED CHARGES
NOV 25, 1996

Page 8

| | | | | | | | 29.60 |
| | | | | | | | 29.60 |

Municipal Utility Tax Surcharge     .57
Illinois PUC Surcharge     .01
Other Surcharges     .00

*** F 19 ***



52654

5 5 6 3 2

**CROWN**
OLDS TOYOTA

255 W. Pershing Road
P.O. Box 3370
Decatur, Illinois 62524-3370
(217) 872-5000
Service (217) 872-5050

*INVOICE*

DUPLICATE 1
PAGE 1

WARREN SAPPINGTON
CHERYL SAPPINGTON
3246 VINING DR.
DECATUR IL 62521
HOME: 424-1442     BUS:

SERVICE ADVISOR: 126 ROBIN R BURCHAM

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT |
|---|---|---|---|---|---|
| | 88 | TOYOTA CAMRY | JT2SV22J7J0001975 | MRSWAS | 75548/75548 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV DATE |
|---|---|---|---|---|---|---|---|
| 01JAN88 | | | 17:00 19JAN96 | | 0.00 | | 19JAN96 |

| R.O. OPENED | READY | OPTIONS: DLR:12111 |
|---|---|---|
| 07:39 19JAN96 | 16:07 19JAN96 | |

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|---|---|---|---|---|---|---|---|---|
| A CHECK HARD START | | | | | | | | |
| | 43 R&I STARTER ASSEMBLY AND REBUILD STARTER | | | | | | | |
| | | 247 | GFE | 2.50 | | | 137.50 | 137.50 |

*************************************************************

PAID

THANK YOU
CROWN OLDS/TOYOTA INC
CASH        CHECK #

Thank You !

Mr. Goodwrench

Genuine

TOYOTA
QUALITY SERVICE
GENUINE PARTS

GM
Parts

CUSTOMER SIGNATURE

**DISCLAIMER OF WARRANTIES**
The seller, CROWN OLDS/TOYOTA, INC., herein expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the sale.

| DESCRIPTION | TOTAL |
|---|---|
| LABOR AMOUNT | 137.50 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 137.50 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 0.00 |
| PLEASE PAY THIS AMOUNT | |

**CUSTOMER COPY**

52654                    5 5 8 6 9         # CROWN
                                            OLDS / TOYOTA
WARREN SAPPINGTON         *INVOICE*         255 W. Pershing Road
CHERYL SAPPINGTON                           P.O. Box 3370
3246 VINING DR.                             Decatur, Illinois 62524-3370
DECATUR IL 62521         PAGE 1             (217) 872-5000
HOME: 424-1442    BUS:                      Service (217) 872-5050



SERVICE ADVISOR:  126 ROBIN R BURCHAM

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|---|---|---|---|---|---|---|
|  | 88 | TOYOTA CAMRY | JT2SV22J7J0001975 | MRSWAS | 75709/75709 | T456 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 01JAN88 |  |  | 17:00 29JAN96 |  | 0.00 |  | 30JAN96 |

| R.O. OPENED | READY | OPTIONS: DLR:12111 |
|---|---|---|
| 06:52 29JAN96 | 12:29 30JAN96 |  |

| LINE | OPCODE | TECH | TYPE | HOURS |  | LIST | NET | TOTAL |
|---|---|---|---|---|---|---|---|---|
| A S O P / SWITCH |  |  |  |  |  |  |  |  |
| 43 REPLACE CLUTCH START SWITCH ASSEMBLY |  |  |  |  |  |  |  |  |
|  | 247 | CPE | 1.00 |  |  |  | 55.00 | 55.00 |
| 1 | 84520-12010 | SWITCH ASSY,START |  |  |  | 41.06 | 41.06 | 41.06 |
| 1 | 94120-41000 | NUT,PTO SHIFT ROD |  |  |  | 0.63 | 0.63 | 0.63 |
|  | ************************************************ |  |  |  |  |  |  |  |

PAID

THANK YOU
CROWN OLDS/TOYOTA INC.
CASH        CHECK

Thank You !
Mr. Goodwrench
Genuine
Parts
TOYOTA
QUALITY SERVICE
GENUINE PARTS

CUSTOMER SIGNATURE

DISCLAIMER OF WARRANTIES

The seller, CROWN OLDS/TOYOTA, INC., herein expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the sale.

| DESCRIPTION | TOTAL |
|---|---|
| LABOR AMOUNT | 55.00 |
| PARTS AMOUNT | 41.69 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 96.69 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 3.02 |
| PLEASE PAY THIS AMOUNT |  |

CUSTOMER COPY




52654                          5 6 6 3 7

**CROWN**
OLDS/TOYOTA

WARREN SAPPINGTON          *INVOICE*
CHERYL SAPPINGTON
3246 VINING DR.                                    255 W. Pershing Road
DECATUR IL 62521                                   P.O. Box 3370
HOME: 424-1442      BUS:          PAGE 1           Decatur, Illinois 82524-3370
                                                   (217) 872-5000
                                                   Service (217) 872-5050

SERVICE ADVISOR:  126 ROBIN R BURCHAM

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TA |
|---|---|---|---|---|---|---|
|  | 88 | TOYOTA CAMRY | JT2SV22J7J0001975 | MRSWAS | 76303/76303 | T10 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | P.O. NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 01JAN88 |  |  | 17:00 19FEB96 |  | 0.00 |  | 19FEB96 |

| R.O. OPENED | READY | OPTIONS: DLR:12111 |
|---|---|---|
| 10:19 19FEB96 | 14:27 19FEB96 |  |

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|---|---|---|---|---|---|---|---|---|
| A | CHECK CRUISE INOP | | | | | | | |
|  | 43 ROAD TEST AND SET CRUISE SEVERAL TIMES-CHECKED | | | | | | | |
|  | OK AT THIS TIME | | | | | | | |
|  | 247 | CPT | 0.00 | | | | 0.00 | 0.00 |

********************************************************



*Thank You !*

*Mr. Goodwrench*

*Genuine*

[GM Parts]   ⊕ **TOYOTA**
             QUALITY SERVICE
             GENUINE PARTS

CUSTOMER SIGNATURE

**DISCLAIMER OF WARRANTIES**

The seller, CROWN OLDS/TOYOTA, INC., herein expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the sale.

| DESCRIPTION | TOTAL |
|---|---|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 0.00 |
| PLEASE PAY THIS AMOUNT |  |

**CUSTOMER COPY**

52654

5 9 1 5 3

**CROWN**
OLDS / TOYOTA

255 W Pershing Road
P O Box 3370
Decatur, IL 62524-3370
(217) 872-5000
Service (217) 872-5050

WARREN SAPPINGTON
CHERYL SAPPINGTON
3246 VINING DR.
DECATUR IL 62521
HOME: 424-1442    BUS:

*INVOICE*

PAGE 1

SERVICE ADVISOR: 126 ROBIN R BURCHAM

| COLOR | YEAR | MAKE/MODEL | | VIN | LICENSE | MILEAGE IN/ OUT | |
|-------|------|------------|--|-----|---------|-----------------|--|
| | 88 | TOYOTA CAMRY | | JT2SV22J7J0001975 | MRSWAS | 77441/77441 | T3 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|----------|-----------|-----------|----------|--------|------|---------|-----------|
| 01JAN88 | | | 17:00 24APR96 | | 0.00 | | 30APR96 |

| R.O. OPENED | | READY | OPTIONS: DLR:12111 |
|-------------|--|-------|--------|
| 08:39 24APR96 | | 11:08 30APR96 | |

| LINE | OPCODE | TECH | TYPE | HOURS | | LIST | NET | TOTAL |
|------|--------|------|------|-------|--|------|-----|-------|
| A | CHECK A/C INOP AT TIMES /// SEE NOTE | | | | | | | |
| | SOP SPECIAL ORDER PART | | | | | | | |
| | 9999 | CPT | 0.00 | | | | 0.00 | 0.00 |

*********************************************

**DISCLAIMER OF WARRANTIES**

The seller, CROWN OLDS/TOYOTA, INC., herein expressly disclaims all warranties, either express or implied, including any implied warranty of merchantability or fitness for a particular purpose, and neither assumes nor authorizes any other person to assume for it any liability in connection with the sale.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 0.00 |
| PARTS AMOUNT | 0.00 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 0.00 |
| LESS INSURANCE | 0.00 |
| SALES TAX | 0.00 |
| PLEASE PAY THIS AMOUNT | 0.00 |

CUSTOMER SIGNATURE

52654                    6 4 1 3 9                    **CROWN**
                                                      OLDS / TOYOTA
WARREN SAPPINGTON           *INVOICE*                 255 W. Pershing Road
CHERYL SAPPINGTON                                     P.O. Box 3370
3246 VINING DR.                                       Oldsmobile   Decatur, Illinois 62524-3370
DECATUR IL 62521            PAGE 1                     (217) 872-5000
HOME: 424-1442   BUS:                                 Service (217) 872-5050

SERVICE ADVISOR: 126 ROBIN R BURCHAM

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/ OUT |
|-------|------|------------|-----|---------|-----------------|
|       | 88   | TOYOTA CAMRY | JT2SV22J7J0001975 | MRSWAS | 78789 /78789 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|----------|-----------|-----------|----------|--------|------|---------|-----------|
| 01JAN88  |           |           | 17:00 15AUG96 |    | 0.00 |         | 19AUG96 |

R.O. OPENED           READY           OPTIONS:  DLR:12111

12:07 15AUG96   13:22 19AUG96

LINE OPCODE TECH TYPE HOURS

| | | | LIST | NET | TOTAL |
|---|---|---|---|---|---|
| A S.O.P./ A/C INOP | | | | | |
| 43 REPLACED A/C COMPRESSOR, CLUTCH AND | | | | | |
| RECEIVER-DRYER; EVAC AND RECHARGE A/C SYSTEM | | | | | |
| 104   CPT  3.50 | | | | 175.00 | 175.00 |
| 1 88320-20590-84 REMAN A/C COMPRESSOR | | | 360.96 | 244.77 | 244.77 |
| 1 88471-10030 TANK, A/C RECEIVER | | | 51.26 | 40.82 | 40.82 |
| 1 88473-32020 BRACKET, RCVR TANK | | | 14.28 | 14.28 | 14.28 |
| 1 88716-32230 PIPE, CLR REFR. LIQUID | | | 14.64 | 14.64 | 14.64 |
| 1 90119-06186 BOLT | | | 1.15 | 1.15 | 1.15 |
| 1 91651-40625 BOLT, HEX, ARM SUP. SET | | | 1.15 | 1.15 | 1.15 |
| 1 91651-40845 BOLT | | | 1.76 | 1.76 | 1.76 |
| 2 1051 RO FREON | | | 26.51 | 23.00 | 46.00 |
| 1 88410-32060 CLUTCH ASSY, MAGNET | | | 194.20 | 136.75 | 136.75 |
| 1 90099-07125 RING, SNAP | | | 2.61 | 2.61 | 2.61 |
| 1 90099-07114 RING, SNAP | | | 1.36 | 1.36 | 1.36 |
| ********************************************************* | | | | | |
| B LUBE, OIL, FILTER, TOP OFF FLUID LEVELS, CK TIRE PRESSURE | | | | | |
| LOF LUBE, OIL, FILTER, TOP OFF FLUID LEVELS, CK TIRE | | | | | |
| PRESSURE | | | | | |
| 104   CPT  0.50 | | | | 8.74 | 8.74 |
| 1 08922-02005 FILTER S/A, OIL | | | 4.95 | 4.95 | 4.95 |
| 1 OIL1 | | | 5.50 | 5.50 | 5.50 |
| ********************************************************* | | | | | |

# PAID

*THANK YOU*
CROWN OLDS/TOYOTA, INC.
CASH              CHECK #

*Thank You!  for allowing us to service your vehicle*

GM Goodwrench Service

TOYOTA
QUALITY SERVICE   GENUINE PARTS

**STATEMENT OF DISCLAIMER**
The factory warranty constitutes all of the warranties with respect to the sale of this item/items. The Seller hereby expressly disclaims all warranties either express or implied, including any implied warranty of merchantability or fitness for a particular purpose. Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this item/items.

| DESCRIPTION | TOTALS |
|-------------|--------|
| LABOR AMOUNT | 183.74 |
| PARTS AMOUNT | 515.74 |
| GAS, OIL, LUBE | 0.00 |
| SUBLET AMOUNT | 0.00 |
| MISC. CHARGES | 0.00 |
| TOTAL CHARGES | 699.48 |
| LESS | 0.00 |
| SALES TAX | 37.39 |
| PLEASE PAY THIS AMOUNT | 736.87 |

CUSTOMER COPY

52654                   6 4 1 3 9              **CROWN**
                                               OLDS / TOYOTA
WARREN SAPPINGTON          *ACCOUNTING*        255 W. Pershing Road
CHERYL SAPPINGTON                              P.O. Box 3370
3246 VINING DR.                                Decatur, IL 62524-3370
DECATUR IL 62521                               (217) 872-5000
HOME: 424-1442     BUS:        PAGE 1          Service (217) 872-5050

SERVICE ADVISOR:  126 ROBIN R BURCHAM

| COLOR | YEAR | MAKE/MODEL | VIN | LICENSE | MILEAGE IN/OUT | TAG |
|---|---|---|---|---|---|---|
|  | 88 | TOYOTA CAMRY | JT2SV22J7J0001975 | MRSWAS | 78789/78789 | T725 |

| DEL DATE | PROD. DATE | WARR. EXP. | PROMISED | PO NO. | RATE | PAYMENT | INV. DATE |
|---|---|---|---|---|---|---|---|
| 01JAN88 |  |  | 17:00  15AUG96 |  | 0.00 |  | 19AUG96 |

| R.O. OPENED | READY | OPTIONS: | DLR:12111 |
|---|---|---|---|
| 12:07 15AUG96 | 13:22 19AUG96 |  |  |

| LINE | OPCODE | TECH | TYPE | A/HRS | S/HRS | SALE | COMP | LIST | NET | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| A S.O.P. / A/C INOP | | | | | | | | | | |
| 43 REPLACED A/C COMPRESSOR, CLUTCH AND | | | | | | | | | | |
| RECEIVER DRYER, EVAC AND RECHARGE A/C SYSTEM | | | | | | | | | | |
| | 104 | CPT | 3.50 | 3.50 | | 17500 | | | 175.00 | 175.00 |
| 1 88320-20590-84 REMAN | | | | | | | | | | |
| A/C COMPRESSOR | | | | | | 24477 | 0 | 360.96 | 244.77 | 244.77 |
| 1 88471-10030 TANK, A/C | | | | | | | | | | |
| RECEIVER | | | | | | 4082 | 0 | 51.26 | 40.82 | 40.82 |
| 1 88473-32020 | | | | | | | | | | |
| BRACKET, RCVR TANK | | | | | | 1428 | 0 | 14.28 | 14.28 | 14.28 |
| 1 88216-32230 PIPE, CLR | | | | | | | | | | |
| REFR.LIQUID | | | | | | 1464 | 0 | 14.64 | 14.64 | 14.64 |
| 1 90119-06186 BOLT | | | | | | 115 | 0 | 1.15 | 1.15 | 1.15 |
| 1 91651-40625 | | | | | | | | | | |
| BOLT, HEX ARM SUP. SET | | | | | | 115 | 0 | 1.15 | 1.15 | 1.15 |
| 1 91651-40845 BOLT | | | | | | 176 | 0 | 1.76 | 1.76 | 1.76 |
| 2 1051 R0 FREON | | | | | | 4600 | 0 | 26.51 | 23.00 | 46.00 |
| 1 88410-32060 CLUTCH | | | | | | | | | | |
| ASSY,MAGNET | | | | | | 13675 | 0 | 194.20 | 136.75 | 136.75 |
| 1 90099-07125 RING, SNAP | | | | | | 261 | 0 | 2.61 | 2.61 | 2.61 |
| 1 90099-07114 RING, SNAP | | | | | | 136 | 0 | 1.36 | 1.36 | 1.36 |
| B LUBE,OIL,FILTER, TOP OFF FLUID LEVELS, CK TIRE PRESSURE | | | | | | | | | | |
| LOF LUBE,OIL,FILTER, TOP OFF FLUID LEVELS, CK TIRE | | | | | | | | | | |
| PRESSURE | | | | | | | | | | |
| | 104 | CPT | 0.50 | 0.50 | | 874 | | | 8.74 | 8.74 |
| 1 08922-02005 FILTER | | | | | | | | | | |
| S/A OIL | | | | | | 495 | 0 | 4.95 | 4.95 | 4.95 |
| 1 OIL1 | | | | | | 550 | 0 | 5.50 | 5.50 | 5.50 |

| ACCOUNT | SALE | CONTROL | ACCOUNT | SALE | CONTROL |
|---|---|---|---|---|---|
| 46001 | 18374 | | 46702 | 51024 | |
| 49100 | 550 | | 32401 | 3739 | |
| 22000 | 7368T | *** | | | |
| COST, SALE, & COMP TOTALS | | | 69948 | 0 | |

**FILE COPY**  P A I D

*THANK YOU*
CROWN OLDS/TOYOTA, INC.
CASH   √  CHECK #

| STATEMENT OF DISCLAIMER | DESCRIPTION | TOTALS |
|---|---|---|
| The factory warranty constitutes all of the warranties with respect to the sale of this item/items. The Seller hereby expressly disclaims all warranties either express or implied, including any implied warranty of merchantability or fitness for a particular purpose. Seller neither assumes nor authorizes any other person to assume for it any liability in connection with the sale of this item/items. | LABOR AMOUNT | 183.74 |
| | PARTS AMOUNT | 515.74 |
| | GAS, OIL, LUBE | 0.00 |
| | SUBLET AMOUNT | 0.00 |
| | MISC. CHARGES | 0.00 |
| | TOTAL CHARGES | 699.48 |
| CUSTOMER SIGNATURE | LESS | 0.00 |
| | SALES TAX | 37.39 |
| | PLEASE PAY THIS AMOUNT | 736.87 |

ACCOUNTING COPY        AUG 1 9 1996