**E-FILED**
Friday, 08 April, 2005 03:31:47 PM
Clerk, U.S. District Court, ILCD

**UIS** University of Illinois at Springfield

RECEIVED
MAY 28 1997

973 HDC MP

BA in S941
PSY 971

Office of Enrollment Services
Division of Student Services
Springfield, IL 62794-9243
Admissions (217) 786-6626 • Financial Assistance (217) 786-6724 • Records (217) 786-6709
Registration (217) 786-6174 • Toll-free (800) 252-8533

# Admission Application

P3

Social Security Number 334 [redacted] 74 [redacted] 1421 (S)

Name: SCHROEDER (Last) MELISSA (First) LYNN (Middle) SCHWENGEL (Maiden)

MAILING ADDRESS: R.R. #1, Box 138 (Number and Street or R.R.) Apt. No.

Home (217) 622-8009 Work ( ) Telephone Number

WARRENSBURG (City or Town) IL (State) 62573 (Zip) MACON (County)

PLACE OF BIRTH*: DECATUR (City) IL (State) MACON (Country (if not U.S.A.))

*If born outside the U.S., please provide proof of U.S. citizenship.

Are you an Illinois resident? (X) Yes ( ) No
Are you a citizen of the U.S.? (X) Yes ( ) No

Length of time in Illinois 25 Years 1 Months
If no, indicate country of citizenship ______

If you are not a citizen of the U.S., what is your status in the U.S.? Documentation of your status must be submitted.
( ) Permanent Resident Immigrant (enclose copy of your alien registration card)
( ) Other Immigrant Status (enclose a copy of your documentation of other status)

IN AN EMERGENCY CONTACT: ☒ Parent ☐ Spouse ☐ Other

Name: PEGGY SCHWENGEL

Address: R.R. #1 Box 138 (Number and Street or R.R.) Apt. No.

Home (217) 622-8009 Work ( ) Telephone Number

WARRENSBURG (City) IL (State) 62573 (Zip) MACON (County)

PERMANENT HOME ADDRESS (Give only if different than mailing address above.)

Address ______ (Number and Street or R.R.) Apt. No. Home ( ) Work ( ) Telephone Number

City State Zip County

( ) Male (X) Female Date of Birth 2 / 4 / 72 (month / day / year)

Marital Status: ( ) Married ( ) Single (X) Divorced ( ) Separated ( ) Widowed

Please check your race-ethnic group
( ) Alaskan Native or American Indian
( ) Asian or Pacific Islander
( ) Black, not of Hispanic Origin
(X) White, not of Hispanic Origin
( ) Hispanic

If you have a health problem or disability of which UIS should be aware, please indicate below:

Chronic Illness ______ Motor Skills ______ Special Senses ______

You are encouraged to complete the above items to assist the University of Illinois at Springfield in fulfilling student needs.

Have you served or are you serving in the U.S. Armed Forces? ( ) Yes, from (month/year) ________ to (month/year ________
(X) No

Are you currently employed? ( ) Full-Time (X) Part-Time (X) Unemployed

IMMUNIZATION – All students born January 1, 1957, or after must provide proof of immunization for tetanus/diphtheria (DPT/DT), measles, mumps, and rubella. International students must also provide documentation of a negative chest x-ray or tuberculin skin test. Questions may be directed to: Campus Health Service, (217) 786-6676.

---

If you have previously applied to or attended the University of Illinois at Springfield, give the term and the year Spring 1994

I want to pursue a ( ) bachelor's degree (X) master's degree

( ) I do not wish to pursue a degree, but want to take courses as a non-degree student. I may take up to 16 semester hours as an undergraduate – 12 semester hours as a graduate – before I will be asked to clarify my student status. Any hours beyond these may not count toward a degree without program approval. (Please complete the colleges/universities attended and courses in progress sections.)

Do you plan to earn Illinois Teacher certification? ( ) Yes (X) No

Do you plan to earn a graduate certificate? (X) Yes ( ) No

When do you wish to begin your study? Fall 19 97 Spring 19 ____ Summer 19 ____ Fall 20 ____ Spring 20 ____ Summer 20 ____

---

Refer to degree programs/minors in the UIS catalog.

If you are a degree-seeking student entering a bachelor's or master's degree program, indicate your proposed program of study (major)

Human Developmental Counseling

If you have a proposed minor (undergraduates only), enter it here ________
If you have a preferred faculty adviser, please enter his or her name below. (Advisers will be assigned for degree-seeking students.)

________ Major Adviser ________ Minor Adviser

---

**LIST ALL COLLEGES/UNIVERSITIES ATTENDED**
(Include University of Illinois at Springfield; give country if not in the United States)

| | College or University | City | State | From mo/yr | To mo/yr | Hours Earned | Degree Conferred |
|---|---|---|---|---|---|---|---|
| 1. | ROBERT MORRIS | SPRINGFIELD | IL | 7/1990 | 9/1991 | 60 | Assoc. |
| 2. | UIS | " | " | 1/1994 | present | 64 | Bachlors |
| 3. | | | | | | | |
| 4. | | | | | | | |
| 5. | | | | | | | |
| 6. | | | | | | | |

**COURSES IN PROGRESS OR TO BE COMPLETED BEFORE THE TERM FOR WHICH YOU ARE APPLYING**

| | College or University | Course Number and Title | Credit Hrs. | Term Enrolled |
|---|---|---|---|---|
| 1. | | | | |
| 2. | | | | |
| 3. | | | | |
| 4. | | | | |
| 5. | | | | |
| 6. | | | | |
| 7. | | | | |
| 8. | | | | |

TO BE CONSIDERED FOR ADMISSION, OFFICIAL TRANSCRIPT(S) FROM ALL COLLEGES/UNIVERSITIES YOU HAVE ATTENDED MUST BE SENT DIRECTLY TO ADMISSIONS FROM EACH ONE.

TO THE BEST OF MY KNOWLEDGE, THE INFORMATION THAT I HAVE SUPPLIED ON THIS APPLICATION IS TRUE AND COMPLETE. I AGREE TO COMPLY WITH ALL LAWFUL POLICIES AND PROCEDURES OF THE UNIVERSITY IN REGARD TO THE DISSEMINATION AND INTERNAL USE OF RECORDS INFORMATION PURSUANT TO THE FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT OF 1974.

Signature of Applicant Melissa Schroeder Date 5/27/97

School of Health and Human Services
Human Development Counseling
University of Illinois at Springfield
Springfield, IL 62794-9243

Application for Admission to Program

Name Schroeder Allison SS# 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
Last, First MI

Requirements to be completed for admission interview

[X] Submit an HDC program application

[X] Provide three (3) references (References on file 0 1 2 3)

[X] Successful completion of prerequisites. Prerequisites may not be used to satisfy HDC degree requirements.

____ a. Abnormal psychology

____ b. Developmental psychology

X c. Social Psychology or Sociology

Information on competency examinations for meeting these prerequisites is available at Program office.

[ ] You have met the requirements. The Program conducts interviews on April 1 and October 15. This office will notify you of your appointment.

Signed Robert J. Crowley, Convener
Assigned Adviser Bill Abler
Date July 11, 1997
Interview Appointment ________

White (OAR)
Yellow (Student)
Pink (Program)

Rev. 1-95

TP 6-16-97

# Notice of Graduate Admission

Office of Enrollment Services ••Admissions/Records

Name Melissa Schroeder
Address RR #1, Box 138
Warrensburg, IL. 62573

SS # 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
Program of Study HDC
Term of Entry SP ____ SU ____ FA 97
[X] First Report [ ] Updated Report

This is an official notice of your admission status. If you have any questions about your academic program, contact the program convener/director. Please feel free to contact the Office of Enrollment Services if you have other questions.

| SCHOOL ATTENDED | DEGREE & DATE | GRADE POINT AVERAGE |
|---|---|---|
| UIS | (X) Awarded ( ) Expected BA (Psy) 5/97 | 3.31 |
| | | CGPA = 3.52 |

CONSTITUTION REQUIREMENTS MET: FEDERAL [X] Met [ ] Not Met [ ] Waived F/J Visa Student
STATE [X] Met [ ] Not Met [ ] Waived F/J Visa Student

Evaluated by Jennifer Case / DW Date 6-13-97

## ADMISSION DECISION

____FULL (all admission requirements and prerequisites have been met)
____DENIED (see enclosed explanation)
____CONDITIONAL (items marked below must be met for full admission)

( ) Must forward official transcript reflecting bachelor's degree from ____________

( ) Must submit to program ____________

( ) Undergraduate GPA is below 2.50. Must complete 8 sem. hrs. of UIS graduate credit with GPA of 3.00 or better. The following courses (exclusive of prerequisites) are approved as meeting these 8 hrs.: ____________

( ) The following program prerequisite course(s) must be completed: ____________

Student may take no more than ____ hours of other course work prior to the completion of program prerequisites.

( ) The following non-prerequisite course(s) must be completed: ____________

Copies: Student File (White), Student (Yellow), Adviser (Pink), Program (Goldenrod)

Signature ____________
Title ____________
Date ____________
Assigned Adviser ____________

PLEASE RETURN WHITE AND YELLOW COPIES TO THE ADMISSIONS OFFICE

(Rev. 2/97)

# THE UNIVERSITY OF ILLINOIS AT SPRINGFIELD

Springfield, Illinois 62794-9243

## ACADEMIC TRANSCRIPT

Previously Named Sangamon State University until June, 1995

Name: MELISSA LYNN ROBINSON

Student ID: 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

Date of Birth: 02/04/72 Issue Date: 11/14/01

Prior Academic History:

| School | | | Degree | Date | Hours | Accepted |
|---|---|---|---|---|---|---|
| R MORRIS-AFTER 86 | CHICAGO | IL | AAS | 1993 | 68.0 | 60.0 |
| LINCOLN LAND COM COL | SPRINGFIELD | IL | | | 4.0 | [illegible] |

SPRING 1994
WORKING WOMEN IN THE 90'S PAC 404 B- 4.0
FOUNDATIONS OF PSYCHOLOGY PSY 301 B 4.0
SEM ATT- [illegible] PTS- 25.2 GPA- [illegible] ERN- [illegible]
CUM ATT- [illegible] PTS- 25.2 GPA- 3.15 ERN- [illegible]

FALL 1994
COGNITIVE PSYCHOLOGY PSY 304 [illegible] 4.0
CHILD DEVELOPMENT PSY 422 [illegible] 4.0
SEM ATT- 8.0 PTS- 25.2 GPA- 3.15 ERN- 8.0
CUM ATT- 16.0 PTS- 50.4 GPA- 3.15 ERN- [illegible]

SPRING 1995
QUANTITATIVE METH/BEHAV SCI. PSY 311 B- 4.0
SEM ATT- [illegible] PTS- 10.[illegible] GPA- 2.70 ERN- 4.0
CUM ATT- [illegible] PTS- 61.2 GPA- 3.0[illegible] ERN- [illegible]

FALL 1995
INTRO TO BIOPSYCHOLOGY PSY 412 [illegible] 4.0
LIFE SPAN DEVELOPMENTAL PSY PSY 421 [illegible] 4.0
SEM ATT- [illegible] PTS- 21.2 GPA- 2.65 ERN- 8.0
CUM ATT- 28.0 PTS- 82.4 GPA- 2.94 ERN- [illegible]

SPRING 1996
EXPERIMENTAL PSYCHOLOGY PSY 308 A [illegible]
SEM ATT- [illegible] PTS- 16.[illegible] GPA- [illegible] ERN- 4.0
CUM ATT- [illegible] PTS- 98.[illegible] GPA- 3.0[illegible] ERN- [illegible]

SUMMER 1996
CONCEPTIONS/HUMAN NATURE/DESTINY PAC 40[illegible] [illegible] 4.0
THE [illegible] PAC 407 [illegible] 4.0
SEM ATT- [illegible] PTS- 30.[illegible] GPA- 3.85 ERN- 8.0
CUM ATT- 40.0 PTS- 129.2 GPA- 3.2[illegible] ERN- [illegible]

FALL 1996
ISSUES,PROB,REFORM/EDUCATION PAC 4[illegible] B+ [illegible]
THEORIES OF PERSONALITY PSY 4[illegible] B 4.0
ABNORMAL PSYCHOLOGY PSY 446 A 4.0
SEM ATT- 12.0 PTS- 41.2 GPA- 3.[illegible] ERN- 12.0
CUM ATT- 52.0 PTS- 170.[illegible] GPA- 3.28 ERN- 1[illegible]

SPRING 1997
FANTASY ENG 48[illegible] CR 4.0
EDUC POLICY:HIS,FORMAT,N,ANALY PAC 4[illegible] B [illegible]
TOPICS:PSYCHOBIOLOGY/VIOLENCE PSY 400 A 4.0
SEM ATT- 8.0 PTS- 28.0 GPA- [illegible].50 ERN- 12.0
CUM ATT- 60.0 PTS- 198.4 GPA- [illegible].31 ERN- [illegible]
*AWARDED B.A. IN PSYCHOLOGY ON 5/[illegible]/97

FALL 1997
CHILD PSYCHOPATHOLOGY/THERAPY PSY 55[illegible] B 4.0
SEM ATT- 4.0 PTS- 12.0 GPA- 3.00 ERN- [illegible]
CUM ATT- 4.0 PTS- 12.0 GPA- 3.00 ERN- [illegible]

FALL 1998
SOCIAL RESEARCH METHODS S[illegible] 403 [illegible] 4.0
SEM ATT- [illegible].0 PTS- 16.0 GPA- [illegible].00 ERN- 4.0
CUM ATT- 8.0 PTS- 28.0 GPA- [illegible].50 ERN- [illegible]
****************END OF TRANSCRIPT****************

Page 1 of 1

Official Transcript issued to:

MS. KAREN L MCNAUGHT
ASSISTANT ATTORNEY GENERAL
500 SOUTH SECOND STREET
SPRINGFIELD, ILLINOIS 62706

REJECT DOCUMENT IF SIGNATURE BELOW IS DISTORTED

Registrar

This [illegible] is printed on blue SCRIP-SAFE® paper with the [illegible] printed [illegible] type across the face of the document. A raised seal is not required. When photocopied the word COPY should appear. A BLACK ON WHITE OR A COLOR COPY SHOULD NOT BE ACCEPTED!

AN OFFICIAL SIGNATURE IS WHITE WITH A BLUE BACKGROUND

BROWN STAINS INDICATE UNAUTHORIZED ALTERATIONS

TRANSCRIPT GUIDE PRINTED ON BACK

# TRANSCRIPT EXPLANATION

University of Illinois at Springfield
P.O. Box 19243
Springfield, Illinois 62794-9243
Office of Enrollment Services
Phone (217) 206-6709 Fax (217) 206-6620
www.uis.edu/~enroll/reg1.html

## HISTORY

The University opened in 1970 as Sangamon State University and became University of Illinois at Springfield in July, 1995.

## ACCREDITATION

University of Illinois at Springfield is accredited by the Commission on Institutions of Higher Education of the North Central Association of Colleges and Schools. In addition, some programs are individually accredited by their respective associations.

## RELEASE OF INFORMATION

The Family Educational Rights and Privacy Act of 1974 prohibits release of this record or its contents to any third party without the written consent of the student.

## COURSE NUMBERING

Until September 1973, courses were identified by the title only. An asterisk was used to designate those courses for which graduate credit was awarded.

Since fall 1973, courses have been numbered as follows:

| | |
|---|---|
| 300-399 | Undergraduate level |
| 400-499 | Undergraduate or graduate depending on the student level |
| 500-599 | Graduate level |

## CREDIT HOURS

Until August 1973, credit hours were expressed in quarter hours. Since fall 1973, semester hours have been used.

## GRADING SYSTEM

*1970 through summer 1982*

| | | |
|---|---|---|
| A | = | Excellent |
| B | = | Good |
| C | = | Passing* |
| S | = | Satisfactory (credit only course) |
| AU | = | Audit |
| I | = | Incomplete |
| NC | = | No Credit** |

* Fall 1972-1979 – C grades unsatisfactory for graduate credit; fall 1979 and after, C may count for graduate credit in some programs.

**Grades of NC do not appear on the transcript prior to 1982.

No GPAs are computed prior to 1982 because of the non-punitive nature of its grading system.

*Beginning fall 1982*

Calculated

| | |
|---|---|
| A | 4.0 |
| A- | 3.7 |
| B+ | 3.3 |
| B | 3.0 |
| B- | 2.7 |
| C+ | 2.3 |
| C | 2.0 |
| C- | 1.7 |
| D+ | 1.3 |
| D | 1.0 |
| D- | 0.7 |
| U | 0.0 |

Not Calculated

| | |
|---|---|
| *CR | Credit |
| NC | No Credit |
| AU | Audit |
| I | Incomplete |
| R | Deferred |
| W | Withdrawal |

* Effective fall 1984 CR equal to B or better for graduate students; C or better for undergraduates.

**TO TEST FOR AUTHENTICITY:** The face of this document has a blue background and the name of the institution appears in small print. Apply fresh liquid bleach to the sample background printed below. If authentic, the paper will turn brown.

UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD • UNIVERSITY OF ILLINOIS AT SPRINGFIELD •

**ADDITIONAL TEST:** When photocopied, the word COPY appears prominently across the face of the entire document. ALTERATION OR FORGERY OF THIS DOCUMENT MAY BE A CRIMINAL OFFENSE! A black and white document is not an original and should not be accepted as an official institutional document. This transcript cannot be released to a third party without the written consent of the student. This is in accordance with the Family Educational Rights and Privacy Act of 1974. If you have additional questions about this document, please contact the Office of the Registrar at (217) 786-6709.

U.S. Patent 5,171,040

SCRIP-SAFE® Security Products, Inc., Cincinnati, OH

ROBERT MORRIS COLLEGE • OFFICE OF REGISTRAR • CHICAGO, IL 60601

ROBERT MORRIS COLLEGE
Office of the Registrar
Chicago, IL 60601

Printed Date 11/04/93

SCH-M-1421
MELISSA SCHROEDER
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
MAJOR: LEGAL SECRETARIAL
ENROLLMENT DATE: 07/16/90

11/8/93

| | AWARDED |
|---|---|
| CERTIFICATE: | |
| DIPLOMA: | 04/26/91 |
| AAS DEGREE: | 09/20/91 |
| BBA DEGREE: | |

| COURSE | TITLE | GRADE | HA | HE | PTS |
|---|---|---|---|---|---|
| JULY 1990 | | | | | |
| ~~BUS 001~~ | ~~TEN KEY MODULE~~ | ~~P~~ | ~~0.0~~ | ~~0.0~~ | ~~0.0~~ |
| DAP 100 | BUS COMP SYST | B | 4.0 | 4.0 | 12.0 |
| MAT 111 | COLLEGE ALGBRA | A | 4.0 | 4.0 | 16.0 |
| SEC 102 | DOC FORMAT/WP | A | 4.0 | 4.0 | 16.0 |
| SEC 123 | FUND BUS COM 1 | A | 4.0 | 4.0 | 16.0 |
| QTR GPA: 3.75 | | | HA: 16.0 | HE: 16.0 | PTS: 60.0 |
| CUM GPA: 3.75 | | | HA: 16.0 | HE: 16.0 | PTS: 60.0 |
| SEPTEMBER 1990 | | | | | |
| ~~BUS 200~~ | ~~LEGAL ENVRN BUS~~ | ~~A~~ | ~~4.0~~ | ~~4.0~~ | ~~16.0~~ |
| ENG 104 | COMPOSITION 1 E | A | 4.0 | 4.0 | 16.0 |
| SEC 103 | DOC PRODCTN/WP | A | 4.0 | 4.0 | 16.0 |
| SEC 107 | PRIN GREGG SHT1 | P | 0.0 | 2.0 | 0.0 |
| SEC 124 | FUND BUS COM 2 | A | 4.0 | 4.0 | 16.0 |
| QTR GPA: 4.00 | | | HA: 16.0 | HE: 18.0 | PTS: 64.0 |
| CUM GPA: 3.65 | | | HA: 32.0 | HE: 34.0 | PTS: 124.0 |
| DECEMBER 1990 | | | | | |
| COM 101 | INTRO TO COM E | B | 4.0 | 4.0 | 12.0 |
| ENG 105 | COMPOSITION 2 | A | 4.0 | 4.0 | 16.0 |
| SEC 104 | ADV WP APPS | A | 4.0 | 4.0 | 16.0 |
| SEC 108 | GREGG SHORTHAND | A | 2.0 | 2.0 | 8.0 |
| SEC 125 | APP BUS COM 1 | A | 4.0 | 4.0 | 16.0 |
| SEC 140 | LEGAL APPS 1 | A | 4.0 | 4.0 | 16.0 |
| QTR GPA: 3.82 | | | HA: 22.0 | HE: 22.0 | PTS: 84.0 |
| CUM GPA: 3.71 | | | HA: 54.0 | HE: 56.0 | PTS: 208.0 |
| FEBRUARY 1991 | | | | | |
| COM 111 | CAREER DEV | A | 4.0 | 4.0 | 16.0 |
| SEC 113 | ADM SUP SYS PRO | B | 4.0 | 4.0 | 12.0 |
| SEC 120 | DICT & TRAN 1 | B | 4.0 | 4.0 | 12.0 |
| SEC 126 | APP BUS COM 2 | A | 4.0 | 4.0 | 16.0 |
| SEC 141 | LEGAL APPS 2 | A | 4.0 | 4.0 | 16.0 |
| QTR GPA: 3.60 | | | HA: 20.0 | HE: 20.0 | PTS: 72.0 |
| CUM GPA: 3.68 | | | HA: 74.0 | HE: 76.0 | PTS: 280.0 |
| APRIL 1991 | | | | | |
| ENG 210 | ARG ANLSYS RES E | A | 4.0 | 4.0 | 16.0 |
| SEC 121 | DICT & TRAN 2 | A | 2.0 | 2.0 | 8.0 |
| SSC 201 | MACROECONOMICS SS | B | 4.0 | 4.0 | 12.0 |
| SSC 220 | SOCIOLOGY AGING SS | A | 4.0 | 4.0 | 16.0 |
| QTR GPA: 3.71 | | | HA: 14.0 | HE: 14.0 | PTS: 52.0 |
| CUM GPA: 3.69 | | | HA: 88.0 | HE: 90.0 | PTS: 332.0 |
| JULY 1991 | | | | | |
| HUM 210 | BUS ETHICS H | B | 4.0 | 4.0 | 12.0 |
| SSC 120 | PSYCHOLOGY SS | A | 4.0 | 4.0 | 16.0 |
| SSC 202 | MICROECONOMICS | A | 4.0 | 4.0 | 16.0 |
| QTR GPA: 3.67 | | | HA: 12.0 | HE: 12.0 | PTS: 44.0 |
| CUM GPA: 3.69 | | | HA: 100.0 | HE: 102.0 | PTS: 376.0 |

E N D O F T R A N S C R I P T

ROBERT MORRIS COLLEGE FOUNDED 1913

Sen / HA 67
HE 68
pts 2[illegible]
gpa 3.69

Linda L. Lee

# LINCOLN LAND COMMUNITY COLLEGE

SPRINGFIELD, ILLINOIS 62794-9256

OK 4-7-97

STUDENT NUMBER 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

STUDENT TRANSCRIPT RECORD FOR:
SCHROEDER MELISSA L
4093 CAMELOT DR
DECATUR IL 62526

DATE OF BIRTH: 02/04/72
YEAR ENTERED: 1996
TERM ENTERED: SPRING
HIGH SCHOOL ATTENDED: 144270
YEAR GRADUATED:

| COURSE NAME | DEPT. | COURSE NO. | CR. HRS. | GRADE | GRADE POINTS |
|---|---|---|---|---|---|
| * * * * SEMESTER SYSTEM BEGINS FALL 74 * * * * * | | | | | |
| SPRING 96 | | | | | |
| GENERAL BIOLOGY LS | BIO | 101 | 4.0 | A | |
| 4.00 4.00 16.00 4.00 4.00 4.00 16.00 4.00 | | | | | |
| * * * DEGREES EARNED FROM LINCOLN LAND COMMUNITY COLLEGE * | | | | | |
| * * * NO DEGREES ON FILE * * * | | | | | |
| * * * NO EVALUATIONS ON FILE * * * | | | | | |

CONDITION OF DISMISSAL

RAISED SEAL NOT REQUIRED
Printed on security paper

Director, Admissions/Records & Registrar

SIGNED: ____________
REGISTRAR

DATE: APR 03 1997

**CERTIFICATE OF SERVICE**

Karen L. McNaught, Assistant Attorney General, hereby certifies that she has served a copy of the foregoing documents from University of Illinois at Springfield, which previously were subpoenaed by the undersigned, upon:

Melissa M. McGrath
Thomson & Weintraub
105 N. Center Street
P.O. Box 3577
Bloomington, Illinois 60702-3577

Diane M. Baron
Clausen Miller, P.C.
10 S. LaSalle Street
Chicago, Illinois 60603

John E. Cassidy
Cassidy & Mueller
323 Commerce Bank Building
416 Main Street
Peoria, Illinois 61602

Robert E. Gillespie
Hinshaw & Culbertson
400 S. Ninth Street
Springfield, Illinois 62701

by depositing a copy of same in a correctly addressed, prepaid envelope and depositing same in the United States Mail in Springfield, Illinois, on December 17, 2001.

KAREN L. McNAUGHT
Assistant Attorney General

KAREN L. McNAUGHT
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
217/782-5819

(b) On or about July 26th, 1996, Judge Sappington began to inquire about my personal life, i.e., the state of my marriage. On one occasion on or about July 29, 1996, Judge Sappington offered to purchase a sexual device for me. Also beginning at this period, Judge Sappington would remark about my personal appearance, noting that I had a "beautiful body"; that he felt "I was a goddess". He also introduced me to individuals in the courthouse saying, "This is Missy Schroeder, not only is she very beautiful, but she is also very intelligent." He once noted to me that he watched for my vehicle to arrive at work. Judge Sappington also discouraged any verbal contact between myself and men who had business with the Circuit Court.

(c) On or about August 19, 1996, Judge Sappington accused me of carrying on an affair with a local attorney. As a result of Judge Sappington's feelings towards me, Judge Sappington indicated he could no longer handle cases of that particular attorney, despite my report that nothing had occurred, nor was occurring, between myself and this attorney.

(d) On or about September 9, 1996, Judge Sappington approached me, placed my face in his hands and forced me to gaze at him. Judge Sappington indicated if he learned I was "shacking up with" anyone, he would kill me.

(e) On or about September 12, 1996, Judge Sappington directed me to his courtroom and directed me to lock the door. Judge Sappington proceeded to explain his previous behaviors by indicating he was attempting to deal with the issue of mortality and with his feelings toward me. Judge Sappington further indicated to me I should not resign from my position, and further that he would never let his feelings toward me again get out of hand. Therefore, I presumed these behaviors would cease.

(f) In mid-September, 1996 Judge Sappington responded that he would like nothing more than to publicly kiss me in front of court personnel and note their reaction. I expressed to him my disgust with his remark. He, however, merely shrugged off my concern with a laugh.

(g) On or about September 18, 1996, Judge Sappington told me that he had shared with another court personnel member that he (Judge Sappington) "would let me sit on his face". On the following day Judge Sappington inquired as to whether I had any questions with regard to our conversation of September 18. Out of fear for his authority over me, I indicated that I had no questions. He proceeded to tell me he would "not do anything until after I was divorced." I abruptly left his office.

(h) In September 1996, Judge Sappington's behaviors appeared irrational; he complained about my providing assistance to other judges within the Sixth Circuit and my contact with local attorneys.

(i) Again, in October 1996, Judge Sappington's behaviors included glaring at me and remarking about my personal appearance.

(j) On or about October 3, 1996, Judge Sappington summoned me along with an Assistant State's Attorney to his Courtroom. Upon my inquiry he explained he had done so to discuss a recent murder victim indicating that because I was "beautiful and naive", I, too, would some day face rape and murder the same way this victim had.

(k) On numerous occasions I was in tears as a result of Judge Sappington's behaviors but had no avenue to turn to. I had never received a personnel policy nor a sex harassment policy at the onset or during my employment with the County.

(l) On October 11, 1996, it became clear to me that Judge Sappington's sexually harassing behaviors would not cease. During trial testimony, a local attorney appeared in the courtroom while I, too, was present as Judge Sappington's clerk. The local attorney approached me to ask me to go to Judge Steadman's chambers to address a scheduling conflict in a particular case. When I left the courtroom, Judge Sappington suddenly stopped the proceedings, leaving the courtroom in the middle of a witnesses testimony. He stormed into the chambers and called the local attorney into his chambers for further discussion. Since that day, this local attorney is no longer permitted to bring his cases in front of Judge Sappington. Judge Sappington's behaviors on this day made it clear to me that his treatment and view toward me was based on his sexist viewpoint.

On October 11, I left work after having taken ill as a result of Judge Sappington's behaviors. On that same date, I phoned the Presiding Judge, and related my concerns about Judge Sappington's sexually harassing behaviors toward me. The Presiding Judge reported that he had spoke with Judge Sappington previously about his behaviors toward me and assured me he would again speak with him. There was nothing done to remedy Judge Sappington's behaviors. Before leaving work, I left a note for Judge Sappington indicating I believed his behaviors were improper.

(m) As a result of Judge Sappington's behaviors, I took a two day administrative leave. Upon my return I reported my concerns about Judge Sappington's behaviors to the Administrative Assistant to the Presiding Judge of the Circuit.

(n) From October 11, 1996, to my date of resignation, it was obvious to myself and others within the county courthouse that Judge Sappington's behaviors toward me were improper. His behaviors since October 11, 1996, progressively caused me to fear being in his presence.

(o) In late November 1996, I was informed by the Presiding Judge that I was being transferred to work with a different judge within the circuit. I was told that due to ongoing rumors about his behaviors, Judge Sappington had to be "protected."

(p) During this period of time, although I considered leaving the position to return to school full-time, because of my financial situation, I could not do so. The Presiding Judge informed me I had a week to decide whether to accept the transfer or resign.

(q) On November 21, 1996, Judge Sappington indicated to me he did not believe his behaviors were improper. I reported these remarks to the Presiding Judge of the circuit, who responded merely that he understood how I felt and that Judge Sappington had not realized how "obvious" he had made his feelings toward me known. On the same day Judge Sappington further indicated to me he had observed my vehicle in the county parking lot in the evening hours. This, too, caused me grave concern because he specified the exact time at which I departed from the parking lot.

(r) On November 22, 1996, Judge Sappington informed me I was to promptly make my decision with regard to whether to transfer or resign. I was further told that if I chose to resign, a number of other individuals would not have to switch positions within the court structure. By this point, I felt very much pressured to resign.

(s) On November 25, 1996, I expressed to the Presiding Judge that I intended to accept the transfer. However, the Presiding Judge then informed me that in his view, the transfer was not "in my best interest." The Presiding Judge further told me that the judge whom I was being transferred to work with had expressed dissatisfaction with the rearrangement. The Presiding Judge further told me, "I would be treated as though I was the problem and not the victim."

(t) The Presiding Judge of the Circuit Court also indicated it was in my "best interest to resign."

(u) I asked the Presiding Judge whether I could be transferred to a judge who was not dissatisfied with the transfer; the Presiding Judge indicated this was not possible.

(v) On November 27, 1996, the Presiding Judge again pressured me for my decision. I was under extreme pressure to resign. I ultimately indicated to the Presiding Judge that I would do so. However, I felt no other option was provided to me.

(w) My employer failed to provide any policy or procedure for handling complaints of sexual harassment and did not educate the staff, nor supervisors nor members of the judiciary, in regard to this topic.

(x) I was isolated in my lines of communication and had no known alternative to address the sexual harassment perpetrated upon me by Judge Sappington -- short of being forced to resign as a result of it.

(y) During the month of December I was ill on a number of occasions as a result of the behaviors perpetrated upon my by Judge Sappington as well as my employer's failure to adequately or address in any property fashion my complaints of sexual harassment.

(z) The Presiding Judge wanted me to indicate in writing I was resigning for school purposes, I refused to do so. During my conversation in regards to my resignation, the Presiding Judge conceded that I should indicate in my resignation letter that I was "resigning because I was working for idiots who did not know how to deal with a situation."

(aa) The effects of the sexually harassing behavior as well as my employer's reaction to it -- forcing me to resign has brought about grave emotional distress which I continue to experience.

2. **Wrongful Discharge.** I was forced to resign from my position in order that my employer not have to address the improper behaviors perpetrated upon me by Judge Sappington. Rather, my employer forced me to resign from my position as judicial clerk and provided me no support, nor avenues to adequately remedy the problem at hand. No action was ever taken against Judge Sappington for his known sexually harassing behaviors.

(a) I was employed by Macon County as a Judicial Clerk to Judge Sappington from March 1994 to January 1997. In January 1997, I was compelled to resign from my position as a result of my employers' unwillingness to address my continual complaints of Judge Sappington's sexually harassing behaviors.

(b) On or about July 26th, 1996, Judge Sappington began to inquire about my personal life, i.e., the state of my marriage. On one occasion on or about July 29, 1996, Judge Sappington offered to purchase a sexual device for me. Also beginning at this period, Judge Sappington would remark about my personal appearance, noting that I had a "beautiful body"; that he felt "I was a goddess". He also introduced me to individuals in the courthouse saying, "This is Missy Schroeder, not only is she very beautiful, but she is also very intelligent." He once noted to me that he watched for my vehicle to arrive at work. Judge Sappington also discouraged any verbal contact between myself and men who had business with the Circuit Court.

(c) On or about August 19, 1996, Judge Sappington accused me of carrying on an affair with a local attorney. As a result of Judge Sappington's feelings towards me, Judge Sappington indicated he could no longer handle cases of that particular attorney, despite my report that nothing had occurred, nor was occurring, between myself and this attorney.

(d) On or about September 9, 1996, Judge Sappington approached me, placed my face in his hands and forced me to gaze at him. Judge Sappington indicated if he learned I was "shacking up with" anyone, he would kill me.

(e) On or about September 12, 1996, Judge Sappington directed me to his courtroom and directed me to lock the door. Judge Sappington proceeded to explain his previous behaviors by indicating he was attempting to deal with the issue of mortality and with his feelings toward me. Judge Sappington further indicated to me I should not resign from my position, and further that he would never let his feelings toward me again get out of hand. Therefore, I presumed these behaviors would cease.

(f) In mid-September, 1996 Judge Sappington responded that he would like nothing more than to publicly kiss me in front of court personnel and note their reaction. I expressed to him my disgust with his remark. He, however, merely shrugged off my concern with a laugh.

(g) On or about September 18, 1996, Judge Sappington told me that he had shared with another court personnel member that he (Judge Sappington) "would let me sit on his face". On the following day Judge Sappington inquired as to whether I had any questions with regard to our conversation of September 18. Out of fear for his authority over me, I indicated that I had no questions. He proceeded to tell me he would "not do anything until after I was divorced." I abruptly left his office.

(h) In September 1996, Judge Sappington's behaviors appeared irrational; he complained about my providing assistance to other judges within the Sixth Circuit and my contact with local attorneys.

(i) Again, in October 1996, Judge Sappington's behaviors included glaring at me and remarking about my personal appearance.

(j) On or about October 3, 1996, Judge Sappington summoned me along with an Assistant State's Attorney to his Courtroom. Upon my inquiry he explained he had done so to discuss a recent murder victim indicating that because I was "beautiful and naive", I, too, would some day face rape and murder the same way this victim had.

(k) On numerous occasions I was in tears as a result of Judge Sappington's behaviors but had no avenue to turn to. I had never received a personnel policy nor a sex harassment policy at the onset or during my employment with the County.

(l) On October 11, 1996, it became clear to me that Judge Sappington's sexually harassing behaviors would not cease. During trial testimony, a local attorney appeared in the courtroom while I, too, was present as Judge Steadman's clerk. The local attorney approached me to ask me to go to Judge Sappington's chambers to address a scheduling conflict in a particular case. When I left the courtroom, Judge Sappington suddenly stopped the proceedings, leaving the courtroom in the middle of a witnesses testimony. He stormed into the chambers and called the local attorney into his chambers for further discussion. Since that day, this local attorney is no longer permitted to bring his cases in front of Judge Sappington. Judge Sappington's behaviors on this day made it clear to me that his treatment and view toward me was based on his sexist viewpoint.

On October 11, I left work after having taken ill as a result of Judge Sappington's behaviors. On that same date, I phoned the Presiding Judge, and related my concerns about Judge Sappington's sexually harassing behaviors toward me. The Presiding Judge reported that he

had spoke with Judge Sappington previously about his behaviors toward me and assured me he would again speak with him. There was nothing done to remedy Judge Sappington's behaviors. Before leaving work, I left a note for Judge Sappington indicating I believed his behaviors were improper.

(m) As a result of Judge Sappington's behaviors, I took a two day administrative leave. Upon my return I reported my concerns about Judge Sappington's behaviors to the Administrative Assistant to the Presiding Judge of the Circuit.

(n) From October 11, 1996, to my date of resignation, it was obvious to myself and others within the county courthouse that Judge Sappington's behaviors toward me were improper. His behaviors since October 11, 1996, progressively caused me to fear being in his presence.

(o) In late November 1996, I was informed by the Presiding Judge that I was being transferred to work with a different judge within the circuit. I was told that due to ongoing rumors about his behaviors, Judge Sappington had to be "protected."

(p) During this period of time, although I considered leaving the position to return to school full-time, because of my financial situation, I could not do so. The Presiding Judge informed me I had a week to decide whether to accept the transfer or resign.

(q) On November 21, 1996, Judge Sappington indicated to me he did not believe his behaviors were improper. I reported these remarks to the Presiding Judge of the circuit, who responded merely that he understood how I felt and that Judge Sappington had not realized how "obvious" he had made his feelings toward me known. On the same day Judge Sappington further indicated to me he had observed my vehicle in the county parking lot in the evening hours. This, too, caused me grave concern because he specified the exact time at which I departed from the parking lot.

(r) On November 22, 1996, Judge Sappington informed me I was to promptly make my decision with regard to whether to transfer or resign. I was further told that if I chose to resign, a number of other individuals would not have to switch positions within the court structure. By this point, I felt very much pressured to resign.

(s) On November 25, 1996, I expressed to the Presiding Judge that I intended to accept the transfer. However, the Presiding Judge then

informed me that in his view, the transfer was not "in my best interest." The Presiding Judge further told me that the judge whom I was being transferred to work with had expressed dissatisfaction with the rearrangement. The Presiding Judge further told me, "I would be treated as though I was the problem and not the victim."

(t) The Presiding Judge of the Circuit Court also indicated it was in my "best interest to resign."

(u) I asked the Presiding Judge whether I could be transferred to a judge who was not dissatisfied with the transfer; the Presiding Judge indicated this was not possible.

(v) On November 27, 1996, the Presiding Judge again pressured me for my decision. I was under extreme pressure to resign. I ultimately indicated to the Presiding Judge that I would do so. However, I felt no other option was provided to me.

(w) My employer failed to provide any policy or procedure for handling complaints of sexual harassment and did not educate the staff, nor supervisors nor members of the judiciary, in regard to this topic.

(x) I was isolated in my lines of communication and had no known alternative to address the sexual harassment perpetrated upon me by Judge Sappington -- short of being forced to resign as a result of it.

(y) During the month of December I was ill on a number of occasions as a result of the behaviors perpetrated upon my by Judge Sappington as well as my employer's failure to adequately or address in any property fashion my complaints of sexual harassment.

(z) The Presiding Judge wanted me to indicate in writing I was resigning for school purposes, I refused to do so. During my conversation in regards to my resignation, the Presiding Judge conceded that I should indicate in my resignation letter that I was "resigning because I was working for idiots who did not know how to deal with a situation."

(aa) The effects of the sexually harassing behavior as well as my employer's reaction to it -- forcing me to resign has brought about grave emotional distress which I continue to experience.

## MEMORANDUM OF AGREEMENT

We, Virginia Ronczkowski ("Mother") and Paul Ronczkowski ("Father") met on July 29, August 17, October 4, October 11, November 15, and 18, 2004 with Karen Anderson in order to develop a parenting plan for our children, Thaddeus, born March 4, 1991; and Emma, born February 17, 1995. Through mutual negotiation we have reached the following agreements and desire that those agreements be incorporated into our legal settlement.

## PARENTING SCHEDULE

The children's primary physical residence will be with Mother. The parents have agreed on joint custody.

Mother and Father will share in the parenting of their children and they will support them visiting with each other. Both parents understand the need to cooperate and remain flexible in developing and implementing the parenting schedule. The following time schedule has been agreed upon by the parents:

a) Father will spend alternate weekends with the children from Friday at 3:30 p.m. until Monday at 8:00 a.m.

b) Father will spend Wednesdays with the children from 3:30 p.m. Wednesday to 8:00 a.m. Thursday each week.

c) Father will spend the Monday after Mother's weekend with the children from 3:30 p.m. to 8:00 p.m. During the summer and when there is no school on Tuesday during the school year, the children will be returned Tuesday morning at 8:00 a.m.

c) The children can spend additional time with Father by mutual agreement of the parents.

## HOLIDAYS

Both parents will support the children visiting with each other. Holidays supercede the regular parenting schedule and will be spent as follows:

a) Thanksgiving, 2004 will be spent with Mother from after school the Wednesday before the holiday until Friday at 3:00 p.m. The children will then spend from 3:00 p.m. Friday until 8:00 p.m. Sunday with Father. This schedule will alternate yearly with Mother starting the rotation in all even numbered years and Father starting the rotation in all odd numbered years.

EXHIBIT
A
03 D 661

STATE OF ILLINOIS

ILLINOIS DEPARTMENT OF HUMAN RIGHTS

RECEIVED
JUN 20 1997
DEPT. OF HUMAN RIGHTS

IN THE MATTER OF

MELISSA SCHROEDER

Complainant,

vs.

MACON COUNTY - MACON COUNTY CIRCUIT COURT DIVISION/SOI ADMINISTRATIVE OFFICE OF THE COURTS/JUDGE WARREN SAPPINGTON

Respondents.

CHARGE NO. 1997SF0777

VERIFIED ANSWER AND RESPONSE OF MACON COUNTY

NOW COMES the County of Macon, a body politic and corporate, by Joe McGlaughlin, Chairman of the Macon County Board, and for its Verified Answer and Response solely and pursuant to the charge of discrimination states as follows:

1. Sex Harassment. The Respondent, County of Macon, a body politic and corporate, herein after referred to as Respondent, states that with respect to the allegations of paragraph 1(a) the County of Macon did not hire Complainant. Complainant was hired by the Macon County Circuit Judges as a Clerk/Steno in March of 1994 and her job title was changed to Judicial Clerk on December 1, 1995. Respondent states that Complainant was hired by and employed as a Judicial Clerk by the Macon County Circuit Court Judges. Complainant was paid by Macon County, but her employment was entirely controlled by the Macon County Circuit Court. Respondent further is without sufficient information to form a belief with respect to further allegations set forth in paragraph 1(a).

2. With respect to allegations of paragraphs 1(b) through (j), Respondent states that it is without sufficient information to form a belief with respect to any allegations contained sub-paragraphs (b) through (j).

3. With respect to paragraph 1(k) Respondent states that it is without sufficient information to form a belief with respect to the allegations contained in the first sentence of paragraph 1(k). Respondent denies each and every allegation contained in the second sentence of paragraph 1(k).

4. That with respect to Complainant's paragraph 1(l), Respondent states that it is without sufficient information to form a belief with respect to the allegations contained in both paragraphs within sub-paragraph (l), and further states that said paragraphs appear to be a narrative of certain allegations of matters occurring solely between Complainant and the Honorable Judge Warren Sappington.

5. That with respect to paragraph 1 sub-paragraphs (m) through (v), Respondent states that it is without sufficient information to form a belief with respect to such allegations. Respondent further states that said sub-paragraphs again to appear to be a narrative of allegations of events for a period of time October 11, 1996 through November 27, 1996 which said allegation of events appear to have taken place exclusively between Complainant and Judges Honorable Warren Sappington and Honorable John Greanias.

6. Respondent denies each and every allegation contained in paragraph 1(w).

7. With respect to paragraph 1(x), Respondent denies each and every allegation contained in the sub-paragraph, particularly with respect to any implication that Complainant is referring in said sub-paragraph to Respondent Macon County.

8. With respect to that portion of paragraph 1(y) which pertains to the allegation of illness on the part of Complainant and the cause of said illness, Respondent states that it is without sufficient information to form a belief with respect to such allegation; with respect to that portion of sub-paragraph referring to "employer's failure," Respondent denies each and every allegation with respect to said charge of failure to address.

9. With respect to paragraph 1(z) Respondent is without sufficient information to form a belief with respect to such allegations.

10. With respect to paragraph 1(aa), Respondent denies each and every allegation with respect to such allegations as Complainant may imply Respondents' knowledge, participation or actions.

11. <u>WRONGFUL DISCHARGE</u>. Respondent denies each and every allegation contained in paragraph 2.

12. With respect to paragraph 2(a) Respondent admits the Complainant was employed as a Judicial Clerk, and admits that she was paid as a result of her employment as Judicial Clerk through a check issued by the County of Macon, denies she was employed by Macon County in said sub-paragraph with respect to the implication that Complainant refers to Macon County as her "employers'

unwillingness" and further states that with respect to each and every other allegation contained in said sub-paragraph, that Respondent is without sufficient information to form a belief with respect to said allegations.

13. With respect to paragraph 2 sub-paragraph (b) through (j), Respondent states that it is without sufficient information to form a belief with respect to allegations contained within said sub-paragraphs and further state that said sub-paragraphs appear to be a narrative of allegations of matters occurring between Complainant and the Honorable Judge Warren Sappington between July 26, 1996 and October 3, 1996.

14. With respect to paragraph 2 (k) Respondent states that it is without sufficient information to form a belief with respect to allegations contained in the first sentence of said sub-paragraph. With respect to the second sentence of sub-paragraph (k) Respondent denies each and every allegation contained in said sentence.

15. With respect to paragraph 2 sub-paragraphs (l) through (v), Respondent states that it is without sufficient information to form a belief with respect to such allegations and further states that said sub-paragraphs appear to be a narrative of alleged events including verbal and personal contact occurring between Complainant and the Honorable Judge Warren Sappington and the Honorable Judge John Greanias occurring between October 11, 1996 and November 27, 1996, which said oral and verbal contact appeared to be made privately between said parties, the content of which Respondent has no knowledge.

16. With respect to paragraph 2(w), Respondent denies each and every allegation with respect to said sub-paragraph as the same could be implied by Complainant to pertain to Respondent herein.

17. With respect to paragraph 2(x), Respondent denies each and every allegation with respect to said sub-paragraph as the same could be implied by Complainant to pertain to Respondent herein.

18. With respect to paragraph 2(y), Respondent states that it is without sufficient information to form a belief with respect to allegations of illness on the part of Complainant, nor with the conclusory statements made by Complainant as to the occasion of said illness. Respondent further states that it denies each and every allegation of sub-paragraph (y) as the same may be implied by Complainant to be alleged activity or lack thereof on the part of Respondent.

19. With respect to paragraph 2(z), Respondent states that it is without sufficient information to form a belief with respect to the allegations of said sub-paragraph.

20. With respect to paragraph 2(aa), Respondent denies each and every allegation contained in said sub-paragraph as the same may be implied by Complainant to be directed toward Respondent herein.

THEREFORE, the Respondent, County of Macon and prays that the Complaint and each paragraph thereof be dismissed.

RESPONSE

1. The County of Macon states that with respect to the Complainant, Melissa Schroeder, it should be noted that Melissa

**NOTICE OF FILING**

I hereby certify that on March 28, 2005, I presented the foregoing document to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

Mr. John Cassidy
CASSIDY & MUELLER
323 Commerce Bank Bldg.
416 Main Street
Peoria, IL 61602

Ms. Diane M. Barron, Esq.
Clausen Miller PC
10 South La Salle Street
Chicago, Illinois 60603-1098

Ms. Karen McNaught
Assistant Attorney General
ILLINOIS ATTORNEY GENERAL'S OFFICE
500 S. Second Street
Springfield, Illinois 62706

By: s/ Melissa M. McGrath
Melissa M. McGrath Attorney Bar No. 6207263
Attorney for Plaintiff
Thomson & Weintraub
105 North Center Street
Bloomington, Illinois 61701
Phone: (309) 829-7069
Fax: (309) 827-3458
E-mail: mmcgrath@tnwlaw.com

Subscribed and sworn to before me this 28 day of March, 2005.

Notary Public

"OFFICIAL SEAL"
Angela M. Park
Notary Public, State of Illinois
My Commission Exp. 10/21/2008

FILED
2005 JAN 19 P 2:28
KATHY A. HOTT
CIRCUIT CLERK

IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
MACON COUNTY, ILLINOIS

MACON COUNTY, ILLINOIS,

Plaintiff,

vs.

MELISSA ROBINSON, ASSOCIATE JUDGE WARREN SAPPINGTON and the, STATE OF ILLINOIS

Defendants.

No. 05 MR 49

**COMPLAINT**
**FOR DECLARATORY JUDGMENT**

Now comes the Plaintiff, MACON COUNTY, a municipal corporation, ("MACON COUNTY"), by its attorneys, CASSIDY & MUELLER, and pursuant to 735 ILCS 5/2-701 brings this Complaint for Declaratory Judgment against Defendants, MELISSA ROBINSON, ASSOCIATE JUDGE WARREN SAPPINGTON and the STATE OF ILLINOIS. In support of this cause of action, MASON COUNTY shows to the Court:

1. This cause of action is brought pursuant to 735 ILCS 5/2-701 for a declaration of the rights and obligations of the parties as a result of an Opinion interpreting a novel question of Illinois law entered by the Seventh Circuit Court of Appeals, *Robinson v. Sappington, et.al.*, 351 F. 3d 317 (7th Cir. 2003) (herein the "underlying case"). A copy of the Opinion is designated as Exhibit A, attached to this Complaint and made a part hereof.

2. On December 9, 2003, the Federal Court of Appeals, Seventh Circuit, issued an opinion from an appeal filed by MELISSA ROBINSON reversing in part and affirming in part the entry of summary judgment by the United States District Court, Central District of Illinois under allegations of sexual discrimination in violation of Title VII of the Federal Civil Rights



Act. The Seventh Circuit, without the issue being raised by any party, stated, as a matter of first impression under what it inferred to be Illinois law, that MACON COUNTY is a necessary party to the Title VII litigation. The Seventh Circuit relied on the Illinois Supreme Court's decision in *Carver v. Sheriff of LaSalle County,* 203 Ill. 2d 497, 787 N.E. 2d 127 (Ill. 2003) in stating that an Illinois county *may* have the obligation to fund a Title VII judgment entered against a Circuit Court Judge's employer, the STATE OF ILLINOIS.

3. The *Robinson v. Sappington, et.al.*, 351 F. 3d 317 (7th Cir. 2003) decision has created an actual case and controversy between MACON COUNTY and MELISSA ROBINSON, ASSOCIATE JUDGE WARREN SAPPINGTON and the STATE OF ILLINOIS regarding a question of Illinois law where there are no controlling precedents under the novel facts presented in the pending federal Title VII action.

4. Relying on *Carver*, the Seventh Circuit stated that MACON COUNTY may be responsible for payment of an adverse Title VII judgment against the STATE OF ILLINOIS. Specifically, it stated:

> "We believe that the implied rule from the Supreme Court of Illinois' decision in *Carver II* applies with equal force in the present case. The responsibility for maintaining and funding the Macon County Circuit Court lies with Macon County. Under Illinois law, it is responsible for the payment of expenses and judgments emanating from the workings of that court. *** Therefore, because Macon County has a financial interest in the outcome of this action, it is a necessary party." *Robinson v. Sappington*, 351 F.3d at 338.

5. The Seventh Circuit's statement that MACON COUNTY is a necessary party and that it may be responsible for paying a Title VII judgment entered against the STATE OF ILLINOIS misinterprets the reasoning and holding of *Carver v. Sheriff of LaSalle County, Illinois,* 203 Ill. 2d 497, 787 N.E. 2d 127 (Ill. 2003) and in so doing misapprehends and misinterprets Illinois law.

6. No Illinois statute or legal precedent has answered the question of whether a county may be responsible for funding an adverse Title VII judgment against the STATE OF ILLINOIS as the employer of the alleged harasser, an associate circuit court judge.

7. An actual case and controversy exists between the parties to this cause because of the Seventh Circuit's misinterpretation of Illinois law. Specifically, in the event of a judgment in favor of the Plaintiff and against the State of Illinois based on the conduct of judicial employees of the State of Illinois the State of Illinois may look to MACON COUNTY to fund that judgment. Absent an interpretation of Illinois law by the courts of Illinois the *dicta* of the Seventh Circuit therefore creates a potential liability where none would otherwise exist.

8. The funding dilemma addressed in the *Carver* decisions only arises if the defendant who must satisfy the judgment has no legal means to raise funds to make payment on its own behalf. As *Carver* decisions found, this dilemma arises under Illinois' unique governmental scheme relating to County Officers under Article VII of the Illinois Constitution. But, it does not exist when the defendant subject to payment of a judgment is the STATE OF ILLINOIS.

9. Furthermore, the *Carver* decisions examined the responsibility for funding of a judgment entered against a *named defendant*, the Sheriff of LaSalle County. In the *Robinson* opinion, the Seventh Circuit did not ask if MACON COUNTY was responsible for funding the defendant, the STATE OF ILLINOIS, but rather only examined whether MACON COUNTY had responsibility for maintaining and funding the "Macon County Circuit Court", a non-legal entity that is not and can not be a defendant in ROBINSON'S Title VII action.

10. In ROBINSON'S Title VII action, there are only two Defendants, the STATE OF ILLINOIS and MACON COUNTY. Although JUDGE WARREN A. SAPPINGTON has been

sued, a Title VII claim can only be brought against SAPPINGTON'S employer, the STATE OF ILLINOIS, because only an "employer" may be found liable for discrimination under Title VII. 42 U.S.C. Section 2000(e)(b) (1994); *Williams v. Banning*, 72 F. 3d 552, 554 (7th Cir. 1995). Accordingly, Plaintiff's action against JUDGE WARREN SAPPINGTON must be construed as an "official capacity" action brought against the STATE OF ILLINOIS. In footnote 9 of the *ROBINSON* opinion, the Seventh Circuit reached that conclusion, stating:

> "In the present case, there is no question that *Judges Sappington and Shonkwiler are employees of the State of Illinois*. As such, *any harassment inflicted by them on lower level state employees under their direction can be imputed to the State of Illinois*. *Ms. Robinson*, by naming Judges Sappington and Shonkwiler in their official capacities, *has sought to hold viable the State of Illinois for the judges' actions*, and, indeed the attorney general has appeared on behalf of the judges throughout this litigation.
>
> *** Therefore, because all parties acknowledge that the State of Illinois was, at the very least, Ms. Robinson's joint employer with the County, *we consider the vicarious liability of the State of Illinois for the harassment of Judge Sappington*." (Emphasis added). (See also Section D of December 9, 2003 opinion). *ROBINSON*, 351 F. 3d at 332,

11. In that the only two Defendants in this action are the STATE OF ILLINOIS and MACON COUNTY, the Seventh Circuit's conclusion that MACON COUNTY is a necessary party to this litigation *implies* that MACON COUNTY is responsible for satisfying a judgment entered against the STATE OF ILLINOIS.

12. MACON COUNTY does not dispute that so long as it is a direct defendant hereunder, subject to employer liability under Title VII, that it is responsible for satisfying any judgment entered against it. (See 745 ILCS 10/9-102 (West 2000)). However, Illinois law does not require MACON COUNTY to satisfy a Title VII judgment entered against the co-defendant, the STATE OF ILLINOIS, and therefore is not a necessary party under the *Carver* reasoning.

13. The *Carver* decisions[1] that were relied upon for "implying" Illinois law in the *Robinson* opinion addressed only one fundamental issue: Under Illinois law, how are federal judgments entered against independently elected county officers[2] satisfied if the county officer (i.e. a Sheriff) does not have the power to levy a tax to procure the funds which are required for that purpose? In *Carver v. Sheriff of LaSalle County, Illinois*, 243 F. 3d 379 (7th Cir. 2001)(*Carver I*), the Seventh Circuit was faced with an appeal from former employees of the LaSalle County Sheriff's Department who had obtained a Title VII judgment against the LaSalle County Sheriff pursuant to settlement. The former employees had filed collection proceedings against the County of LaSalle under Rule 69 of the Federal Rules of Civil Procedure seeking satisfaction of the settlement judgment entered against the LaSalle County Sheriff's Office. the Seventh Circuit recognized that Illinois law had not answered the question of how a federal judgment entered against an independently elected county officer would be satisfied when the county officer had no taxation or appropriation abilities. To obtain an answer, the following question was certified to the Illinois Supreme Court:

> "Whether, and if so when, Illinois law requires counties to pay judgments entered against a sheriff's office in an official capacity. If [the Supreme Court of Illinois] believes that the answer depends on whether the case was settled as opposed to litigated, we would welcome treatment of that distinction as well."

The Illinois Supreme Court accepted the certified question and answered it in *Carver II.*

14. In deciding the certified question, the Illinois Supreme Court underwent a two step process stating that "the resolution of this question involves the interpretation of statutes

---

[1] *Carver v. Sheriff of LaSalle County, Illinois*, 243 F.3d 379 (7th Cir. 2001) (*Carver I*); *Carver v. Sheriff of LaSalle County, Illinois*, 203 Ill. 2d 497, 787 N.E. 2d 127 (Ill. 2003) (*Carver II*) and *Carver v. Sheriff of LaSalle County, Illinois*, 324 F.3d 947,(7th Cir. 2003) (*Carver III*).

[2] Under Article VII, (Local Government) §4(b) of the Constitution of Illinois, independently elected county officers are defined as follows, "Each county shall elect a sheriff, county clerk, and treasurer and may elect or appoint a coroner, recorder, assessor, auditor and such other officers as provided by law or county ordinance." (Ill. Const.1970, Art. VII §4(b).

found within the Tort Immunity Act (745 ILCS 10/1-101 *et. seq.* (West 2000)) and the Counties Code (55 ILCS 5/1-1001 et seq. (West 2000)". *Carver II*, 203 Ill 2d at 506.

15. The first step towards resolution of the question involved the Illinois Supreme Court's analysis of the LaSalle County Sheriff's statutory ability under Illinois law to settle claims and pay judgments. It focused on Sections 9-102 of the Tort Immunity Act (745 ILCS 10/9-102) to answer this initial issue.

16. The court held that the LaSalle County Sheriff's Office was a "local public entity" within Section 1-206 and therefore turned its attention to the issue of whether Section 9-102 of the Tort Immunity Act authorized the sheriff to settle claims and pay federal judgments, stating:

> "Having found that the office of sheriff is a "local public entity," we return to an examination of section 9-102 of the Tort Immunity Act, the statutory provision which is at the crux of the dispute between the parties." *Carver II*, 203 Ill.2d at 515.

17. The Supreme Court held: (1) Section 9-102 empowered the sheriff to settle the Title VII action, and (2) required the sheriff's office to pay the "tort judgment or settlement for compensatory damages for which *it*...is liable" (emphasis in *Carver II*, 203 Ill.2d 515).

18. *Carver II* places statutory responsibility for paying the federal judgment upon the LaSalle County Sheriff, not the County of LaSalle. As applied to the underlying case this means that the STATE OF ILLINOIS, not MACON COUNTY, is responsible for the payment of *its* own judgments.

19. The statutory construction of 9-102, requiring a defendant to pay its own judgments, when coupled with a judgment entered against an Article VII county officer who has no ability to pay, created a "dilemma" because 9-102 "is silent with respect to the specific mechanism for funding the judgment". *Carver II*, 203 Ill.2d 516. The supreme court recognized

that the sheriff is an independently elected county officer under Article VII (Local Government) of Illinois' Constitution (*Carver II,* 203 Ill.2d 512-513) but lacks the authority to levy taxes and establish a budget. *Carver II,* 203 Ill.2d 516. That "dilemma" required the court to under take the second prong in the process of answering the certified question; Who would *fund* the sheriff's obligation to pay?

20. In addressing the funding question, the court relied upon Section 4-6003 of the Counties Code, 55 ILCS 5/4-603 (West 2000). That provision dictates that county sheriffs are to be financed by public funds appropriated by the county board. By extension, the court determined that the county's financing obligations toward the sheriff also required the county to fund the payment of judgments entered against the sheriff, stating:

> As stated, although the office of sheriff is constitutionally created (Ill. Const.1970, art. VII, § 4(c)), and the sheriff is an independently elected county officer, the county sheriff lacks the authority to levy taxes or establish a budget. Instead, the General Assembly has determined that the sheriff's office is to be financed by public funds appropriated to it by the county board. See 55 ILCS 5/4-6003 (West 2000); 55 ILCS 5/5-1106 (West 2000). We conclude that, under this statutory scheme, the county is obligated to provide funds to the county sheriff to pay official capacity judgments entered against the sheriff's office. *Carver II,* 203 Ill.2d 516.

21. Under the *Carver II,* the County of LaSalle was required to finance a Title VII federal settlement judgment entered against an Article VII county officer, the LaSalle County Sheriff, who had no independent ability to levy taxes or appropriate funds to pay the judgment.

22. The Seventh Circuit opinion in the underlying case states that MACON COUNTY is a necessary party to this litigation under Rules 17 and 19 of the Federal Rules of Civil Procedure, thereby implying that Illinois law may require it to fund any Title VII judgment entered against the STATE OF ILLINOIS. As the table below illustrates, the funding dilemma found in *CARVER* does not exist *in this case.*

| LaSalle County Sheriff (*Carver* decisions) | State of Illinois |
|---|---|
| 1. Sheriff is an independently elected county officer under Art. VII, §4(b) of the Illinois Constitution and "Local Public Entity" under §2-106 and §9-102 of the Illinois Tort Immunity Act. | 1. The State is not an elected Article VII county officer and §2-106 of Illinois Tort Immunity Act specifically excludes the State or any office, officer, department, or division from the definition of a "local public entity". |
| 2. As an independently elected county officer and "Local Public Entity", the Sheriff is legally required to pay its Title VII judgments under §9-102 of the Illinois Tort Immunity Act. But, Section 9-102 is silent with respect to the funding mechanism. | 2. Since State is not a "local public entity", the State is not subject to the payment obligations of §9-102 of the Illinois Tort Immunity Act. (But, the State nonetheless must pay federal Title VII judgment obligations. See *Nanda v. Bd. of Trustees of the Univ. of Illinois,* 303 F.3d 817 (7th Cir.2002).). |
| 3. The sheriff, an independently elected county officer, has no authority to levy taxes or establish a budget to obtain funds to pay Title VII judgments. | 3. The State has the authority to levy taxes and appropriate funds for the payment of Title VII judgments under Articles VIII (Finance) and IX (Revenue) of the Illinois Constitution and the Illinois Court of Claims Act. (See, *Preston v. Thompson*, 565 F. Supp. 294, 301 (N.D.Ill. 1983) |
| 4. **Dilemma** – Who funds the sheriff's obligation to pay its Title VII judgments? | 4. **There is no funding dilemma**. The State does pay its own Title VII judgment obligations through the Court of Claims Act. |
| 5. *Carver II's* Answer to dilemma - Since the county is obligated to wholly finance the sheriff's office under Section 4-6003 of the County Codes, it must also finance payment of the sheriff's Title VII judgments | 5. Since there is no dilemma, no answer is required. The State simply pays its own judgment obligations. Furthermore, no statute requires the county to finance *the State of Illinois*. |

23. The *Carver II* decision simply answers the judgment funding problems that arise under Illinois' unique scheme of electing and financing independently elected county officers. If an Article VII county officer were empowered to levy a tax or otherwise appropriate funds for the payment of a federal judgment, there would be no need to determine if a third party should be held responsible.

24. In this case, the only defendant other than MACON COUNTY is the STATE OF ILLINOIS. Under Illinois law, the STATE OF ILLINOIS has no similar funding limitations to those suffered by a county sheriff. Unlike the LaSalle County Sheriff, or other Article VII elected county officers, the Court of Claims Act (See, *Preston v. Thompson*, 565 F. Supp. 294, 301 (N.D.Ill. 1983)) gives the State authority to pay judgments against it and the power to raise revenues.