E-FILED
Friday, 08 April, 2005  03:38:05 PM
Clerk, U.S. District Court, ILCD

**504**                    **541 FEDERAL SUPPLEMENT**

ful distinction between public defenders and guardians ad litem for Section 1983 purposes.

[7, 8] Complaint ¶¶ 71 and 72 also allege M. Lawrence Goodman is responsible for supervising all guardians ad litem and thus caused—in a supervisory role—the incompetent representation of Clay. Again the situation is indistinguishable from that of public defenders. If Goodman indeed had such responsibility, it would be an administrative function subject to only a good faith immunity. Because the Complaint adequately alleges a cause of action for administrative malfeasance, Complaint ¶¶ 71 and 72 shall stand while Paragraphs 68–70 are stricken.

### Count XI

[9] Count XI attempts to state a cause of action against the Circuit Court for establishing a policy that led to Clay's injuries. Under Rule 17(b) this Court must again look to state law to determine if the Circuit Court is an entity capable of being sued.

Illinois Constitution Art. 6, § 7(a) provides:

The State shall be divided into Judicial circuits consisting of one or more counties.

Ill.Rev.Stat. ch. 37, § 72.1 implements that provision:

The County of Cook shall be one judicial circuit and the State of Illinois, exclusive of the County of Cook, shall be and is divided into judicial circuits as follows....

Those as well as all the other provisions establishing the Illinois court system demonstrate the state was divided into various circuits for the administrative convenience of the judges who actually operate the courts. Thus the Circuit Court of Cook County is nothing more than a geographical

division to determine which judges as a group will handle which cases. This Court finds the Circuit Court is not an entity that can be sued under Rule 17(b). Count XI is dismissed.[3]

### Count XII

[10] Count XII alleges a cause of action for malpractice under Illinois law against Friedman, Harris, Doherty and Katz. Defendants have raised no substantive objection to that Count. Because some of Clay's federal allegations survive this opinion, Count XII is properly part of this case as to Doherty and Katz under this Court's pendent jurisdiction.

But permitting a pendent state law claim against Friedman and Katz poses a different problem. All federal law claims against them have been dismissed, and they could remain parties to this action solely on the basis of the pendent state claim.

Although some question exists whether such pendent *party* jurisdiction should be judged by all the same standards as pendent *claim* jurisdiction,[4] any reasoned exercise of discretion here requires dismissal of Friedman and Harris from this action. Maintenance of Clay's action against their supervisors Doherty and Katz will require proof of prior incompetent representation by Friedman and Harris. But such evidence is likely inadmissible in a malpractice action against Friedman and Harris under Fed.R.Evid. 404(b). And even if it *might* technically be relevant, Clay's jury demand and the potential of prejudice would probably cause its exclusion under Fed.R.Evid. 403. Thus a trial of the pendent claims against Friedman and Harris simultaneously with the federal and pendent claims against all other defendants would pose hazards that would far outweigh any resulting economies of scale.

---

3.  Even were the Circuit Court an entity capable of being sued under Rule 17(b), it would in all likelihood be absolutely immune from suit under Section 1983 under the doctrine of judicial immunity.

4.  See, *Hixon v. Sherwin-Williams Co.*, 671 F.2d 1005 (7th Cir. 1982); *United States ex rel. Hoover v. Franzen*, 669 F.2d 433 (7th Cir. 1982). Doherty, Katz and Goodman are involved on a pendent claim basis in Counts XII and XIV.



CLAY v. FRIEDMAN 505
Cite as 541 F.Supp. 500 (1982)

In short this Court finds that retaining Friedman and Harris in this action solely on a pendent state law claim would not serve the interests of "judicial economy, convenience and fairness to litigants...." *United ed Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Count XII shall therefore remain only as to Doherty and Katz.

### Count XIII

Count XIII attempts to state a cause of action under Illinois law against the Office of the Public Defender of Cook County. For the reasons discussed as to Count IX, Count XIII is also dismissed.

### Count XIV

Count XIV asserts a cause of action under Illinois law against Goodman and unnamed members of the Office of the Guardian Ad Litem. Because Goodman remains before this Court on a federal law claim (Count X), this Court will permit Count XIV's additional pendent claims as to him.[5] But the Complaint's cryptic reference to "unnamed subordinates" (Paragraphs 84 and 85) appears to rest on an unspecified failure of unidentified staff members to protect Clay's interests (see Paragraph 70). Pendent party considerations make this Court reluctant to permit Clay to inject such persons into the litigation without more specifics to justify doing so. If and when Clay provides such particulars, the issue can be dealt with on an informed basis.

### Count XV

Count XV attempts to state a cause of action under Illinois law against the Circuit Court. Just as with Count XI, Count XV is dismissed.

### Count XVI

Complaint ¶¶ 91, 92 and 93 assert a claim against Friedman under the assumption he was appointed guardian ad litem for Clay.

3. This Court expresses no opinion as to the viability of Count XIV should Goodman prevail

As already stated, no Section 1983 cause of action exists against guardians ad litem. Accordingly those paragraphs are stricken.

[11] Complaint ¶ 94 alleges Doherty, Katz, Goodman, the Circuit Court, the Public Defender and the County of Cook failed to take appropriate supervisory actions necessary to prevent the court-appointed guardian ad litem from providing incompetent representation for Clay. That paragraph is stricken because:

(1) Neither the Circuit Court nor the Public Defender is a suable entity.

(2) Count X already alleges a cause of action against Goodman for supervisory malfeasance.

(3) There is no allegation supporting the notion that Doherty or Katz had any supervisory powers over a guardian ad litem.

(4) There is no allegation as to what supervisory actions were not taken, so that the whole paragraph does not comply even with the notice pleading requirement of Rule 8.

Complaint ¶ 75 alleges that Friedman, Katz, Goodman, the Circuit Court, Public Defender and County of Cook are liable under Illinois law for Friedman's actions in his role as a guardian ad litem. Most of that paragraph must also be stricken for the same reasons just discussed. All that might survive is the pendent claim against Friedman, and that is stricken for the reasons expressed as to Count XII.

### Count XVII

[12] Count XVII alleges a cause of action against Cook County for promulgating policies and customs that caused all the alleged harms to Clay. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 96 S.Ct. 2018, 56 L.Ed.2d 611 (1973). Under this Court's regularly-applied standard of pleading, Clay has adequately alleged a custom or policy of Cook County that could have caused Clay's in-

on his summary judgment motion.

Sept. 25th, 2002-May 4th, 2004

I was called in on September 25th 2002. I was berated and then harassed for about four months by Steve with threats of time off without pay and time with him riding with me all day if my production numbers don't rise they were well off the company goal.  Very emotionally I told Steve that I was doing the best that I could and that if he thinks I'm not giving 100% then he needs to just ride with me for the week and then compare the numbers.  He never took me up on my offer however two weeks later Steve called me into his office and stated the he found why my production is so high. I was using the wrong work codes. I was doing 760's these are meter exchanges I completed maybe 5 a day and my completion code was wrong causing my production to jump.  Other employees knew to use a certain code but I didn't which made me upset. I found out later that Steve on individual tailgates taught white employees how to trick the CAD system in getting better production numbers.  After making the correction I was one of the best in 760 productions in our area.  I had to tell Steve's supervisor myself what happen and why such a change in my production numbers.  I asked Steve to put this event in writing due to the treats of time off.  As usual I never received anything in writing.   Steve knows that my production issues are a reporting problem.  Gaps in time and other CAD issues are training issues NOT falsification. It's ironic that only Eric and I have these problems. My training comes from helpful white employees not from Steve these employees are amazed that I didn't know half of what can be helpful in reporting and shaving time. When I asked where they get this information I'm told at Steve's tailgates. I can honestly say I have been not been given the same information and Eric will admit the same.  Steve by splitting up tailgates can dictate who gets what information clearly unfair and racially motivated.

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

RECEIVED
APR 0 7 1998
DEPT. OF HUMAN RIGHTS

In the Matter of:                              )
                                               )
MELISSA SCHROEDER,                             )
                                               )
        Complainant,                           )
                                               )
vs.                                            )    Charge Number 1997SF0777
                                               )
MACON COUNTY, MACON COUNTY                     )
CIRCUIT COURT DIVISION and                     )
STATE OF ILLINOIS, ADMINISTRATIVE             )
OFFICE OF THE ILLINOIS COURTS,                 )
                                               )
        Respondents.                           )

## RESPONSE TO REQUEST FOR FURTHER INFORMATION

Come now the respondents, Administrative Office of the Illinois Courts and Warren Arthur Sappington, by and through their counsel, James E. Ryan, Attorney General of the State of Illinois, and hereby respond to the Request for Further Information in the instant matter. In support thereof, the following statements are made:

QUESTION 1

What legal entity is Macon County Circuit Court Division a division of?

RESPONSE:

Respondents cannot answer the question of what division Macon County Circuit Court Division is. This was an arbitrary title given by complainant in attempting to bring her claim. Respondents previously have noted to the Illinois Department of Human Rights that "Macon County Circuit Court Division" does not exist as an entity.

Without waiving this argument, the Illinois judiciary was created by Article VI of the Constitution of the State of Illinois of 1970. Accordingly, judicial power is vested in one Supreme Court of Illinois, one appellate court of Illinois (comprised of five appellate divisions), and the circuit courts (of which there are twenty-one circuits serving 102 counties). See Constitution of the State of Illinois of 1970, Art. VI, §§ 1, 7. The Circuit Courts Act (705 ILCS 35/1 et seq. (1996)) provides that the

Macon County
58b

Sixth Judicial Circuit is comprised of Champaign, Douglas, Moultrie, <u>Macon</u>, DeWitt, and Piatt Counties (705 ILCS 35/1 (1996)[emphasis added]). However, the circuits are a geographic division to determine which judges as a group will handle which cases and are not capable of suing or being sued. *Clay v. Friedman*, 541 F. Supp. 500, 504 (N.D. Ill. 1982). Rather, the circuits comprise, in part, the judiciary of the State of Illinois.

## QUESTION 2

What, if any, is the relationship between the entity named in #1 above and the Illinois Administrative Office of the Courts [sic]?

## RESPONSE

As previously stated, the Macon County Circuit Court Division is not an entity. Without waiving this argument, the Constitution of the State of Illinois of 1970 created the Illinois judiciary. *See* Constitution of the State of Illinois of 1970, Art. VI, §1. The chief justice of the Supreme Court of Illinois is responsible for the administration of all courts in this State. *See* Constitution of the State of Illinois of 1970, Art. VI, §16; Supreme Court Rule 30. The Supreme Court of Illinois appoints an administrative director and staff to administer and supervise all of these courts. *See* Constitution of the State of Illinois of 1970, Art. VI, §16; Supreme Court Rule 16. The administrative director and his (or her) staff comprise the Administrative Office of the Illinois Courts.

## QUESTION 3

What, if any, statutory authority defines the legal existence of the Illinois Administrative Office of the Courts [sic] and the legal entity named in answer to #1 above?

## RESPONSE

As previously stated, Macon County Circuit Court Division is not a legal entity. Without waiving this argument, Article VI, §§1 and 16 of the Constitution of the State of Illinois of 1970 as well as Supreme Court Rule 30 define the existence of the Administrative Office of the Illinois Courts. Article VI, §7 and the Circuit Court Act (705 ILCS 35/1 *et seq.* (1996)) define the existence of the circuit courts of which Macon County belongs to the Sixth Judicial Circuit. However, the circuits are not capable of suing or being sued as a legal entity. *See Friedman v. Clay*, 541 F. Supp. 500, 504 (N.D. Ill. 1982). Rather, the circuits are part of the judiciary of the State of Illinois. *Id.* at 504.

Respectfully submitted,

ADMINISTRATIVE OFFICE OF THE ILLINOIS
COURTS and WARREN ARTHUR SAPPINGTON,
Respondents,

JAMES E. RYAN, Attorney General
State of Illinois,
Attorney for Respondents,

KAREN L. McNAUGHT, #06200462
Assistant Attorney General
500 South Second Street
Springfield, IL  62706
(217) 782-9092

BY: _____
KAREN L. McNAUGHT
Assistant Attorney General

Of Counsel.

3

## CERTIFICATE OF SERVICE

Karen L. McNaught, Assistant Attorney General, hereby certifies that she

has served the foregoing Response to Request for Further Information upon:

> Libby J. Miller
> Charge Processing Division
> Illinois Department of Human Rights
> 222 S. College Street, Room 101A
> Springfield, Illinois 62706

by causing it to be hand delivered in Springfield, Illinois on April 7, 1998.

KAREN L. McNAUGHT
Assistant Attorney General

KAREN L. McNAUGHT
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62706
217/782-9092

Charge No. 1997SF0777
Page 2

IV.  **Jurisdiction**

|  | |
|---|---|
| Alleged Violation | A-D. October 13, 1996 to November 23, 1996<br>E-H. November 23, 1996 |
| Charge Filed<br>(Amendments if any) | April 11, 1997 |
| Number of Employees | 15+ |

V.  **Uncontested Facts**

A.  Complainant was hired in March 1994 as a secretary to Judge Sappington.  In January 1996 the position of secretary was given the title of Judicial Clerk.

B.  Judge Sappington was Complainant's supervisor throughout her employment.

C.  Complainant resigned her position on November 23, 1996 to be effective January 11, 1997; however, Complainant's actual last day of work was December 13, 1996.

VI.  **Allegation A: Sexual Harassment (Respondent #1)**

A.  **Prima facie case**

1.  Complainant is a member of a protected class in that she is female.

2.  A member of management, Judge Sappington, engages in at least two incidents of sexual conduct that are not trivial in nature.

3.  Respondent had knowledge of the harassment.

4.  The alleged harasser, Judge Sappington, was Complainant's supervisor and thus Respondent is strictly liable for any unwelcome sexual conduct of the harasser.

5.  The conduct created a hostile, intimidating, and offensive work environment for Complainant and substantially interfered with Complainant's ability to perform her job.

Charge No. 1997SF0777
Page 3

B.  **Finding**

    1.  Lawrence R. Fichter, State's Attorney of Macon County, states
that Complainant was hired by the Macon County Circuit Judges
as a Judicial Clerk.  Complainant was paid by Macon County but
her employment was entirely controlled by the Circuit Court.
Respondent #1 had no day-to-day contact with the Complainant.

    2.  No testimony has been offered by the Complainant to indicate
that Respondent #1 did have knowledge of the alleged sexual
harassment or that they had authority over the alleged
harasser.

    3.  Evidence supports Respondent's position that they were not
Complainant's employer and, therefore, a Lack of Jurisdiction
finding is recommended.

VII. **Allegation B: Sexual Harassment (Respondent #2)**

A.  **Prima facie case**

    1.  Complainant is a member of a protected class in that she is
female.

    2.  A member of management, Judge Sappington, engaged in at least
two incidents of sexual conduct that are not trivial in nature.

    3.  Respondent had knowledge of the harassment.

    4.  The alleged harasser, Judge Sappington, was Complainant's
supervisor and thus Respondent is strictly liable for any
unwelcome sexual conduct of the harasser.

    5.  The conduct created a hostile, intimidating, and offensive
work environment for Complainant and substantially interfered
with Complainant's ability to perform her job.

B.  **Findings**

    1.  Nathan Maddox, Assistant Director of the Administrative Office
of Illinois Courts, states that Respondent 2 is not considered
an employer of Complainant and thus should not be named as a
Respondent.  Mr. Maddox states that Respondent 2 has no
day-to-day involvement in the local oversight of judges or
their staff.  The policies and procedures are implemented at
the circuit court level by the chief judge, presiding judge,
or his or her designee.

0088

APO

## 1.33 COMMUNICATION WITH COURT

I do not anticipate that you will need to communicate with me. If you do need to communicate with me, the only proper way is in writing. The writing must be signed by the presiding juror, or, if he or she is unwilling to do so, by some other juror. The writing should be given to the marshal, who will give it to me. I will respond either in writing or by having you return to the courtroom so that I can respond orally.

[If you do communicate with me, you should not indicate in your note what your numerical division is, if any.]

7th Circuit etc

Shelly
type
title
from other
pages



## 1.32 SELECTION OF PRESIDING JUROR;
## GENERAL VERDICT

Upon retiring to the jury room, you must select a presiding juror. The presiding juror will preside over your deliberations and will be your representative here in court.

Forms of verdict have been prepared for you.

[Forms of verdict read.]

(Take these forms to the jury room, and when you have reached unanimous agreement on the verdict, your presiding juror will fill in, date, and sign the appropriate form.)

OR

(Take these forms to the jury room, and when you have reached unanimous agreement on the verdict, your presiding juror will fill in and date the appropriate form, and all of you will sign it.)

38

Source 7th Circuit Pattern Civil Instructions.
(18 October 2004)

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

IN THE MATTER OF:                    )
                                     )
MELISSA SCHROEDER,                   )
                                     )
               COMPLAINANT,          )        CHARGE NO.  1997SF0777
AND                                  )        EEOC NO.    21B972090
                                     )
1.  MACON COUNTY,                    )
2.  ILLINOIS ADMINISTRATIVE          )
    OFFICE OF THE COURTS,            )
3.  JUDGE WARREN SAPPINGTON,         )
4.  JOHN P. SHONKWILER, CHIEF        )
    JUDGE OF THE SIXTH JUDICIAL      )
    CIRCUIT/MACON COUNTY CIRCUIT)
    COURT,                           )
               RESPONDENT.           )

REQUEST FOR REVIEW

        Ms. Diane M. Baron
        Clausen  Miller, PC
        Attorneys at Law
        10 South LaSalle Street
        Chicago, IL  60603


TO:    Ms. Melissa Schroeder

DATE:  August 3, 1998

REQUEST FOR REVIEW FILING DEADLINE:  September 8, 1998

        I hereby request that the Department of Human Rights' dismissal
of the charge be reviewed by the Chief Legal Counsel of the
Department.
        IN THE SPACE PROVIDED BELOW, YOU MUST LIST AND DESCRIBE THE
SPECIFIC REASONS THAT THE CHARGE SHOULD NOT HAVE BEEN DISMISSED.  If
applicable, you may write on the back of this form or attach
information or documents, which support your Request for Review.

_____


_____              _____
 SIGNATURE                             DATE

YOU MUST ENCLOSE THE ORIGINAL AND THREE COPIES OF YOUR ENTIRE REQUEST
AND SIGN, DATE AND HAVE THIS FORM POSTMARKED OR HAND DELIVERED BY THE
FILING DEADLINE DATE ABOVE, TO:

Chief Legal Counsel, Illinois Department of Human Rights,
100 West Randolph Street, Suite 10-100, Chicago, IL  60601.

THIS FORM MAY NOT BE SENT VIA TELEFAX.

NOD/SE
12/97

STATE OF ILLINOIS )
                   ) ss
COUNTY OF COOK   )                FILE NO(S) <u>1997SF0777</u>

### AFFIDAVIT OF SERVICE

Gloria J. Polk, being first duly sworn, on oath states that she served a copy of the attached <u>NOTICE OF SUBSTANTIAL EVIDENCE AND</u> <u>NOTICE OF DISMISSAL</u>  on each person named below by depositing same this 3rd day of August, 1998, in the U. S. Mail Box at 100 West Randolph Street, Chicago, Illinois, 60601, properly posted for FIRST CLASS MAIL, addresses as follows:

_____

      Ms. Diane M. Baron
      Clausen  Miller, PC
      Attorneys at Law
      10 South LaSalle Street
      Chicago, IL  60603

                                    _____
                                      Gloria J. Polk

SUBSCRIBED and SWORN to before me this 3rd day of August, 1998.

_____
      NOTARY PUBLIC

```
"OFFICIAL SEAL"
Marilyn Sanchez
Notary Public, State of Illinois
My Commission Expires Aug. 7, 2001
```

<u>PLEASE NOTE:</u>

      The above signed persons are responsible only for <u>mailing</u> these documents.  If you wish a review of the findings in this case you must complete the Request for Review form attached.  Department staff are not permitted to discuss the investigation findings once a Notice of Dismissal has been issued.

STATE OF ILLINOIS
DEPARTMENT OF HUMAN RIGHTS

IN THE MATTER OF:                    )
                                     )
MELISSA SCHROEDER,                   )
                                     )
                 COMPLAINANT,        )        CHARGE NO.   1997SF0777
AND                                  )        EEOC NO.     21B972090
                                     )
1.  MACON COUNTY,                    )
2.  ILLINOIS ADMINISTRATIVE          )
    OFFICE OF THE COURTS,            )
3.  JUDGE WARREN SAPPINGTON,         )
4.  JOHN P. SHONKWILER, CHIEF        )
    JUDGE OF THE SIXTH JUDICIAL )
    CIRCUIT/MACON COUNTY CIRCUIT)
    COURT,                           )
                 RESPONDENT.         )

## NOTICE OF SUBSTANTIAL EVIDENCE
## AND NOTICE OF DISMISSAL

TO:

      Ms. Diane M. Baron
      Clausen Miller, PC
      Attorneys at Law
      10 South LaSalle Street
      Chicago, IL  60603

DATE:  August 3, 1998
REQUEST FOR REVIEW FILING DEADLINE: September 8, 1998

The enclosed investigation report notes that the charge in this matter involves the following allegations of civil rights violations:

### DISMISSAL

YOU ARE HEREBY NOTIFIED that, based on the investigation conducted by DHR, as reflected in the enclosed report, the Director has concluded that there is a lack of jurisdiction in support of allegation(s) I, A, B, E, F and I, G.

### PROCEDURE

If you disagree with the dismissal of the allegation(s) you may seek review by filing a "Request for Review" with the CHIEF LEGAL COUNSEL (CLC) of the Department, on the attached form by the filing deadline indicated above.

If you file a "Request for Review," Respondent will be notified by the CLC.

If an EEOC charge number is cited above, this charge was also filed with the Equal Employment Opportunity Commission (EEOC). If this charge alleges a violation under Title VII of the Civil Rights Act of 1964, as amended, or the Age Discrimination in Employment Act of 1967, Complainant has the right to request EEOC to perform a Substantial Weight Review of this dismissal.

should have free access to all school records, teachers, administrators, etc., and will make every effort to advise the other of their school activities in hopes that both parents will be active participants in their education and socialization. Both parents will check the school website for a copy of the calendar and other pertinent school information including when report cards are sent home with the children, school picture days, extra-curricular schedules, etc. If something is sent home with the children that is not on the website, the parent receiving the information will provide the other parent with a copy of the note or call to leave the pertinent information. They will attend separate parent teacher conferences.

## HEALTH CARE

Routine decisions as to health care for the children will be made by the parent with whom the children are residing on the date that such becomes necessary. Mother will coordinate all dental and immunization appointments and Father will coordinate all routine physical checkups and optometry appointments. Both parties recognize that in a medical emergency either parent can act without prior consultation with the other parent. The parent who acts in regard to the medical emergency care will contact the other person as soon as possible.

In the event a child requires major surgery or other recommended medical procedures, the parents will consult with each other about the appropriateness of the treatment. They will agree on a course of action that is in the best interest of that child. If they are unable to agree on treatment, they will seek a second opinion from an agreed upon specialist If that opinion is the same as the first, they will follow through with treatment. If it is not the same, they will seek a third opinion from a mutual agreed upon specialist and go with the two recommendations that are most similar.

Both parents agree that the children may participate in counseling if necessary. They further agree they will participate with their children as requested by the therapist.

## RELIGION

Both parents agree the children may participate in religious activities with both parents.

## CHANGES IN CIRCUMSTANCES

If a major change, such as a move to a different geographic location, change in work schedule or the remarriage of a parent should occur which would make this parenting agreement impractical, the agreement will be renegotiated and modified as necessary.

537 N.E.2d 784
127 Ill.2d 453, 537 N.E.2d 784, 130 Ill.Dec. 455
**(Cite as: 127 Ill.2d 453, 537 N.E.2d 784, 130 Ill.Dec. 455))**

Page 1

Supreme Court of Illinois.
Michael A. ORENIC, Judge, et al., Petitioners,
v.
The ILLINOIS STATE LABOR RELATIONS
BOARD, Respondent (The County of Cook et
al., Intervenors-Respondents).
No. 66984.

March 29, 1989.

Four chief judges brought action for writ of prohibition or mandamus against State Labor Relations Board, seeking to forbid Board to consider counties as joint employers of court employees. The Supreme Court, Stamos, J., held that Board cannot consider counties as joint employers of court employees.

Writ of prohibition granted.

**West Headnotes**

**[1] Mandamus** ⟨⟩1
250k1

**[1] Mandamus** ⟨⟩7
250k7
Mandamus is discretionary and is appropriate only where there is clear right to requested relief, clear duty of respondent to act, and clear duty of respondent to comply with writ.

**[2] Mandamus** ⟨⟩11
250k11
Though mandamus is extraordinary, court may consider petition for writ when it possesses issue that is novel and of crucial importance to administration of justice even if all normal requirements for writ's award are not met initially.

**[3] Prohibition** ⟨⟩1
314k1
For writ of prohibition to issue, action to be prohibited must be judicial or quasi-judicial in nature, jurisdiction of tribunal against which writ is sought must be inferior to that of issuing court, action to be prohibited must be either outside tribunal's jurisdiction, or if within its jurisdiction, beyond its legitimate authority, and petitioner must be without any other adequate remedy.

**[4] Mandamus** ⟨⟩73(1)
250k73(1)
Writ of prohibition, rather than writ of mandamus, was appropriate vehicle for awarding relief in action seeking to prevent State Labor Relations Board from considering counties as joint employers of court employees for purposes of collective bargaining.

**[5] Prohibition** ⟨⟩3(5)
314k3(5)
Chief judges seeking to forbid State Labor Relations Board from considering counties as joint employers of court employees for purposes collective bargaining were not required to seek administrative review by Appellate Court prior to grant of writ of prohibition, since appellate delay during review threatened irreparable harm to judges' employment relationship with their employees and jeopardized smooth operation of court system; additionally, three of four judges could not have obtained administrative review at time of filing petition because no board orders had been entered in their cases. S.H.A. ch. 48, ¶¶ 1609(i), 1611(e).

**[6] Prohibition** ⟨⟩10(2)
314k10(2)
Arguments of chief judges seeking writ of prohibition concerned jurisdiction of inferior tribunal, as required for issuance of writ, in light of judges' contention that State Labor Relations Board exceeded its legitimate authority, if not its very jurisdiction, by certifying counties as joint employers with chief judges in regard to court employees and by disregarding constitutional questions surrounding the issue.

**[7] Prohibition** ⟨⟩10(2)
314k10(2)
Condition of issuance of writ of prohibition, that inferior tribunal's jurisdiction or authority would actually be exceeded by action to be prohibited, was met in light of finding that State Labor Relations Board exceeded its legitimate authority in classifying chief judges and counties as joint employers of court employees for purposes of collective bargaining.

**[8] Prohibition** ⟨⟩15
314k15
Notwithstanding statement by two of four chief judges that they had nothing immediately at stake in petition for writ of prohibition to forbid State Labor

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Macon County
62

537 N.E.2d 784
(Cite as: 127 Ill.2d 453, 537 N.E.2d 784, 130 Ill.Dec. 455)

Relations Board from considering counties as joint employers of court employees for purposes of collective bargaining, judges had standing for reasons of judicial economy as well as by reason of Board's continuing classification of judges as joint employers even after loss of representation election.

**[9] Labor and Employment ☞1109**
231Hk1109
            (Formerly 232Ak176 Labor Relations)
State Labor Relations Board cannot consider counties to be joint employers of courts nonjudicial employees for purposes of collective bargaining under State Public Labor Relations Act, in that state, personified by chief judge of each circuit, is sole employer of all court employees; save for setting and paying salaries and providing facilities, subject to ultimate court power, counties are entitled to no other role in regard to court's nonjudicial employees that might arguably be considered role of joint employer. S.H.A. ch. 48, ¶ 1601 et seq.

**[10] Courts ☞55**
106k55
Sections of state constitution providing for intergovernmental cooperation cannot validate any "compact" that is contrary to separation of powers or inherent powers of unified court system. S.H.A. Const. Art. 2, § 1; Art. 6 § 1; Art. 7, § 10(a, c).

**[11] Courts ☞55**
106k55
Neither Constitution nor clause authorizing county-provided supplements to judicial salaries necessarily implies ultimate county control of number, salary, or employment conditions of court personnel. S.H.A. Const. Art. 6, §§ 14, 18(c).

**785 *455 ***456 Lee J. Schwartz, Special Asst. Atty. Gen., Julie O'Donnell Allen and Neil L. Brilliant, Sidley & Austin, Chicago, for petitioners.

Neil F. Hartigan, Atty. Gen., Springfield (Robert J. Ruiz, Sol. Gen., Rosalyn B. Kaplan, Asst. Atty. Gen., Chicago, of counsel), for respondent.

Richard M. Daley, State's Atty., Chicago (Joan S. Cherry, Deputy State's Atty., Iris E. Sholder, Asst. State's Atty., of counsel), for intervenor-respondent County of Cook.

**786 ***457 David R. Akemann, Elgin, for intervenors-respondents Counties of Vermilion and Will.

Gilbert Feldman, Cornfield & Feldman, Chicago, for intervenor-respondent American Federation of State, County and Municipal Employees.

Justice STAMOS delivered the opinion of the court:

This is an original action for a writ of prohibition or *mandamus,* brought by four chief judges of Illinois circuit courts (the four chief judges) against the Illinois State Labor Relations Board (the Board). Three Illinois counties and two labor organizations have intervened as respondents.

The principal question is whether, given their statutory role in funding the circuit courts, counties may be *456 considered joint employers of those courts' nonjudicial employees for purposes of collective bargaining under the Illinois Public Labor Relations Act (the Act) (Ill.Rev.Stat.1987, ch. 48, par. 1601 *et seq.*).    As explained later in this opinion, we answer that question in the negative and issue a writ of prohibition accordingly.

## I. BACKGROUND

The present action arises out of four cases pending before the Board.

The first case, No. S-RC-88-71, involves the Honorable Michael A. Orenic, as chief judge of the 12th Judicial Circuit;  the County of Will;  and District 55, International Association of Machinists and Aerospace Workers, AFL-CIO (IAM).    In that case, IAM petitioned the Board for an election so that, as the petition was amended, IAM might represent all assistant public defenders (except for confidential employees, supervisors, and others excluded by the Act) said to be employed jointly by the county, the chief judge, and the public defender in the office of the Will County public defender. The Board hearing officer's recommended opinion found that the county and the chief judge are the assistant public defenders' joint employers.

The second case, No. S-RC-88-74, involves the Honorable Ralph S. Pearman, as chief judge of the Fifth Judicial Circuit;  the County of Vermilion; and the International Brotherhood of Electrical Workers, Local 399 (IBEW).    In that case, IBEW petitioned the Board for an election so that it might represent (except for guards, supervisors, and others excluded by the Act) all regular full-time and part-time bailiffs said to be employed jointly by the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 N.E.2d 784                                                                                                                    Page 3
(Cite as: 127 Ill.2d 453, *456, 537 N.E.2d 784, **786, 130 Ill.Dec. 455, ***457)

county and the chief judge at the Vermilion County courthouse facility.

The third case, No. S-CA-88-137, involves the Honorable John W. Rapp, Jr., as chief judge of the 15th *457 Judicial Circuit; the County of Stephenson; and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW (UAW). In that case, UAW filed an unfair labor practice charge against Chief Judge Rapp for refusing to bargain, in a role as joint employer with Stephenson County, concerning clerk-stenographers and senior stenographers employed in the Stephenson County court services department. The case followed a determination by the Board that the county and the chief judge are joint employers of those employees. (*County of Stephenson*, 3 Pub. Employee Rep. (Ill.) par. 2066, No. S-RC-87-45 (ISLRB Oct. 28, 1987).) In *County of Stephenson*, Stephenson County had taken the position that it was not an employer of the stenographic employees.

The fourth case, No. S-RC-88-63, involves the Honorable Joseph M. McCarthy, as chief judge of the 16th Judicial Circuit; the County of De Kalb; and the American Federation of State, County and Municipal Employees, Council 31, AFL-CIO (AFSCME). In that case, AFSCME petitioned for an election so that it might represent, with certain exclusions and after certain stipulations had been made, all unrepresented nonprofessional employees of De Kalb County (as employer) and of certain elected county officials, the clerk of the circuit court in De Kalb County, and Chief Judge McCarthy (as respective joint employers). Chief Judge McCarthy's employees at issue are bailiffs and jury commission clerks. The Board hearing officer's **787 ***458 recommended opinion found that the county is a joint employer with the circuit court's chief judge and the court's clerk in De Kalb County, respectively, as to the latter officials' employees.

On June 10, 1988, we allowed the four chief judges' motion for leave to file their petition for a writ of prohibition or *mandamus*. (Ill. Const.1970, art. VI, § 4(a); 107 *458 Ill.2d R. 381.) We also entered an order, effective until our final resolution of the issues raised in this action, (1) allowing the Board to continue its consideration of the representation cases and to conduct any elections that it saw fit under the Act, but (2) prohibiting the Board from certifying in those cases any bargaining

unit that includes a county as joint employer of judicial-branch employees, (3) requiring the Board to stay any final decisions in those cases relating to the identity of the employers of judicial-branch employees, and (4) prohibiting the Board from processing the unfair labor practice charge in the Stephenson County case, and requiring the Board to stay that proceeding.

Intervening in this action are Cook, Vermilion, and Will Counties, AFSCME, and IAM, all as respondents. Ill.Rev.Stat.1987, ch. 110, par. 2-408.

The four chief judges have advised the court in briefs that AFSCME, IAM, and IBEW lost the representation elections conducted during 1988 in the 16th, 12th, and 5th Judicial Circuits respectively and that therefore Chief Judges McCarthy, Orenic, and Pearman "have nothing immediately at stake in this litigation" but that they remain interested in its result, particularly since at the time of filing briefs Chief Judges Orenic and Pearman were each currently considered a joint employer with Will County and Vermilion County respectively as to certain judicial-branch employees. In addition, though the parties have not suggested it of record, the court takes judicial notice (see *Madden v. City of Chicago* (1918), 283 Ill. 165, 171, 119 N.E. 60) that Chief Judges Orenic and McCarthy have resigned their positions as chief judges.

## II. ISSUES

In their petition, the four chief judges contend that, for several reasons, the Board lacks jurisdiction over the counties said to be joint employers of court employees in *459 the four pending actions. The four chief judges contend that:

(1) the State is the sole employer of State judicial-branch employees;

(2) the counties' funding role in relation to the court system cannot make them employers of judicial-branch employees, because, according to the four chief judges, the statutes [FN*] requiring counties to fund the courts violate provisions of the Illinois Constitution creating a unified State court system (Ill. Const.1970, art. VI, § 1) and mandating State budgets and appropriations for State government expenses (Ill. Const.1970, art. VIII, §§ 2(a), (b)); and

FN* The four chief judges have not enumerated the funding statutes at issue, and in reply to Cook County's criticism of their failure they say that in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 N.E.2d 784
(Cite as: 127 Ill.2d 453, *459, 537 N.E.2d 784, **787, 130 Ill.Dec. 455, ***458)

Page 4

*County of Cook,* 4 Pub. Employee Rep. (Ill.) pars. 2025, 3011, Nos. S-RC-87-113, L-RC-87-26 (ISLRB & ILLRB Apr. 27, 1988), Cook County refused to stipulate as to an enumeration. The four chief judges agree to the substantial accuracy of Cook County's citation of what they term "some of the statutes providing for county funding of the judicial system." (Ill.Rev.Stat.1987, ch. 25, pars. 20, 27.3; ch. 34, pars. 432, 1102, 5605 through 5607, 5609; ch. 37, pars. 806-1(2), 806-3 through 806-7, 806-10; ch. 38, pars. 113-3, 204-5, 204-6, 204-7(2)(a), (3), (11), 204-8(4); ch. 78, pars. 26, 29; ch. 108 1/2 , par. 9-101 *et seq.;*  ch. 110 1/2 , par. 13-3.1.) However, any failure to identify precisely the potentially affected statutes need not detain us, since we do not actually reach the issue of their constitutionality.

(3) if counties are deemed employers of judicial-branch employees, their role is merely ministerial and they lack authority to participate in collective bargaining between chief judges and labor organizations as to those employees.
Accordingly, the four chief judges pray (1) for a writ of prohibition that would prohibit the Board from certifying any bargaining unit in which a county has been listed as a joint employer of judicial-branch employees, or (2) for a *460 writ of *mandamus* that **788 ***459 would command the Board to take no such further action.

In their brief, the four chief judges expand on the foregoing contentions by arguing that the cited constitutional provisions "eliminat[e] the counties as co-employers" of State court employees (seemingly whether or not the funding statutes themselves are unconstitutional) and that, even if the funding statutes are constitutional and the counties' funding role is not wholly ministerial, the counties' collective-bargaining role as joint employers is "limited to negotiation over the strictly financial terms of employment." In particular, and somewhat elliptically, the four chief judges expand on or modify their jurisdictional contention by urging that the requested writ is justified because, since the Board itself believes it has no jurisdiction to decide constitutional issues that they raise, the Board should be prevented from issuing orders that are formulated without regard to constitutionality.

The four chief judges also suggest that our decision in *County of Kane v. Carlson* (1987), 116 Ill.2d 186, 107 Ill.Dec. 569, 507 N.E.2d 482, held that counties are not joint employers of State judicial-branch employees.

The four chief judges detail their reasons for asserting that counties, through assumption of a collective-bargaining role as to court employees and through refusals to yield on financial matters during bargaining, actually or potentially are sources of interference in the courts' critical decisions on funding and other administrative issues. The four chief judges say that, in order to fulfill their duty to engage in good-faith collective bargaining, judicial negotiators have had to accept counties' bargaining positions even when they disagreed with them and that the counties therefore have impeded judicial administration.

As an example of interference with judicial administration, the four chief judges cite statements made by *461 Du Page County in an *amicus curiae* brief filed in *County of Cook,* 4 Pub. Employee Rep. (Ill.) pars. 2025, 3011, Nos. S-RC-87-113, L-RC-87-26 (ISLRB & ILLRB Apr. 27, 1988), which supported collective-bargaining classification of Cook County as a joint employer of adult probation officers. In that brief, Du Page County described itself as employer of judicial-branch employees and asserted that the chief judge and the county board "both possess independent authority over separate, significant terms and conditions of employment" as to those employees because the county board "has control of the budgeting process" and of "the number of positions, salaries and fringe benefits of elected officials' [including the chief judge's] employees." Du Page County there argued that "if collective bargaining agreements are reached with respect to wages without the participation of the County, wage increases that were not planned for could negatively impact on the assessment of taxes and the use of revenues derived from taxes."

The four chief judges contend that, even if the statutes requiring counties to fund circuit courts are constitutional, counties should have no authority to participate or interfere in collective bargaining between chief judges and labor organizations and that counties should be subject to chief judges' determinations as to number, salary, hours, and working conditions of court employees. Otherwise, they say, the State's unified judicial system (see *Ampersand, Inc. v. Finley* (1975), 61 Ill.2d 537, 542, 338 N.E.2d 15) will experience a "devastating impact" because of counties' local political considerations, the influence of employment terms applicable to the counties' own employees, and the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

counties' possible indifference to requirements for equal standards of judicial administration statewide.

**\*462** The four chief judges cite *Painter v. Board of Trustees* (1987), 161 Ill.App.3d 26, 29-30, 112 Ill.Dec. 319, 513 N.E.2d 928, for the proposition that "a local governmental entity can be called upon to enact the necessary taxes to fund another local government activity, even though it has no control over the amount to be included in that levy." They argue that, *a fortiori*, a local governmental entity such as a county can be so called upon with regard to a State **\*\*789 \*\*\*460** government activity such as operation of the circuit court.

To the same effect, they also cite *Polich v. Chicago School Finance Authority* (1980), 79 Ill.2d 188, 37 Ill.Dec. 357, 402 N.E.2d 247, and *Chicago School Finance Authority v. City Council* (1984), 104 Ill.2d 437, 84 Ill.Dec. 668, 472 N.E.2d 805, dealing with city council duties to fund the Chicago schools, as well as decisions from other States upholding courts' authority to provide for funding according to their own needs even in the face of local authorities' opposition (*Commonwealth ex rel. Carroll v. Tate* (1971), 442 Pa. 45, 274 A.2d 193; *In re Court Reorganization Plan* (1978), 161 N.J.Super. 483, 391 A.2d 1255, *aff'd* (1979), 78 N.J. 498, 396 A.2d 1144; *Mowrer v. Rusk* (1980), 95 N.M. 48, 618 P.2d 886; *Zylstra v. Piva* (1975), 85 Wash.2d 743, 539 P.2d 823). In support of their primary argument that the Illinois system of county funding for court operations is unconstitutional, the four chief judges also cite *County of Allegheny v. Commonwealth* (1987), 517 Pa. 65, 534 A.2d 760.

In response to the four chief judges' contentions, the Board asserts that it must determine questions of representation and unfair labor practices on the basis of specific and controlling Illinois law. The Board says that it has consistently held an employer to be each entity "whose presence is necessary to create an effective bargaining relationship." (See *County of Tazewell*, 1 Pub. Employee Rep. (Ill.) par. 2022, No. S-RC-2 (ISLRB Sept. 27, 1985); *Du Page County Board*, 1 Pub. Employee Rep. (Ill.) par. 2003, Nos. S-RC-9, S-RC-17 **\*463** (ISLRB Apr. 26, 1985).) In *Du Page County Board*, the Illinois State Labor Relations Board observed:

" '[W]ho is the employer' is a question of who has the authority to hire, promote, evaluate, discipline, discharge and set work rules for the employees in question, *as well as the authority to obtain funding and to set fringe benefits.* [Citation.]" (Emphasis added.) (*Du Page County Board*, 1 Pub. Employee Rep. (Ill.) par. 2003, at VIII-13.)

Accord *County of Kane v. Illinois State Labor Relations Board* (1988), 165 Ill.App.3d 614, 621-23, 116 Ill.Dec. 359, 518 N.E.2d 1339; *City of Rockford v. Illinois State Labor Relations Board* (1987), 158 Ill.App.3d 166, 171-73, 111 Ill.Dec. 196, 512 N.E.2d 100.

Because it considers itself unauthorized to act beyond the scope of powers granted it by the General Assembly (see *Schalz v. McHenry County Sheriff's Department Merit Comm'n* (1986), 113 Ill.2d 198, 202, 100 Ill.Dec. 553, 497 N.E.2d 731; *Homefinders, Inc. v. City of Evanston* (1976), 65 Ill.2d 115, 129-30, 2 Ill.Dec. 565, 357 N.E.2d 785; *Town of Decatur*, 2 Pub. Employee Rep. (Ill.) par. 2024, No. S-RC-144, at VIII-178 (ISLRB May 29, 1986)), the Board has stated in a previous case that its prerogative is not "to declare the invalidity of Illinois statutes" and that it "must take the governmental structure as [it finds] it," adding:

"Our function in a case like this is to identify the parties necessary for an effective bargaining relationship, given the facts as they exist and as they are decreed in unambiguous laws. [We] cannot ignore the statutes and established facts that give the County control over important aspects of [employment of probation officers], merely because that control may be inconsistent with the intent underlying the Constitution. If the structure of government must be reordered to reflect the constitutional design, it is for other authorities to effect the change. Until then, we must recognize the situation that presently exists." (*County of Cook*, 4 Pub. Employee Rep. (Ill.) pars. **\*464** 2025, 3011, Nos. S-RC-87-113, L-RC-87-26, at X-149, XI-68 (ISLRB & ILLRB Apr. 27, 1988).)

The Board's brief in the present cause adheres to the quoted views.

The Board also advises us in its brief that, should we affirm the constitutionality of the statutes providing for county funding of the court system, in determining joint employer status the Board expects that it would continue as in the past to examine "the legal and factual role played by a given county with respect to the funding **\*\*790 \*\*\*461** of particular judicial employees." In this connection, the Board says that merely characterizing the counties' funding role as ministerial (for which the four chief judges

537 N.E.2d 784                                                                                              Page 6
(Cite as: 127 Ill.2d 453, *464, 537 N.E.2d 784, **789, 130 Ill.Dec. 455, ***461)

alternatively argue), without analyzing each statute providing for a county funding role, "would do little to assist in the determination of any county's status as a joint employer under a specific statutory provision," since that determination must depend on statutory funding duties and the parties' actual conduct in a given case.

Thus, the inference we draw from the Board's brief is that, unless we expressly hold the funding statutes to be unconstitutional or expressly forbid the Board to consider counties as joint employers of court employees, in a given case the Board might apply labor law principles to find joint-employer status, even in the face of a declaration by us that the counties are not the constitutional employers of such employees or that the funding statutes *per se* are insufficient to make the counties' funding role more than "ministerial." In any event, the Board's brief does specifically request that, if we hold the funding statutes to be constitutional, we decline to label the counties' funding role "ministerial."

For its part, Cook County as intervenor contends that county funding of the judicial system is constitutional; that the funding system confers on counties a *465 joint-employer status that is consistent with a unified judicial system; that our opinion in *County of Kane v. Carlson* did not decide whether a county may be a joint employer of court employees; that counties cannot be required to pay "ministerially" for employment terms negotiated by chief judges; and that Chief Judges Orenic and McCarthy should be dismissed as petitioners for lack of interest in the subject matter. In addition, Cook County contends that prohibition or *mandamus* does not lie in this cause and that the four chief judges rely on nonexistent or unpersuasive evidence of county interference in judicial administration.

Vermilion and Will Counties contend that our decision in *Drury v. County of McLean* (1982), 89 Ill.2d 417, 60 Ill.Dec. 624, 433 N.E.2d 666; rejected the view that, by paying salaries of nonjudicial employees of the courts, counties subjected such employees to their control. Vermilion and Will Counties also contend that our decision in *County of Kane v. Carlson* (1987), 116 Ill.2d 186, 107 Ill.Dec. 569, 507 N.E.2d 482, means that county authority to pay nonjudicial employees of the courts does not contravene the separation of powers. Vermilion and Will Counties contend further that the counties' statutory mandate

to pay the salaries of courts' nonjudicial employees is authorized by constitutional provisions (Ill. Const.1970, art. VI, §§ 14, 18; art. VII, §§ 10(a), (c); art. VIII, § 2) dealing with counties' payment of additional salaries to judges, court clerks, and other nonjudicial court personnel; intergovernmental cooperation; and State finance. In an argument similar to one advanced by Cook County, Vermilion and Will Counties contend that counties' role in funding nonjudicial court employees cannot be regarded as simply ministerial, because recognizing courts' "dictatorial" authority to determine such employees' compensation would be tantamount to giving courts rather than county boards the power to tax county residents.

*466 AFSCME's brief argues merely that we should decide, as an additional issue, whether the Administrative Office of the Illinois Courts (the AOIC) ought to be considered a joint employer with chief judges or counties as to probation officers. AFSCME's concern arises out of the subject matter of *County of Cook*, 4 Pub.Employee Rep. (Ill.) pars. 2025, 3011, Nos. S-RC-87- 113, L-RC-87-26 (ISLRB & ILLRB Apr. 27, 1988). On September 29, 1988, we denied a motion by the four chief judges to strike AFSCME's brief. However, on that same date we denied AFSCME's motion to dismiss the four chief judges' petition or, in the alternative, to direct them to bring the AOIC before this court.

Because we hold that counties ought not to be considered joint employers of nonjudicial employees of courts, AFSCME's contention becomes moot as it applies to county-AOIC joint-employer status. As it applies**791 ***462 to any status of chief judges and the AOIC as joint employers of probation officers, we agree with Cook County and the four chief judges that, despite having received leave to intervene, AFSCME has not moved this court for leave to file its own petition in this cause. (107 Ill.2d R. 381(a).) AFSCME has briefed an issue as to which it has filed no claim for relief; the AOIC is not a party to this cause; and we do not believe that we must consider AFSCME's concern in order to achieve a complete resolution of the issues before us.

No brief has been filed by IAM. The four chief judges advise us in their reply brief that IAM's stated reason for filing no brief was IAM's loss of its representation election in Will County. The four

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

chief judges advise us also that Stephenson County, IBEW, and UAW chose not to intervene or file a brief but have been provided with copies of all documents filed by the four chief judges in this cause.

## *467 III. ANALYSIS

This court has strongly recommended that the General Assembly develop a system of full State funding for the court system that would not rely on the counties' present statutory role. (Annual Report of the Supreme Court to the General Assembly, Jan. 27, 1989, at 1.)    However, a policy recommendation against the present county-based system is not equivalent to a judgment on its constitutionality.

In the cause now before us, we need not reach the question whether the present funding statutes are constitutional, because we conclude that the Board cannot constitutionally apply a test of joint-employer status so as to result in classifying counties as joint employers with chief judges in regard to court employees.    Our conclusion relies on the need to harmonize traditional labor law principles, derived from experience in the private employment sector, with the scheme of the Illinois Constitution's unified court system and separation of powers and with the nature of public-sector employment.    We conclude further that a writ of prohibition should issue in this cause.

### A. Subsidiary Issues

As preliminary matters, we address Cook County's contentions that prohibition or *mandamus* does not lie, that *County of Kane v. Carlson* did not decide the issues of this cause, and that Chief Judges Orenic and McCarthy should be dismissed as petitioners.

### 1. Availability of *Mandamus* or Prohibition

[1][2]  *Mandamus* and prohibition are both extraordinary writs.    (See generally Allen, *Mandamus, Quo Warranto, Prohibition, and Ne Exeat,* 1960 U.Ill.L.F. 102.)    *Mandamus* is discretionary and is appropriate only where *468 there is a clear right to the requested relief, a clear duty of the respondent to act, and clear authority in the respondent to comply with the writ. (*League of Women Voters v. County of Peoria* (1987), 121 Ill.2d 236, 242-43, 117 Ill.Dec. 275, 520 N.E.2d 626.)    Though *mandamus* is extraordinary, we may

consider a petition for the writ when it presents an issue that is novel and of crucial importance to the administration of justice, even if all the normal requirements for the writ's award are not met initially. *Knuepfer v. Fawell* (1983), 96 Ill.2d 284, 291, 70 Ill.Dec. 708, 449 N.E.2d 1312.

[3] For a writ of prohibition to be issued, the action to be prohibited must be judicial or quasi-judicial in nature;  the jurisdiction of the tribunal against which the writ is sought must be inferior to that of the issuing court;  the action to be prohibited must be either outside the tribunal's jurisdiction or, if within its jurisdiction, beyond its legitimate authority;  and the petitioner must be without any other adequate remedy. (*People ex rel. No. 3 J. & E. Discount, Inc. v. Whitler* (1980), 81 Ill.2d 473, 479-80, 43 Ill.Dec. 721, 410 N.E.2d 854.)    Actions of an administrative official, such as a Director of Revenue and his departmental hearings referee, may be sufficiently judicial in nature to be subject to a writ of prohibition.  *Whitler,* 81 Ill.2d at 480, 43 Ill.Dec. 721, 410 N.E.2d 854.

**792 ***463 [4] The office of *mandamus* is to provide affirmative rather than prohibitory relief ( *People ex rel. Scott v. Kerner* (1965), 32 Ill.2d 539, 543, 208 N.E.2d 561), though *mandamus* may lie to compel the undoing of an act (*People ex rel. Bier v. Scholz* (1979), 77 Ill.2d 12, 16, 31 Ill.Dec. 780, 394 N.E.2d 1157).   By contrast, a writ of prohibition is used to prevent judicial or quasi-judicial action that would be taken without jurisdiction or that would be beyond the scope of legitimate jurisdictional authority. (*People ex rel. Foreman v. Nash* (1987), 118 Ill.2d 90, 97, 112 Ill.Dec. 714, 514 N.E.2d 180 .)   The relief sought by the four chief judges is prohibitory in nature, regardless of whether the Board has a "duty" or "authority" to act in accordance with any writ of *mandamus* that we might frame in *469 an attempt to provide the relief sought.   Hence, we conclude that a writ of prohibition rather than of *mandamus* is the appropriate vehicle for awarding relief.

### a. Mandamus or Declaratory Judgment

Cook County argues that in reality the four chief judges are seeking a declaratory judgment and that this is one reason for us to refuse the requested writ. A similar argument was made in *People ex rel. Scott v. Kerner* (1965), 32 Ill.2d 539, 208 N.E.2d 561, but, as we noted then (32 Ill.2d at 544-46),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 N.E.2d 784
(Cite as: 127 Ill.2d 453, *469, 537 N.E.2d 784, **792, 130 Ill.Dec. 455, ***463)

frequently the declaration of a right to be enforced by *mandamus* will occur simultaneously with the writ's award, especially where "public issues of serious concern require speedy resolution" (32 Ill.2d at 546, 208 N.E.2d 561). In any event, we have concluded that prohibition rather than *mandamus* lies.

### b. Writ or Administrative Review

[5] In addition, Cook County urges that because administrative review by the appellate court is now available in representation cases and unfair labor practice cases (Ill.Rev.Stat.1987, ch. 48, pars. 1609(i), 1611(e)), the four chief judges have a remedy other than the writ they seek.

However, the four chief judges point to appellate delay during any review as threatening the smooth operation of the court system and possibly causing irreparable harm to their employment relationship with their employees.

We agree that such results are likely and that appellate proceedings would inadequately remedy them. The effects of improperly ordered certification or bargaining would not easily be undone, if at all. Positions taken, agreements reached, and appropriations made would be on public view and formalized on the public record in a way seldom if ever equaled in private-sector collective *470 bargaining. Even if such consequences may be said to ensue from all public-sector certification or bargaining orders that are ultimately reversed on appeal, the vital public interest in an efficient, continually functioning, and independent court system furnishes additional reason for us to conclude that administrative review would be inadequate in this case. See *People ex rel. No. 3 J. & E. Discount, Inc. v. Whitler* (1980), 81 Ill.2d 473, 483-84, 43 Ill.Dec. 721, 410 N.E.2d 854; *People ex rel. Swift v. Superior Court* (1935), 359 Ill. 612, 618-19, 195 N.E. 517; *People ex rel. Modern Woodmen of America v. Circuit Court* (1931), 347 Ill. 34, 40, 44-45, 179 N.E. 441.

Finally, according to the four chief judges' reply brief, the orders in Chief Judges Orenic's and McCarthy's cases were entered before the July 1, 1988, effective date of the statutory amendment granting them the right of administrative review (Ill.Rev.Stat.1987, ch. 48, par. 1609(i)), and those chief judges would therefore not be entitled to such

review. And, because of what we are advised was IBEW's loss of its representation election, Chief Judge Pearman might be held to lack standing as an "aggrieved" party (Ill.Rev.Stat.1987, ch. 48, par. 1609(i)) to seek such review of the order entered in his case.

In any event, at the time of filing their petition, three of the four chief judges could not have obtained such administrative review, because no final Board orders had been entered in their cases. Hence, if they had a right to the relief sought at the time of filing their petition, that right should not necessarily be defeated by any **793 ***464 subsequent theoretical ripeness of their cases for administrative review; and if the fourth petitioner, Chief Judge Rapp, had an independent right to the relief he sought when he joined in the petition, any concurrent availability of administrative review is no bar, particularly in light of the inadequacy of such review to avert the claimed potential harm to the judicial system.

*471 c. Prohibition and Issues of Inferior Jurisdiction

[6] Cook County also contends that the writ of prohibition may not issue unless a petitioner's arguments "concern" the jurisdiction of an inferior tribunal (*People ex rel. No. 3 J. & E. Discount, Inc. v. Whitler* (1980), 81 Ill.2d 473, 480, 43 Ill.Dec. 721, 410 N.E.2d 854) and that the Board has clear jurisdiction and authority to determine who is a public employer or joint employer. As we explained in *Whitler* (81 Ill.2d at 479-80, 43 Ill.Dec. 721, 410 N.E.2d 854) one of the four conditions for issuance of a writ of prohibition is that "the action sought to be prohibited must be either outside the jurisdiction of the tribunal or, if within its jurisdiction, *beyond its legitimate authority.*" (Emphasis added.)

Though their jurisdictional argument is somewhat confusingly stated, the four chief judges contend in essence that the Board exceeds at least its legitimate authority if not its very jurisdiction by certifying counties as joint employers with chief judges in regard to court employees and by disregarding constitutional questions surrounding the issue.

[7] Arguments such as the four chief judges' need not be wholly correct in order to "concern" jurisdiction; thus, for this reason alone, Cook

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 N.E.2d 784                                                                                                          Page 9
(Cite as: 127 Ill.2d 453, *471, 537 N.E.2d 784, **793, 130 Ill.Dec. 455, ***464)

County's contention is inadquate.     More importantly, the condition for issuance of a writ is that the inferior tribunal's jurisdiction or authority would actually be exceeded by the action to be prohibited, not merely that the petitioner argue "concerning" that issue.   Because we find that the Board does in fact exceed its legitimate authority when it classifies chief judges and counties as joint employers of court employees, the condition is satisfied.

It is of no moment that the Board arguably lacks power to declare a statute such as the funding statutes unconstitutional and to refuse to follow it. While it may be that the Board had no choice other than to follow the *472 statutes, this does not mean that achieving an unconstitutional result by so doing lies within the Board's "legitimate authority."  Even if the Board in a sense was statutorily left powerless to avoid straying outside its legitimate authority as ultimately defined by us, the fact remains that, by declaring the result of the Board's actions to be *ultra vires,* we can do for the Board what it could not do for itself, *i.e.,* construe the constitution so as to limit its authority and then keep the Board within that authority.   Once having made such a declaration, as we do in this opinion, we can and do view the writ of prohibition's jurisdiction-related condition for issuance to have been met.

d. Evidentiary Sufficiency

We need not address Cook County's contention that the four chief judges rely on incompetent summaries of factual matters as evidence.   Cook County argues that to support their petition the four chief judges are not entitled to cite offers of proof, or statements contained in *amicus curiae* briefs filed in other Board cases, as evidence of county "co-employer" interference with judicial administration. The four chief judges reply that they are compelled to cite offers of proof because the precedent of successful arguments by Cook County itself in *County of Cook* led to exclusion of the actual proof from the Board record in the present case.

Even if Cook County is procedurally correct, the four chief judges' petition need not depend on such evidentiary submissions.     If, as we decide, requiring a chief judge and a county to bargain as joint employers of court employees inevitably invades the administrative province of the courts, thereby contravening the separation of powers and

tending to undermine the unity of the court system, we need not **794 ***465 consider evidence that such a requirement already has impeded judicial administration.

*473 Therefore, whether or not the four chief judges would be entitled to a writ of *mandamus,* Cook County has failed to show that prohibition does not lie in this cause.

2. *Carlson* as Decisive Precedent

Rather tentatively, the four chief judges assert in their brief that our decision in *County of Kane v. Carlson* (1987), 116 Ill.2d 186, 107 Ill.Dec. 569, 507 N.E.2d 482, "at least arguably" resolved the issues raised in the present cause and that we "could" find in their favor on grounds of *res judicata.*   In *Carlson,* we held that, for purposes of the Act, a circuit court clerk rather than a chief judge was "the" employer of his deputy clerks.   In *Carlson,* the County of Kane had already conceded that it was not "the" employer of the deputy clerks.  (116 Ill.2d at 200, 107 Ill.Dec. 569, 507 N.E.2d 482.) After our opinion was filed, the circuit court clerk moved that we recall our mandate and issue a revised mandate specifically determining that he was his deputy clerks' sole employer.   We then entered an order on April 27, 1987, denying the motion and stating:   "The court resolved the question raised in this motion at page 6 of the slip opinion in this cause."     That page contained the holding that a circuit court clerk was the employer of his deputy clerks. See *Carlson,* 116 Ill.2d at 200, 107 Ill.Dec. 569, 507 N.E.2d 482.

Cook County responds that the doctrine of *res judicata* is inapplicable because neither the parties, nor the facts, nor the relief sought in *Carlson* is the same as in the present cause.  (See *Housing Authority v. Young Men's Christian Association* (1984), 101 Ill.2d 246, 254, 78 Ill.Dec. 125, 461 N.E.2d 959 (facts and relief); *Spiller v. Continental Tube Co.* (1983), 95 Ill.2d 423, 432, 69 Ill.Dec. 399, 447 N.E.2d 834 (parties).)   In addition, Cook County contends that Kane County's concession of nonemployer status in *Carlson* means that *Carlson* decided only whether chief judges, rather than counties, might be joint employers of deputy clerks of the circuit court. See *474 County of Kane v. Illinois State Labor Relations Board* (1988), 165 Ill.App.3d 614, 621, 116 Ill.Dec. 359, 518 N.E.2d

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 N.E.2d 784                                                                                          Page 10
(Cite as: 127 Ill.2d 453, *474, 537 N.E.2d 784, **794, 130 Ill.Dec. 455, ***465)

1339.

We agree with Cook County that neither *res judicata* nor the issues for decision in *Carlson* allow our opinion in that case to be viewed as decisive of the issues in the present one.

3. Standing of Chief Judges

[8] Cook County contends that Chief Judges Orenic and McCarthy should be dismissed as petitioners because of their statement that they have nothing immediately at stake. In their brief, the four chief judges have not replied to this contention.

We consider that, for reasons of judicial economy as well as by reason of the Board's continuing classification of the chief judges as joint employers even after loss of a representation election, the four chief judges retain standing to seek relief. In addition, our noticing Chief Judges Orenic's and McCarthy's resignations as chief judges does not lead to abatement or compel dismissal of the action as to their claims, since their successors might be substituted as parties merely on motion or suggestion. Ill.Rev.Stat.1987, ch. 110, pars. 2-1008(a), (d).

B. Chief Judges and Counties as Joint Employers
[9] We now turn to the principal question in the case, the joint-employer issue.

As labor law has developed, largely in a Federal and private-sector context, the test for existence of joint employers has come to be defined as whether "two or more employers exert significant control over the same employees--where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." (*National Labor Relations Board v. Browning-Ferris Industries of Pennsylvania, Inc.* (3d Cir.1982), 691 F.2d 1117, 1124.) *475 Relevant factors include the putative joint employer's role in "hiring and firing; promotions and demotions; setting **795 ***466 wages, work hours, and other terms and conditions of employment; discipline; and actual day-to-day supervision and direction of employees on the job." Jansonius, *Use and Misuse of Employee Leasing*, Lab.L.J. 35, 36 (Jan. 1, 1985) (citing cases). See generally Annot., 73 A.L.R.Fed. 609 (1985).

The issues of the present case were foreshadowed

in *County of Kane v. Carlson* (1987), 116 Ill.2d 186, 107 Ill.Dec. 569, 507 N.E.2d 482. In that case, we observed that application of the Act to the judicial branch does not *per se* intrude unconstitutionally on judicial authority, because separation of powers "does not require, nor could it realistically demand, complete independence among the branches of government." (116 Ill.2d at 206, 107 Ill.Dec. 569, 507 N.E.2d 482.) However, we distinguished between Board orders "directly impairing the administrative and supervisory authority of the judiciary" and orders that have merely "an indirect or collateral effect, if any." (116 Ill.2d at 209, 107 Ill.Dec. 569, 507 N.E.2d 482.) We noted that judicial review of Board or arbitral orders can enable courts to provide "a necessary check on intrusions into those powers reserved to the judicial branch." (116 Ill.2d at 209, 107 Ill.Dec. 569, 507 N.E.2d 482.) We emphasized that our decision was based simply on "the posture of the proceedings before us" (116 Ill.2d at 210, 107 Ill.Dec. 569, 507 N.E.2d 482) and that many other possible constitutional questions, not then presented, might arise "as the broad provisions of the Act are applied to the unique workings of the judicial branch" (116 Ill.2d at 210, 107 Ill.Dec. 569, 507 N.E.2d 482).

We held in *Drury v. County of McLean* (1982), 89 Ill.2d 417, 60 Ill.Dec. 624, 433 N.E.2d 666, that, under section 18(b) of article VI of the Illinois Constitution (Ill. Const.1970, art. VI, § 18(b)), clerks of circuit courts are nonjudicial members of the judicial branch of State government and are not county officers (*Drury*, 89 Ill.2d at 424, 60 Ill.Dec. 624, 433 N.E.2d 666), even though county boards are required to pay and, subject to statutory limits, to *476 fix their salaries. The requirement that county boards provide circuit court clerks' salaries was imposed by the General Assembly. (Ill.Rev.Stat.1987, ch. 25, par. 27.3.) In turn, the General Assembly's power to prescribe the manner of funding the clerks' salaries is derived from section 18(c) of article VI of the Illinois Constitution (Ill. Const.1970, art. VI, § 18(c)), which states, "The salaries of clerks *and other non-judicial officers* shall be as provided by law." (Emphasis added.)

"It is within the legislature's constitutional powers to require that counties pay the salary and expenses of the circuit court clerk. The fact that counties pay the salaries and expenses of circuit court clerks

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 N.E.2d 784                                                                          Page 11
(Cite as: 127 Ill.2d 453, *476, 537 N.E.2d 784, **795, 130 Ill.Dec. 455, ***466)

does not make the office of circuit court clerk a county office." (*Drury*, 89 Ill.2d at 425, 60 Ill.Dec. 624, 433 N.E.2d 666.) Similarly, the fact that a county pays the salaries of other nonjudicial employees in the judicial branch, or even administers personnel policies covering them by agreement with the judicial branch, does not in constitutional or statutory terms make the county their employer. Rather, the State, personified by the chief judge of each circuit, is their employer.

The constitutional tripartite separation of powers strengthens our conclusion that the State, not a county, is the sole employer of all court employees. Traditional principles of labor law, developed mostly in a Federal context that has been largely limited to private-sector employment relations, might arguably suggest that, upon viewing the totality of their economic relationships (see, *e.g.*, *Secretary of Labor v. Lauritzen* (7th Cir.1987), 835 F.2d 1529, 1534- 35; *Beliz v. W.H. McLeod & Sons Packing Co.* (5th Cir.1985), 765 F.2d 1317, 1327), the counties and the State are to be considered joint employers of court employees whose salaries the counties pay. However, given our responsibility to reconcile Illinois public-sector labor law with Illinois constitutional principles whenever possible, we must construe the labor law term *477 "employer" in a way that comports with the legal authority and responsibility of counties and courts respectively as well as with our constitution's separation of powers and unified court system.

**796 ***467 [10] In this connection, we must say that Vermilion and Will Counties' constitutional arguments altogether miss the mark. The Illinois Constitution's article VII intergovernmental-cooperation provisions (Ill. Const.1970, art. VII, §§ 10(a), (c)) deal only with otherwise constitutional compacts, even if imposition of joint-employer status on an unwilling chief judge or county could be considered a compact. Therefore, article VII cannot validate any "compact" that is contrary to separation of powers (Ill. Const.1970, art. II, § 1) or the inherent powers of a unified court system (Ill. Const.1970, art. VI, § 1).

[11] As to the joint-employer question posed by the present action, the fact that legislation is expressly authorized for instituting county-provided supplements to judicial salaries (Ill. Const.1970, art. VI, § 14) adds nothing to the weight of authorization for legislation establishing county funding of courts'

nonjudicial employees (Ill. Const.1970, art. VI, § 18(c)). Neither authorizing clause of the constitution necessarily implies ultimate county control of the number, salary, or employment conditions of court personnel, as becomes obvious at once when the case of judges (Ill. Const.1970, art. VI, § 14) is considered. Thus, to the extent that a county's joint-employer status at the bargaining table effects such control, it lacks any authority in the cited sections of article VI.

When the National Labor Relations Act (NLRA), ch. 372, 49 Stat. 449 (1935) (codified as amended at 29 U.S.C. §§ 151 through 169 (1982 & Supp. IV 1986)), was adopted in 1935, it exempted governments from mandatory collective bargaining. (See NLRA § 2(2), 29 U.S.C. § 152(2) (1982).) The next five decades of labor law therefore focused almost entirely on the private economic sector's *478 employment relations. As late as 1984, it was possible to write that "[l]abor law casebooks and treatises often omit the subject of public employment entirely" and that "[t]here has been no scholarly treatment integrating the three major bodies of law that shape public employment--civil service law, collective bargaining law, and constitutional law." Note, *Developments in the Law--Public Employment*, 97 Harv.L.Rev. 1611, 1614 (1984).

As at least one commentator points out, "the appropriations process has become a major factor in public sector employee relations" (Allshouse, *The Role of the Appropriations Process in Public Sector Bargaining*, 17 Urb.Law. 165, 165 (1985)), and "[o]ne of the basic differences between private and public sector collective bargaining is the involvement of the legislative branch" (17 Urb.Law. at 197, citing *Abood v. Detroit Board of Education* (1977), 431 U.S. 209, 228, 97 S.Ct. 1782, 1796, 52 L.Ed.2d 261, 279-80). Yet, despite recognition of this and numerous other differences between public- and private-sector collective bargaining, "the statutes enacted for public sector bargaining, and the administrative rules and decisions * * * are modeled on the * * * private sector," yielding a "cognitive dissonance" that often impedes fruitful analysis. (Summers, *Bargaining in the Government's Business: Principles and Politics*, 18 U.Tol.L.Rev. 265, 265, 281 (1987).) Difficulties have been noted in attempting to institutionalize private-sector labor relations practices in the Federal government's collective-bargaining system, which prohibits strikes and greatly limits negotiations on matters of wages

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## PARENTING RESPONSIBILITIES AND COOPERATION

Each parent agrees to confer on a regular basis concerning the needs, growth, and care of their children, and will permit and encourage communication by the other with medical and school personnel regarding their progress and welfare. Each parent agrees to promote in them respect and affection for the other parent. They further agree that:

a) Neither parent will have a significant others (male or female) stay overnight when the children are in his her care unless legally married to that individual.

b) The children will be required to take a gun safety course prior to handling guns with either parent. All guns will be in locked gun cabinets with the ammunition being stored in a separate location unknown to the children.

c) The off-duty parent will have first option to watch the children if the on-duty parent is unable to do so overnight or for a long period of time during his/her parenting time.

d) Should either parent be involved in an activity in the morning when the children would typically be sleeping, the parent scheduled to be with the children will get one of the children up or provide adult supervision until a child is up.

e) Both parents will notify each other if he/she is going out of state during his/her regular parenting time prior to leaving with the children.

f) Both parents will provide an alternate telephone number if his/her cell phone is off in order for the off-duty parent to be able to contact the children at all times.

g) Both parents will encourage the children to keep their cell phone charged.

h) The parents will review this parenting schedule prior to Thanksgiving, 2005.

## FUTURE CONFLICT RESOLUTION

Both parents will attempt to avoid disputes in the future. Should disputes arise, they will attempt to resolve their disagreements or if breaches of this agreement occur, each party agrees to submit these issues to the process of mediation through the services of Karen Anderson on whom they have mutually agreed. Both parents agree to follow the process of mediation to its conclusion prior to either party seeking further relief or modification.

_Virginia Ronczkowski_    11/22/04          _Paul Ronczkowski_    11/22/04
Virginia Ronczkowski    DATE                 Paul Ronczkowski    DATE

537 N.E.2d 784

(Cite as: 127 Ill.2d 453, *481, 537 N.E.2d 784, **797, 130 Ill.Dec. 455, ***468)

employment terms, and vice versa. If a county were intransigent on a salary issue, it might prevent agreement between employees and a chief judge as to other working conditions. It thus becomes obvious that the counties and the courts **798 ***469 could not practicably bifurcate "employer" authority so that the counties might bargain salaries and the courts might separately bargain other terms of employment.

Labor representatives at the bargaining table know that any agreement reached will be affected by the county boards' salary-setting and appropriations authority, but similar knowledge prevails when labor representatives bargain with agencies of the executive branch for agreements that will be affected by the General Assembly's budgetary authority. (See Henkel & Wood, *Collective Bargaining by State Workers: Legislatures Have the Final Voice in the Appropriation of Funds,* 11 J.Collective Negotiations Pub.Sector 215, 217 (1982).) The General Assembly's budgetary authority with regard to the executive branch certainly surpasses that of county boards with regard to the judicial branch. Just as the General Assembly's appropriations role fails to make that body the joint employer of executive-branch employees (see Allshouse, *The Role of the Appropriations Process in Public Sector Bargaining,* 17 Urb.Law. 165, 167-68), the counties' appropriations role fails all the more to make counties the joint employers of the circuit courts' nonjudicial employees.

*482 Cook County's citation of *Scholz* to the contrary is unavailing. In *Scholz,* this court directed expungement of portions of a chief judge's administrative order that had set nonjudicial employees' salaries at levels somewhat higher than those set by a county board. However, the basis for expungement was merely our conclusion from the record that the county board had not acted so unreasonably as to warrant the chief judge's invocation of his inherent powers (*Scholz,* 77 Ill.2d at 18, 31 Ill.Dec. 780, 394 N.E.2d 1157), and we went on to affirm at length the existence of those powers (*Scholz,* 77 Ill.2d at 19-22, 31 Ill.Dec. 780, 394 N.E.2d 1157; see *Knuepfer,* 96 Ill.2d at 292-93, 70 Ill.Dec. 708, 449 N.E.2d 1312). See generally Annot., 59 A.L.R.3d 569 (1974).

For this reason, it is disingenuous for Cook County to argue in its brief that no precedent supports courts' authority to "appropriate" funds. Though

Cook County contends that such an "appropriation" authority would contravene the separation of powers, the fact is rather that a county board's effective veto of the courts' employment of needed personnel would violate not only the separation of powers but also the inherent authority of the courts. (See *Ampersand, Inc. v. Finley* (1975), 61 Ill.2d 537, 542, 338 N.E.2d 15.) Moreover, the four chief judges contend for no "appropriation" power on the part of the courts, nor do we hold that such power exists as such; rather, the courts have the power in truly needful cases to order that an appropriation be made by those officials entitled to make it. In turn, those officials can review their entire budgetary scheme and its supporting revenue base so as to make any needed adjustments to accommodate such an appropriation, which courts would not be in position to do if they were to essay a direct appropriation themselves. Nevertheless, without suffering an invasion of their rightful authority, the courts cannot allow counties to control or interfere with their employment and collective-bargaining decisions by assuming a joint-employer role in labor negotiations.

*483 We are also mindful that *Scholz* was decided before passage of the Act. Therefore, even to the extent that *Scholz* might be read by some to support a county's limited power to set nonjudicial employees' salaries independently of the court (but see *Scholz,* 77 Ill.2d at 19, 31 Ill.Dec. 780, 394 N.E.2d 1157 (the public interest requires that the three branches of government work in harmony); accord *Knuepfer,* 96 Ill.2d at 293, 70 Ill.Dec. 708, 449 N.E.2d 1312), and even though the judicial branch must give proper deference to the county boards as the "governmental branch having initial responsibility" for setting salaries (see *Knuepfer,* 96 Ill.2d at 293, 295, 70 Ill.Dec. 708, 449 N.E.2d 1312), *Scholz* cannot be viewed as decisive authority for construing the Act so as to define a county as a joint employer of circuit court employees for collective-bargaining purposes. On the contrary, a narrow interpretation of a statute granting powers to an administrative agency may be necessary to sustain its **799 ***470 constitutionality. 3 N. Singer, Sutherland on Statutory Construction § 65.02, at 222 (Sands 4th ed. 1986).

Cook County's citation of *City of Rockford v. Illinois State Labor Relations Board* (1987), 158 Ill.App.3d 166, 111 Ill.Dec. 196, 512 N.E.2d 100, is likewise insufficient. Whether or not that case

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

correctly applied the traditional labor law test for joint-employer status, it involved two units of local government, one of which created the other by ordinance. The present cause, involving a local government unit and the independent judicial branch of State government, is easily distinguished.

We are aware that the Washington Supreme Court has reached a different conclusion on a similar question (*Zylstra v. Piva* (1975), 85 Wash.2d 743, 539 P.2d 823), but we decline to follow its reasoning. In *Zylstra,* the court's conclusion rested in large part on the fact that the Public Employees' Collective Bargaining Act (Wash.Rev.Code §§ 41.56.010 through 41.56.950 (1972)) applied to county but not State employees (*Zylstra,* 85 Wash.2d at 748, 539 P.2d at 826). The court expressed its desire to preserve **484** for the affected employees "as large a sphere of collective bargaining as possible" (*Zylstra,* 85 Wash.2d at 748, 539 P.2d at 826) by holding that, for purposes of wage bargaining, employees of a juvenile court were employees of the county, even though they were employees of the State for purposes of bargaining over hiring, working conditions, and other matters. Moreover, unlike Illinois courts, the juvenile court in Washington was a creature of the legislature rather than of the constitution. *Zylstra,* 85 Wash.2d at 749, 539 P.2d at 827.

Rather than subscribe to the Washington Supreme Court's analysis in *Zylstra,* we find persuasive part of the Michigan Supreme Court's opinion in *Judges of the 74th Judicial District v. Bay County* (1971), 385 Mich. 710, 190 N.W.2d 219. In *Bay County,* the Michigan court decided that State district court employees "are not employees of the county, city or other district control unit, even though they are paid by the district control unit." (*Bay County,* 385 Mich. at 723, 190 N.W.2d at 224.) Therefore, a collective-bargaining agreement executed by a county board as employer was held not to bind the judicial district that embraced the county. (*Bay County,* 385 Mich. at 724, 190 N.W.2d at 224.) This conclusion was reached even though each county board had appropriations authority over the court's budget. *Bay County,* 385 Mich. at 725-26, 190 N.W.2d at 225-26; Mich.Comp.Laws Ann. § 600.8271(1) (West 1968).

The parties to collective bargaining--that is, chief judges and labor representatives--as well as county boards must, of course, be aware that chief judges

and county boards have the practical task of working together in an attempt to effectuate any collective-bargaining agreements reached. (See *County of Kane v. Carlson* (1987), 116 Ill.2d 186, 208, 107 Ill.Dec. 569, 507 N.E.2d 482 (some blurring of interdependent branches' roles necessary to smooth functioning); *Knuepfer v. Fawell* (1983), 96 Ill.2d 284, 297, 70 Ill.Dec. 708, 449 N.E.2d 1312 (Simon, J., *485 dissenting) ("Good government requires accommodation between its branches"); *People ex rel. Bier v. Scholz* (1979), 77 Ill.2d 12, 19, 31 Ill.Dec. 780, 394 N.E.2d 1157 (public interest requires branches to work in harmony); accord *Kotche v. County Board* (1980), 87 Ill.App.3d 1127, 1132, 42 Ill.Dec. 886, 409 N.E.2d 501.) However, this fact does not require the counties to be seated at the bargaining table as joint employers.

Any conflict between traditional labor law principles and constitutional principles must be resolved in favor of the latter; and treating county boards as joint employers with chief judges in respect of the courts' nonjudicial employees would unduly trench on the judicial branch's separate and equal status (see *Scholz,* 77 Ill.2d at 19, 31 Ill.Dec. 780, 394 N.E.2d 1157). The mere need for county board approval in order to effectuate judicial-branch salaries negotiated at the bargaining table does not logically mandate inclusion of the counties in the bargaining. Constitutional considerations furnish the remaining rationale for their exclusion.

**800 ***471 Accordingly, a writ of prohibition will issue, prohibiting the Board (1) from certifying or maintaining in effect the certification of any bargaining unit in which a county is listed as a joint employer of judicial-branch employees, and (2) from basing any finding of unfair labor practices on a chief judge's refusal to bargain, together with a county, in a role as joint employer of judicial-branch employees. We therefore need not reach additional questions raised by some of the parties as to defining the substantive areas of bargaining in which chief judges and counties might each play a joint-employer role.

*Writ awarded.*

WARD and CALVO, JJ., took no part in the consideration or decision of this case.

127 Ill.2d 453, 537 N.E.2d 784, 130 Ill.Dec. 455

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

537 N.E.2d 784
(Cite as: 127 Ill.2d 453, *485, 537 N.E.2d 784, **800, 130 Ill.Dec. 455, ***471)

Page 15

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

958 F.2d 1419
958 F.2d 1419
(Cite as: 958 F.2d 1419)
▷

United States Court of Appeals,
Seventh Circuit.
Marjane WARREN, Plaintiff-Appellant,
v.
Randolph STONE, the Public Defender, Paul
Biebel, Jr., individually and in his
official capacity, the ex-Public Defender, Harry G.
Comerford, Chief Judge,
individually and in his official capacity as Chief
Judge of the Circuit Court
of Cook County and County of Cook, Defendants-
Appellees.
Mary BURMEISTER, Plaintiff-Appellant,
v.
Randolph N. STONE, individually and in his official
capacity as Public
Defender, Paul Biebel, Jr., ex-Public Defender,
individually and in his
official capacity, and Harry G. Comerford,
individually and in his official
capacity as Chief Judge of the Circuit Court of Cook
County, et al.,
Defendants-Appellees.
Nos. 90-3828, 90-3829.

Argued Nov. 13, 1991.
Decided March 20, 1992.

Employees from county public defender's office
brought § 1983 action claiming they were denied
property rights without due process when they were
demoted or terminated as a result of alleged
violations of office procedure. The United States
District Court for the Northern District of Illinois,
Charles R. Norgle and Ann Claire Williams, JJ.,
found that employees were not county employees but
rather were state employees not entitled to hearing.
Appeals were taken.   The Court of Appeals held
that employees of public defender's office were state
and not county employees and thus were not entitled
to evidentiary hearing before dismissal.

Affirmed.

Coffey, Circuit Judge, filed dissenting opinion.

West Headnotes

[1] Constitutional Law ⬤➞277(1)
92k277(1)
To establish due process violation in connection with

disciplinary action or discharge, employees must
first establish property right to job. 42 U.S.C.A. §
1983; U.S.C.A. Const.Amends. 5, 14.

[2] Officers and Public Employees ⬤➞1
283k1
For purposes of determining whether employee
works for state or county, source of funding is not
conclusive.

[3] Constitutional Law ⬤➞278.4(3)
92k278.4(3)

[3] Counties ⬤➞67
104k67
Employees in county public defender's office were
state employees, not county employees, for purposes
of determining whether failure to hold evidentiary
hearing before discharging employees, as required
by county, resulted in violation of employees' due
process rights.

[4] Constitutional Law ⬤➞278.4(5)
92k278.4(5)

[4] States ⬤➞53
360k53
Because employees in public defender's office were
state and not county employees, failure of county to
hold evidentiary hearing before discharging
employees, which would have violated county
disciplinary procedures, did not violate due process
rights of employees.
*1420 Stuart K. Jones (argued), Chicago, Ill., for
plaintiff-appellant in No. 90-3828.

Denise M. Mercherson, Connie R. Barba (argued),
Jane L. Stuart,   Connie R. Barba, Office of the
State's Atty. of Cook County, Chicago, Ill., for
defendants-appellees in No. 90-3828.

Stuart K. Jones (argued), Chicago, Ill., for
plaintiff-appellant in No. 90- 3829.

Denise M. Mercherson, Connie R. Barba (argued),
Office of the State's Atty. of Cook County,
Chicago, Ill., for defendants-appellees in No.
90-3829.

Before WOOD, Jr., [FN*] COFFEY and
MANION, Circuit Judges.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



958 F.2d 1419
(Cite as: 958 F.2d 1419, *1420)

FN* The Honorable Harlington Wood, Jr. assumed senior status on January 16, 1992, which was after oral argument in this case.

**PER CURIAM.**

Plaintiffs Marjane Warren and Mary Burmeister worked in the Cook County Public Defender's Office. When they were demoted or terminated because of alleged violations of office procedure they filed separate suits under 42 U.S.C. § 1983 claiming, *inter alia,* they were denied property rights without due process. The respective district courts found that plaintiffs were not county employees but state employees who were not entitled to a hearing. Both judges dismissed the federal claim for failure to state a claim and the pendent state claims without prejudice. 751 F.Supp. 759 and 751 F.Supp. 1302. Plaintiffs appeal and we affirm. [FN1]

FN1. Although these cases were appealed separately, they were consolidated for purposes of oral argument. We now consolidate them for disposition.

## I.

The two cases before us present similar facts. For purposes of review of a motion to dismiss, we accept the facts set forth in the complaints as true and make all reasonable inferences in favor of the plaintiffs. *Johnson v. Martin,* 943 F.2d 15, 16 (7th Cir.1991). Warren was an employee of the Cook County Public Defender's Office (PDO), and Burmeister was her supervisor. *1421 As alleged, in October 1987, both employees were wrongfully accused of destroying personnel records in violation of federal law by the interim Public Defender, defendant Paul Biebel. Biebel further accused Burmeister of making unauthorized changes in the PDO budget request, favoring some office employees, and breaking into Bob Gevirtz's office. All of the charges were untrue. Neither employee was given a hearing to respond to the accusations, and both were suspended indefinitely without pay.

Soon thereafter, Biebel took further action against Warren by transferring her to a far less desirable position in night bond court, despite the recommendation of her doctor that such a transfer could injure her health. In the letter of transfer, Biebel warned her that failure to report to the new position would lead to termination. Warren alleges that the effect of this letter was to constructively discharge her since she felt compelled by her health and her doctor not to report to night bond court. Ultimately, defendant Randolph Stone, who by then had assumed the position of the Public Defender, discharged her.

As a direct result of the charges against Burmeister, Biebel transferred her to a low-level receptionist position. Several months later, Stone officially demoted Burmeister to the position of receptionist, with a cut in salary of approximately $15,000 per year.

Both plaintiffs allege that the officials responsible for the disciplinary actions acted wholly outside the scope of the Cook County Rules and Regulations Governing Employee Conduct. They allege that they were county employees, and as such any disciplinary proceedings against them should have been conducted in compliance with the county personnel policy. Since the defendants failed to comport with this progressive disciplinary policy, the plaintiffs argue they have been denied the property interests they had in their jobs without due process of law. The defendants assert that Warren and Burmeister were state, not county, employees, and thus the personnel policy on which the plaintiffs base their claims is inapplicable.

## II.

[1] As a prerequisite to establishing a due process violation, plaintiffs must first establish a property right to their respective jobs. *Wolf v. Larson,* 897 F.2d 1409, 1411 (7th Cir.1990). Property interests for purposes of the Fourteenth Amendment "are defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The plaintiffs allege that the Cook County employment policy created a property interest in their jobs. If they are not county employees, however, they cannot rely on the county policy, and their complaints would be insufficient to state a section 1983 cause of action.

For the most part, Illinois statutes are not helpful in determining the employment status of the plaintiffs. The Illinois legislature has enacted no specific provision which clearly designates the county or the state as the employer of the staff of the PDO. [FN2] Nonetheless, the plaintiffs point out that the Illinois

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

958 F.2d 1419
**(Cite as: 958 F.2d 1419, \*1421)**

statute authorizing the appointment of the Public Defender's staff does provide some support for treating them as county employees. This statute provides:

> FN2. Several states do have statutes which declare decisively that persons working in the public defender system are state employees (*see* Tenn.Code Ann. § 8-14-208 (1991), 13 V.S.A. § 5254 (1990), 19 Okl.St. § 138.1 (1990)) or are county employees (*see* S.D.Codified Laws § 7-16A-6 (1991)). Illinois does not have a definitive statute.

Assistants. The Public Defender shall have power to appoint, in such manner as the judges before mentioned shall direct, such number of assistants, all duly licensed practitioners, as such judges shall deem necessary for the proper discharge of the duties of the office, *who shall serve at the pleasure of the Public Defender.* He shall also, in like manner, appoint such number of clerks and other employees as may be necessary for the due transaction of the business of the \*1422 office. The compensation of such assistants, clerks and employees shall be fixed by the County Board and paid out of the county treasury.

Ill.Rev.Stat. ch. 34, § 3-4008 (1989) (amended by 1991 Ill.Legis.Serv. 111 (West)) (emphasis added). The "at the pleasure of" language was left out of the provisions governing "clerks and other employees." Plaintiffs surmise that this omission could indicate that county termination procedures could apply to these employees. However, that is not the only reasonable interpretation. The omission may simply be an oversight by the legislature, or it may mean that the legislature is delegating to the Public Defender the responsibility for formulating some sort of disciplinary policy for his "clerks and other employees." Speculation aside, the statutory language at the time of the alleged violation is inconclusive as to state or county employee status, and the legislative history of the statute then in force is not helpful. [FN3]

> FN3. In support of its position, the dissent relies on the text and legislative history of the 1991 amendments to the public defender enabling act. We note, however, that the 1991 amendments have no bearing on the events at issue here which occurred in 1987 and 1988. In particular, the dissent relies on a statement by Senator Collins: "What this amendment does, it simply separates and make[s], in the County of Cook, the ... Public

Defender's Office independent of the Judiciary." 87th General Assembly, Regular Session, Senate Transcript (June 27, 1991). If the 1991 amendments make the Cook County PDO independent of the judiciary, it follows that prior to the amendments, the PDO was *not* independent of the judiciary. Thus, at the time of the facts giving rise to the plaintiffs' complaints, separation of powers concerns were still implicated.

**[2]** The plaintiffs further argue that since by statute the Public Defender's staff is paid by the county and receives county benefits, this should be indicative of county employee status. This may be a logical argument were we to start with a clean slate. But the Illinois courts have already spoken. The Illinois Supreme Court has determined that funding is not conclusive as to state or county employee status. *Drury v. County of McLean,* 89 Ill.2d 417, 60 Ill.Dec. 624, 627, 433 N.E.2d 666, 669 (1982) ("The fact that counties pay the salaries and expenses of circuit court clerks does not make the office of circuit court clerk a county office."). Recently, in *Orenic v. State Labor Relations Bd.,* 127 Ill.2d 453, 130 Ill.Dec. 455, 466, 537 N.E.2d 784, 795 (1989), the Illinois Supreme Court held:

> [t]he fact that a county pays the salaries of other nonjudicial employees in the judicial branch, or even administers personnel policies covering them by agreement with the judicial branch, does not in constitutional or statutory terms make the county their employer....

> The constitutional tripartite separation of powers strengthens our conclusion that the State, not a county, is the sole employer of all court employees.

*See also Baker v. DuPage County,* 703 F.Supp. 735, 737 (N.D.Ill.1989) (circuit court legal secretary held to be state employee regardless of the fact her paycheck came from the county). Moreover, compensation of nonjudicial court employees can be subject to the ultimate control of the judiciary through its inherent power to compel payment of the funds necessary for the efficient and effective operation of the judicial branch. *See People ex rel. Bier v. Scholz,* 77 Ill.2d 12, 31 Ill.Dec. 780, 782-83, 394 N.E.2d 1157, 1159-60 (1979).

Although the Illinois courts have not yet addressed the specific issue of a PDO employee's status for purposes of section 1983 liability, Illinois case law does provide strong guidance. In *Orenic,* 130 Ill.Dec. 455, 537 N.E.2d 784, the Illinois Supreme

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court addressed whether counties may be considered joint employers of state circuit courts' nonjudicial employees for purposes of collective bargaining under the Illinois Public Labor Relations Act. The status of assistant public defenders was explicitly at issue. The court held that "the State, personified by the chief judge of each circuit, is their employer." *Id.,* 130 Ill.Dec. at 466, 537 N.E.2d at 795. The role of counties is limited:

> Except for setting and paying salaries and providing facilities subject to ultimate court power, the counties are entitled *1423 to no other role in regard to the courts' nonjudicial employees that might arguably be considered the role of a joint employer.

*Id.,* 130 Ill.Dec. at 468, 537 N.E.2d at 797. The court explained that such a result was mandated by the Illinois Constitution which "contemplates '[o]nly one unified court system operating statewide' and 'does not contemplate nor does it authorize the exercise of any control over or permit the imposition of a burden on the judicial system by any local entity.' " *Id.* (quoting *Ampersand, Inc. v. Finley,* 61 Ill.2d 537, 338 N.E.2d 15, 18 (1975)). Treating the counties as joint employers would pose a severe separation of powers problem, "unduly trench[ing] on the judicial branch's separate and equal status." *Orenic,* 130 Ill.Dec. at 470, 537 N.E.2d at 799.

The plaintiffs attempt to distinguish *Orenic* by focusing on the separation of powers issue. They assert that the *Orenic* court had no alternative but to refuse to recognize the counties as joint employers in the collective bargaining context because of significant potential interference with the judiciary's autonomy. By contrast, they maintain, there is no such threat of interference in the present case. Rather, they explain that acknowledging the county as employer for disciplinary proceedings has only a "peripheral impact" on the judiciary, and the *Orenic* court recognized that "legislation may permissibly have a peripheral effect on judicial administration." *Id.,* 130 Ill.Dec. at 468, 537 N.E.2d at 797. The plaintiffs contend that *Orenic* represents a narrow holding, and that it should be confined to collective bargaining under state labor law.

*Orenic* has broader impact than the plaintiffs would like to think. [FN4] But even if we accepted the plaintiffs' contention that PDO employees may be considered state employees for some purposes and county employees for others, the present case would still fall within these narrowed parameters of

*Orenic.* The plaintiffs characterize the impact of the county personnel policy as "peripheral." This is a significant understatement. Holding PDO employees subject to the elaborate county personnel policy would pose the same sort of separation of powers problem that the *Orenic* court sought to prevent. The Illinois Supreme Court found that allowing the counties to assert joint employer status "would be an evisceration of the courts as free and independent employers of their own employees, since authority over compensation is central to employer status." *Id.,* 130 Ill.Dec. at 468, 537 N.E.2d at 797. Like compensation, authority over the standards for disciplining and firing employees is "central to employer status," and should be left solely in the hands of the judicial branch.

FN4. The dissent cites three cases in support of its position that *Orenic* has been limited under Illinois law to the collective bargaining context. Yet, in each of those cases, the court emphasizes that *Orenic* represents a special case precisely because of the separation of powers concerns involved. *People ex rel. Baricevic v. Wharton,* 136 Ill.2d 423, 144 Ill.Dec. 786, 790, 556 N.E.2d 253, 257 (1990) (*Orenic* cited to support the statement that "[t]he prohibition on interfering with the judiciary's administrative authority applies to the executive branch as well as to the legislature."); *AFSCME v. Educ. Labor Relations Bd.,* 197 Ill.App.3d 521, 143 Ill.Dec. 541, 544, 554 N.E.2d 476, 479 (1990) ("[T]he current case lacks the constitutional separation of powers question which underlies *Orenic*."); *Riley v. County of Pike,* 761 F.Supp. 74, 76 (C.D.Ill.1991) ("In *Orenic* ..., constitutional separation of powers concerns were one factor that led the Illinois Supreme Court to hold that the Illinois circuit courts could not be co-employers with the counties in which they sat, even though the counties set and paid the salaries of non-judicial employees.").

To support their claims, the plaintiffs rely on *Kurata v. Silverman,* 95 Ill.App.3d 89, 50 Ill.Dec. 609, 419 N.E.2d 717 (1981), which held that an assistant public defender had the status of a county employee and was therefore protected by the county personnel policy. The majority opinion found county employee status appropriate since the county paid the public defender's salary and expenses, and the public defender was represented by the State's Attorney's Office. But *Kurata* predated the Illinois Supreme Court's holdings in *Drury, supra,* and *Orenic* which clearly discard any reliance on the fact that the county pays the *1424 salary. *Kurata* is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.