**E-FILED**
Tuesday, 26 April, 2005 01:17:16 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | | |
|---|---|---|
| MELISSA ROBINSON,<br>(p/k/a MELISSA SCHROEDER)<br><br>Plaintiff,<br><br>vs.<br><br>JUDGE WARREN A. SAPPINGTON<br>SIXTH JUDICIAL CIRCUIT,<br>(IN OFFICIAL CAPACITY) and<br>MACON COUNTY,<br><br>Defendants. | ) | Case No. 1:04-cv-1360 |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER OBJECTION TO DEFENDANTS' MOTION IN LIMINE RELATED TO LOST RETIREMENT AND INSURANCE BENEFITS**

Plaintiff, MELISSA ROBINSON (p/k/a MELISSA SCHROEDER) ("Plaintiff") by her counsel, Thomson & Weintraub provides the following Memorandum in Support of Her Objection to Defendants' Motion *in Limine* to bar her testimony concerning retirement benefits and insurance benefits as a portion of her damages:

## I. INTRODUCTION

Defendants have known that Plaintiff was seeking compensation for lost retirement benefits and insurance benefits since Plaintiff responded to their interrogatories on March 12, 2001. (Ex. 1)[1]. Additionally, Defendants failed to provide discovery relative to these damages despite Plaintiff's requests. Plaintiff's Second Request to Produce requested, "All documentation concerning benefits to which Plaintiff was entitled during the relevant times,

---

[1]Plaintiff has informed Defendants she no longer intends to seek damages for insurance benefits.

including, but not limited to, insurance benefits and retirement benefits. Defendants also failed to provide documents responsive to the following inquiry, "All manuals describing the above materials." Defendants cannot now complain that Plaintiff intends to use the web site provided to Illinois Municipal Retirement Fund ("IMRF") employees for purposes of calculating her lost retirement benefits.

Moreover, Defendants had ample opportunity to further investigate this claim by seeking leave to further depose Plaintiff prior to the Pre-Trial Conference date. Nevertheless, Plaintiff made herself available for further deposition with the understanding that the parties would then reach a stipulation as to her damages related to lost retirement benefits and insurance. Now, at this late juncture, Defendants contend they would be prejudiced by allowing Plaintiff to testify about these damages. Defendants now seek to use against Plaintiff her good faith in allowing further deposition well beyond all discovery deadlines.

Defendants have provided no case law to support their contention Plaintiff cannot testify to her calculations for her lost retirement benefits consistent with the IMRF web site provided to all IMRF employees for the purpose of calculating their benefits. Additionally, Macon County has submitted Exhibit No. 54, a manual, published by the IMRF, related to retirement benefits. That manual invites employees to utilize the IMRF web site to calculate future pension payments. (Ex. 4). Defendant, Judge Warren A. Sappington has moved to admit that Exhibit pursuant to the Final Pre-Trial Order filed on March 4, 2005. Defendants should now be precluded from questioning the authenticity of the IMRF web site or the admissibility of calculations reached through the use of that web site.

In the event this Court concludes a jury cannot determine the present value of Plaintiff's lost retirement benefits consistent with a jury instruction to be proffered to the Court, Plaintiff concedes she has not presented such testimony. Plaintiff would agree to Defendants' calculation of the present value of lost retirement benefits as established by the IMRF web site and as testified to by Plaintiff in her deposition on March 29, 2005. (Ex. 2). Plaintiff's lost retirement benefits would be established at ninety-five thousand seven hundred and sixteen dollars and thirty-two cents ($95,716.32) and the parties can stipulate to the present value of those retirement benefits consistent with Macon County's calculations introduced during Plaintiff's deposition on March 29, 2005, but revised consistent with the ninety-five thousand seven hundred and sixteen dollars and thirty-two cent ($95,716.32) calculation. (Ex. 2).

## II. ARGUMENT

### A. IMRF Web Site Is Reliable.

The IMRF web site provides IMRF employees a bases for calculating the pension monies they would receive on a monthly basis averaging a number of years of their salary, age at retirement, and years of service at retirement. The IMRF web site further provides an amount the monthly pension benefit will increase yearly. From this calculation provided by the IMRF pension calculator Plaintiff calculated her retirement benefits. She also explained in her deposition how she calculated the amount of annual wages she considered in reaching her calculations.

Plaintiff had expected the parties would stipulate to the calculation of her retirement benefits once Defendants had an opportunity to further depose her for three (3) hours concerning this topic. However, it is now clear that Plaintiff's cooperative nature in providing an additional

deposition is being used against her by Defendants. Judicial notice has been taken of a web site considered reliable and accurate. Denius v. Dunlap, 330 F3d 919, 926 (7th Cir. 2003). Federal Courts have also looked to web site information in making rulings. See Austin v. American Association of Neurological Surgeons, 253 F3d 967, 971 (7th Cir. 2001); Weaver v. Hollywood Casino - Aurora, Inc., 255 F3d 379, 384 (7th Cir. 2001); Robins v. B and B Lines, Inc., 830 F3d 648, 651 (7th Cir. 1987) (court could take judicial notice of arbitration association rules incorporated in pension fund rules). There is no disclaimer on the IMRF web site precluding a party from using this web site to reach their calculations with regard to lost pension benefits. Moreover, Defendants' Exhibits refer employees to the IMRF web site to calculate pension benefits. (Ex. 4).

Plaintiff should not be precluded from testifying that based on the IMRF web site, made available to IMRF employees for purposes of calculating their pension benefits, her lost pension benefits would have totaled ninety five thousand seven hundred sixteen dollars and thirty-two cents ($95,716.32). (Ex. 2 and 4). Barring Plaintiff's testimony would be highly prejudicial.

**B. Life Expectancy Table**

Prior to the Final Pre-Trial Conference Plaintiff provided to Defense counsel Plaintiff's Exhibit 32, a life table for females depicting Plaintiff's life expectancy at 82 years of age. This resource is from the National Vital Statistic Report, Vol. 53, No. 6, November 10, 2004. (Ex. 3). Defendants deposed Plaintiff who disclosed she will testify to her life expectancy at the age of 82, consistent with an earlier Exhibit provided to Defendants prior to the Final Pre-Trial Conference. Defendants seem to suggest Plaintiff should be required to introduce expert testimony concerning this factor. Defendants provide no support for such a contention. This

Court can take judicial notice of Plaintiff's life expectancy as provided by the National Vital Statistics Report. Plaintiff respectfully requests that this Court do so.

**C. Jury Instruction or Stipulation Can Remedy Present Value Concerns.**

Plaintiff concedes she has not presented evidence as to the present value of her lost retirement benefits. Nor, however, has either Defendant provided this Court with case law that requires Plaintiff to provide such testimony. A jury could be instructed that it must discount Plaintiff's damages related to her retirement benefits to present value.[2] If this Court believes a specific present value of Plaintiff's retirement benefits should be presented to the jury Plaintiff will agree to stipulate to Macon County's calculation of her lost retirement benefits as presented in the course of Plaintiff's March 29, 2005, deposition if Defendants agree to revise the lost retirements calculations consistent with Plaintiff's calculation as opposed to their calculation in the amount of approximately eighty-two thousand dollars ($82,000.00).

## III. CONCLUSION

Contrary to Defendants' contention it is Plaintiff who would be severely prejudiced if not permitted to testify about her lost retirement benefits. Defendants had amply opportunity to further investigate Plaintiff's claims for lost retirement benefits and lost medical insurance. In March 2001, Plaintiff disclosed these damages would be sought. Defendants were provided ample opportunity to further depose Plaintiff concerning these damages in an effort to reach a stipulation. Rather, Defendants have attempted to turn the table on Plaintiff and use this testimony to preclude her testimony. Plaintiff should not be penalized for following this Court's

---

[2]In an effort to simplify matters for stipulation and presentation to the jury, Plaintiff has not muddied the waters by also seeking pre-judgment interest.

direction to attempt to stipulate to her damages for presentation to the jury.

Defendants' Motion *in Limine* as to Plaintiff's retirement benefits and insurance benefits damages should be denied. In the event this Court believes presentation of the present value of Plaintiff's lost retirement benefits to the jury is inappropriate, Plaintiff will stipulate to a present value of her lost retirement benefits.

Respectfully submitted,
By: s/ Melissa M. McGrath

Melissa M. McGrath Attorney Bar No. 6207263
Attorney for Plaintiff
Thomson & Weintraub
105 North Center Street
Bloomington, Illinois 61701
Phone: (309) 829-7069
Fax: (309) 827-3458
E-mail: mmcgrath@tnwlaw.com

Subscribed and sworn to before me
this 26th day of April, 2005.

Angela M. Park
Notary Public

"OFFICIAL SEAL"
Angela M. Park
Notary Public, State of Illinois
My Commission Exp. 10/21/2008

**NOTICE OF FILING**

I hereby certify that on April 26, 2005, I presented the foregoing document to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

Mr. John Cassidy
CASSIDY & MUELLER
323 Commerce Bank Bldg.
416 Main Street
Peoria, IL 61602

Ms. Diane M. Baron, Esq.
Clausen Miller PC
10 South La Salle Street
Chicago, Illinois 60603-1098

Ms. Karen McNaught
Chief, General Law Bureau
500 S. Second Street
Springfield, Illinois 62706

By: s/ Melissa M. McGrath
Melissa M. McGrath Attorney Bar No. 6207263
Attorney for Plaintiff
Thomson & Weintraub
105 North Center Street
Bloomington, Illinois 61701
Phone: (309) 829-7069
Fax: (309) 827-3458
E-mail: mmcgrath@tnwlaw.com

Subscribed and sworn to before me
this 26th day of April, 2005.

Notary Public

"OFFICIAL SEAL"
Angela M. Park
Notary Public, State of Illinois
My Commission Exp. 10/21/2008

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

MELISSA ROBINSON,
(p/k/a/ MELISSA SCHROEDER)

Plaintiff,

vs.

Case No. 99-2266

JUDGE WARREN A. SAPPINGTON
SIXTH JUDICIAL CIRCUIT,
(IN OFFICIAL CAPACITY AND
INDIVIDUALLY)

Defendant,

MACON COUNTY,

Defendant,

JOHN P. SHONKWILER, CHIEF JUDGE,
SIXTH JUDICIAL CIRCUIT, MACON
COUNTY CIRCUIT COURT, MACON
COUNTY, (IN OFFICIAL CAPACITY AND
NOT INDIVIDUALLY).

Defendant.

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S INTERROGATORIES**

Plaintiff, Melissa Schroeder Robinson, by her attorneys, Thomson & Weintraub, and pursuant to Federal Rule of Civil Procedure 33 provides the following as her answers to Defendant's Interrogatories:

1. State your full name (including any aliases and dates of those aliases), addresses of all locations at which you lived within the last twenty years, your date of birth, and your social security number.

**RESPONSE:**

Name: Melissa Lynn Robinson
Address: 371 Shoreline Place
Decatur, IL 62521
Phone No. (217) 422-5832

**Plaintiff's Exhibit 1**

| | |
|---|---|
| Previous Information: | Melissa Lynn Schroeder<br>4093 Camelot Dr.<br>Decatur, IL 62526 |
| Maiden Name: | Melissa Lynn Schwengel |
| DOB: | 2-4-72 |
| SS#: | 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 |

Plaintiff objects to the 20 year duration of the Interrogatory request as overly burdensome and not relevant to the pending matter. Plaintiff has provided information relevant to the previous 10 years.

2. List all of the places in which you have been employed for the last twenty years. For each entry, give the places of employment, address, telephone number, and owner of the business and/or the name of the last person who supervised you.

**RESPONSE:**

i. Alliance for the Mentally Ill of Illinois
730 E. Vine Street
Springfield, IL 62703
(217) 522-1403
Supervisor: Randy Wells

ii. Soyland Access to Independent Living
2545 Millikin Parkway
Decatur, IL 62526
(217) 876-8888
Supervisor: Matt Abrahamson/Jim Hoffert

iii. Piatt County Mental Health Center
1921 E. Market Street
Monticello, IL 61856
(217) 762-8546
Supervisor: Phyllis Usher

iv. Residential Developers
910 Hillside Court
Monticello, IL 61856
(217) 762-2888
Supervisor: Mike Stanfield/Chris Patton

Plaintiff objects to the duration of the request. Plaintiff has limited her responses to the previous ten years. Anything beyond that is overly broad, unduly burdensome and not likely to lead to relevant information.

3.     List all of the incidents in which you claim you were sexually harassed by Judge Sappington. For each entry, state who was present, what was said or done, the date of the occurrence, and where the place of the occurrence allegedly took place.

**RESPONSE:**

Plaintiff objects.  Deposition testimony is the proper venue for such an inquiry.  Subject to this objection Plaintiff responds:

(a)     On or about July 26th, 1996, Judge Sappington began to inquire about my personal life, i.e., the state of my marriage.  On one occasion on or about July 29, 1996, Judge Sappington offered to purchase a sexual device for me.  Also beginning at this period, Judge Sappington would remark about my personal appearance, noting that I had a "beautiful body"; that he felt "I was a goddess".  He also introduced me to individuals in the courthouse saying, "This is Missy Schroeder, not only is she very beautiful, but she is also very intelligent."  He once noted to me that he watched for my vehicle to arrive at work.  Judge Sappington also discouraged any verbal contact between myself and men who had business with the Circuit Court.

(b)     On or about August 19, 1996, Judge Sappington accused me of carrying on an affair with a local attorney.  As a result of Judge Sappington's feelings towards me, Judge Sappington indicated he could no longer handle cases of that particular attorney, despite my report that nothing had occurred, nor was occurring, between myself and this attorney.

(c)     On or about September 9, 1996, Judge Sappington approached me, placed my face in his hands and forced me to gaze at him.  Judge Sappington indicated if he learned I was "shacking up with" anyone, he would kill me.

(d)     On or about September 12, 1996, Judge Sappington directed me to his courtroom and directed me to lock the door.  Judge Sappington proceeded to explain his previous behaviors by indicating he was attempting to deal with the issue of mortality and with his feelings toward me.  Judge Sappington further indicated to me I should not resign from my position, and further that he would never let his feelings toward me again get out of hand.

(e)     In mid-September, 1996 Judge Sappington responded that he would like nothing more than to publicly kiss me in front of court personnel and note their reaction.  I expressed to him my disgust with his remark.  He, however, merely shrugged off my concern with a laugh.

(f)     On or about September 18, 1996, Judge Sappington told me that he had shared with another court personnel member that he (Judge Sappington)

"would let me sit on his face". On the following day Judge Sappington inquired as to whether I had any questions with regard to our conversation of September 18. Out of fear for his authority over me, I indicated that I had no questions. He proceeded to tell me he would "not do anything until after I was divorced."

(g)   In September 1996, Judge Sappington's behaviors appeared irrational; he complained about my providing assistance to other judges within the Sixth Circuit and my contact with local attorneys.

(h)   Again, in October 1996, Judge Sappington's behaviors included glaring at me and remarking about my personal appearance.

(i)    On or about October 3, 1996, Judge Sappington summoned me along with an Assistant State's Attorney to his Courtroom. Upon my inquiry he explained he had done so to discuss a recent murder victim indicating that because I was "beautiful and naive", I, too, would some day face rape and murder the same way this victim had.

(j)    On October 11, 1996, it became clear to me that Judge Sappington's sexually harassing behaviors would not cease. During trial testimony, a local attorney appeared in the courtroom while I, too, was present as Judge Sappington's clerk. The local attorney approached me to ask me to go to Judge Steadman's chambers to address a scheduling conflict in a particular case. When I left the courtroom, Judge Sappington suddenly stopped the proceedings, leaving the courtroom in the middle of a witnesses testimony. He stormed into the chambers and called the local attorney into his chambers for further discussion.

(h)   I was out at my mother's home in Warrensburg, Illinois, trying to think. I had been out there between 10 and 15 minutes when a plane starting flying overhead. It made several circles around the property. It was flying fairly low. I went inside for a few minutes and then went back outside and left. I had suspicioned that the person in the plane was Judge Sappington. It made me feel ver uncomfortable and when I went to work on the following Monday and asked Judge Sappington what he did over the weekend. He began boasting how he went flying over the weekend and how he flew over my mother's home. He spoke of how beautiful it was and so on. I made no response to his comments and left his office.

(g)   Judge Sappington continually shook my hand in person and in front of office staff and attorneys. Judge Sappington indicated that he wished more than anything that he could give me a hug. I indicated that was not what I wanted. It was over one mother later that Judge started shaking my hand.

(h)     Judge Sappington called me beautiful between 75 to 100 times between August 1996 to November 1996.

(i)     Judge Sappington called me a Goddess on 30-50 occasions.

(j)     Judge Sappington called me a "Blonde Demi Moore" on more than 25 occasions.

Discovery Continues

4.     State the names, addresses, and telephone numbers, and dates of occurrences known to you or your attorney, or your representatives, or anyone acting on your behalf or their own behalf:

a)     Of all persons who saw or heard, or claim to have seen or heard, or to have any knowledge of any of the events or happenings which occurred at the time of or at the scene of the incident referred to in your lawsuit, and the events leading up to or immediately after the said incident. State the relationship of each such witness to you.

b)     Of all persons who heard, or claim to have heard, any statements made by any person concerning how the incident happened or the person or persons at fault in the occurrence.

c)     Of all persons who claim to have any knowledge concerning the events, injuries, or damages claims to be sustained by you or others in the incident, other than any doctors as previously mentioned.

**RESPONSE:**

Ruth Young
123 S. Taylor Avenue
Decatur, IL 62522
(217) 875-0319

Judge John K. Greanias
Macon County Courthouse
253 E. Wood Street
Decatur, IL 62523
(217) 424-1434

Judge John L. Davis
Macon County Courthouse
253 E. Wood Street
Decatur, IL 62523
(217) 424-1437

John Robinson
Plaintiff's Husband

Leona Miller
Macon County Courthouse
253 E. Wood Street
Decatur, IL 62523
(217) 424-1434

Janice Shonkwiler
Macon County Courthouse
253 E. Wood Street
Decatur, IL 62523
(217) 424-1434

Judge Paul M. Francis
Macon County Courthouse
253 E. Wood Street
Decatur, IL 62523
(217) 424-0857

Discovery Continues

        5.      List each occurrence when you complained to an employee of the State of
Illinois about the alleged sexual harassment by Judge Sappington. For each such entry,
state to whom you complained, when (time and date) you complained, of what you
complained or what you stated, where the alleged complaint took place, who was
present, and what action was taken as a result of your complaint.

**RESPONSE:**

        Plaintiff objects.  Deposition testimony is the proper venue for such an inquiry.
        Subject to this objections Plaintiff responds:

a)      I went to Ruth Young on several occasions and she came to me and she
        made sure that I needed to understand that what she felt was that Judge
        Sappington was obsessed with me.

b)      I wrote a letter to Judge Sappington about his actions in October, 1996,
        on the day the occurrence with Frank Byers took place and I informed him
        that he was out of line and out of control.  He tried to reach me by phone
        18 times through that day when I requested he leave me alone.  During
        this time he flew over my family's home in his airplane.

c)      On the date of the occurrence with Frank Byers, I went to Janice
        Shonkwiler, who informed me that Judge Greanias was on vacation but
        gave me his home phone number and indicated that I needed to contact
        him immediately.

d)      I told Janice Shonkwiler what occurred and that I would be leaving the
        courthouse because I was very upset.

e)      I called Judge Greanias at home.  He listened to what I had to say.
        Indicated that he had already spoken with Judge Sappington the previous
        week about his actions towards me and indicated that Judge Shonkwiler
        was also aware of the actions of Judge Sappington.  Judge Greanias
        state that he did not know if God ever intended to have men and women
        work together.  Judge Greanias asked me what I felt was the matter with
        Judge Sappington.  I told him that I believed that Judge Sappington felt
        that he was in love with me.  Judge Greanias indicated that I needed to
        take an Administrative Leave of Absence, Paid, so that he could deal with

Sappington and that he would speak with Judge Sappington the following day on a Saturday, because Sappington was scheduled to do Saturday Bond Court.

f)  On October 11, I left work after having taken ill as a result of Judge Sappington's behaviors. On that same date, I phoned the Presiding Judge, and related my concerns about Judge Sappington's sexually harassing behaviors toward me. The Presiding Judge reported that he had spoke with Judge Sappington previously about his behaviors toward me and assured me he would again speak with him.

g)  I told Judge Greanias on the phone when I called him at his home that day that Judge Sappington had previously made a sexual remark to Judge Davis and Judge Francis about me. Judge Greanias' remark was that he was not sure if it was a good idea for men and women to work together in the same workplace.

h)  As a result of Judge Sappington's behaviors, I took a two day administrative leave. Upon my return I reported my concerns about Judge Sappington's behaviors to the Administrative Assistant to the Presiding Judge of the Circuit.

i)  In late November 1996, I was informed by the Presiding Judge that I was being transferred to work with a different judge within the circuit. I was told that due to ongoing rumors about his behaviors, Judge Sappington had to be "protected."

j)  Judge Sappington was in Judge Greanias' office with me when Judge Greanias indicated that the transfer was due to the rumors and he further stated that I had been mentally abused in my current situation and Judge Greanias further indicated that he must make the transfer because he had a judge to protect.

k)  During this period of time, although I considered leaving the position to return to school full-time, because of my financial situation, I could not do so. The Presiding Judge informed me I had a week to decide whether to accept the transfer or resign.

l)  Judge Greanias told me I would be treated as the problem and not the victim. He further told me that due to the emotion and mental abuse I had already dealt with, transferring was not in my best interest.

m)  On November 25, 1996, I expressed to the Presiding Judge that I intended to accept the transfer. However, the Presiding Judge then informed me that in his view, the transfer was not "in my best interest." The Presiding Judge further told me that the judge whom I was being

transferred to work with had expressed dissatisfaction with the rearrangement. The Presiding Judge further told me, "I would be treated as though I was the problem and not the victim."

n)     The Presiding Judge of the Circuit Court also indicated it was in my "best interest to resign."

o)     I asked the Presiding Judge whether I could be transferred to a judge who was not dissatisfied with the transfer; the Presiding Judge indicated this was not possible.

p)     On November 27, 1996, the Presiding Judge again pressured me for my decision. I was under extreme pressure to resign. I ultimately indicated to the Presiding Judge that I would do so. However, I felt no other option was provided to me.

q)     The Presiding Judge wanted me to indicate in writing I was resigning for school purposes, I refused to do so. During my conversation in regards to my resignation, the Presiding Judge conceded that I should indicate in my resignation letter that I was "resigning because I was working for idiots who did not know how to deal with a situation."

r)     On November 21, 1996, Judge Sappington indicated to me he did not believe his behaviors were improper. I reported these remarks to the Presiding Judge of the circuit, who responded merely that he understood how I felt and that Judge Sappington had not realized how "obvious" he had made his feelings toward me known. On the same day Judge Sappington further indicated to me he had observed my vehicle in the county parking lot in the evening hours.

Discovery Continues

6.     If you were unsatisfied with the action that was taken as a result of your alleged complaint, what action did you request to take?

**RESPONSE:**

Plaintiff objects. It was not Plaintiff's obligation to remedy the sexually harassing behaviors once she notified her employer of these behaviors. Without waiving this objection Plaintiff states as follows:

a)     Plaintiff throughout the sexual harassment by Judge Sappington objected to these behaviors and asked that they cease. Plaintiff also sought direction from the Administrative Assistant as well as the Presiding Judge.

b)   I asked the Presiding Judge whether I could be transferred to a judge who was not dissatisfied with the transfer; the Presiding Judge indicated this was not possible.

c)   When I came back from Administrative Leave I was placed with Judge Diamond. I enjoyed the work. I was told that his clerk was unhappy working with Sappington and within a short period of time I was placed back with Sappington. I was approached by Janice Shonkwiler and she asked if I was concerned about this. I indicated that I was but I was not being given a choice and I would go in at the last minute before court started and would immediately leave and return to my desk.

d)   Judge Greanias after moving me back with Sappington came to Sappington one evening and stated that I was going to be moved to Judge Francis. Judge Francis was not happy about this and this is when Judge Greanias informed me that I would be treated like the person to blame and not as a victim and that the first six months would be hell. He suggested I resign for my own protection.

Discovery Continues

7.    List all of the physicians, mental health personnel, medical personnel, or other health care professionals which you have seen or of whom you have been in the care as a result of the incidents alleged in your complaint in the case at bar. For each such entry, give the name, last known address, telephone number, type of service rendered, dates of service, payments made, and diagnosis.

**RESPONSE:**

Eva Muller, Ph.D.
980 Clock Tower Dr.
Springfield, IL 62704-1304
(217) 793-0688

Bob Cokely, Ph.D.
348 W. Prairie
Decatur, IL 62522
(217) 422-0053

Discovery Continues. Plaintiff's counsel is in the process of obtaining medical records and bills.

8. List all of the damages you claim in your complaint, specifying the amount of damages you claim for each entry.

**RESPONSE:**

**DAMAGES TO DATE**

| | | |
|---|---|---|
| Lost Wages | $ 4,800.00 | |
| Gas to Springfield | $ 2,400.00 | (1 year) |
| Depreciation on Jeep | $ 2,000.00 | (Grand Cherokee) |
| Counseling | $ 4,000.00 | (Past and future counseling) |
| Emotional Distress | $300,000.00 | |
| Punitive Damages | $300,000.00 | |
| **TOTAL DAMAGES** | **$613,200.00** | |

Calculations exclude retirement benefits and other benefits not yet valued, attorney fees and costs.

Discovery Continues

9. List any time other than the alleged incidents involving Judge Sappington that you claim you were the victim of sexual harassment or any other type of discrimination. For each such entry, state the name, address, and telephone number of the alleged person who discriminated against you, the date of the alleged discrimination, the nature of the alleged discrimination (give complete details), where the alleged discrimination occurred, and any complaints filed or results of the claim that you made.

**RESPONSE:**

Plaintiff was discriminated against in the treatment she received by the Presiding Judge as well as the Chief Judge of Macon County and the Administrative Assistant to the Presiding Judge. Plaintiff's complaints of sexual harassment by Judge Sappington were disregarded in order that Judge Sappington be protected. This disregard for Plaintiff's complaints of sexual harassment is an additional form of sexual discrimination perpetrated upon her by her employers.

See Plaintiff's responses to additional Interrogatory materials.

Discovery Continues

10. What evidence do you have that Judge Shonkwiler knew of the incidents alleged in your complaint? For each such entry, state what Judge Shonkwiler knew, how he was made aware of the alleged incidents, when he was made aware of the incidents, and who advised him of such alleged incidents.

**RESPONSE:**

a) I was told by Janice Shonkwiler that she felt Judge Shonkwiler knew about the incidents because he was calling a lot to speak with Judge Greanias during the time of the occurrences.

b) Judge Greanias told me while we were going through the moving option to Judge Francis that Judge Shonkwiler was aware of what was going on.

c) Judge Sappington acknowledged to me that he believed Cheryl Sappington contacted Judge Shonkwiler because she was concerned about her husband's feelings towards me and intended on putting a stop to it.

Discovery Continues.

Respectfully Submitted,

Melissa Robinson

MELISSA ROBINSON,
p/k/a Melissa Schroeder, Plaintiff

MELISSA M. McGRATH
Thomson & Weintraub
105 North Center Street
P.O. Box 3577
Bloomington, Illinois 60702-3577
(309) 829-7069

**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

MELISSA ROBINSON,
(p/k/a/ MELISSA SCHROEDER)

Plaintiff,

vs.

Case No. 99-2266

JUDGE WARREN A. SAPPINGTON
SIXTH JUDICIAL CIRCUIT,
(IN OFFICIAL CAPACITY AND
INDIVIDUALLY)

Defendant,

MACON COUNTY,

Defendant,

JOHN P. SHONKWILER, CHIEF JUDGE,
SIXTH JUDICIAL CIRCUIT, MACON
COUNTY CIRCUIT COURT, MACON
COUNTY, (IN OFFICIAL CAPACITY AND
NOT INDIVIDUALLY).

Defendant.

**AFFIDAVIT OF COMPLIANCE**

NOW COMES MELISSA SCHROEDER, p/k/a MELISSA ROBINSON, Plaintiff, and states that she has fully complied with the Interrogatories propounded by Defendant, John P. Shonkwiler

Melissa Robinson
MELISSA SCHRODER,
p/k/a MELISSA ROBINSON

Subscribed and sworn before me
this 10 day of March, 2000.

Notary Public

MELISSA M. McGRATH
Thomson & Weintraub
105 North Center Street
P.O. Box 3577
Bloomington, Illinois 60702-3577
(309) 829-7069

IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MELISSA ROBINSON, (f/k/a/ MELISSA SCHROEDER)

Plaintiff,

vs.

JUDGE WARREN A. SAPPINGTON SIXTH JUDICIAL CIRCUIT, (IN OFFICIAL CAPACITY AND INDIVIDUALLY)

Defendant,

MACON COUNTY,

Defendant,

JOHN P. SHONKWILER, CHIEF JUDGE, SIXTH JUDICIAL CIRCUIT, MACON COUNTY CIRCUIT COURT, MACON COUNTY, (IN OFFICIAL CAPACITY AND NOT INDIVIDUALLY).

Defendant.

Case No. 99-2266

FILED
MAR 14 2001
JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

**PROOF OF SERVICE**

The undersigned certifies that Plaintiff's Response to Defendants Shonkwiler and Sappington's Interrogatories was served upon the Attorneys of Record of all parties where indicated to the above-entitled cause by enclosing same in an envelope plainly addressed to such at their place of business, as disclosed by the pleadings of record herein, with postage fully prepaid by depositing said envelope in a U.S. Post Office Box in Bloomington, Illinois on the 12 day of March 2001.

**Attorney of Record**

Ms. Karent McNaught
Assistant Attorney General
500 South Second Street
Springfield, IL 62706

Mr. Robert Gillespie
Hinshaw & Culbertson
400 S. Ninth Street, Ste 200
Springfield, IL 62701

Mr. John Cassidy
Cassidy & Mueller
323 Commerce Bank Bldg.
416 Main Street
Peoria, IL 61602

Diane Baron
Clausen Miller P.C.
10 South LaSalle Street
Chicago, IL 60603-1098

Melissa M. McGrath

Subscribed and sworn before me this 12 day of March, 2001

Notary Public

OFFICIAL SEAL
MARCY A SEEMAN
NOTARY PUBLIC STATE OF ILLINOIS
MY COMMISSION EXP. FEB. 8,2004

**MELISSA M. MCGRATH**
Thomson & Weintraub
105 N. Center Street
Bloomington, IL 61701
(309) 829-7069

# Lost Retirement Benefits



PLAINTIFF'S
EXHIBIT
38
1:04-cv-1360

| Inactive IMRF Retirement Age | Benefits @ Retirement Based on 8 Yrs. Service | Yrly. Benefit w/ annual increase of $6.08 per month |
|---|---|---|
| 55 | 202.79 | 2433.48 |
| 56 | 208.87 | 2506.44 |
| 57 | 214.95 | 2579.4 |
| 58 | 221.03 | 2652.36 |
| 59 | 227.11 | 2725.32 |
| 60 | 233.19 | 2798.28 |
| 61 | 239.27 | 2871.24 |
| 62 | 245.35 | 2944.2 |
| 63 | 251.43 | 3017.16 |
| 64 | 257.51 | 3090.12 |
| 65 | 263.59 | 3163.08 |
| 66 | 269.67 | 3236.04 |
| 67 | 275.75 | 3309 |
| 68 | 281.83 | 3381.96 |
| 69 | 287.91 | 3454.92 |
| 70 | 293.99 | 3527.88 |
| 71 | 300.07 | 3600.84 |
| 72 | 306.15 | 3673.8 |
| 73 | 312.23 | 3746.76 |
| 74 | 318.31 | 3819.72 |
| 75 | 324.39 | 3892.68 |
| 76 | 330.47 | 3965.64 |
| 77 | 336.55 | 4038.6 |
| 78 | 342.63 | 4111.56 |
| 79 | 348.71 | 4184.52 |
| 80 | 354.79 | 4257.48 |
| 81 | 360.87 | 4330.44 |
| 82 | 366.95 | 4403.4 |

Total from Age 55 to age 82 = $95,716.32

| Year | Yearly Salary |
|---|---|
| 1996 | 18,500 |
| 1997 | 19,300 |
| 1998 | 20,130 |
| 1999 | 20,995 |
| 2000 | 21,898 |
| 2001 | 22,840 |

Home Members Retirees Employers Legislation Site Map Search

# IMRF Pension Calculator

IMRF Online

***Estimate your retirement benefits now!***

This pension calculator will give you an estimated pension amount based upon information you provide. Since ar benefits must be determined at the time you retire based on your actual information at that time, this estimate ma accurate.

**Please note that this Pension Calculator does not use your actual account data.** If you wish to see a more a estimate, you can either request a formal pension estimate, or request a User ID and password for our Secure M Access area, which includes a pension estimator that uses your actual member information.

**Please select the IMRF plan you will retire under:**

Regular IMRF

Sheriff's Law Enforcement Personnel (SLEP)

Elected County Official (ECO)

Elected County Official (ECO) with 20 years of SLEP Service

**Enter your age at retirement:**

Years: Months:

**Enter the total service credit you will have earned at retirement:**

Years: Months:

**Enter your Monthly Final Rate of Earnings(FRE)*:**

$

* For the Regular or SLEP plans, the amount should be a monthly average of the highe consecutive 48 months out of the last 10 years. For the ECO plan, the amount should I earnings rate divided by 12.

Enter this amount as a whole number, rounded to the nearest dollar, with no punctuatic example, if your Final Rate of Earnings at retirement will be $4,250.80 you would enter box above.

Calculate

Return to previous page

If you have questions regarding IMRF benefits, contact us by email or call 1-800-ASK-IMRF (1-800-275-4673).

*IMRF Online provides a brief summary of IMRF benefits and the administration of those benefits. IMRF members' and employers' rights and obligations are governed by Article 7 of the Illinois Pension Code.*

00533

| Home Page | Members | Retirees | Employers | Inactive Members | Publications | Legislation | Find IMRF |
|Employment at IMRF | Board of Trustees |Field Services| About IMRF | Site Map | Search |

1:04-cv-01260-MMM-BGC # 334 Page 27 of 43
MAR 29, 2005 20:17 000-000-00000 Page 3
IMRF - Pension Calculator Result Page 1 of 1

Home Members Retirees Employers Legislation Site Map Search

IMRF Online

# IMRF Pension Calculator

***Estimate your retirement benefits now!***

Here are the results of your pension calculator processing. Please remember that these numbers are calculated based upon the information that you have provided and will be accurate only to the extent of that information.

| | |
|---|---|
| You have selected the following plan | Regular |
| You gave your age at retirement as | 55 Years |
| You gave your service at retirement as | 8 Years |
| You gave your monthly Final Rate of Earnings for benefit purposes as | $ 1,789 |
| Based upon the data above, you would be entitled to a monthly IMRF pension benefit of | $ 202.79 |
| Each January 1st your monthly benefit will increase by | $ 6.08 |

Your pension will be determined at the time of your retirement and will be based on actual records and calculated under the provisions of Article 7 of the Illinois Pension Code (40 ILCS 5/7-101 *et seq.*).

Another Calculation?
Home

If you have questions regarding IMRF benefits, contact us by email or call 1-800-ASK-IMRF (1-800-275-4673).

*IMRF Online provides a brief summary of IMRF benefits and the administration of those benefits. IMRF members' and employers' rights and obligations are governed by Article 7 of the Illinois Pension Code.*

| Home Page | Members | Retirees | Employers | Inactive Members | Publications | Legislation | Find IMRF | Employment at IMRF | Board of Trustees |Field Services| About IMRF | Site Map | Search |

For questions or comments about this web site, email webmaster.

Copyright @ 2003 Illinois Municipal Retirement Fund

http://www.imrf.org/AllAccess/PensionCalculator.asp 3/24/2005



THE WORLD FACTBOOK

Select a Country or Location

CATEGORIES

**United States**

Click to enlarge

Introduction
Geography
People
Government
Economy
Communications
Transportation
Military
Transnational Issues

Home Reference Maps Appendixes Print-Friendly Page

In general, information available as of 1 January, 2004 was used in the preparation of The World Factbook 2004.

This page was last updated on 13 January, 2005

Legend: Definition Field Listing Rank Order

**Introduction** **United States**

Top of Page

**Background:**

**00535**

Britain's American colonies broke with the mother country in 1776 and were

world's third-largest country by size (after Russia and Canada) and by populatic (after China and India); Mt. McKinley is highest point in North America and Death Valley the lowest point on the continent

**People** **United States**

Top of Page

**Population:**

293,027,571 (July 2004 est.)

**Age structure:**

*0-14 years:* 20.8% (male 31,122,974; female 29,713,748)
*15-64 years:* 66.9% (male 97,756,380; female 98,183,309)
*65 years and over:* 12.4% (male 15,078,204; female 21,172,956) (2004 est.)

**Median age:**

*total:* 36 years
*male:* 34.7 years
*female:* 37.4 years (2004 est.)

**Population growth rate:**

0.92% (2004 est.)

**Birth rate:**

14.13 births/1,000 population (2004 est.)

**Death rate:**

8.34 deaths/1,000 population (2004 est.)

**Net migration rate:**

3.41 migrant(s)/1,000 population (2004 est.)

**Sex ratio:**

*at birth:* 1.05 male(s)/female
*under 15 years:* 1.05 male(s)/female
*15-64 years:* 1 male(s)/female
*65 years and over:* 0.71 male(s)/female
*total population:* 0.97 male(s)/female (2004 est.)

**Infant mortality rate:**

*total:* 6.63 deaths/1,000 live births
*male:* 7.31 deaths/1,000 live births
*female:* 5.91 deaths/1,000 live births (2004 est.)

**Life expectancy at birth:**

*total population:* 77.43 years
*male:* 74.63 years
*female:* 80.36 years (2004 est.)

**Total fertility rate:**

2.07 children born/woman (2004 est.)

**HIV/AIDS - adult**

00536



Home Members Retirees Employers Legislation Site Map



# About IMRF

***Information about the Illinois Municipal Retirement Fund***

About IMRF
- About IMRF
- Find IMRF
- Springfield Regional Counseling Center
- Frequently Asked Questions (FAQ)
- Ethics Policy
- Glossary of Terms
- Freedom of Information Act (FOIA)
- Contact Us

- Member Access
- Employer Access
- Pension Calculator
- IMRF Forms
- Publications
- Inactive Members
- About IMRF
- en español
- Board of Trustees
- Field Services
- Employer Workshops
- Member Workshops
- Employment at IMRF
- Find IMRF Employers
- Frequently Asked Questions
- Glossary of Terms
- Find IMRF
- For Reciprocal Systems
- Doyle Rowe LTD
- NCPERS Life Insurance
- Contact Us
- Privacy Policy & Legal Disclaimer

## About the Illinois Municipal Retirement Fund

The Illinois Municipal Retirement Fund was created in 1939 by the Illinois General A and began operating in 1941 with 5 original employers and $5,000 in assets. Today serves more than 2,800 employers and has more than $16.3 billion in assets.

Since 1941, IMRF has provided employees of local governments and school district (with the exception of the City of Chicago and Cook County) with a sound and effici for the payment of retirement, disability, and death benefits.

As of December 2003, IMRF counted 167,952 active members, 75,775 annuitants, local units of government in Illinois.

*IMRF Mission Statement*

*"To efficiently and impartially develop, implement, and administer in a prudent manner programs that provide income protection to members and their beneficiaries on behalf of participating employers."*

Read more about our visions and values.

### How is IMRF administered?

IMRF is established under statutes adopted by the Illinois General Assembly. It is g a Board of eight Trustees who must also be participating members and one trustee be receiving an IMRF annuity.

Four trustees are elected by employers, three are elected by participating members non-voting annuitant trustee is elected by IMRF annuitants (individuals receiving IM retirement benefits). Trustees receive no compensation, only reimbursement for ex

The Board appoints an Executive Director who is responsible for all administrative f and supervision of staff employees. The Board also appoints medical and investme consultants, an actuary and an independent auditor.

IMRF administers three plans: Regular IMRF, Sheriff's Law Enforcement Personnel and the Elected County Official Plan (ECO).

### How do IMRF benefits plans work for our members?

00537

#### How the IMRF plan operates locally

1:04-cv-01360-MMM-BGC # 334 Page 31 of 43
JAN-26-2005 01:26 000-000-00000 Page 10
IMRF Online - About IMRF Page 2 of 2

IMRF serves employers including cities, villages, counties, school districts, townshi various special districts, such as parks, forest preserves and sanitary districts. Altho participation exceeds 160,000 members, IMRF is a local program. Each employer b account to provide future benefits for its own employees.

### How the IMRF SLEP plan operates locally

The IMRF SLEP program currently serves approximately 130 units of government a membership of more than 3,000 participants. However, IMRF is still a local program SLEP employer builds up a savings account to provide pensions for its SLEP memb

### How the IMRF ECO plan operates locally

The ECO plan is an alternative benefit plan for elected county officials providing en disability, retirement, and death benefits.The ECO plan is an employer option, the c first adopt the plan in order for the elected county official to participate in it.

### IMRF Authorized Agents

Each IMRF employer appoints one of its employees to serve as IMRF Authorized A IMRF Authorized Agent handles the operation of the plan locally and has the neces to apply for all IMRF benefits.

If you have questions regarding IMRF benefits, contact us by email or call 1-800-ASK-IMRF (1-800-275-4673)

*IMRF Online provides a brief summary of IMRF benefits and the administration of those benefits. IMRF members' and employers' rights and obligations are governed by Article 7 of the Illinois Pension Code.*

| Home Page | Members | Retirees | Employers | Inactive Members | Publications | Legislation | Find IMRF |
| Employment at IMRF | Board of Trustees | Field Services | About IMRF | Site Map | Search | Privacy Policy & Legal Disclaimer |

For questions or comments about this web site, email webmaster.

Copyright © 2004 Illinois Municipal Retirement Fund
Page Last Updated by JEC on 12/20/05

00538

http://www.imrf.org/info/about.htm 1/26/2005

View the 2003 Member Statement mailing schedule

Home Members Retirees Employers Legislation Site Map

# Inactive Members IMRF Online

***Information for inactive members of IMRF***

Inactive Members
Address Change
Benefits at a Glance
Contribution Refunds
Changing IMRF Information
Service Credit
Divorce (QILDRO)
Find an IMRF Employer
Forms
*Fundamentals* newsletters
Glossary
Long Term Care Insurance
Member Access
Member Statements
Pension Calculator
Reciprocal Act and Systems
Refund of Contributions
Member Workshops
Member Access
Employer Access
Pension Calculator
IMRF Forms
Publications
Inactive Members
About IMRF
en español
Board of Trustees
Field Services
Employer Workshops
Member Workshops
Employment at IMRF
Find IMRF Employers
Frequently Asked Questions
Glossary of Terms
Find IMRF
For Reciprocal

## Inactive Member Benefits at a Glance

If you are an inactive IMRF member, it means that you have funds and service cred but you are no longer actively contributing to IMRF. Therefore, your benefits differ fi that you were eligible for as a contributing member.

### How do inactive and active member benefits differ?

When you stopped actively participating in IMRF you no longer qualified for all of th available to an active IMRF member.

Inactive IMRF members qualify only for pension and death benefits. The following a describes the benefits available to you and your beneficiaries.

### Your IMRF Retirement benefits

To qualify for an IMRF pension, you must meet the following requirements:

- You must be vested (have at least eight years of service credit). This can inc reciprocal service.
- You must not be working in any position which qualifies for IMRF coverage.
- You must be at least age 55. IMRF "normal" retirement age is 60. If you retir age 55 and 60 and have less than 35 years of service credit, your pension w reduced for age.

Please note: IMRF can "back date" (retroactively pay) a pension benefit only 12 mo are vested and no longer participate in IMRF but are at least age 55, we recommen for your pension.

### Your IMRF Death benefits

If you die while you have contributions on deposit with IMRF but are not actively pa your beneficiaries are entitled to benefits. The benefits depend on your vesting stat If you are:

- Less than age 55, the funds in your member contribution account are paid to beneficiary(ies).
- Age 55 or older and:

00539

Systems
- Doyle Rowe LTD
- NCPERS Life Insurance
- Contact Us
- Privacy Policy & Legal Disclaimer

- Not eligible to receive a pension, the funds in your member contributic are paid to your beneficiary(ies).

- Eligible to receive a pension, the funds in your member contribution a a lump sum payment of $3,000 will be paid to your beneficiary(ies). O married at the time of your death and your spouse was married to you one year before you terminated your IMRF participation, your spouse to receive a monthly surviving spouse pension plus the $3,000.

## Should you take a refund of your contributions?

If you are vested (through IMRF or reciprocal service), having money in IMRF is a v asset for your future retirement.

The decision to take a refund should not be made lightly. By accepting a refund of y contributions you forfeit all rights to any future IMRF benefits, although you may rep refund at a later date if you return to work with an IMRF or reciprocal employer for t

If you have at least 12 months in IMRF and have service credit in another Illinois Re System, this credit may be combined to meet the vesting requirements for both syst

If you have less than 12 months of service in IMRF and do not plan to return to an I employer, we recommend that you consider a refund or rollover of your IMRF funds

Be aware that you cannot take a refund of your contributions if you are still working same IMRF employer, even if you no longer participate in IMRF.

If you are not vested with IMRF and do not have service with a reciprocal system, y an IMRF Member Service Representative at 1-800-ASK-IMRF (1-800-275-4673) to taking a contribution refund or rollover is right for you.

If you have questions regarding IMRF benefits, contact us by email or call 1-800-ASK-IMRF (1-800-275-4673)

*IMRF Online provides a brief summary of IMRF benefits and the administration of those benefits. IMRF members' and employers' rights and obligations are governed by Article 7 of the Illinois Pension Code.*

| Home Page | Members | Retirees | Employers | Inactive Members | Publications | Legislation | Find IMRF |
| Employment at IMRF | Board of Trustees | Field Services | About IMRF | Site Map | Search | Privacy Policy & Legal Disclaimer |

For questions or comments about this web site, email webmaster.

Copyright © 2004 Illinois Municipal Retirement Fund
Page Last Updated by JEC on 07/02/02

00540


IMRF
Online

Illinois Municipal Retirement Fund
"Locally Funded, Financially Sound"

**IMRF believes in 100% funding. Find out why.**

Search IMRF Online

Search

Member Access
Employer Access
Pension Calculator
IMRF Forms
Publications
Inactive Members
About IMRF
en español
Board of Trustees
Field Services
Employer Workshops
Member Workshops
Employment at IMRF
Find IMRF Employers
Frequently Asked Questions
Glossary of Terms
Find IMRF
For Reciprocal Systems
Doyle Rowe LTD
NCPERS Life Insurance
Contact Us
Privacy Policy & Legal Disclaimer

Home | Members | Retirees | Employers | Legislation | Site Map

members
retirees
employers

**Important message regarding email fraud:**

IMRF has recently received reports from other state's retirement systems of frauduler emails sent to their members. These emails pretend to be from the pension fund, and they will provide pension estimates or benefit changes in exchange for personal inforr from the member.

IMRF will never send you an email asking for your account password, Social Security number, or other personal or financial information. We will also never send you an en notifying you of any changes to your benefit or to provide you with a pension estimate do not solicit personal information by email because email is not secure, and we do n take risks with your information.

If you receive an email that states it comes from IMRF that requests any confidential personal information, **DO NOT RESPOND** and contact us immediately by email or by calling us at 1-800-ASK-IMRF (1-800-275-4673).

If you have questions regarding IMRF benefits, contact us by email or call 1-800-ASK-IMRF (1-800-275-4673)

*IMRF Online provides a brief summary of IMRF benefits and the administration of those benefits. IMRF members' and employers' rights and obligations are governed by Article 7 of the Illinois Pension Code*

00541

| Home Page | Members | Retirees | Employers | Inactive Members | Publications | Legislation | Find IMRF |
| Employment at IMRF | Board of Trustees | Field Services | About IMRF | Site Map | Search | Privacy Policy & Legal Disclaimer |

JAN 26,2005 01:27 000-000-00000 Page 14
1:04-cv-01360-MMM-BGC # 334 Page 35 of 43
IMRF - Pension Calculator Result Page 1 of 1

Home Members Retirees Employers Legislation Site Map Search

# IMRF Pension Calculator

IMRF Online

***Estimate your retirement benefits now!***

Here are the results of your pension calculator processing. Please remember that these numbers are calculated based upon the information that you have provided and will be accurate only to the extent of that information.

| | |
|---|---|
| You have selected the following plan | Regular |
| You gave your age at retirement as | 55 Years |
| You gave your service at retirement as | 8 Years |
| You gave your monthly Final Rate of Earnings for benefit purposes as | $ 1,903 |
| Based upon the data above, you would be entitled to a monthly IMRF pension benefit of | $ 215.71 |
| Each January 1st your monthly benefit will increase by | $ 6.47 |

Your pension will be determined at the time of your retirement and will be based on actual records and calculated under the provisions of Article 7 of the Illinois Pension Code (40 ILCS 5/7-101 *et seq.*).

Another Calculation?
Home

If you have questions regarding IMRF benefits, contact us by email or call 1-800-ASK-IMRF (1-800-275-4673).

*IMRF Online provides a brief summary of IMRF benefits and the administration of those benefits. IMRF members' and employers' rights and obligations are governed by Article 7 of the Illinois Pension Code*

| Home Page | Members | Retirees | Employers | Inactive Members | Publications | Legislation | Find IMRF |
|Employment at IMRF | Board of Trustees |Field Services| About IMRF | Site Map | Search |

For questions or comments about this web site, email webmaster.

Copyright @ 2003 Illinois Municipal Retirement Fund

Based on 2001 Pay

00542

http://www.imrf.org/AllAccess/PensionCalculator.asp 1/26/2005

State Employees Retirement

# State Employees' Retirement System of Illinois

**SERS Links** **SERS History**

January 26, 2005

What's New
Pension Calculator
Contact Us
History
Board of Trustees
Member/Retiree/Survivor Information
FAQ's
Glossary of Terms
Workshops/Seminars
Forms
Publications
Human Resources
Financial
⊞ State Links
Search Illinois
Go
[Search Tips]

**External Links**

Illinois State Board of Investment

State Features

Illinois Rx Buying Club

# The History of SERS

Several new Illinois state agencies were created in the early to mid-1940s, with one of them being the State Employees' Retirement System (SERS). On January 1, 1944, 17,237 state employees elect to become members of SERS, while 5,307 waived their membership. All new members have to serve a 12-month qualifying period. Also that year, the first SERS financial statement is prepared, with assets totaling $1.6 million, liabilities of $.4 million, and a reserve of 1.2 million.

The following benefits are provided at SERS' inception:

- Service Retirement Allowance
- Reversionary Annuity
- Ordinary Disability Benefit
- Death Benefit
- Accidental Disability Benefit
- Accidental Death Benefit
- Death Benefit during Retirement
- Refund of Contributions

After World War II, SERS membership increases 12% due to employees returning home from service in the armed forces. By 1952, the average annual salary of a state employee is $3,354, while the average retirement benefit amounts to $946.

During the 1960s, legislation passes allowing a survivor benefit to all SERS members, the assets of SERS reach the $100 million mark, and federal Social Security benefits are offered to all state

00543

employees who elect to participate.

The Illinois State Board of Investments (ISBI) is created in 1970. All investment functions of SERS are transferred to the ISBI. On July 1, 1971, Social Security numbers are used to identify SERS members and their accounts. By the late-70s, SERS develops the semi-annual newsletter "The SERS-O-GRAM," and creates a preretirement workshop program to start in FY80.

The SERS total return on investments is 44.1% in 1983. A year later, that rate plummets to 5.2%, clearly reflecting the volatility of the marketplace.

In 1990, SERS builds and takes possession of its new office building at 2101 South Veterans Parkway. The following year, the first Early Retirement Incentive passes the General Assembly. The program is an overwhelming success, with over 4,600 employees retiring under this provision.

The first pension enhancement for state employees since 1971 becomes law on January 1, 1998. The new law increases benefits for employees with Social Security to a flat rate formula of 1.67% for each year of service. Employees without Social Security receive a flat rate of 2.2% for each year of service. As a concession, SERS members no longer receive 1/2 of their pay for unused sick time after January 1, 1998.

The Rule of 85 takes effect on January 1, 2001. This provision allows employees to retire without a reduction in their pension when any combination of age and service credit equals 85. Previously, employees had to have 35 years of service or be age 60 to retire without penalty.

The second ERI passes the General Assembly effective August 1, 2002. It allows SERS members to purchase up to five years of age and service enhancement. A total of 11,039 participate in the ERI, more than double the members who took the first ERI.

At the end of FY04, SERS has 70,621 active members, and 42,307 retirees. Estimated total net assets amount to $9.990 billion, with an actuarial estimated liability of $18.443 billion. In comparison, at the end of FY03, SERS had 70,192 active

00544

Home Members Retirees Employers Legislation Site Map Search

# IMRF Pension Calculator

IMRF Online

***Estimate your retirement benefits now!***

Here are the results of your pension calculator processing. Please remember that these numbers are calculated based upon the information that you have provided and will be accurate only to the extent of that information.

| | |
|---|---|
| You have selected the following plan | Regular |
| You gave your age at retirement as | 55 Years |
| You gave your service at retirement as | 8 Years |
| You gave your monthly Final Rate of Earnings for benefit purposes as | $ 1,406 |
| Based upon the data above, you would be entitled to a monthly IMRF pension benefit of | $ 159.38 |
| Each January 1st your monthly benefit will increase by | $ 4.78 |

Your pension will be determined at the time of your retirement and will be based on actual records and calculated under the provisions of Article 7 of the Illinois Pension Code (40 ILCS 5/7-101 *et seq.*).

Another Calculation?
Home

If you have questions regarding IMRF benefits, contact us by email or call 1-800-ASK-IMRF (1-800-275-4673).

*IMRF Online provides a brief summary of IMRF benefits and the administration of those benefits. IMRF members' and employers' rights and obligations are governed by Article 7 of the Illinois Pension Code.*

| Home Page | Members | Retirees | Employers | Inactive Members | Publications | Legislation | Find IMRF |
|Employment at IMRF | Board of Trustees |Field Services| About IMRF | Site Map | Search |

For questions or comments about this web site, email webmaster

Copyright @ 2003 Illinois Municipal Retirement Fund

00545

State Employees' Retirement System of Illinois

Rod

# SERS Links

What's New
Pension Calculator
Contact Us
History
Board of Trustees
Member Retiree Survivor Information
FAQ's
Glossary of Terms
Workshops/Seminars
Forms
Publications
Human Resources
Financial

# State Links

Search Illinois

Go

[Search Tips]

# External Links

Illinois State Board of Investment

Inspector General

# Insurance Rates

Contribution Rates for July 1, 2004 - June 30, 2005

| | | Quality Care Health Plan (cigna) Premium is $625.96/mo. Medicare premium is $350.48/mo. | | HMO/POS Plans Premium is $377.14/mo. Medicare premium is $233.68/mo. | |
|---|---|---|---|---|---|
| Full Years of Service | State Pays | Member Pays | Medicare Member Pays | Member Pays | Medicare Member Pays |
| 0 | 0% | $625.96(100%) | $350.48 (100%) | $377.14 (100%) | $233.68 (100%) |
| 1 | 5% | 594.66 (95%) | 332.95 (95%) | 358.28 (95%) | 221.99 (95%) |
| 2 | 10% | 563.36 (90%) | 315.43 (90%) | 339.42 (90%) | 210.31 (90%) |
| 3 | 15% | 532.06 (85%) | 297.90 (85%) | 320.56 (85%) | 198.62 (85%) |
| 4 | 20% | 500.76 (80%) | 280.38 (80%) | 301.71 (80%) | 186.94 (80%) |
| 5 | 25% | 469.47 (75%) | 262.86 (75%) | 282.85 (75%) | 175.26 (75%) |
| 6 | 30% | 438.17 (70%) | 245.33 (70%) | 263.99 (70%) | 163.57 (70%) |
| 7 | 35% | 406.87 (65%) | 227.81 (65%) | 245.14 (65%) | 151.89 (65%) |
| 8 | 40% | 375.57 (60%) | 210.28 (60%) | 226.28 (60%) | 140.20 (60%) |
| 9 | 45% | 344.27 (55%) | 192.76 (55%) | 207.42 (55%) | 128.52 (55%) |
| 10 | 50% | 312.98 (50%) | 175.24 (50%) | 188.57 (50%) | 116.84 (50%) |
| 11 | 55% | 281.68 (45%) | 157.71 (45%) | 169.71 (45%) | 105.15 (45%) |
| 12 | 60% | 250.38 (40%) | 140.19 (40%) | 150.85 (40%) | 93.47 (40%) |
| | | 219.08 (35%) | | 131.99 (35%) | |

# SERS Links

Mission Statement
What's New
Retiree Insurance Menu Page

00546



JAN 26,2005 01:28 000-000-00000 Page 19
1:04-cv-01360-MMM-BGC # 334 Page 40 of 43
Welcome to State Employees' Retirement System
Page 2 of 2

| 13 | 65% | 122.66 (35%) | 81.78 (35%) |
|---|---|---|---|
| 14 | 70% | 187.78 (30%) 105.14 (30%) | 113.14 (30%) 70.10 (30%) |
| 15 | 75% | 156.49 (25%) 87.62 (25%) | 94.28 (25%) 58.42 (25%) |
| 16 | 80% | 125.19 (20%) 70.09 (20%) | 75.42 (20%) 46.73 (20%) |
| 17 | 85% | 93.89 (15%) 52.57 (15%) | 56.57 (15%) 35.05 (15%) |
| 18 | 90% | 62.59 (10%) 35.04 (10%) | 37.71 (10%) 23.36 (10%) |
| 19 | 95% | 31.29 (5%) 17.52 (5%) | 18.85 (5%) 11.68 (5%) |
| 20+ | 100% | 0 0 | 0 0 |

Copyright © 2004 State Retirement System

SRS Privacy Policy | Illinois Privacy Information | Kids Privacy | Web Accessibility | SRS Webmaster

00547

http://www.state.il.us/srs/SERS/ins_insuranceFY05.htm 1/26/2005

Table 3. Life table for females: United States, 2002

| Age | Probability of dying between ages x to x+1 | Number surviving to age x | Number dying between ages x to x+1 | Person-years lived between ages x to x+1 | Total number of person-years lived above age x | Expectation of life at age x |
|---|---|---|---|---|---|---|
| | $q(x)$ | $l(x)$ | $d(x)$ | $L(x)$ | $T(x)$ | $e(x)$ |
| 0–1 | 0.006271 | 100,000 | 627 | 99,449 | 7,985,456 | 79.9 |
| 1–2 | 0.000418 | 99,373 | 42 | 99,352 | 7,886,007 | 79.4 |
| 2–3 | 0.000281 | 99,331 | 28 | 99,317 | 7,786,655 | 78.4 |
| 3–4 | 0.000201 | 99,303 | 20 | 99,294 | 7,687,338 | 77.4 |
| 4–5 | 0.000170 | 99,284 | 17 | 99,275 | 7,588,044 | 76.4 |
| 5–6 | 0.000163 | 99,267 | 16 | 99,259 | 7,488,769 | 75.4 |
| 6–7 | 0.000127 | 99,250 | 13 | 99,244 | 7,389,510 | 74.5 |
| 7–8 | 0.000123 | 99,238 | 12 | 99,232 | 7,290,266 | 73.5 |
| 8–9 | 0.000133 | 99,226 | 13 | 99,219 | 7,191,034 | 72.5 |
| 9–10 | 0.000132 | 99,212 | 13 | 99,206 | 7,091,815 | 71.5 |
| 10–11 | 0.000126 | 99,199 | 12 | 99,193 | 6,992,610 | 70.5 |
| 11–12 | 0.000130 | 99,187 | 13 | 99,180 | 6,893,416 | 69.5 |
| 12–13 | 0.000145 | 99,174 | 14 | 99,167 | 6,794,236 | 68.5 |
| 13–14 | 0.000186 | 99,160 | 18 | 99,150 | 6,695,069 | 67.5 |
| 14–15 | 0.000210 | 99,141 | 21 | 99,131 | 6,595,919 | 66.5 |
| 15–16 | 0.000253 | 99,120 | 25 | 99,108 | 6,496,788 | 65.5 |
| 16–17 | 0.000389 | 99,095 | 39 | 99,076 | 6,397,680 | 64.6 |
| 17–18 | 0.000440 | 99,057 | 44 | 99,035 | 6,298,604 | 63.6 |
| 18–19 | 0.000466 | 99,013 | 46 | 98,990 | 6,199,569 | 62.6 |
| 19–20 | 0.000457 | 98,967 | 45 | 98,945 | 6,100,578 | 61.6 |
| 20–21 | 0.000454 | 98,922 | 45 | 98,899 | 6,001,634 | 60.7 |
| 21–22 | 0.000502 | 98,877 | 50 | 98,852 | 5,902,734 | 59.7 |
| 22–23 | 0.000467 | 98,827 | 46 | 98,804 | 5,803,882 | 58.7 |
| 23–24 | 0.000453 | 98,781 | 45 | 98,759 | 5,705,078 | 57.8 |
| 24–25 | 0.000486 | 98,736 | 48 | 98,712 | 5,606,319 | 56.8 |
| 25–26 | 0.000498 | 98,688 | 49 | 98,664 | 5,507,607 | 55.8 |
| 26–27 | 0.000510 | 98,639 | 50 | 98,614 | 5,408,943 | 54.8 |
| 27–28 | 0.000507 | 98,589 | 50 | 98,564 | 5,310,329 | 53.9 |
| 28–29 | 0.000565 | 98,539 | 56 | 98,511 | 5,211,765 | 52.9 |
| 29–30 | 0.000599 | 98,483 | 59 | 98,454 | 5,113,253 | 51.9 |
| 30–31 | 0.000632 | 98,424 | 62 | 98,393 | 5,014,800 | 51.0 |
| 31–32 | 0.000668 | 98,362 | 66 | 98,329 | 4,916,406 | 50.0 |
| 32–33 | 0.000724 | 98,296 | 71 | 98,261 | 4,818,077 | 49.0 |
| 33–34 | 0.000786 | 98,225 | 77 | 98,187 | 4,719,816 | 48.1 |
| 34–35 | 0.000853 | 98,148 | 84 | 98,106 | 4,621,630 | 47.1 |
| 35–36 | 0.000958 | 98,064 | 94 | 98,017 | 4,523,524 | 46.1 |
| 36–37 | 0.001034 | 97,970 | 101 | 97,920 | 4,425,506 | 45.2 |
| 37–38 | 0.001120 | 97,869 | 110 | 97,814 | 4,327,586 | 44.2 |
| 38–39 | 0.001221 | 97,759 | 119 | 97,700 | 4,229,772 | 43.3 |
| 39–40 | 0.001433 | 97,640 | 140 | 97,570 | 4,132,072 | 42.3 |
| 40–41 | 0.001493 | 97,500 | 146 | 97,427 | 4,034,502 | 41.4 |
| 41–42 | 0.001653 | 97,355 | 161 | 97,274 | 3,937,075 | 40.4 |
| 42–43 | 0.001750 | 97,194 | 170 | 97,108 | 3,839,801 | 39.5 |
| 43–44 | 0.001995 | 97,023 | 194 | 96,927 | 3,742,693 | 38.6 |
| 44–45 | 0.002091 | 96,830 | 202 | 96,729 | 3,645,766 | 37.7 |
| 45–46 | 0.002304 | 96,627 | 223 | 96,516 | 3,549,037 | 36.7 |
| 46–47 | 0.002376 | 96,405 | 229 | 96,290 | 3,452,521 | 35.8 |
| 47–48 | 0.002577 | 96,176 | 248 | 96,052 | 3,356,231 | 34.9 |
| 48–49 | 0.002859 | 95,928 | 274 | 95,791 | 3,260,179 | 34.0 |
| 49–50 | 0.003031 | 95,654 | 290 | 95,509 | 3,164,389 | 33.1 |
| 50–51 | 0.003194 | 95,364 | 305 | 95,211 | 3,068,880 | 32.2 |
| 51–52 | 0.003522 | 95,059 | 335 | 94,892 | 2,973,669 | 31.3 |
| 52–53 | 0.003634 | 94,724 | 344 | 94,552 | 2,878,777 | 30.4 |
| 53–54 | 0.004142 | 94,380 | 391 | 94,185 | 2,784,225 | 29.5 |
| 54–55 | 0.004434 | 93,989 | 417 | 93,781 | 2,690,040 | 28.6 |
| 55–56 | 0.005100 | 93,572 | 477 | 93,334 | 2,596,260 | 27.7 |
| 56–57 | 0.005006 | 93,095 | 466 | 92,862 | 2,502,926 | 26.9 |
| 57–58 | 0.005886 | 92,629 | 545 | 92,357 | 2,410,064 | 26.0 |
| 58–59 | 0.006441 | 92,084 | 593 | 91,787 | 2,317,707 | 25.2 |
| 59–60 | 0.007266 | 91,491 | 665 | 91,158 | 2,225,920 | 24.3 |
| 60–61 | 0.007576 | 90,826 | 688 | 90,482 | 2,134,761 | 23.5 |
| 61–62 | 0.008476 | 90,138 | 764 | 89,756 | 2,044,279 | 22.7 |
| 62–63 | 0.009201 | 89,374 | 822 | 88,963 | 1,954,523 | 21.9 |
| 63–64 | 0.010101 | 88,552 | 894 | 88,104 | 1,865,561 | 21.1 |
| 64–65 | 0.011149 | 87,657 | 977 | 87,169 | 1,777,456 | 20.3 |
| 65–66 | 0.012107 | 86,680 | 1,049 | 86,155 | 1,690,288 | 19.5 |
| 66–67 | 0.013059 | 85,631 | 1,118 | 85,071 | 1,604,132 | 18.7 |

PLAINTIFF'S EXHIBIT 32

Plaintiff's Exhibit 3

1:04-cv-1360

**Table 3. Life table for females: United States, 2002—Con.**

| Age | Probability of dying between ages x to x+1 | Number surviving to age x | Number dying between ages x to x+1 | Person-years lived between ages x to x+1 | Total number of person-years lived above age x | Expectation of life at age x |
|---|---|---|---|---|---|---|
| | $q(x)$ | $l(x)$ | $d(x)$ | $L(x)$ | $T(x)$ | $e(x)$ |
| 67–68 | 0.014571 | 84,512 | 1,231 | 83,897 | 1,519,061 | 18.0 |
| 68–69 | 0.015591 | 83,281 | 1,298 | 82,632 | 1,435,164 | 17.2 |
| 69–70 | 0.017396 | 81,982 | 1,426 | 81,269 | 1,352,533 | 16.5 |
| 70–71 | 0.018991 | 80,556 | 1,530 | 79,791 | 1,271,263 | 15.8 |
| 71–72 | 0.020454 | 79,026 | 1,616 | 78,218 | 1,191,472 | 15.1 |
| 72–73 | 0.022525 | 77,410 | 1,744 | 76,538 | 1,113,254 | 14.4 |
| 73–74 | 0.024633 | 75,666 | 1,864 | 74,734 | 1,036,716 | 13.7 |
| 74–75 | 0.027135 | 73,802 | 2,003 | 72,801 | 961,981 | 13.0 |
| 75–76 | 0.030098 | 71,800 | 2,161 | 70,719 | 889,180 | 12.4 |
| 76–77 | 0.032631 | 69,639 | 2,272 | 68,503 | 818,461 | 11.8 |
| 77–78 | 0.036094 | 67,366 | 2,432 | 66,151 | 749,958 | 11.1 |
| 78–79 | 0.039472 | 64,935 | 2,563 | 63,653 | 683,807 | 10.5 |
| 79–80 | 0.044110 | 62,372 | 2,751 | 60,996 | 620,154 | 9.9 |
| 80–81 | 0.049300 | 59,621 | 2,939 | 58,151 | 559,158 | 9.4 |
| 81–82 | 0.053298 | 56,681 | 3,021 | 55,171 | 501,007 | 8.8 |
| 82–83 | 0.062179 | 53,660 | 3,337 | 51,992 | 445,836 | 8.3 |
| 83–84 | 0.064550 | 50,324 | 3,248 | 48,700 | 393,844 | 7.8 |
| 84–85 | 0.075055 | 47,075 | 3,533 | 45,309 | 345,144 | 7.3 |
| 85–86 | 0.083221 | 43,542 | 3,624 | 41,730 | 299,836 | 6.9 |
| 86–87 | 0.091996 | 39,919 | 3,672 | 38,082 | 258,105 | 6.5 |
| 87–88 | 0.101390 | 36,246 | 3,675 | 34,409 | 220,023 | 6.1 |
| 88–89 | 0.111404 | 32,571 | 3,629 | 30,757 | 185,614 | 5.7 |
| 89–90 | 0.122037 | 28,943 | 3,532 | 27,177 | 154,857 | 5.4 |
| 90–91 | 0.133280 | 25,411 | 3,387 | 23,717 | 127,681 | 5.0 |
| 91–92 | 0.145119 | 22,024 | 3,196 | 20,426 | 103,964 | 4.7 |
| 92–93 | 0.157532 | 18,828 | 2,966 | 17,345 | 83,538 | 4.4 |
| 93–94 | 0.170488 | 15,862 | 2,704 | 14,510 | 66,193 | 4.2 |
| 94–95 | 0.183953 | 13,158 | 2,420 | 11,947 | 51,683 | 3.9 |
| 95–96 | 0.197880 | 10,737 | 2,125 | 9,675 | 39,736 | 3.7 |
| 96–97 | 0.212217 | 8,613 | 1,828 | 7,699 | 30,061 | 3.5 |
| 97–98 | 0.226905 | 6,785 | 1,540 | 6,015 | 22,363 | 3.3 |
| 98–99 | 0.241875 | 5,245 | 1,269 | 4,611 | 16,347 | 3.1 |
| 99–100 | 0.257053 | 3,977 | 1,022 | 3,465 | 11,737 | 3.0 |
| 100+ | 1.00000 | 2,954 | 2,954 | 8,271 | 8,271 | 2.8 |

## Your final rate of earnings (FRE)

Your final rate of earnings (FRE) for retirement is your highest total earnings during any 48 consecutive months within your last 10 years of IMRF service divided by 48. Usually, this is the average of the last 48 months of service.

### Simple FRE calculation

To calculate this IMRF member's FRE at retirement, the last four years (48 months) are used because his earnings were highest in the last 48 consecutive months:

| Year | Earnings | |
|---|---|---|
| 2004 | $19,500 | Highest 48 months |
| 2003 | $18,500 | Highest 48 months |
| 2002 | $17,500 | Highest 48 months |
| 2001 | $16,500 | Highest 48 months |
| 2000 | $13,000 | |
| 1999 | $12,000 | |
| 1998 | $11,000 | |
| 1997 | $10,000 | |
| 1996 | $9,000 | |
| 1995 | $8,000 | |

**Total of last 48 consecutive months:**

| | | |
|---|---|---|
| 4 year total | = | $72,000 |
| Divided by 48 | = | $1,500 |
| **This member's FRE** | = | **$1,500** |

### Increase in salary during last three months

If your earnings for the last three months are more than 25% greater than your highest earnings in any of the previous 45 months, IMRF reduces those earnings when we calculate your FRE. Although you are paid the higher amount *by your employer*, IMRF uses a lesser amount in your FRE calculation.

## How is your retirement benefit calculated?

### Your IMRF defined benefit pension

Your retirement benefit (pension) is based on your final rate of earnings and your years of IMRF service credit. Your IMRF pension is paid as long as you live and is increased on January 1 of each year after you retire by 3% of the monthly pension amount you first received. For more on pension payments and increases, refer to page 22.

### Regular pension formula

- 1-2/3% of your final rate of earnings for each of the first 15 years of service credit,

  *plus*
- 2% of your final rate of earnings for each year of service credit more than 15 years.

The total pension at retirement cannot exceed 75% of your final rate of earnings.

### An example of a pension calculation

When you retire, you have 19 years of service credit and a final rate of earnings of $2,000 per month.

Using the Regular pension formula:

| | | | | |
|---|---|---|---|---|
| First 15 years of service credit— | | | | |
| 1-2/3% x 15 years = 25% | x | $2,000 | = | $500.00 *plus* |
| Service credit over 15 years— | | | | |
| 2% x 4 years = 8% | x | $2,000 | = | $160.00 |
| **Total monthly pension** | | | = | $660.00 |

### Estimating the amount of your future pension

- **Quick estimate**—turn to page 24 or use the simple calculator available on our website, www.imrf.org.
- Estimate using **your actual IMRF member information**—visit the secure Member Access area of our website (see page 39).
- **Formal** pension estimate—call 1-800-ASK-IMRF (1-800-275-4673). We recommend you request a formal estimate if you are within five years of retirement.

**Plaintiff's Exhibit 4**