IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| MELISSA ROBINSON,<br>(p/k/a MELISSA SCHROEDER)<br><br>Plaintiff,<br><br>vs.<br><br>JUDGE WARREN A. SAPPINGTON<br>SIXTH JUDICIAL CIRCUIT,<br>(IN OFFICIAL CAPACITY) and<br>MACON COUNTY,<br><br>Defendants. | Case No. 1:04-cv-1360<br>Honorable Judge Michael M. Mihm |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF HER RESPONSE TO DEFENDANT, JUDGE WARREN A. SAPPINGTON'S MOTION IN LIMINE RELATED TO RELATIONSHIP BETWEEN JUDGE SAPPINGTON AND HIS WIFE**

Plaintiff, MELISSA ROBINSON (p/k/a MELISSA SCHROEDER) by her counsel, Thomson & Weintraub provides the following memorandum in support of her objections to Judge Warren A. Sappington's *Motion in Limine* Related to Relationship Between Judge Sappington and his Wife:

**Introduction**

Defendant, Judge Warren A. Sappington, ("Judge Sappington") contends the fact he had an affair with his legal secretary who subsequently became his wife is not relevant. Plaintiff believes this testimony is relevant because Plaintiff anticipates testimony will be solicited to suggest Plaintiff sought out Judge Sappington's attention for the purpose of destroying his marriage and also because she was attracted to him. Witnesses anticipated to testify on behalf of Defendants are expected to proffer such testimony as they did in their depositions.

1

## Statement of Facts

Although Judge Sappington correctly notes his wife testified they had been married for twenty-five (25) years, during that time Judge Sappington had only two other judicial clerks in addition to Plaintiff. (Ex. 1, Mrs. Sappington deposition, 71:8-11). Judge Sappington's wife, Cheryl Sappington, testified in deposition that in September or October 1996, she told Judge Sappington to stop working with Plaintiff or she would divorce him. (Ex. 1, Mrs. Sappington deposition, 56:1-13). Mrs. Sappington also testified to certain behaviors demonstrated by Plaintiff that led Mrs. Sappington to believe Plaintiff was "coming onto" Judge Sappington. (Ex. 1, Mrs. Sappington deposition, 63:16-21).

Plaintiff anticipates that additional witnesses called by Judge Sappington and/or Macon County will attempt to solicit testimony to suggest Plaintiff was seeking out attention from Judge Sappington.

## Argument

The fact Judge Sappington had a sexual relationship with a previous employee (his current wife) coupled with the fact Plaintiff was only the third judicial clerk Judge Sappington had since his marriage to Mrs. Sappington represents relevant information.

As noted by the case law relied upon by Judge Warren A. Sappington, the use of other crimes, wrongs, or acts are admissible if offered for purposes such as motive, intent, plan or opportunity. (FRE 404(b); Okai v. Verfuth, 275 F3d 606, 610 (7th Cir. 2001). Moreover, even if viewed as an attempt to introduce a prior bad act of Judge Warren A. Sappington, the four prong test outlined in Okai will be met in this case.

Plaintiff intends to elicit such testimony to rebut testimony she anticipates Defendants will introduce which will suggest she initiated a romantic involvement with Judge Warren A. Sappington. Therefore the evidence is admissible under the first prong outlined in <u>Okai</u>. As noted above, Judge Warren A. Sappington had only three judicial clerks since the time he had his affair with his current wife while she was his legal secretary. As such the act is of sufficiently recent vintage as required under the factors outlined in <u>Okai</u>.

With regard to the third factor, the facts speak for themselves. Plaintiff anticipates Judge Sappington and his wife will concede they had an affair while she was his legal secretary and they subsequently have married.

Finally, the probative value - whether, in fact, Judge Warren A. Sappington sexually harassed Plaintiff or whether Plaintiff sought out his attentions are outweighed by any unfair prejudice directed to Judge Warren A. Sappington.

**Conclusion**

Defendants should not be allowed to solicit testimony to insinuate that Plaintiff sought out the attention of Judge Warren A. Sappington while precluding Plaintiff from presenting evidence of Judge Sappington's previous sexual behaviors with an employee (his current wife).

WHEREFORE, Plaintiff respectfully requests that this Court deny Defendant, Judge Warren A. Sappington's *Motion in Limine* related to his relationship between he and his wife.

Respectfully submitted,
By: s/ Melissa M. McGrath
Melissa M. McGrath Attorney Bar No. 6207263
Attorney for Plaintiff
Thomson & Weintraub
105 North Center Street
Bloomington, Illinois 61701
Phone: (309) 829-7069
Fax: (309) 827-3458
E-mail: mmcgrath@tnwlaw.com

Subscribed and sworn to before me
this ___29th___ day of April, 2005.

_____
Notary Public

"OFFICIAL SEAL"
Angela M. Park
Notary Public, State of Illinois
My Commission Exp. 10/21/2008

## NOTICE OF FILING

I hereby certify that on April 29th, 2005, I presented the foregoing document to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

Mr. John Cassidy
CASSIDY & MUELLER
323 Commerce Bank Bldg.
416 Main Street
Peoria, IL 61602

Ms. Karen McNaught
Chief, General Law Bureau
500 S. Second Street
Springfield, Illinois 62706

Ms. Diane M. Baron, Esq.
Clausen Miller PC
10 South La Salle Street
Chicago, Illinois 60603-1098

By: s/ Melissa M. McGrath
Melissa M. McGrath Attorney Bar No. 6207263
Attorney for Plaintiff
Thomson & Weintraub
105 North Center Street
Bloomington, Illinois 61701
Phone: (309) 829-7069
Fax: (309) 827-3458
E-mail: mmcgrath@tnwlaw.com

Subscribed and sworn to before me this 29th day of April, 2005.

_____
Notary Public

"OFFICIAL SEAL"
Angela M. Park
Notary Public, State of Illinois
My Commission Exp. 10/21/2008

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

MELISSA ROBINSON, p/k/a )
MELISSA SCHROEDER, )
  )
      Plaintiff, )
  )
vs. )  Case No. 99-2266
  )
JUDGE WARREN A. SAPPINGTON, )
SIXTH JUDICIAL CIRCUIT, )
(In Official Capacity and )
Individually), and MACON )
COUNTY, )
  )
      Defendants. )

   THE DEPOSITION of CHERYL SAPPINGTON, a witness, called by the plaintiff for examination in the above-entitled cause, pursuant to the Federal Rules of Civil Procedure, taken before me, Brenda L. Zeitler, CSR-RPR, a Notary Public in and for the State of Illinois, at the law offices of Thomson & Weintraub, 105 North Center Street, in the City of Bloomington, County of McLean, and State of Illinois on the 20th day of July, A.D. 2000, commencing at 9:00 a.m.

ORIGINAL

Page 2

APPEARANCES:

THOMSON & WEINTRAUB
BY: MELISSA M. McGRATH, ESQ.
Attorney at Law
105 North Center Street
Bloomington, Illinois 61701
    On Behalf of the Plaintiff.

MS. KAREN McNAUGHT, ESQ.
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62708
    On Behalf of Judge Sappington.

HINSHAW & CULBERTSON
BY: RICHARD CHAPIN, ESQ.
Attorney at Law
1802 Fox Drive
Champaign, Illinois 61820
    On Behalf of Macon County.

ALSO PRESENT:

JUDGE WARREN SAPPINGTON, Defendant

* * * * * * * * * * * *

INDEX
                                                    Page
WITNESS:

  CHERYL SAPPINGTON
    Direct Examination by Ms. McGrath ......... 3

EXHIBITS:

  DEPOSITION EXHIBIT NUMBER 1 ................. 19
    Notice of Deposition

  DEPOSITION EXHIBIT NUMBER 2 ................. 23
    Notes

Page 3

1    (Witness sworn.)
2         CHERYL SAPPINGTON,
3  called as a witness, after being first duly sworn, was
4  examined and testified upon her oath as follows:
5         DIRECT EXAMINATION
6         BY MS. McGRATH:
7    Q    Mrs. Sappington, would you spell your name for
8  the court reporter?
9    A    Cheryl, C-h-e-r-y-l, Sappington,
10 S-a-p-p-i-n-g-t-o-n.
11        MS. McGRATH: I'm going to be asking you some
12 questions this morning. If I ask you anything that you
13 don't understand, please ask me to reword it. Okay?
14        THE WITNESS: Yes.
15        MS. McGRATH: Try to say "yes" or "no" as
16 opposed to nodding your head so that the court reporter can
17 get that down.
18        Also, try to wait -- there's going to be times
19 I will ask you something and you will know what your answer
20 is before I even complete the question. Try to wait until I
21 have completed the question to begin speaking so that the
22 court reporter gets down what both of us have said. Okay?
23        THE WITNESS: Okay.
24

Page 4

1  BY MS. McGRATH:
2    Q    You've been identified as an individual having
3  information about telephone calls received by Plaintiff.
4  Were you aware of that?
5    A    Was I aware that I'd been identified as such?
6    Q    Yes.
7    A    I don't know that I was aware of it. It's not
8  surprising.
9    Q    So are you aware of telephone calls received
10 by Melissa Schroeder, now known as Melissa Robinson?
11   A    Yes.
12   Q    Is there more than one telephone call that you
13 are aware of?
14   A    I'm aware of, most specifically, the telephone
15 calls that occurred the weekend of November 9 through 11,
16 1996. Those are the most recent ones in my memory.
17   Q    Who placed the call to who?
18   A    If I could give you some information as to how
19 this worked that weekend. My mother's birthday was November
20 11. So that was on Monday, as I recall. And it would have
21 been the Saturday before that. So I believe it would have
22 been the 9th that she and I went to the mall to shop for her
23 birthday.
24        When I got into the car to go home, I phoned

Page 53

1  Q  Did your husband tell you that he told the
2  plaintiff not to call his home?
3  A  My husband told her that he could not talk
4  with her about anything of a personal nature at any place,
5  any time, anywhere; and that included, in my mind, the
6  phone. But he did not -- that included everything:
7  Anyplace, anywhere, anytime.
8  Q  Did your husband tell you at any time that he
9  told the plaintiff specifically not to phone him at his home
10 phone number?
11 A  No.
12 Q  Concerning the documents that you spoke about
13 earlier, which you relied on in preparing your notes within
14 Deposition Exhibit 2, you did not bring copies of those
15 materials with you today, did you?
16 A  Those are -- no.
17 Q  I'm going to ask that you produce those for me
18 within the next ten days, unless that's an unreasonable
19 amount of time to request you to get those together. And
20 that is the documents we spoke of, the calendars, the
21 planners, the financial records, the correspondence, and
22 anything else you relied on in preparing your notes. And
23 that would be pursuant to the notice of deposition which we
24 reviewed earlier.

Page 54

1     Any information you have concerning what
2  you've characterized as Plaintiff being upset about being
3  reassigned to Judge Francis, is that information you
4  obtained based on what your husband told you?
5  A  Yes.
6  Q  What did your husband tell you concerning that
7  topic?
8  A  He told me that she told him that she didn't
9  want to work for Judge Francis, that her husband -- I
10 believe it was her husband -- had heard -- well, I don't
11 know if it was the plaintiff or her husband, but between the
12 two of them, they had obtained some basis of knowledge that
13 Judge Francis had phoned some defendants in cases and that
14 the defendants thought that he was coming on to them.
15    And she had also heard that he sexually
16 harassed his employees, and she didn't want to work for him.
17 She asked my husband to go with her to Judge Greanias to
18 request that he not reassign her to Judge Francis, that she
19 wanted to work for my husband.
20 Q  What was your understanding of why the topic
21 of reassigning the plaintiff to Judge Davis even came up?
22 A  Judge Davis was calling Judge Greanias and
23 criticizing the plaintiff, asking what was going on; and he
24 was creating so much communication about the plaintiff and

Page 55

1  my husband to Judge Greanias that it was my understanding
2  that it was just thought best to reassign her to another
3  judge.
4  Q  What were the criticisms that Judge Davis was
5  bringing to Judge Greanias?
6  A  Criticism of her work, as we spoke about
7  earlier. He had heard about the Frank Byers incident, and
8  he wanted to know what was going on. That's all I know.
9  Q  Do you know anything more specific about the
10 criticisms Judge Davis was raising about the plaintiff's
11 work, other than what you indicated earlier?
12 A  No. Just that he was critical of her work.
13    I don't think it was just one time. I think
14 it was more than one time. But how many times, I have no
15 idea.
16 Q  And you don't have any specifics as to what
17 the criticisms of her work were?
18 A  No.
19 Q  Do you know whether Judge Davis received an
20 explanation concerning the Frank Byers incident?
21 A  No.
22 Q  Do you know anything else about the reason the
23 reassignment of the plaintiff to Judge Francis was being
24 considered, other than what you've just indicated?

Page 56

1  A  Well, I told my husband that if he continued
2  to work with her, that we would be getting divorced, after
3  she ordered that statue.
4  Q  That's when you told your husband that, after
5  she ordered the statue?
6  A  Yes.
7  Q  What month? When was that?
8  A  That was September.
9  Q  And was it in September that you told your
10 husband that?
11 A  I can't recall if it was in September. It may
12 have been in October. Sometimes I take a while to think
13 things over.
14 Q  And what was your husband's response?
15 A  He said he wouldn't work with her any longer.
16 Q  And what action, if any, did your husband take
17 in assuring that he would not work with her any longer?
18 A  He communicated that to Judge Greanias.
19 Q  When did he communicate that to Judge
20 Greanias?
21 A  I do not know. It was after I communicated it
22 to him, in the fall of 1996.
23 Q  How long after you told your husband that
24 you'd get a divorce if he continued to work with her did he

## Page 61

1 anymore in early October?
2 A Well, we also talked about the fact that he
3 shouldn't be going to lunch with her if he wasn't going to
4 talk with her about anything. He quit going to lunch with
5 her because he didn't -- we talked about the fact that it
6 probably was not an appropriate thing to do.
7 Q Now, the statue that you talked about earlier
8 that your husband told you Melissa Schroeder bought for him,
9 you never physically saw the statue, did you?
10 MS. McNAUGHT: Objection as to the form of the
11 question. I think it assumes facts that are not in
12 evidence. Would you like me to explain?
13 MS. McGRATH: Sure.
14 MS. McNAUGHT: You said the statue that
15 Melissa "bought for your husband," and I don't believe that
16 there's been any testimony that it actually was purchased.
17 She offered to buy it or she told someone that she was going
18 to buy it, but I don't believe that there's been any
19 testimony that it actually was purchased. And I don't know
20 if this witness would have that knowledge.
21 BY MS. McGRATH:
22 Q Was the statue ever purchased by Melissa
23 Schroeder for your husband, to your knowledge?
24 A She told my husband that she purchased it.

## Page 62

1 But I have no knowledge that she purchased it other than
2 that.
3 Q And you never saw a statue that was purchased
4 for your husband by Melissa Schroeder?
5 A No.
6 Q When was this that Melissa Schroeder -- that
7 you found a cake in the car that had been sent home by
8 Melissa Schroeder?
9 A Right around the time of my husband's
10 birthday, right around the statue date.
11 Q And that was in?
12 A Early September.
13 Q So was it a birthday cake?
14 A That was my understanding. It was a ding dong
15 cake.
16 Q A ding dong cake?
17 A I don't know what that is.
18 Q Did your husband tell you that it was a ding
19 dong cake?
20 A That's what my husband told me: It was a ding
21 dong cake.
22 Q You mention that there were other comments
23 made by Melissa Schroeder. Tell me about those other
24 comments.

## Page 63

1 A I don't know where we are at this point.
2 Q I'm sorry. Let me make the question clearer.
3 Along with indicating that Melissa Schroeder
4 would bring him food, as far as your explanation of
5 behaviors of Melissa Schroeder that were causing you
6 concern, you said that she would fix soup. She sent a cake
7 home. There was the statue. And you said that there were
8 other comments made by Melissa Schroeder. It's the other
9 comments that I would like you to explain.
10 A Of course, I can't repeat this conversation
11 word for word, but the gist of the conversation was that she
12 had had a bad weekend. She was upset again about whatever
13 she was upset about at that time. I believe it was Don,
14 family problems, whatever it was. And she had needed to see
15 her counselor.
16 She hadn't had sexual relations in months.
17 All she wanted was a hug and that her husband wouldn't even
18 give her a hug. And my husband turned to her and said,
19 "Well, I can't do that. All I can do is to give you a
20 professional handshake." I thought that was a come-on to my
21 husband.
22 Q Any other comments?
23 A She said to my husband that she wanted to go
24 on vacation with the boys. She didn't have sons or

## Page 64

1 brothers, to my knowledge. She was concerned about getting
2 stranded in a hotel at night and wanted to know if my
3 husband would help her out if she got stranded in a hotel.
4 And my husband said that he would do what he could, but he
5 wouldn't promise her that he wouldn't give her a lecture.
6 And my husband and I had discussed that, and
7 we determined that he would never go to a hotel alone to
8 pick her up. We would go together if she, in fact, did get
9 stranded.
10 Other comments: She said she had no morals.
11 She would show my husband her photo ID of her driver's
12 license and say, "This is the old me, and Don wants the old
13 me back," the implication being that she was now pretty and
14 thin and she was no longer ugly and fat like in the photo
15 ID.
16 And said that before she went to work at the
17 courthouse, that she used to be innocent and shy and that
18 type of person; and then, after going to work at the
19 courthouse, she had changed. So it just seemed to me that
20 she was trying to let him know that she was not innocent and
21 shy. She was open. She had no morals. And I felt
22 threatened. I felt that she was pursuing my husband.
23 Q These are all comments that your husband
24 reported to you that had been made by Melissa Schroeder?