```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
 2                     URBANA DIVISION

 3

 4   MELISSA ROBINSON f/k/a MELISSA          )
     SCHROEDER,                              )
 5                                           )
                Plaintiff,                   )
 6                                           )
          - vs -                             ) No:   99-2266
 7                                           )
     JUDGE WARREN SAPPINGTON, et al.,        )
 8                                           )
                Defendants.                  )
 9

10

11

12

13        THE DEPOSITION of DR. ROBERT COKLEY, the

14   witness herein, called by the Defendant, Judge

15   Sappington, for examination pursuant to notice and

16   pursuant to the Rules of the Supreme Court thereof

17   pertaining to the taking of depositions taken before

18   me, Daphne G. Killam, CSR, License No. 084-004413, a

19   Notary Public in and for the State of Illinois, at 348

20   W. Prairie, in the City of Decatur, County of Macon,

21   and State of Illinois on the 27th day of September,

22   A.D., 2001, commencing at 10:00 a.m.

23
```

COPY


DEFENDANT'S EXHIBIT B

ADVANTAGE REPORTING SERVICES

1-800-347-3124

1  meant is that they were in St. Louis and John had -- I
2  don't know how many drinks, but he was verbally
3  attacking Missy in front of his friends and that was
4  upsetting to her, which rightly so that she would be
5  upset, I guess.
6     Q.  Was she there?  How did she know about that?
7     A.  Well, she was with him.
8     Q.  Okay.
9     A.  I'm pretty sure.
10    Q.  All right.  And there is no mention in that
11 session of Judge Sappington, correct?
12    A.  No, there wasn't.
13    Q.  All right.  And then when was the next time you
14 saw Missy?
15    A.  1-19-99.
16    Q.  And what was the focus of that session?
17    A.  She was under a lot of stress from her
18 ex-husband, Don, battling over the children.  Her
19 oldest daughter Abby or Abigail was depressed that her
20 father wasn't calling her and that's what it was all
21 about in reference to the battles that were going on
22 and his refusing to participate in terms of visitation
23 and threatening her and not going to pay and he was

1    going to leave the State and that whole thing.  And
2    then she was really upset because her daughter, Abby,
3    wanted to visit with her dad and her dad wouldn't call
4    or have anything to do with her.  This would be the
5    last one.
6        Q.    All right.  Did you have any contact with
7    Melissa after the session of 1-19-99?
8        A.    No.
9        Q.    Do you have an opinion to a reasonable degree
10   of social worker certainty as to the cause of Melissa
11   Robinson's emotional problems during the time you
12   treated her?
13       A.    I think there were three main issues -- or
14   three main stressors.  The primary one being the
15   conflict between her and her husband, John Robinson, in
16   reference to bringing the two families together and
17   working out the family atmosphere.  The second issue
18   was she was worried about the whole process of
19   litigation in reference to Judge Sappington and what
20   the Judge might do.  And the third would be in
21   reference to her ex-husband in the battle over the
22   custody and visitation with him and support.
23       Q.    Did she ever tell you that Judge Sappington had

1  anything.
2  Q.   Okay.  Did you believe that Melissa had worked
3  out her problems with her marriage and ex-husband when
4  she stopped seeing you?
5  A.   Yeah.  I think they were doing better.  The
6  ex-husband I think there was still some litigation,
7  some issues that went on with them until they resolved
8  that.  But I think with her current husband, John,
9  things had improved and they were doing pretty good.
10 Q.   Okay.  So did you believe that it was -- strike
11 that.  Did you believe that she did not have any
12 further counseling at that time?
13 A.   Right.
14 Q.   You never sent her -- referred her for
15 medication, correct?
16 A.   No.  She was never that depressed.
17 Q.   Do you know how long she had had this diagnosis
18 of adjustment disorder?  Could you tell how long she
19 had it?
20 A.   Well, she had it from the time I saw her until
21 the time she left.
22 Q.   You don't know how long she had it before?
23 A.   No, she didn't have it before because

1   A.  Correct.  Because my notes refer to the times
2   we talked about in terms of the family and the notes I
3   will referred no if the notes about where she talked
4   about the litigation or her concerns about what was
5   happening in reference to her case.
6   Q.  In regards to what she informed you of on an
7   ongoing basis during this matter it appears since you
8   wrote down everything that was important, her comments
9   about the litigation was minor in comparison to the
10  other notes now, right?
11  A.  In reference to my notes, correct.
12  Q.  Okay.  And again, you wrote down what you felt
13  was important from the conversations, correct?
14  A.  Correct.
15  Q.  Now, you said you released her because you felt
16  that she had made some adjustment?
17  A.  Two things.  When a person comes in for
18  voluntary therapy, they can come and go as they please.
19  So we don't release.
20  Q.  You felt she stopped coming to you because you
21  felt she was making the adjustment with her family?
22  A.  Right.  And I always -- when I see a patient, I
23  tell them if there are any problems to come back any

1   time or call.
2   Q. So you felt that the stressors that was
3   involved in her life that basically she was working
4   them out and they were resolving; is that correct?
5   A. Right.
6   Q. And, of course, what you're mainly talking
7   about in that situation is her family situation,
8   correct?
9   A. Correct.
10  Q. Because the litigation is still ongoing?
11  A. Yeah.
12  Q. She hasn't seen you since she worked out the
13  stresses with her family situation in your opinion?
14  A. Right.
15  Q. So would it be fair to say then since the
16  litigation is ongoing she in your opinion does not need
17  any type of therapy in regards to that particular
18  stress?
19  A. Correct.
20      MR. CASSIDY: I have nothing else.
21
22
23

```
 1    behaviors to you?
 2         A.   Yes, I have.
 3         Q.   In your professional experience, would you
 4    agree it's not uncommon for the victim to put on hold
 5    at times their stress resulting from that behavior?
 6         A.   Correct.
 7         Q.   But that stress can then come back or no longer
 8    be put on hold and cause problems for that victim?
 9         A.   True.
10         Q.   You don't know today as you sit there today, do
11    you, whether Missy is suffering emotionally currently?
12         A.   I don't think so.  I don't know.
13         Q.   You haven't seen her since January of 1999,
14    right?
15         A.   Yes, I have seen her since January of 1999.
16         Q.   Have you counselled her since January of 1999?
17         A.   I have.
18         Q.   And in your counseling since January of 1999,
19    has she discussed with you concerns about Judge
20    Sappington?
21         A.   No, she has not.
22              MR. GILLESPIE:  I'm going to raise an objection
23    to the records of those.
```

1       THE DEPONENT: No, because at that time you
2  didn't ask for those records.
3       MS. BARON: I thought I asked if that was the
4  last time.
5       THE WITNESS: The last time I saw her was when
6  her husband almost died from a particular infection.
7       MR. GILLESPIE: Are we declaring privilege on
8  these new records? I think we're entitled to them.
9       MS. McGRATH: Do you want to go back on direct
10 and ask him about that?
11
12            FURTHER EXAMINATION CONDUCTED
13 QUESTIONS BY MS. BARON:
14    Q.   Sure. Doctor, you stated that you have treated
15 Missy Robinson after January of 1999?
16    A.   Right.
17    Q.   Do you have records from those sessions with
18 her?
19    A.   Yes, I do.
20    Q.   Could you provide us copies now?
21    A.   I would have to get them.
22
23       (A break was taken at this time.)

```
 1   BY MR. BARON:
 2       Q.  So, doctor, are you going to provide us with
 3   your records for the later session?
 4       A.  I can't provide them until I get a release from
 5   both parties.
 6       Q.  Can you tell us when you saw her?
 7       A.  I can't tell you that.
 8           MS. BARON:  Well, we're going to reserve our
 9   right to continue questioning after we see those
10   records.
11           THE DEPONENT:  Yeah, if they give me
12   permission.
13
14           FURTHER EXAMINATION CONDUCTED
15   QUESTIONS BY MS. McGRATH:
16       Q.  Let me go back on.  I have a few questions.  In
17   your professional opinion, doctor, can someone still
18   function at a high level at work and at school but
19   suffer stress?
20       A.  Correct.
21           MS. McGRATH:  I don't have anything further.
22
23
```