IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| MELISSA ROBINSON, <br> (p/k/a/ MELISSA SCHROEDER) <br><br> Plaintiff, <br><br> vs. <br><br> JUDGE WARREN A. SAPPINGTON <br> SIXTH JUDICIAL CIRCUIT, <br> (IN OFFICIAL CAPACITY) <br><br> Defendant, <br><br> and <br><br> MACON COUNTY, <br><br> Defendant. | Case No. 1:04-cv-1360 |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR NEW TRIAL[1]**

**I.      INTRODUCTION**

Plaintiff, Melissa Robinson (p/k/a Melissa Schroeder) ("Melissa") respectfully asks this Court to grant a new trial pursuant to F.R.C.P. 59(a) & (d) and 60(b). The decision to grant a new trial is committed to the discretion of the District Court and will not be disturbed absent a clear abuse of discretion. A new trial is warranted where the verdict is against the clear weight of the evidence or the trial was unfair to the moving party. David v. Caterpillar, Inc., 324 F3d 851, 863 (7th Cir. 2003). The jury verdict, finding that Melissa Robinson failed to prove by a preponderance of the evidence that a hostile work environment resulted from sexual harassment

---

[1] Plaintiff respectfully seeks leave to supplement this Memorandum with citation to the transcript record when the transcripts are prepared by the Court Reporter.

1

by Judge Warren A. Sappington ("Judge Sappington") was against the great weight of the evidence.

Second, allowing Judge Sappington to assassinate Melissa's character while basing his defense on facts based on his "motives" and "intent" clearly resulted in a verdict inconsistent with substantial justice. David v. Caterpillar, Inc., 324 F3d 851, 863 (7th Cir. 2003).

Finally, allowing the State of Illinois to introduce into evidence the sexual harassment policy which was supposed to have guided the judges' behaviors, with absolutely no evidence the policy had been adequately distributed to anyone, and it had never been given to Melissa, allowed the jury to consider evidence which resulted in an injustice.

## II.    THE EVIDENCE COMPELLED A CONTRARY VERDICT.

### A.    Melissa's Testimony Was Unimpeached.

#### 1.    Typical Judge/Clerk relationship at beginning.

When Melissa began working with Judge Sappington in March 1994, he was professional and considerate and Melissa had a great deal of respect for him. She was proud to be working within the judicial system. Immediately after she told Judge Sappington she was contemplating divorce he began questioning her personal life. This began in July 1996, and his harassing conduct became more severe and pervasive[2] until December 18th when she was forced to quit because of the conduct and her employer's failure to address the conduct.

#### 2.    Conduct escalates.

On July 29, 1996, Judge Sappington summoned Melissa into his chambers, threw an article about cervical cancer toward her and accused her of having an affair. Later the same day

---

[2]Although a Plaintiff need not show the conduct both severe and pervasive, the evidence in this case established both well beyond a preponderance of the evidence.

2

he offered to buy her a vibrator. When he did so Melissa turned red. Judge Sappington laughed and left his chambers.

Thereafter, Judge Sappington's conduct became frightening. He was obsessive. He called her beautiful 50 to 75 times between August and December 1996. He called her a goddess, a blonde goddess and a blonde Demi Moore 20 to 25 times in October and November 1996. On other occasions Judge Sappington offered to feed Melissa's parking meter.

Through the month of August 1996, Judge Sappington shook Melissa's hand in the morning and afternoon. He later told her he was doing it for physical contact. He knew the feelings were not reciprocal and he told Melissa his conduct would end.

In early August 1996 Judge Sappington told Melissa her nipples were showing and men were looking at her. Melissa went home in tears, showered, changed and returned to work. On August 19, 1996, Judge Sappington threw a notepad at Melissa after ordering her into his chambers. He accused her of having an affair with Attorney Frank Byers because he saw his car parked next to hers after work hours. Judge Sappington told her he could not stand the thought of her being with anyone else. He told her a story about an old client of his, Joyce Long who had been killed. When Judge Sappington's behaviors became bizarre in August, Melissa used lunch hours to study and went to exercise 3 to 4 times per week to avoid his behaviors. In September she stopped attending mental health hearings. Julia Jewell confirmed Melissa stopped attending these hearings.

### 3.  Incidents occur more frequently.

On September 9, 1996, Judge Sappington put Melissa's face in his hands and threatened to kill her if she shacked up with anyone. On September 12, 1996, Judge Sappington ordered

3

Melissa to lock the courtroom door, told her he was trying to deal with his feelings, he knew his feelings were not reciprocal and she should not resign. In mid-September Judge Sappington became angry because he thought Leona Miller was keeping notes on he and Melissa. During the Leona Miller incident, red-faced Judge Sappington pounded on Leona Miller's door and shook his finger at her.

On September 18, 1996, Judge Sappington told Melissa he told Judge Davis he wanted her to sit on his face. Melissa felt violated, sick and angry. Judge Sappington said if his wife found out he would lie. He told her others already knew about the comment, including Judge Francis. On the next day, September 19, 1996, Judge Sappington ordered Melissa into his chambers, told her to look him in the eyes, asked if she had any questions about the "sit on face" discussion and told her he would not do anything until after she was divorced.

On September 25, 1996, Melissa offered to assist Judge Diamond. Judge Sappington stormed into Judge Greanias' office and Melissa was subsequently ordered to do no work for any other judge. Judge Sappington told her it was time people knew she was more than his secretary. Judge Diamond testified he had never been summoned into the presiding judge's office in his twenty-five years as a judge. On October 3, 1996, Judge Sappington summoned Melissa into the courtroom and had Assistant State's Attorney Jack Ahola describe the gruesome murder of Karen Slover. Judge Sappington told her she was beautiful and one day she would face rape and murder like Karen Slover.

On October 4, 1996, Judge Sappington became angry because he was not invited to lunch with Ruth Young and Melissa. He glared at them from the window. He also ordered Melissa to trade vehicles with him despite Melissa having told him she was leaving early that day because it

4

was the anniversary of her daughter's death.

On October 11, 1996, Judge Sappington stopped a court proceeding, stormed out of the courtroom, his gown flying in the air, his face beet red, and summoned Attorney Byers to his chambers. Judge Sappington subsequently recused himself from all further court proceedings.[3] After the October 11 incident Judge Sappington demanded that no one approach the bench.

4. **Melissa reported behaviors to Presiding Judge.**

On October 11, 1996, Melissa called Presiding Judge Greanias ("Judge Greanias") at home and reported Judge Sappington's conduct. Melissa told him she did not have a relationship with Attorney Byers, told him about the Byers incident, the "sit on face" comment, the threat to kill, the plane incident, the breast incident and Judge Sappington's comment about Attorney Byers' car being parked next to hers on the earlier occasion in August. Judge Greanias told her he knew there was something going on. He had seen her upset earlier in the workplace. She told Judge Greanias about the Judge Diamond incident. Judge Greanias commented he did not know if God ever intended for men and women to work together. After she made the reports to Janice Shonkwiler and Judge Greanias in October 1996, she felt her job was in jeopardy. She felt afraid. Judge Greanias stopped communicating with her and never asked her how she was doing until after she resigned.

She was placed on administrative leave and when she returned Janice Shonkwiler told her not to go to Judge Greanias with any other problems. Melissa worked for Judge Diamond for

---

[3]Testimony presented by Judge Sappington suggested Attorney Byers interrupted the court proceeding and Melissa should not have been speaking with Attorney Byers. Melissa was not reprimanded as a result of this incident. Moreover, this Court must recognize recusal from further court proceedings with Attorney Byers was a jealous reaction in light of Judge Sappington's improper obsession with Melissa's personal life.

5

approximately a week and one-half. Thereafter Janice Shonkwiler told her she had to return to work for Judge Sappington. Judge Sappington confirmed Melissa worked with Judge Diamond when she returned.

When Judge Sappington learned Melissa had spoken with Judge Greanias, Judge Sappington was angry and told her so. Judge Greanias and Janice Shonkwiler testified thereafter the relationship between Melissa and Judge Sappington was cold. Melissa testified Janice Shonkwiler, Judge Greanias and nearly all of the judges gave her the silent treatment after she reported Judge Sappington's conduct in early October 1996 and Ruth Young confirmed this silent treatment.

5. **Behaviors continued while Melissa forced to resign.**

On November 20, 1996, Judge Greanias told Melissa the rumors were getting very bad and she had been abused. Judge Sappington told Melissa Judge Francis had a reputation for making moves on women in his courtroom. On November 21, 1996, Judge Sappington told Melissa he had done nothing inappropriate. Judge Sappington told Melissa he saw her car in the lot that evening. By this that Melissa was getting the cold shoulder from everyone at work. On November 24, 1996, Melissa went to the courthouse to get ready for the transfer to Judge Francis. She received a telephone call from Judge Sappington asking her to meet and have a drink. When she rushed from the building she heard the elevator rising and saw Judge Sappington's car outside of the building.

On November 25, 1996, when Melissa spoke with Judge Greanias he told her the transfer was not in her best interest and she would be treated as the problem and not the victim. He said Judge Francis would make her first six months "hell". She had noted Judge Francis' anger over

the transfer. Melissa asked if she could transfer to another judge and Judge Greanias said no. Judge Greanias' testimony - - a judge for in excess of twenty (20) years, could not recall this discussion and many other discussions Melissa had with him about Judge Sappington's conduct.

On November 27, 1996, Judge Greanias told Melissa the transfer would be effective on December 2, 1996. He told her everyone was mad and Melissa should resign. Melissa asked again if there was any other option and Judge Greanias said no[4]. Judge Greanias told her to put in her resignation letter that she was working for idiots who did not know how to deal with the situation.

On December 2, 1996, Judge Greanias called Melissa into his chambers and said it was obvious she was upset. She told Judge Greanias about the phone call she received from Judge Sappington on November 24, 1996. Judge Greanias told her she could stay home until her resignation date of January 10, 1997.[5] Melissa attempted to attend work but missed work on a number of days as a result of the emotional stress. When Melissa told Judge Sappington she resigned, Judge Sappington's only comment was, "Oh hell, I've got a plane to catch." Shortly before Christmas 1996, Judge Sappington called Ruth Young and asked about Melissa.

**B.    Ruth Young's Testimony Confirmed Sexually Harassing Conduct.**

Ruth Young, Judge Greanias' judicial clerk, testified Judge Sappington referred to Melissa as a beautiful blonde and said she was gorgeous. He said this in his office and at lunch.

---

[4]Judge Sappington testified he knew Judge Francis had a reputation for calling female defendants and employees; he told Melissa this and he was in a meeting with Judge Greanias and Melissa when Melissa asked if she could be transferred elsewhere as a result

[5]Presiding Judge Greanias did not recall what was said in this meeting other than Melissa said she was going back to school -- another incredulous claim which never happened. Melissa found alternative employment within eleven weeks -- and never returned to school full time.

Judge Sappington told her he flew his plane around trying to find Melissa. Judge Sappington shared the "sit on face" comment with Ruth Young and when she expressed her disgust, Judge Sappington laughed and said, "Well it's the truth." Judge Sappington had told Ruth Young that morning that Melissa was mad at him and he didn't understand why. Ruth Young testified that Judge Sappington was suffocating Melissa. He called her his "golden goddess" and said he had formed her into a golden goddess. Ruth Young observed Judge Sappington's obsession with Melissa. He insisted on sitting next to Melissa at lunch and regularly referred to her as his golden goddess. In October 1996, when Ruth Young told Judge Sappington he could not go to lunch with she and Melissa, she heard a crash, went back to the doorway and there were books laying on the floor.

On another occasion Judge Sappington told Ruth Young he did not want Melissa dating an attorney and if Melissa did, that attorney would not appear in his courtroom. Ruth Young testified after the Attorney Byers' incident in the courtroom Melissa was very upset. Ruth Young told Judge Greanias about her concerns about Judge Sappington's conduct toward Melissa. Ruth Young testified Janice Shonkwiler, co-workers, and the judges gave Melissa the silent treatment after she reported Judge Sappington's conduct. Shortly before Ruth Young left her job, Judge Greanias told her Melissa had been abused.

C.    **Assistant Knew Behaviors Amounted To Sexual Harassment.**

Janice Shonkwiler ("Janice"), Presiding Judge Greanias' Administrative Assistant, testified she had seen Melissa crying in the workplace before October 16, 1996. Others confirmed Melissa cried in the workplace. On October 16, 1996, Melissa came to Janice crying. Melissa told Janice about Judge Sappington spying on her; that he had flown a plane over her

8

parents' home; and that Judge Sappington threatened to kill Melissa if she shacked up with anyone. Janice also knew: Judge Sappington offered to buy Melissa a vibrator; others were talking about Judge Sappington's conduct toward Melissa due to his frequent lunches with Melissa; and that Judge Sappington had seen Melissa's car parked next to Attorney Byers' car and he had suspected Melissa was having an affair with Byers.

Although Janice did not recall Melissa leaving early on October 11, 1996, crying she noted that her journal, which she prepared at the time the incidents took place, indicated that, in fact, Melissa had left work early crying. After October 16, 1996, Judge Greanias told Janice to keep Melissa and Judge Sappington apart. Janice testified she assigned another clerk to work for Judge Sappington but she did not know where Melissa worked. By October 16th Janice knew Melissa wanted space from Judge Sappington.

Janice believed Judge Sappington was jealous of Attorney Byers and that Judge Sappington was possessive of Melissa. Janice indicated only that she could not recall if Melissa told her she was afraid of Judge Sappington after the Attorney Frank Byers incident. Janice's testimony demonstrated she knew Melissa believed Judge Sappington behaviors were unwelcome – at least by October 1996. Janice testified, in light of training she received after Melissa left her job, that Melissa's reports of sexual harassment should have been investigated. No investigation was ever initiated.

### D. Additional Evidence Confirmed Judge Sappington's Sexual Harassment/Hostile Work Environment.

Consistent with Melissa's testimony, Dr. Eva Muller testified that in June 1997, Melissa reported that she had worked for judges who she had admired and respected until she began to

9

experience sexual harassment by one of the judges.[6]

Dr. Robert Cokley testified Melissa shared with him a number of the same incidents she testified to at court concerning Judge Sappington's conduct. Dr. Cokley testified there was no reason to disbelieve Melissa's reports and that her fear of Judge Sappington's conduct was reasonable.

Melissa's exhibits also supported the effects Judge Sappington's behaviors had on Melissa. She left work early on a number of occasions as a result of the stress. Moreover, when she spoke with Judge Greanias on October 16, 1996, Judge Greanias knew Judge Sappington's conduct was unwelcome and he directed Melissa to take paid time off.

Attorney Jay Watts testified beginning in December 1995 throughout 1996, he noted Judge Sappington treating Melissa differently. He testified Judge Sappington watched over Melissa. Jay Watts also testified that after Melissa left her employment Judge Sappington told him, in relation to the "sit on face" comment that could only happen, "in my dreams".

### E.  This Court Possesses Expertise the Jury Lacked.

This Court is aware of the close working relationship between a judge and his judicial clerk; the policies associated with courtroom decorum; and the skills associated with serving as a member of the judiciary. In this case this court has expertise the jury did not possess. The jury could not see through the black robes of Judge Sappington, Presiding Judge Greanias, and Chief Judge Shonkwiler. When each judge, "could not recall" numerous reports by Melissa this court must conclude an injustice was done to Melissa. A judge knows when a witness continually states, "I do not recall," as opposed to an affirmative answer the witness is avoiding the truth.

---

[6]Muller had no medical records because her office lost them limiting the testimony Melissa could provide from her.

10

Judge Sappington, Judge Greanias and Judge Shonkwiler were not truthful.

F. **Judge Sappington's Testimony Established Sexually Harassing Conduct.**

The testimony by Judge Warren A. Sappington demonstrated he had no reasonable bases to be concerned that Melissa was having anything but a professional relationship with Attorney Byers. More importantly, what Melissa did outside of work could not have reasonably been viewed as Judge Sappington's business.

1. **Judge Sappington's admissions amount to sexual harassment/hostile work environment.**

Judge Sappington testified when he spoke with Melissa about things of a personal nature no one else was around. Such is the nature of a sexual harasser. Judge Sappington testified he believed he had a right to demonstrate the following conduct toward Melissa: (1) he offered to purchase her a vibrator; (2) told her who she could see outside of work; (3) talked to her about cervical cancer; (4) felt he could counsel her about her divorce; (5) he could call her beautiful 25 or more times; (6) he could shake her hand on a number of occasions; (7) he could share with her the "sit on face" comment; and (8) tell her he wanted her to kiss him in public. This alone was enough for a conclusion Judge Sappington's conduct created a hostile environment.

Judge Sappington destroyed the note Melissa left for him on October 16, 1996, after the Attorney Byers incident. A judge - - destroying evidence of an employee's complaint after the management experience he relied on in his earlier testimony?

2. **Judge Sappington's lack of recall established sexual harassment/hostile work environment.**

Judge Sappington could only "not recall" the following conduct by him: (1) whether he told someone he knew he could only have a relationship with Missy in his fantasies; (2) whether

11

he told Ruth Young Missy was precious; (3) whether he ever spoke with Judge Greanias about the "sit on face" comment; (4) whether he ever told Ruth Young he had created Missy; (5) whether he had locked the door in the courtroom while only he and Melissa were in the courtroom; (6) whether he summoned Jack Ahola into the courtroom with Melissa and he present to discuss the Slover incident; (7) whether Melissa told him she was fearful for her safety because of his conduct; nor (8) whether he told Melissa he was trying to keep his feelings for her under control. Judge Sappington, rather than testifying truthfully and admitting to his conduct, merely refused to recognize this conduct - - but did not deny this conduct.

G.   **Judge Greanias Was Not Believable.**

Judge Greanias testified he told Judge Sappington to stop his behaviors in October 1996. Judge Greanias testified he never investigated whether those behaviors stopped thereafter. When Melissa spoke with Judge Greanias on October 16th, Judge Greanias testified he knew she felt uncomfortable. He did not recall whether Melissa told him Judge Sappington was obsessed with her nor whether she told him Judge Sappington was in love in her. Nor did he recall the Attorney Byers incident other than it upset and embarrassed Melissa. Judge Greanias also only recalled he had spoken with Attorney Byers about the October 11th incident but did not remember what was said. Attorney Byers said Judge Greanias told him he had done nothing wrong and the judges would "cover" fro Judge Sappington as a result of Judge Sappington recusing himself from all of Attorney Byers' cases.

He did recall Melissa told him that Judge Sappington was doing things that were unwelcome. One incident he recalled was that Judge Sappington watched her out the window. He did not recall whether he ever asked Melissa how things were going anytime after Melissa

reported to him Judge Sappington's sexually harassing conduct. Nor did Judge Greanias recall if he gave her any direction as to how to deal with additional issues which arose with Judge Sappington as a result of his conduct. Judge Greanias conceded the discussion about transferring Melissa the first time on October 1996, was, in fact, as a result of Melissa's reports of Judge Sappington's harassing conduct.

### H.     Chief Judge Shonkwiler Closed Ears and Eyes.

Chief Judge Shonkwiler intentionally ignored Judge Sappington's sexually harassing conduct. He was Judge Sappington's personal friend and did not know - nor made an effort to know Melissa Robinson. He knew about the Attorney Byers' incident, yet did not investigate. He knew about the "sit on face" comment yet took no action - - because there was nothing to be done because Melissa was gone? Chief Judge Shonkwiler's testimony can only be viewed as a Chief Judge who wholly disregarded his obligations to investigate a claim of improper behaviors committed by his friend, Judge Sappington.

### I.     The Jury Verdict Cannot Stand.

The evidence outlined above establishes the jury verdict, that Melissa did not experience a hostile environment as a result of Judge Sappington's sexual harassment, was against the great weight of the evidence. As a result this Court must grant Melissa's request for a new trial.

### III.    THE TRIAL WAS UNFAIR TO PLAINTIFF

Certain evidentiary rulings in this matter were inconsistent with substantial justice and there is a significant chance the evidentiary errors affected the outcome of the trial. Shick v. Illinois Department of Human Services, 307 F3d 605, 611 (7th Cir. 2002).

13

### A. Character Evidence was Improper.

Allowing Judge Sappington to assassinate Melissa's character to the extent of suggesting she did not love her children while allowing Judge Sappington to portray himself as an ill, old, sick, confused man who only wanted to protect Melissa, clearly resulted in a verdict inconsistent with substantial justice. David v. Caterpillar, Inc., 324 F3d 851, 863 (7th Cir. 2003). Moreover, pursuant to F.R.C.P. 60(b), Melissa was surprised by this assassination because Melissa had no notice, either in the course of discovery, the pretrial order, or as an affirmative defense that Judge Sappington would claim Melissa's alleged indiscretions as a defense to his sexually harassing conduct which created a hostile work environment.

Because the reasons Judge Sappington's conduct amounted to sexual harassment was not relevant, allowing him to introduce evidence that he had been ill and his demeanor had changed with others in the courtroom allowed the jury to find an "excuse" for the hostile environment/sexually harassing conduct perpetrated by him upon Melissa Robinson. No such "excuse" exists under Federal Sexual Harassment Law.

Judge Sappington's motives were not at issue. The harassing conduct need not be motivated by sexual desire but rather motivated by general hostility toward the presence of a woman in the workplace. That Judge Sappington's conduct was clearly of a sexual nature and involved intimidating, harassing behavior in the workplace and was motivated by Melissa's presence in that workplace cannot be disputed. Oncale v. Sundowner Offshore Services, Inc., 523 US 75, 81, 118 S.Ct. 998, 1002 (1998): Berry v. Delta Airlines, Inc., 260 F3d 803, 810 (7th Cir. 2001); Markham v. White, 172 F3d 486, 492 (7th Cir. 1999).

### B. Sexual Harassment Policy Should Not Have Been Admitted.

The State of Illinois Sexual Harassment Policy (D's Ex. 3) should not have been admitted into evidence. There is a significant chance the jury considered the policy as evidence of the factors necessary to establish a hostile environment sexual harassment claim. Melissa's counsel objected to its admission absent any showing the policy had been distributed to Melissa or relied upon by Melissa's employer when Melissa reported Judge Sappington's conduct. Melissa's counsel further objected to its admission absent a redaction of text which intimated the harasser's "intent" was at issue in the case.

There is a significant chance the jury looked to the policy, noted in the "investigation" section and the "disciplinary action" section that the "intent" of the harasser was relevant, and bought, hook, line and sinker, Judge Sappington's poor, poor, old sick me did not mean to sexually harass Melissa Robinson. Clearly such was not the proper standard for the jury to consider whether Melissa was sexually harassed.

### IV. CONCLUSION

For the reasons outlined above and as a matter of equity and substantial justice, Plaintiff, Melissa Robinson respectfully asks this Court to grant her a new trial.

Respectfully requested,
Melissa A. Robinson p/k/a Schroeder,
Plaintiff,
By: s/ Melissa M. McGrath
Melissa M. McGrath Attorney Bar No. 6207263
Attorney for Plaintiff
Thomson & Weintraub
105 North Center Street
Bloomington, Illinois 61701
Phone: (309) 829-7069
Fax: (309) 827-3458
E-mail: mmcgrath@tnwlaw.com

## NOTICE OF FILING

I hereby certify that on September 2nd, 2005, I presented the foregoing document to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

Ms. Karen McNaught
Chief, General Law Bureau
Government Representation Department
500 South Second St.
Springfield, IL 62706

Ms. Diane M. Baron, Esq.
Clausen Miller PC
10 South La Salle Street
Chicago, Illinois 60603-1098

Mr. John Cassidy
CASSIDY & MUELLER
323 Commerce Bank Bldg.
416 Main Street
Peoria, IL 61602

Mr. Terence J. Corrigan
ILLINOIS ATTORNEY GENERAL
500 S Second Street
Springfield, Illinois 62706

Subscribed and sworn to before me this 2nd day of September, 2005

_____
Notary Public

"OFFICIAL SEAL"
Angela M. Park
Notary Public, State of Illinois
My Commission Exp. 10/21/2008

By: s/ Melissa M. McGrath
Melissa M. McGrath Attorney Bar No. 6207263
Attorney for Plaintiff
Thomson & Weintraub
105 North Center Street
Bloomington, Illinois 61701
Phone: (309) 829-7069
Fax: (309) 827-3458
E-mail: mmcgrath@tnwlaw.com

3