E-FILED
Tuesday, 04 October, 2005 02:15:12 PM
Clerk, U.S. District Court, ILCD

12

1 that though.

2 Q   Am I correct that it was your understanding -- strike
3 that.  You also became aware of certain discussions
4 concerning transferring Melissa from Judge Sappington,
5 correct?

6 A   I was aware of that.

7 Q   And your understanding of the reason there were
8 discussions about transferring Melissa?

9 A   I think -- discussions between who?

10 Q   Let me ask you this, Judge Shonkwiler.  What was your
11 understanding of the reason or reasons the transfer was
12 being considered?

13 A   Judge Greanias had a visit from Melissa Schroeder at
14 his home during his vacation.  He called me the next day
15 and advised me of the visit.  He said, "I'm not sure" --
16 something to this effect.  "I'm not sure what the visit
17 was about, but to be on the safe side I have asked Janice
18 Shonkwiler to give her a copy of the Illinois Supreme
19 Court sexual harassment policy and procedure."  I do not
20 know if that was done.

21 Q   And what did Judge Greanias indicate to you when he
22 spoke with you about what Melissa reported to Judge
23 Greanias?

24 A   We had a series of four or five phone calls
25 concerning this matter.

1  Q    Okay. I would like to direct you first of all,
2  Judge, to the first discussion -- or, I'm sorry, the
3  discussion you have just indicated you had with Judge
4  Greanias. First of all, when did that take place?
5  A    I do not know.
6  Q    Can you give me a month?
7  A    I can't give you a month. I have no record of it.
8  Q    Okay. Tell me what Judge Greanias said in this
9  conversation, as best you recall, and what you said?
10 A    He indicated that he had had a visit from
11 Ms. Schroeder, that he wasn't sure the nature of the visit
12 or something like that, and he indicated that he had told
13 his administrative assistant, Janice Shonkwiler, to give
14 Melissa Schroeder a copy of the sexual harassment policy.
15 That's basically it. We did not go into detail.
16 Q    Did you ask Judge Greanias what types of conduct
17 Melissa had reported?
18 A    I didn't. I did not and he did not tell me.
19 Q    Did you ask Judge Greanias who the behavior involved
20 that Melissa had reported?
21 A    I think I -- I'm pretty sure -- my impression was it
22 was Judge Sappington.
23 Q    What makes you have that impression, Judge
24 Shonkwiler?
25 A    At some time I learned that Judge Davis was unhappy

1   matters we discussed when he called.

2   Q   How often back in 1996 did you speak with Judge

3   Greanias, Judge Shonkwiler?

4   A   When the occasion arose, if there was a problem in

5   Macon County or if I wanted to ask him a question

6   concerning the administration of the court in Macon

7   County, I would call him or he would call me.

8   Q   Did you -- in July of 1996 through December of 1996,

9   did you receive calls frequently from Judge Greanias where

10  you discussed problems that were happening at the Macon

11  County courthouse?

12  A   No.  I wouldn't say it was frequently, no.

13  Q   How many times, Judge Shonkwiler, would you believe

14  you spoke with Judge Greanias about problems at the Macon

15  County courthouse from July of 1996 to December of 1996?

16  A   I would have no idea.

17  Q   By the way, Judge Shonkwiler, do you socialize with

18  Judge Warren Sappington?

19  A   I do.  I would say that I have -- well, prior to this

20  case we would have dinner maybe two to four times a year.

21  Q   And since this case has arose, do you still socialize

22  with Judge Sappington?

23  A   We were asked during the active part of the case not

24  to associate with each other.

25  Q   So I would be correct that you haven't socialized

```
 1   with him in the last nine years?
 2   A    No.  We socialized, oh, maybe six months ago.
 3   Q    What was that occasion, Judge Shonkwiler?
 4   A    Just dinner, getting together.
 5   Q    In October of 1996, didn't Judge Sappington and his
 6   wife have dinner at your home?
 7   A    In October of 1996?  I don't think so.  They may have
 8   come in the house, but it was not for dinner.
 9   Q    What about in November of 1996?  Wouldn't Judge
10   Sappington and his wife have been at your home?
11   A    They could have been, but I just don't recall.
12   Q    Well, let me ask you this, Judge Shonkwiler.  Did
13   Judge Sappington and his wife ever talk with you about
14   Melissa Robinson's allegation of sexual harassment conduct
15   by him while they had dinner at your home between October
16   through December of 1996?
17   A    They did not.
18   Q    How is it you can be so certain about that, Judge
19   Shonkwiler?
20   A    Because, counsel, I'm such a bad cook, I wouldn't put
21   anyone through that.  And we would trade dinners so to
22   speak.  I would take them out to a restaurant.  So they
23   never -- I am sure they never had dinner in my home.
24   Q    All right.  Did you ever have dinner anywhere with
25   Judge Sappington and his wife between October 1 of 1996
```

1  and the end of 1996 where you discussed the sexually
2  harassing conduct Melissa Robinson had complained about?
3  A    In 1996?  I don't believe so because I don't think I
4  learned about that until early 1997, but I'm trying to
5  pull from memory.
6  Q    Well, Judge, Judge Sappington told you about an
7  incident in his courtroom concerning Frank Byers --
8  A    He did, yes.
9  Q    I apologize, but let me get the question out.  Judge
10 Sappington told you about the incident in his courtroom
11 involving Frank Byers before January of 1997, correct?
12 A    I think so, but it was not about sexual harassment.
13 Q    Well, tell me, Judge Shonkwiler, what did Judge
14 Sappington tell you about the incident concerning Frank
15 Byers in the courtroom?
16 A    He told me that -- at least my impression of what he
17 said --
18 Q    Judge, if I just might clarify my question, I would
19 like you to tell me as best you can your recollection of
20 what Judge Sappington said, okay?
21 A    My recollection is that Judge Sappington was in his
22 courtroom.  Melissa Schroeder was his clerk.  A lawyer
23 named Frank Byers came in the courtroom.  He was
24 apparently talking to Melissa Schroeder.  He had asked him
25 to leave because it was a very fast moving court and he

1  needed her undivided attention.  I understood that he then
2  said that she was upset and left the offices.
3  Q    You would agree, would you not, Judge Shonkwiler,
4  that at least back in 1996 it was a common occurrence for
5  an attorney to approach a judicial clerk in the courtroom
6  in Macon County?
7  A    I'm not sure it was a common occurrence, but it
8  happened.  Attorneys want to get their business with the
9  clerk done, but when it's during the court it interrupts
10 proceedings of the court, so a judge will try to cut that
11 off so he can finish his busy call.
12 Q    Well, am I correct that you had no understanding as
13 to why Judge Sappington saw Mr. Byers' actions as such a
14 problem?  Am I correct?
15 A    Why he saw it as a problem?
16 Q    Yes, Judge.
17 A    No, I don't see why he saw it as a problem, but it
18 apparently was fresh on his mind and he mentioned it, but
19 I don't know why.
20 Q    And, in fact, you didn't understand why it was a
21 problem, am I correct, Judge?
22 A    I would say that's correct.
23 Q    Thank you.  Is it your testimony, Judge Shonkwiler,
24 you recall more than one conversation with Judge Greanias
25 about Melissa's reports?

```
 1   for Melissa to have told Judge Greanias about the conduct
 2   of Judge Sappington, she had to use the words "sexual
 3   harassment"?
 4   A    Oh, I don't believe so.
 5          MS. McGRATH: I don't have anything further,
 6   Judge.
 7
 8                    * * * * * * * * * *
 9
10              FURTHER RE-DIRECT EXAMINATION
11   BY MS. McGRATH:
12   Q    I just have one follow-up question.  Judge
13   Shonkwiler, you testified that you became aware of the
14   Byers incident in the courtroom, correct?
15   A    I'm sorry?
16   Q    You became aware of the Byers incident, the incident
17   concerning Frank Byers, in the courtroom?
18   A    I did.
19   Q    You became aware at least as early as January of 1997
20   that Judge Sappington had -- Melissa claimed Judge
21   Sappington had talked about him wanting to sit on her
22   face, correct?
23   A    I learned about that, but I don't think I learned
24   about it before she left.
25   Q    I understand that, Judge.  After she left, you did
```

```
 1   not initiate any investigation, correct?
 2   A    I did not.
 3   Q    Okay.  You had the information about who was involved
 4   in the Frank Byers incident, didn't you?
 5   A    I did.
 6   Q    You had the incident -- the information about who was
 7   involved allegedly in the sit-on-his-face comment,
 8   correct?
 9   A    Correct.
10   Q    You didn't have anything in writing from Melissa,
11   correct?
12   A    Correct.
13   Q    But you could have initiated an investigation with
14   the information that you had, couldn't you have?
15   A    I could have requested an investigation be made.
16   Q    And no investigation was made, correct?
17   A    Correct.
18            MS. McGRATH:  Thank you, Judge.
19
20                  * * * * * * * * *
21
22
23
24
25
```

|   |   |
|---|---|
| 1 | **FURTHER RE-DIRECT EXAMINATION** |
| 2 | BY MS. McGRATH: |
| 3 | Q    One more question.  Judge Shonkwiler, you were the |
| 4 | chief judge of the Sixth Judicial Circuit when you |
| 5 | received that information, were you not? |
| 6 | A    I was. |
| 7 | Q    If in fact Judge Sappington told Melissa that he |
| 8 | waned her to sit on his face, wouldn't that have caused |
| 9 | you some concern? |
| 10 | A    It would cause me concern. |
| 11 | Q    And wouldn't that be something that should be |
| 12 | investigated even if that employee is no longer with the |
| 13 | Sixth Judicial Circuit to protect possibly other employees |
| 14 | from the same conduct? |
| 15 | A    Counsel, if we had the specifics, an investigation |
| 16 | would be started in Macon County, yes. |
| 17 |         MS. McGRATH:  Nothing further, Judge. |
| 18 |         THE COURT:  Thank you.  Anything else?  All |
| 19 | right.  Thank you very much.  You may step down.  You are |
| 20 | cautioned not to discuss your testimony with any other |
| 21 | witness. |
| 22 |   |
| 23 |         * * * TRANSCRIPT EXCERPT CONCLUDED * * * |
| 24 |   |
| 25 |   |

Exhibit 7

Testimony of Jay Watts

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE CENTRAL DISTRICT OF ILLINOIS


MELISSA ROBINSON,                    )
(p/k/a MELISSA SCHROEDER),           )
                                     )
                    Plaintiff,       )
                                     )
            vs.                      )  Case No. 1:04-CV-1360
                                     )  Peoria, Illinois
JUDGE WARREN A. SAPPINGTON,          )
SIXTH JUDICIAL CIRCUIT,              )
(IN OFFICIAL CAPACITY),              )
                                     )
                    Defendant.       )
                                     )
            and                      )
                                     )
MACON COUNTY,                        )
                                     )
                    Defendant.       )
```

**DIRECT TESTIMONY OF JAY WATTS**
**AUGUST 18, 2005**

BEFORE:
THE HONORABLE MICHAEL M. MIHM,
United States District Judge,
and a Jury

1    A.  I, I don't know that I would say that I
2 noticed he was treating her differently.  What I noticed
3 was that there seemed to be, from my point of view, an
4 undue amount of tension in the air of Judge -- what I
5 would call watching over her or checking up on her to the
6 point that it made me feel uncomfortable.
7         MR. CORRIGAN:  Objection as to foundation.
8         THE COURT:  I'm sorry?
9         MR. CORRIGAN:  Objection as to foundation.
10        THE COURT:  Well, okay.  Just a moment.
11        Did you finish your answer?
12        THE WITNESS:  Yes.
13        THE COURT:  All right.  Lay a foundation.
14 BY MS. McGRATH:
15   Q.  When is the -- can you give me a time when you
16 first observed Judge Sappington acting in this manner?
17   A.  Well, if I might, if I can give you some
18 preview of, of when he didn't act different or abnormal.
19        When Missy first started working for Judge --
20 and I honestly don't recall when that was; sometime, I'm
21 going to guess, in the mid '90s -- there seemed to be a
22 good rapport as I would be in court or I would be checking
23 with the judge's office to schedule court dates or drop
24 off briefs or see if they had received pleadings or what
25 we should follow in terms of procedure.  In other words,

1   what I would call a, a fairly normal interaction between

2   the judge and his staff, specifically Missy.

3       Q.   And when did you notice that change?

4       A.   At some -- when I noticed it was in the last

5   month or so of when we were in the -- what is the actual

6   courthouse, which is at 253 East Wood, and then we moved

7   over to what's known as the Ambassador because they were

8   doing renovations at the courthouse.  So, from, say, a

9   month or so before we moved to the temporary quarters at

10  the Ambassador throughout the time period through the end

11  of 1996.

12      Q.   Okay.  Can you share with the jury any

13  particular -- and I want you to answer yes or no first.

14  Can you share with the jury any particular incident that

15  you recall where you observed these behaviors of -- this

16  conduct by Judge Sappington?

17      A.   Yes.

18           MR. CORRIGAN:  Objection as to foundation on

19  these incidents.

20           THE COURT:  Just a moment.  She told him she

21  was asking for a yes or no answer.  That's completely

22  appropriate.  Now give her a chance to do it.

23           Lay the foundation.

24  BY MS. McGRATH:

25      Q.   I'm sorry.  He answered yes?

1    A.   Yes.

2    Q.   Okay.  And where did this incident take place?

3    A.   The first incident I recall took place in the
4  old courthouse or the --

5    Q.   Okay.

6    A.   -- what we call the original courthouse.

7    Q.   All right.  And when did that incident take
8  place?

9    A.   Again, I would say that was within the last
10 month or so prior to moving over to the Ambassador.

11   Q.   Okay.  So, late 1995, assuming that you moved
12 to the Ambassador in January 1996?

13   A.   That's correct.

14   Q.   Was anyone else present other than you and
15 Judge Sappington when you observed this?

16   A.   Well, other than Missy and perhaps Leona, his
17 court reporter, although they were in different areas
18 within the office so I don't know whether Leona observed
19 anything or she didn't, truthfully.

20   Q.   Okay.  And tell the jury what you observed.

21   A.   The first thing I recall seeing is I was
22 standing -- Missy's office was kind of an ante-office I
23 will call it.  The judge was on down the hallway, as was
24 his court reporter off to the left.  Missy was kind of in
25 the hallway on the left-hand side in just a small office

1  area.

2  And I recall once or twice standing there
3  speaking with her about scheduling a case or whatever that
4  might pertain to a case, and we might even have been
5  having small talk about, "How are your kids?" and so on,
6  so forth. But I recall at one point Judge came to his
7  door -- and I'm talking maybe from me to you distance-
8  wise -- and he just stood there, which I thought was
9  unusual.

10  Q.  Why did you think that was unusual?

11  A.  Well, because normally Judge was very
12  friendly; he would engage me in conversation. It was just
13  uncommon for him not to say anything, you know, like,
14  "Jay, how are you doing?" or, "Do you need" -- you know,
15  "Can I help you with something?" or whatever. And he just
16  stood there.

17  Q.  Okay. Is there -- when is the next incident
18  you can date for me, first of all, when you observed Judge
19  Sappington's conduct that you thought was unusual?

20  A.  The next incident I recall was one morning in
21  what we call divorce court, or the lawyers and the judges
22  call it moans and groans, when people come in --

23  Q.  All right. Hang on one second. Tell me when
24  this incident took place.

25  A.  We were in the Ambassador building, and it

1  Q. Okay.

2  A. We were just standing there talking. And he

3  just stopped probably from here to the railing, and, and

4  he just stood there and stared which, again, was uncommon

5  for him.

6  Q. From your observations of this conduct by

7  Judge Sappington, did you get a sense that Judge

8  Sappington's behaviors were more as a response to some

9  type of an amorous relationship?

10  MR. CORRIGAN: Objection. The witness's

11  interpretation is not relevant.

12  THE COURT: Sustained.

13  BY MS. McGRATH:

14  Q. From your observations of Judge Sappington's

15  conduct directed towards Melissa, what did you believe was

16  going on with Judge Sappington?

17  MR. CORRIGAN: Same objection.

18  THE COURT: Sustained.

19  BY MS. McGRATH:

20  Q. Did you have a discussion with Judge

21  Sappington after Melissa left her job at the courthouse

22  where the issue of Missy Robinson sitting on the judge's

23  face was discussed?

24  A. I did.

25  Q. Can you tell me when that happened?

1    with the court or with Judge Sappington?

2        A.   Yes, I believe so.

3        Q.   What else did Judge Sappington say?

4        A.   I don't remember whether he initiated or I

5    initiated it, but I said, Well, Judge, so what happened?

6    What's -- Why did Missy leave?

7        And he said something to the effect of, She

8    was uncomfortable. That they -- just speaking

9    generically, they had him either having an affair with her

10   or being obsessed with her, and that Davis had even

11   mentioned something about, Well, wouldn't you like to have

12   her sit on your face?

13       And I said, Well, what did you say, Judge?

14       And he said, Well, sure. Who wouldn't? But

15   only in my dreams.

16       Q.   Did Judge Sappington say anything else during

17   that discussion with you about Missy?

18       A.   He said -- again, I'm speaking in general

19   terms. He said that he thought a lot of her, that he was

20   concerned about her welfare. He knew that she was having

21   marital problems, and, and he was concerned about her just

22   being safe and that sort of thing. And he said, Maybe I

23   did hover over her or treat her differently.

24       But, you know, that's, that's pretty much how

25   he addressed it, as I recall.