IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MELISSA ROBINSON, | ) | |
| (f/k/a MELISSA SCHROEDER) | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 04-1360 |
| | ) | |
| JUDGE WARREN A. SAPPINGTON | ) | |
| SIXTH JUDICIAL CIRCUIT, | ) | |
| (IN OFFICIAL CAPACITY AND | ) | |
| INDIVIDUALLY), | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| MACON COUNTY, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| JOHN P. SHONKWILER, CHIEF JUDGE, | ) | |
| SIXTH JUDICIAL CIRCUIT, MACON | ) | |
| COUNTY CIRCUIT COURT, MACON | ) | |
| COUNTY, (IN OFFICIAL CAPACITY AND | ) | |
| NOT INDIVIDUALLY). | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT SAPPINGTON'S RESPONSE TO PLAINTIFF'S MOTION FOR NEW TRIAL

COMES NOW the defendant, Warren A. Sappington, by and through his counsel, LISA MADIGAN, Attorney General of the State of Illinois, and hereby responds to the plaintiff's motion for a new trial. In support thereof, the following statements are made.

## FACTS

Plaintiff commenced her employment as a secretary and/or docket clerk at the Sixth Judicial Circuit, Macon County, Illinois, in 1994. She was assigned to work with Judge Warren A. Sappington, a nonelected, associate judge.

Because asbestos abatement and other renovations were being performed on the state courthouse in Macon County, most of the personnel associated with the judiciary moved to temporary quarters in a building formerly known as the Ambassador Hotel. The quarters were cramped, the secretaries and clerks shared space, the courtrooms were small, and the chambers of the judges were not always located on the same floors as their respective courtrooms.

Richard Hopkins, an attorney practicing in Macon County in the mid to late 1990's, testified that it was difficult to hear in the courtroom of Judge Sappington while in the Ambassador Building. Mr. Hopkins testified that Judge Sappington required counsel to be more formal in the courtroom, such as requiring attorneys to stand when addressing the court; requiring attorneys to ask permission before approaching the bench or a witness; and requiring one person to speak at one time. Mr. Hopkins also testified Judge Sappington became less tolerant of interruptions in his courtroom when housed in the Ambassador Hotel.

Only Judge Paul Francis and his courtroom staff, which consisted of court reporter Wendy Reeves and docket clerk Angie Moeller, remained at the main courthouse. Judge Francis was allowed to remain at the main courthouse despite renovations, because his courtroom was not affected by the construction.

For a long period of time during plaintiff's tenure with judiciary personnel, plaintiff had an unusually close relationship with Judge Sappington. She often brought in baked goods and coffees, she transported Judge Sappington to and from the mechanic shop when he had car problems, she read the newspaper in his chambers, she was present in his chambers when he discussed matters with attorneys, she was allowed to study during

2

business hours for the college classes she was taking, and she and Judge Sappington often went to lunch together.

In July 1996, Judge Sappington and his wife went to China for the wedding of a family member. Prior to his return, Judge Sappington became ill. Although he could not recall a specific time frame, Richard Hopkins testified Judge Sappington became grumpy and out of humor. Plaintiff also testified that Judge Sappington became ill while he was in China.

After his return from China, Judge Sappington asked plaintiff about her immediate family. Plaintiff announced that she was seeking a divorce from her husband, Don Schroeder. Plaintiff testified Judge Sappington seemed concerned about her situation and she volunteered that she and her husband were married at a young age after she became pregnant and they had since grown apart. According to Judge Sappington, plaintiff later made comments during their discussions such as that she had not had intimate relations with her husband in many months; that she had never wanted to have children and therefore wanted to give full custody to her husband, Don; and that she had no morals after Judge Sappington attempted to discuss with plaintiff a book written by Dr. Laura Schlessinger. Judge Sappington also testified that plaintiff made a comment to him that he interpreted as an indication that plaintiff wanted to engage in orgy-type activity with multiple males at the same time. According to Judge Sappington, plaintiff also told him that she had met Frank Byers, an attorney who practiced before Judge Sappington, at the beer tent during the Illinois State Fair, in August 1996. According to plaintiff, Judge Sappington angrily confronted plaintiff on Monday, August 19, 1996, about being with Byers.

Judge Sappington, who had represented clients in divorce cases prior to being appointed to the bench and who had presided over domestic relations cases while on the court, became concerned about plaintiff.  He attempted to counsel her about potential consequences she might encounter.  Plaintiff admitted to Janice Shonkwiler that she was seeking marriage counseling from Judge Sappington.  Judge Sappington testified that he told plaintiff she should be very careful of having multiple sexual partners; of being promiscuous and committing adultery before any divorce was final; and, if she were in need of sexual pleasure, she should purchase a vibrator.  Judge Sappington testified that while he was counseling plaintiff, he offered to purchase the vibrator if plaintiff felt she was in need of such a device and were too embarrassed to purchase it herself.   Judge Sappington also testified that he told plaintiff she should tell Frank Byers to spend less time hanging around her work area, if the attorney were to continue to have proceedings set before Judge Sappington.  This was based on Judge Sappington's interpretation of ethics rules and concern over an appearance of impropriety.  According to Judge Sappington, plaintiff said she would take care of the situation.

Plaintiff also testified that in August or September 1996, the courtroom was very cold on one particular occasion.  According to Judge Sappington, plaintiff was wearing a thin blouse that day.  Judge Sappington testified that he privately advised her that she should wear a jacket.

Judge Sappington and his wife, Cheryl, testified that Cheryl had a telephone conversation with plaintiff on a Saturday in September 1996, in which Cheryl advised plaintiff of long-term effects that relinquishing custody of children could have on family dynamics.  Plaintiff confirmed in her testimony that the telephone call had occurred.

Ruth Young, despite being confused about events and dates, was quite clear that Judge Sappington became very concerned about plaintiff after men in a white van attempted to accost plaintiff on a city street in broad daylight. As a result, according to Ruth Young, Judge Sappington made arrangements for plaintiff to park in a more secure area by the courthouse and made a comment reflecting the concern that arose, in part, from the unsolved murder of a local woman named Karen Slover.

On September 17, 1996, Judge Davis sent a memorandum to Judge Sappington criticizing plaintiff for placing certain documents in court files. *See* Defendant's Trial Exhibit #19. Judge Greanias testified that he became aware of this criticism, but dismissed the allegation because he thought Judge Davis was incorrect on the statutory interpretation.

On direct examination, plaintiff was asked what happened on September 18, 1996. Plaintiff struggled to recall, but testified a lot was going on and could not recall what other incidents occurred. Only later during her direct examination did she recall the alleged traumatic event. According to plaintiff, Richard Hopp, a Macon County attorney, told her that Judge Davis had criticized Judge Sappington and alleged Judge Sappington had given plaintiff judicial authority. Plaintiff testified she then had a conversation with Judge Sappington during which she relayed what Richard Hopp had told her. Judge Sappington asked if anything sexual was mentioned. Judge Sappington told plaintiff that Judge Davis was engaging in locker room talk and then said words to the effect of "bet you wouldn't mind if Missy sat on your face" to which Judge Sappington replied, "yeah, whatever." Although plaintiff testified on direct examination that she did not know why Judge Sappington had told her of Judge Davis' comments, she admitted on cross-examination that the notes in her journal written nine years earlier reflected that she had demanded that

5

Judge Sappington tell her what Davis had said.

In late September 1996, Circuit Court Judge John Davis complained about the amount of time plaintiff was spending with Judge Sappington. According to court personnel, there were rumors about plaintiff and Judge Sappington. The testimony of Judge Greanias and Judge Sappington revealed that Judge Greanias notified Judge Sappington of these rumors. As a result, Judge Sappington ceased going to lunch with plaintiff in September 1996.

Plaintiff testified that on October 3, 1996, she was called into the courtroom of Judge Sappington and there was an incident which involved Assistant State's Attorney Jack Ahola. According to Ahola, Judge Sappington pontificated his theory of who killed Karen Slover, a Macon County woman who had been brutally killed. Although plaintiff testified that Ahola graphically detailed the murder and dismemberment of Slover, Ahola testified plaintiff's rendition of the dismemberment of Karen Slover during the case at bar contained details that were incorrect and that he would not have described the events of a yet unsolved murder to members of the general public such as plaintiff, because it could have the effect of impeding the criminal investigation. Plaintiff testified that she was so emotionally traumatized by this event that she left work early. However, her time sheets for October 3, 1996, indicate plaintiff left at the normal close of business.

Plaintiff and Ruth Young also testified that they went to lunch together on October 4, 1996, and Judge Sappington became enraged because he was not invited. Ruth Young testified she saw Judge Sappington watching them from the window in his chambers as they walked down the street. However, Judge Greanias testified that because of the tinted windows, it was impossible to see from the outside in. Moreover, plaintiff had planned to

6

take off the afternoon of October 4, 1996, and Judge Sappington knew this, because he signed plaintiff's benefit time request. In addition, Judge Sappington testified he took off the afternoon of October 4, 1996, to go flying. As such, there was no expectation that Judge Sappington had of going to lunch with plaintiff on that day.

On Friday, October 11, 1996, Frank Byers came into the courtroom of Judge Sappington. Some witnesses, such as Richard Hopkins and Jennifer Cavaness, testified that Byers, who was not involved in the hearing before Judge Sappington, was disruptive and took longer than normal to request a file from plaintiff. Most witnesses to the incident agree that plaintiff left the courtroom while a witness was testifying to attend to Byers. While the case was being heard, plaintiff had the responsibility of giving the witnesses an oath; marking, recording, and retaining exhibits allowed into evidence; and typing docket entries of the proceedings. When plaintiff left with Byers and court was in session, Judge Sappington interrupted the proceedings, pursued Byers, and demanded that Byers proceed to the chambers of Judge Sappington. According to the testimony of Judge Sappington, he thought that plaintiff had talked to Byers about the appearance of impropriety and, when it became evident that Byers was interrupting court to speak with plaintiff, Judge Sappington interceded. Judge Sappington testified that he took this drastic measure because he felt he was responsible under Canon 3 of the Code of Judicial Conduct (Supreme Court Rule 63) to protect himself and his staff against any appearance of impropriety and partiality.

Plaintiff testified that she was so upset by this that she felt compelled to leave the courthouse. Janice Shonkwiler, the Administrative Assistant, testified she did not know why plaintiff was upset, but contacted Judge Greanias, the Presiding Judge in Macon

7

County, and advised him that plaintiff had left work crying.  Judge Greanias and Janice Shonkwiler testified that Judge Greanias told Janice to have plaintiff call Judge Greanias at his home if she wanted to discuss anything.  Judge Greanias was on vacation as of Friday, October 11, 1996, but he was available to speak with plaintiff.  Judge Greanias testified that when plaintiff called him during the afternoon of October 11, 1996, she complained that Judge Sappington had flown an airplane over her house, that Judge Sappington had watched her from a window, and that Judge Sappington had become upset when she left the courtroom with Frank Byers earlier that day.

Judge Greanias  offered to transfer her to another judge.  Plaintiff admitted that during this telephone conversation with Judge Greanias, she told him she did not want to be transferred. According to Janice Shonkwiler, Judge Greanias advised Janice that plaintiff would be taking a couple of days of administrative leave and then Janice was to reassign plaintiff to another courtroom.    Witnesses testified that the courthouse was closed on Monday, October 14, 1996, in observance of Columbus Day.  According to plaintiff and Janice Shonkwiler, plaintiff took administrative leave and returned on Wednesday, October 16, 1996.  Janice Shonkwiler testified that by October 17, 1996, plaintiff and Judge Sappington had "patched things up" and seemed to be "getting along" so there was no need to transfer plaintiff to work with another judge.

Plaintiff and Ruth Young testified that Judge Sappington called plaintiff beautiful and referred to her as a "golden goddess" or a "blonde Demi Moore."  Judge Sappington testified that plaintiff had complained that she had been overweight and made comments to suggest she had low self-esteem.  Ruth Young testified that one instance occurred when they made jokes about plaintiff not eating the food she brought and another time occurred

when they were joking and plaintiff reacted to the joke by smiling. Judge Sappington denied that he referred to plaintiff as a "golden goddess" but admitted that he had referred to plaintiff as someone who dressed like Demi Moore who wore a jacket in the film, A Few Good Men.

At a November 7, 1996, shelter case hearing, Judge Davis presided over a hearing at which a witness testified that she had consulted with "Missy," Judge Sappington's secretary regarding matters in a pending case. *See* Defendant's Trial Exhibit #20 (pp. 4, 7, 17-20). Judge Davis wrote a subsequent memorandum to Judge Greanias dated November 15, 1996, and attached a copy of the transcript. Judge Greanias testified that he decided to move plaintiff to another courtroom where Judge Davis would not have the opportunity to scrutinize her behavior.

Judge Greanias testified that he spoke with plaintiff about transferring her and she initially agreed. Judge Greanias and Judge Sappington testified that plaintiff later enlisted Judge Sappington to go with her to Judge Greanias and request that she not be transferred, but rather that she be allowed to stay with Judge Sappington. Plaintiff also told Judge Greanias, according to his testimony, that she was contemplating resignation, and he advised her to take some time to think about her decision. Plaintiff admitted on cross-examination that she told Judge Greanias she might quit so that she could return to college.

According to Janice Shonkwiler, Judge Greanias announced on November 21, 1996, his decision to move plaintiff to the courtroom of Judge Francis (in the main courthouse) and Angie Moeller to the courtroom of Judge Sappington. Several witnesses, including Judge Francis, Wendy Reeves, Angie Moeller, Judge Greanias, and Janice

9

Shonkwiler, testified that many of the staff, even those who would not be affected by the moves, were unhappy. According to witnesses, Judge Greanias did not explain his reason for the move. Judge Greanias testified he was attempting to protect Judge Sappington from unwarranted criticisms by Judge Davis, and not any allegations made against Judge Sappington by plaintiff.

The only allegation plaintiff made of allegedly harassing behavior after October 11, 1996, concerned a telephone call in late November 1996. At the time, plaintiff was considering whether to accept the reassignment or whether to resign, she claimed that Judge Sappington left a message asking whether she wanted to meet and talk. Judge Sappington denied that he made this telephone call.

Judge Greanias testified that he waited several days in November 1996 for written confirmation from plaintiff that she was going to resign. When plaintiff failed to send a written letter resigning her post, Judge Greanias sent plaintiff a letter dated December 3, 1996, confirming her resignation. *See* Plaintiff's Trial Exhibit #12. Janice Shonkwiler testified that plaintiff admitted that she voluntarily quit because she did not want to work for Judge Francis. Wendy Reeves testified plaintiff stated that she was upset and did not want to be transferred from Judge Sappington because they were very close and like family.

On cross-examination, plaintiff admitted her daughters were ill and therefore she missed work. She also admitted that she became ill on December 13, 1996, and upon the advise of her physician, did not return to work after December 18, 1996.

## A. PLAINTIFF'S CLAIMS REGARDING "CHARACTER EVIDENCE"

Plaintiff maintains that this Court improperly allowed evidence that she did not love

10

her children which adversely reflected her character and deprived her of a fair trial.  The evidence of which plaintiff complains consisted of the testimony of Judge Sappington and his wife that plaintiff, while discussing her impending divorce, indicated that she did not want custody of her children.  The evidence was not offered to attack plaintiff's character, but was offered as part of the testimony detailing the conversations plaintiff had with Judge Sappington and his wife about her marriage and divorce.

Plaintiff insists that, in part, Judge Sappington's sexual harassment of plaintiff took the form of engaging in discussion of plaintiff's personal life.  The Seventh Circuit has repeatedly held that, in determining whether comments rise to the level of sexual harassment prohibited by the law, the finder of fact must consider all of the relevant circumstances.  *See, e.g., Whittaker v. Northern Illinois University*, 424 F.3d 640, 645 (7th Cir. 2005); *Moser v. Indiana Department of Corrections*, 406 F.3d 895, 902 (7th Cir. 2005); *Smith v. Northeastern Illinois University*, 388 F.3d 559, 566 (7th Cir. 2004); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965 (7th Cir. 2004).  One of the circumstances which must be considered is the context in which comments were made.  *Shanoff v. Illinois Department of Human Services*, 258 F.3d 696, 705 (7th Cir. 2001); *Markhen v. White*, 172 F.3d 486, 493 (7th Cir. 1999)("The defendants may . . . be able to supply enough context for certain remarks that, under *Oncale's [v. Sundowner Offshore Services, Inc.*, 523 U.S. 75 (1998)] standards, it becomes clear that they were not the kind of harassment the law addresses.")[1]

In the present case, the jury needed to hear the totality of the circumstances in order

---

[1]While *Markhen* was a *Bivens* action, not a Title VII claim, *Oncale*, upon which the court relied was a Title VII case.

to determine whether the discussion about plaintiff's personal life was unwelcome, whether it was gender based discrimination, and whether it was severe or pervasive enough to create an objectivity and subjectivity hostile environment. Evidence regarding the context of the conversation was necessary for the jury to make this determination. Plaintiff cannot insist that Judge Sappington's conversation with her constituted gender-based discrimination and also demand exclusion of her portion of that conversation. Since Mrs. Sappington's conversation with plaintiff was a follow up to her husband's conversation, it was relevant as tending to prove that Judge Sappington's conversation occurred as he testified and supporting the position of Judge Sappington that plaintiff was seeking his advice and support regarding her divorce.

Plaintiff also alleges that she was given no notice in discovery that Judge Sappington would raise this evidence as a defense. Plaintiff asserts that it should have been raised as an affirmative defense. Plaintiff cites no authority for this proposition and the evidence concerned issues upon which plaintiff bore the burden of proof. Nothing about plaintiff's character was used as an affirmative defense.

Furthermore, plaintiff was made aware of this testimony during discovery. Plaintiff's attorney questioned Judge Sappington on two different days during discovery. Plaintiff's counsel elicited the following testimony from Judge Sappington during his deposition on March 13, 2001:

> Q.   Why did you give her the book by Dr. Laura?
>
> A.   We had been talking about custody. And in her desire for a divorce, and as I indicated to you, she talked about she needed a vacation with the boys. I tried to impress upon her that at least I as a judge would have been influenced in a divorce case where custody was in issue the amount of time

> spent by the mother away from the children....
>
> * * *
>
> Q.    Is there anything else you can tell me as far as the reason you gave her Dr. Laura's book?
>
> * * *
>
> A.    It all revolved around her talking with me, and my wife, and talked with both of us about this, about her wanting a divorce and <u>not wanting the children from almost April to November</u>....

*See* Exhibit A [emphasis added]. If plaintiff had wanted more details, she had the opportunity to ask follow-up questions.

Plaintiff also alleges that defendant was improperly allowed to introduce evidence that Judge Sappington was ill in the Autumn of 1996 as an excuse for his alleged discriminatory behavior. Defendants offered no such excuse. Plaintiff's theory of the case was that after she told Judge Sappington that she was getting a divorce, his demeanor changed and he became obsessed with her. Testimony was presented that Judge Sappington became more short tempered in the Autumn of 1996, including in situations not involving plaintiff. To the extent that evidence was presented showing that Judge Sappington's personality changed in the Autumn of 1996, he was entitled to offer evidence which would suggest that an explanation existed for the change other than the alleged obsession with plaintiff.

This Court prohibited defendants from going into detail on this issue and kept this evidence to a minimum. Furthermore, plaintiff herself testified that Judge Sappington was ill when he returned from China. Plaintiff was not unfairly prejudiced by the limited evidence regarding Judge Sappington's illness in the Autumn of 1996.

Although it is not clear from her motion, plaintiff may be attacking evidence regarding the health of Judge Sappington at the time of trial. During the trial, Judge

13

Sappington was attended by a nurse at the insistence of his doctor.  The nurse was either slow returning to her seat after a break or came in front of the bar too quickly during a break.[2]  Defense counsel was concerned the jurors might have seen a woman who was not Mrs. Sappington doting on Judge Sappington and therefore asked Judge Sappington to identify the nurse.  Defendants did not belabor the point and never argued that Judge Sappington was entitled to sympathy based upon his health.  The jury was already aware of Judge Sappington's frail health from observing him at trial.  Plaintiff was not unfairly prejudiced by the brief reference to Judge Sappington's present health.

There was no error in the Court's rulings regarding the evidence of which plaintiff complains.  Even if some error occurred, plaintiff is not entitled to a new trial.  "A new trial is warranted only if the error has a substantial and injurious effect or influence on the determination of a jury."  *Cerabio LLC v. Wright Medical Technology, Inc.*, 410 F.3d 981, 994 (7th Cir. 2005).  The minor points on which plaintiff claims error did not have a substantial and injurious effect on the jury determination.  Accordingly, plaintiff is not entitled to a new trial based on the claimed evidentiary errors regarding what plaintiff claims to be character evidence.

## B.  ADMISSION OF SEXUAL HARASSMENT POLICY

Plaintiff also claims that the Court erred in admitting the sexual harassment policy promulgated by the Administrative Office of Illinois Courts.  This policy was admitted as relevant to the affirmative defense that the State of Illinois acted reasonably.  Since the jury found that plaintiff was not the victim of gender based discrimination, as that term was

---

[2]At this time the undersigned cannot recall which of these scenarios occurred which led to the question regarding who the nurse was.

defined in the instructions, any error regarding the affirmative defense did not prejudice plaintiff.

Plaintiff nevertheless argues that she was prejudiced because the policy made reference to intent, which plaintiff contends was improper.  The policy indicates that, in assessing discipline for violating the policy, the employer should determine whether the violation was intentional or unintentional.  At trial, this Court determined that this evidence was not likely to confuse the jury.

Plaintiff's sole argument on this position is that there is a significant chance that the jury focused only on the discipline section of the policy, saw a reference to intent, and bought Judge Sappington's argument that he was a sick old man who did not mean to sexually harass plaintiff.  Defendant made no such argument.  In fact, defense counsel told the jury that they must use the definition of sexual harassment found in the jury instructions.

Neither those instructions, nor the policy of which plaintiff complains, indicated that sexual harassment occurs only when there is an intent to harass.  Given the instructions of the Court on this point, the language in the sexual harassment policy, and the arguments of counsel for both sides, no basis exists for asserting that a substantial likelihood exists that the policy confused the jury as to the law.

## C.    PLAINTIFF'S TESTIMONY WAS IMPEACHED AND/OR CONTRADICTED

In her supplemental memorandum in support of the motion for new trial, plaintiff claims her testimony was unimpeached.  She cites references only to the examination performed by plaintiff's counsel, rather than the trial record as a whole.

However, the full record indicates that plaintiff was impeached and there was

contradictory evidence elicited from other witnesses.  For example, plaintiff testified that her journal indicated that Judge Sappington referred to her as beautiful and intelligent on a regular basis.  However, on cross-examination, plaintiff admitted in her deposition that she testified this happened on only one occasion when Judge Sappington introduced her to a new attorney starting at the Guardianship and Advocacy Commission.  Plaintiff also admitted under cross-examination at trial that later in her deposition, she could not recall what was said.  As such, prior to trial, there were at least three different versions by plaintiff of how Judge Sappington commented on her appearance.

Ruth Young also testified about the comments Judge Sappington made about plaintiff's physical appearance.  Ms. Young testified Judge Sappington commented one time when a group was joking that plaintiff did not eat the food she brought for others.  On another occasion, during lunch, Judge Sappington commented on plaintiff's appearance and she smiled.  Ruth Young testified she thought plaintiff reacted to the comments in the humorous manner they were intended.

Plaintiff testified that she was traumatized on October 3, 1996, when Judge Sappington allegedly required plaintiff to sit in a courtroom and listen to Jack Ahola give his rendition of the brutal murder and dismemberment of Karen Slover.  However, Jack Ahola testified Judge Sappington was offering his theory of the case and plaintiff did not appear to be distressed at the time.  Plaintiff testified at trial that she was so distraught over the event that she had to leave early.  Her time records from October 3, 1996, indicate otherwise.

There also was testimony that was contradicted about the incidents of October 4, 1996.  Judge Greanias testified that it was impossible for a person outside the Ambassador

Hotel, to see someone inside the building, because of the tint on the windows. Nevertheless, Ruth Young testified she saw Judge Sappington watch plaintiff and Young as they walked down the street to lunch. Judge Sappington could not have expected to go to lunch with plaintiff on this day, because she had requested the afternoon off, and Judge Sappington took the afternoon off to fly an airplane. On the contrary, Judge Sappington testified that after he became aware of the rumors about him and plaintiff and the objections of Judge Davis on September 17, 1996, he ceased going to lunch with plaintiff.

Plaintiff also alleged that Richard Hopkins was a witness to Judge Sappington grabbing her face and threatening to kill her if she ever shacked up with anyone. At trial, Richard Hopkins testified he did not witness the event. Judge Sappington denied that this event occurred. In his testimony, Judge Sappington said plaintiff asked him if he would come and get her if ever she were in trouble and he responded that he probably would, but not without a lecture.

Plaintiff claimed during the trial that she had no idea why Judge Sappington repeated the comment made by Judge Davis about sitting on one's face. However, on cross-examination, plaintiff admitted that in her journal she had written nearly nine years earlier, she demanded Judge Sappington tell her about the comment made by Judge Davis.

Plaintiff also testified that she was given only a one-page sexual harassment policy by Janice Shonkwiler. However, in her deposition, plaintiff identified the seven-page Sexual Harassment Policy promulgated by the Supreme Court of Illinois effective May 1, 1993, as the policy she was given and was forced to admit this inconsistency upon cross-

examination.

Plaintiff also testified she was transferred to Judge Diamond after her return from administrative leave in October 1996.  However, Judge Diamond testified there was no such transfer.  So did Judge Greanias, Judge Sappington, Janice Shonkwiler and Ruth Young.

Plaintiff also engaged in actions that were inconsistent with her testimony at trial.  For example, plaintiff testified she was terrified of Judge Sappington.  However, she admitted that in her journal she noted she told Judge Greanias she declined his offer on October 11, 1996, to transfer plaintiff to another judge.  In late November 1996, plaintiff asked Judge Greanias to remain as the judicial clerk to Judge Sappington and then enlisted the assistance of Judge Sappington to make the same request.

Plaintiff also claimed in her testimony that she had difficulty eating and sleeping for the last nine years.  However, the notes of her counselor in 2005 indicated plaintiff's problem had occurred for only a mere two weeks.

Witnesses at the trial testified that they saw no inappropriate behavior by Judge Sappington toward plaintiff.  However, witnesses did testify that plaintiff appeared to dote on Judge Sappington when she brought him baked goods, poured his coffee, and was present as he had conversations in his chambers with attorneys.

In her post-trial motion, plaintiff has attempted to misrepresent facts that are contradicted by the exhibits she has attached to her motion.  Examples include that Judge Greanias told plaintiff she had been abused  (*see* Document #393, p. 7) which Judge Greanias denied  (*see* Plaintiff's Exhibit #5 to the post-trial motion, p. 53); that Judge Greanias told plaintiff that Judge Francis would make her first six months "hell" (*see*

Document #393, p. 7) which Judge Greanias denied (*see* Plaintiff's Exhibit #5 to the post-trial motion, p. 53); and that Judge Greanias told plaintiff she should resign (*see* Document #393, p. 7) which Judge Greanias denied (see Plaintiff's Exhibit #5 to the post-trial motion, p. 53).

Plaintiff claims that her testimony was corroborated by the testimony of Dr. Eva Muller, Dr. Robert Cokely, and Jay Watts. There was an ample basis for the jury to find that the testimony of each of these witnesses was not credible. Jay Watts testified to an incident where Judge Sappington became so angry with Frank Byers that Judge Sappington broke his gavel. According to Frank Byers, this incident never happened. Dr. Eva Muller had no notes regarding her sessions with plaintiff. She had only her summary that reflected that plaintiff sought assistance with her lawsuit. Dr. Muller also testified that, according to the primary diagnostic manual for those in her profession, her diagnosis was wrong. Dr. Cokely testified that plaintiff continuously sought treatment for incidents related to defendant. Dr. Cokely's notes belie this assertion. Until the eve of trial, the sessions with plaintiff concerned other matters. Furthermore, both Dr. Muller and Dr. Cokely could only testify based on information they learned from plaintiff. Thus, if the jury did not find plaintiff credible, they were entitled to discount the testimony of Muller and Cokely.

In assessing the standard to be applied to a motion for a new trial on a claim that the verdict was against the manifest weight of the evidence, the Seventh Circuit noted, "Where the trial judge disagrees with a jury verdict the Seventh Amendment's limitations on the judge's power to reexamine the jury verdict[3] [are] implicated and a more exacting

---

[3]"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be

standard of review applies." *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995)(reversing decision which granted plaintiffs a new trial after verdict for defendants). In exercising its discretion in ruling on a motion for a new trial, "[i]n cases involving simple issues but highly disputed facts...greater deference should be afforded the jury's verdict than in cases involving complex issues with facts not highly disputed." *Id.*

The *Latino* court relied upon a Third Circuit decision wherein the court stated, "Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case with complex factual determinations." *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1352 (3rd Cir. 1991). A new trial should only be granted because a decision is against the manifest weight of the evidence when the record shows that the verdict "resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Latino*, 58 F.3d at 315.

While the "district judge can take away from the jury testimony that reasonable persons could not believe...the exception is a narrow one." *Id.* It may "be invoked only where the testimony contradicts indisputable physical facts or laws." *Id.* Based on these principles, the *Latino* court found it was error to grant a new trial based on the trial court's determination that the defendants had committed perjury, noting that, "since the credibility of the witnesses is peculiarly for the jury, it is an invasion of the jury's province to grant a new trial merely because the evidence was sharply in conflict." *Id.* at 317, *quoting Williams v. City of Valdosa*, 689 F.2d 964, 973 n.7 (11th Cir. 1982).

_____

otherwise reexamined in any Court of the United States, than according to the rules of the common law." *See* U.S. Const. amendment VII.

The issues in this case were simple and well within the competence of the jury.  The facts were sharply in dispute.  The jury's assessment of credibility and its determination of the reaction of a reasonable person to the situation faced by the plaintiff are entitled to deference.  The verdict was not against the manifest weight of the evidence.  Plaintiff has offered no valid basis for overturning that decision.

## D.    PLAINTIFF HAD THE BURDEN TO PROVE HER CASE TO THE JURY

Plaintiff asserts that the Court has knowledge the jury lacked regarding the relationship between a judge and his staff and the conduct of judges.  Plaintiff asserts that the Court is in a better position than a jury to assess the evidence.[4]  Plaintiff has cited no authority for the proposition that the relationship between a judge and his clerk, judicial decorum, and the responsibilities of a judge are proper subjects for judicial notice.  Defendant objects that those points are matters so inherent in the position that any matter regarding the relationship among staff in Judge Sappington's courtroom is properly the subject of judicial notice under Rule 201 of the Federal Rules of Evidence.

Furthermore, there is nothing about the nature of the relationship between a judge and his clerk or the duties of a judge which is outside the grasp of a jury.  The issues for the jury were simple and well within the competence of the members of the jury.  Furthermore, since the jury was required to assess the issue from a reasonable person standard, the jury was arguably in a better position to decide the issues than the Court.  Even in assessing the evidence in the light most favorable to plaintiff, the Seventh Circuit found that a jury question was presented on the issue of whether the situation faced by

---

[4]The demand for a jury trial was made by plaintiff.

plaintiff would constitute a hostile work environment for a reasonable person.  *Robinson v. Sappington*, 351 F.3d 317, 330 (7th Cir. 2003)("Viewing the evidence in the light most favorable to Ms. Robinson, we believe that a jury could conclude that Judge Sappington's conduct towards Ms. Robinson was objectively hostile.").  Given that the jury was not constrained to view the evidence in the light most favorable to plaintiff, it was within the province of the jury to conclude that plaintiff did not face an objectively hostile work environment.

WHEREFORE for the above and foregoing reasons, defendant, Warren A. Sappington, respectfully requests this honorable Court deny plaintiff's request for a new trial.

Respectfully submitted,
WARREN A. SAPPINGTON,

Defendant,

LISA MADIGAN, Attorney General,
State of Illinois,

Attorney for Defendant,

Karen L. McNaught, #6200462
Assistant Attorney General
500 South Second Street
Springfield, Illinois  62706          BY: /s/Karen L. McNaught
(217)782-1841                                   Karen L. McNaught
                                                          Assistant Attorney General
Of Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

MELISSA ROBINSON,                    )
(f/k/a MELISSA SCHROEDER            )
     Plaintiff,                    )
                                      )
     v.                              )     NO.  04-1360
                                      )
JUDGE WARREN A. SAPPINGTON          )
SIXTH JUDICIAL CIRCUIT,             )
(IN OFFICIAL CAPACITY),             )
     Defendant,                    )
                                      )
MACON COUNTY,                       )
     Defendant,                    )
                                      )
MACON COUNTY CIRCUIT,              )
     Defendant.                    )

**Certificate of Service**

I hereby certify that on November 1, 2005, I presented the foregoing Response to Plaintiff's Motion for a New Trial to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to the following:

    Melissa McGrath          John Cassidy         Diane Baron

    www.thomsonandweintraub.com    c_m@mtco.com    dbaron@clausen.com

and I hereby certify that on November 1, 2005, I have mailed by United States Postal Service, the document to the following non-registered participant:

                  Respectfully submitted,

              /s/Karen L. McNaught_____
              Karen L. McNaught, #6200462
              Assistant Attorney General
              Attorney for Defendant
              Office of the Attorney General
              500 South Second Street
              Springfield, IL  62706
              Telephone:  (217) 782-1841
              Facsimile:  (217) 524-5091
              kmcnaught@atg.state.il.us